# TAB 3



LOAN AND SECURITY AGREEMENT

DATED AS OF MARCH 29, 2017

BY AND AMONG

FLAGSTAR BANK, FSB

AND

LIVE WELL FINANCIAL, INC.

Detroit_13383011_7

## TABLE OF CONTENTS

**SECTION 1.      DEFINITIONS AND EXHIBITS** .................................................1
  1.1     Definitions .............................................................................1
  1.2     Conventions; Interpretation ............................................11

**SECTION 2.      CREDIT FACILITIES** ....................................................12
  2.1     Revolving Loan Facility..................................................12
  2.2     Prepayment; Maturity.....................................................12
  2.3     Revolving Loan Unused Fee ..........................................12
  2.4     Closing Fee ......................................................................13
  2.5     Yield Maintenance and Breakage..................................13
  2.6     Default Interest ...............................................................13
  2.7     Late Payment Fee............................................................13
  2.8     Lender's Expenses ..........................................................13
  2.9     Borrower Payments; Automatic Debit............................13

**SECTION 3.      YIELD PROTECTION AND TAXES** ..........................13
  3.1     Increased Costs................................................................13
  3.2     Taxes ................................................................................14

**SECTION 4.      CONDITIONS OF CLOSING/ADVANCES** ................15
  4.1     Conditions to Closing.....................................................15
  4.2     Conditions to All Extensions of Credit..........................16

**SECTION 5.      SECURITY** ...................................................................16
  5.1     Security Interest ..............................................................16
  5.2     No Liens ...........................................................................16
  5.3     Location of Records and Collateral................................16
  5.4     Status of Collateral .........................................................17
  5.5     Perfection Information ....................................................17
  5.6     Perfection, Third Parties, Further Assurances ...............17
  5.7     Termination; Revival......................................................17
  5.8     Borrower Remains Liable ...............................................17

**SECTION 6.      REPRESENTATIONS AND WARRANTIES** ...............17
  6.1     Organization and Qualification......................................18
  6.2     Authority, Valid Obligations; Approvals.......................18
  6.3     Title to the Collateral; Absence of Liens.......................18
  6.4     Compliance ......................................................................18
  6.5     Financial Statements.......................................................19
  6.6     Events of Default: Solvency............................................19
  6.7     Taxes ................................................................................19
  6.8     Labor Relations; Litigation............................................19
  6.9     [Reserved] .......................................................................19
  6.10    ERISA .............................................................................19
  6.11    Capitalization ..................................................................20

Detroit_13383011_7

## TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 6.12 | [Reserved]. | 20 |
| 6.13 | Environmental and Regulatory Compliance | 20 |
| 6.14 | Anti-Money Laundering/International Trade Law Compliance | 20 |
| 6.15 | Accuracy of Representations; Survival | 21 |
| 6.16 | Borrower Name | 21 |
| 6.17 | Agency Approvals; Compliance with Agency Guides | 21 |
| 6.18 | [Reserved] | 21 |
| 6.19 | Compliance With Law, Etc | 21 |
| 6.20 | Investment Company Act Compliance | 22 |
| 6.21 | No Broker | 22 |
| SECTION 7. | AFFIRMATIVE COVENANTS | 22 |
| 7.1 | Financial Statements and Other Reporting Requirements | 22 |
| 7.2 | Conduct of Business | 23 |
| 7.3 | Maintenance and Insurance | 24 |
| 7.4 | Taxes | 24 |
| 7.5 | [Reserved]. | 24 |
| 7.6 | Security Interest | 25 |
| 7.7 | Inspection by the Lender; Books and Records | 25 |
| 7.8 | Use of Proceeds | 25 |
| 7.9 | [Reserved] | 25 |
| 7.10 | No Amendments to Organizational Documents | 25 |
| 7.11 | [Reserved]. | 25 |
| 7.12 | Name, Location | 25 |
| 7.13 | Applicable Law | 25 |
| 7.14 | Online Access to Custodial Account Information | 25 |
| SECTION 8. | NEGATIVE COVENANTS | 25 |
| 8.1 | Investments | 25 |
| 8.2 | Merger and Acquisitions; Asset Sales | 26 |
| 8.3 | Change in Ownership | 26 |
| 8.4 | [Reserved] | 26 |
| 8.5 | Restrictions on Liens | 26 |
| 8.6 | [Reserved]. | 26 |
| 8.7 | Financial Covenants | 26 |
| 8.8 | [Reserved] | 26 |
| 8.9 | Anti-Money Laundering/International Trade Law Compliance | 26 |
| 8.10 | FHA Insurance | 27 |
| 8.11 | No Plan Assets | 27 |
| 8.12 | ERISA Compliance | 27 |
| SECTION 9. | EVENTS OF DEFAULT; ACCELERATION | 27 |
| 9.1 | Events of Default | 27 |
| 9.2 | Remedies | 29 |
| 9.3 | Certain Remedies with Respect to Collateral | 29 |

Detroit_13383011_7

## TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 9.4 | Certain Rights with Respect to Collateral | 29 |
| 9.5 | Rights of Secured Party Under UCC | 29 |
| **SECTION 10.** | **SET OFF** | **29** |
| **SECTION 11.** | **GENERAL** | **30** |
| 11.1 | [Reserved] | 30 |
| 11.2 | Written Notices | 30 |
| 11.3 | Term of Agreement | 30 |
| 11.4 | No Waivers | 30 |
| 11.5 | Further Assurances | 30 |
| 11.6 | Governing Law; Jurisdiction | 30 |
| 11.7 | Indemnification | 31 |
| 11.8 | Amendments, Waivers, Etc | 32 |
| 11.9 | Binding Effect of Agreement; Assignment | 32 |
| 11.10 | Computation of Interest and Fees, Payments, Etc | 32 |
| 11.11 | Interest Limitations | 32 |
| 11.12 | No Marshalling | 33 |
| 11.13 | Table of Contents and Section Headings | 33 |
| 11.14 | USA Patriot Act | 33 |
| 11.15 | [Reserved] | 33 |
| 11.16 | Entire Agreement; Miscellaneous | 33 |
| 11.17 | Federal Reserve | 33 |
| 11.18 | Signature Counterparts | 33 |
| 11.19 | [RESERVED] | 34 |
| 11.20 | WAIVER OF JURY TRIAL, SERVICE OF PROCESS AND DAMAGES | 34 |

Detroit_13383011_7

**TABLE OF CONTENTS**
(continued)

EXHIBITS

Exhibit A - Form of Compliance Certificate
Exhibit B - - Fidelity & Mortgage Errors / Omissions Insurance Requirements
Exhibit C - Form of Borrowing Base Certificate
Exhibit D – Form of Request for Advance

Detroit_13383011_7

<u>LOAN AND SECURITY AGREEMENT</u>

This Loan and Security Agreement is made as of March 29, 2017 (the "Closing Date") by and between Live Well Financial, Inc., a Delaware corporation (the "Borrower") and Flagstar Bank, FSB, a federally chartered savings bank (together with its successors and assigns, the "Lender").

SECTION 1.   DEFINITIONS AND EXHIBITS.

1.1    <u>Definitions</u>. In this Agreement and in the Loan Documents (unless the context thereof requires a contrary definition or unless the same will be defined therein, in which latter event, the definitions will be cumulative and not exclusive), the following words, phrases, and expressions will have the respective meanings attributed to them, to be equally applicable to both the singular and plural forms, unless the plural form is the term so defined:

"<u>Adjusted Tangible Net Worth</u>" means the excess of the Borrower's Total Assets over Total Liabilities, except that the following assets shall be excluded from the Borrower's Total Assets: (i) advances or loans to shareholders (or other equity owners, e.g., in the case of a limited liability company, any member of such company or any beneficial owner of one or more of the economic attributes of an interest in such company), directors, officers, employees, or affiliates of the Borrower; (ii) investments in affiliates; (iii) assets pledged to secure any liabilities not included in the debt of the Borrower; (iv) any real estate the fair value of which cannot be accurately determined by Lender in its sole determination; (v) any cash or marketable securities pledged to third parties, including any such assets held in (or available, directly or indirectly, as collateral to secure obligations with respect to) a margin account; (vi) any securities or other assets (but excluding Collateral) for which Lender determines, in its reasonable, good faith, discretion, that there is not a ready market; (vii) any repurchased loan, promissory note, or the like carried on the Borrower's balance sheet in excess of its fair value (but only to the extent of such excess); (ix) those assets that Lender, reasonably and in good faith, determines would be deemed by HUD to be unacceptable in calculating adjusted tangible net worth or other relevant measure in accordance with HUD's requirements in effect as of the date of determination; (x) any intangible assets, including but not limited to, goodwill; and (xi) deposits and prepaid expenses.

"<u>Advance</u>" means any advance of the Revolving Loan.

"<u>Affiliate</u>" means, with reference to any Person:

(a)    any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with the specified Person,

(b)    any other Person that is a director, officer or trustee of, or general partner in, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is a director, officer or trustee of, or general partner in or with respect to which the specified Person serves in a similar capacity,

(c)    any other Person that, directly or indirectly, is the beneficial owner of 25% or more of any class of equity securities of, or otherwise has a beneficial interest equivalent to 25% or more ownership interest in, the specified Person,

(d)      a Person of which the specified Person is directly or indirectly the owner of 25% or more of any class of equity securities or in which the specified Person has a beneficial interest equivalent to 25% or more ownership interest, and

(e)      for purposes of <u>Sections 6.10</u> and <u>8.12</u>(as it relates to any Plan), "Affiliate" instead means, within the meaning of Section 414(b), (c), (m) or (o) of the Code, (i) any member of a controlled group that includes the Borrower, (ii) any trade or business, whether or not incorporated, under common control with the Borrower, and (iii) any member of an affiliated service group that includes the Borrower.

"<u>Agency</u>" means Fannie Mae, Ginnie Mae, the FHA or HUD, and any successor to any of the foregoing.

"<u>Agency Guides</u>" collectively means any guide relating to mortgage-backed securities published by any Agency, as amended, modified, supplemented or restated from time to time.

"<u>Agreement</u>" means this Agreement, including the exhibits attached hereto, as originally executed, or if this Agreement is amended, varied, restated or supplemented from time to time, as so amended, varied, restated or supplemented.

"<u>Anti-Terrorism Laws</u>" means any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

"<u>Applicable Margin</u>" has the meaning given the term in the Note.

"<u>Applicable Interest Rate</u>" has the meaning given the term in the Note.

"<u>Borrowing Base</u>" means 80% of the Market Value of the Ginnie Mae Bonds held in the Custodial Account in which Lender maintains a perfected, first priority, security interest, as determined on the basis of the most current Borrowing Base Certificate required or to be submitted under Section 7.1.5, provided, however, if the Market Value of such Ginnie Mae Bonds (as reasonably determined by the valuation provided by the Custodian) declines by more than fifteen per cent (15%) from the Market Value stated in the most recent Borrowing Base Certificate delivered in accordance with Section 7.1.5, at the Lender's discretion, the Borrowing Base, shall reduce to 80% of the updated Market Value and Borrower must make any payment owing under Section 2.1.1 as a result of the revaluation. For the avoidance of doubt, the Lender may not reduce the 80% advance percentage in response to a decline in Market Value of the Ginnie Mae Bonds.

"<u>Borrowing Base Certificate</u>" means a borrowing base certificate in substantially the form of Exhibit C completed in accordance with Lender's instruction.

"<u>Business Day</u>" means any day on which the head office of the Lender is open for transactions of all of its normal and customary business.

"<u>Capital Expenditures</u>" means, for any period, the aggregate of all expenditures incurred during such period for the acquisition or leasing (pursuant to a Capitalized Lease) of fixed or

Detroit_13383011_7

capital assets or additions to Equipment, plant and property that should be capitalized under GAAP.

"Capitalized Lease" means any lease of any property (whether real, personal or mixed) with respect to which the discounted present value of the rental obligations as lessee thereunder, in conformity with GAAP, is required to be capitalized.

"Change of Control" means an event or series of events whereby Michael Hild (i) shall cease to control, directly or indirectly, more than 26% on a fully diluted basis of the aggregate issued and outstanding voting stock (or comparable voting interests) of Borrower, or (ii) shall fail to be able to elect a controlling majority of the Board of Directors of Borrower.

"Closing Agenda" means the Closing Agenda attached dated of even date hereof.

"Closing Date" means March 29, 2017.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all of the following assets and property, tangible and intangible, of the Borrower, whether now or hereafter existing, whether now owned or hereafter acquired, wherever located:

(a)     the Custodial Account and all Ginnie Mae Bonds and other securities from time to time held in such account and all sums from time to time on deposit in such account; and

(b)     all proceeds of the foregoing.

In interpreting the words used in this definition whether or not defined herein, reference will be made to the UCC.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate, in form attached as Exhibit A hereto, calculating (in detail satisfactory to Lender) Borrower's compliance with the financial covenants set forth in Section 8.7 hereof.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated" (or "consolidated") or "Consolidating" (or "consolidating") means, when used with reference to any financial term in this Agreement, the aggregate for two or more Persons of the amounts signified by such term for all such Persons determined on a consolidated (or consolidating) basis in accordance with GAAP, applied on a consistent basis. Unless otherwise specified herein, "Consolidated" and "Consolidating" shall refer to Borrower and its Subsidiaries, determined on a Consolidated or Consolidating basis.

"Control Agreement" means the Securities Account Control Agreement among Borrower, Lender and Custodian, in form acceptable to Lender and which Lender maintains exclusive control of the Custodial Account.

"Covered Entity" means (a) each Borrower, each of Borrower's Subsidiaries, all Guarantors and all pledgors of Collateral or other security for Obligations and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

"Custodial Account" means Securities Account Number 189526000 established and maintained by the Borrower with the Custodian and any replacements and substitutions for it. The Custodial Account shall be maintained in Borrower's name but under the exclusive control of the Lender. The Lender shall have exclusive control over the disposition of all Ginnie Mae Bonds and other financial assets held in the Custodial Account, and the Borrower shall not have any right to transfer, trade or otherwise direct the disposition of such financial assets held in the Custodial Account without the written consent of the Lender, except as otherwise specifically set forth in the Control Agreement.

"Custodian" means, U.S. Bank or another financial institution acceptable to Lender in its sole discretion.

"Default" means any event or condition that, with the giving of notice and/or the passage of time, would constitute an Event of Default.

"Default Rate" means: (a) with respect to any Advance, three percent (3%) in excess of the Applicable Interest Rate for such Advance, and (b) with respect to any other Obligation, three percent (3%) in excess of the Prime Rate.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations thereunder.

"Event of Default" as defined in Section 9.1.

"Excluded Hedging Obligation" means, with respect to any Guarantor of a Hedging Obligation, including the grant of a security interest to secure the guaranty of such Hedging Obligation, any Hedging Obligation if, and to the extent that, such Hedging Obligation is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty or grant of such security interest becomes effective with respect to such Hedging Obligation. If a Hedging Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Hedging Obligation that is

4

attributable to swaps for which such Hedging Obligation or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Lender or required to be withheld or deducted from a payment to a Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender being organized under the laws of, or having its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of a Lender pursuant to a law in effect on the date on which such Lender becomes a party hereto or such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.2, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to a Lender's failure to comply with Section 3.2(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Fannie Mae" means the Federal National Mortgage Association and any successor to its functions.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"FHA" means the Federal Housing Administration and any successor agency or entity.

"Financial Covenants" means each of the following:

(a)     Minimum Adjusted Tangible Net Worth. The Borrower will not permit its Adjusted Tangible Net Worth to be less than $40,000,000, as tested quarterly with the fiscal quarter ending on March 31, 2017.

(b)     Leverage Ratio. The Borrower will not permit the ratio of (a) Total Liabilities to (b) Adjusted Tangible Net Worth to be more than 15 to 1, as tested as of the end of each fiscal quarter beginning with the fiscal quarter ending on March 31, 2017.

(c)     Net Income. The Borrower will not permit its Net Income to be less than $1, as tested as of the end of each fiscal year beginning with the fiscal year ending on December 31, 2017.

(d)     Minimum Liquidity. The Borrower will maintain, at all times, Unrestricted Cash and Cash Equivalents in an amount not less $8,000,000.

"Freddie Mac" means the Federal Home Loan Mortgage Corporation and any successor to its functions.

"GAAP" means generally accepted accounting principles consistently applied as in effect from time to time.

"Ginnie Mae" means the Government National Mortgage Association, an agency of the United States of America and any successor to its functions.

"Ginnie Mae Bonds" means a mortgage pass-through security, collateralized mortgage obligation, real estate mortgage investment conduit or other security that (a) is based on and backed by an underlying pool of Mortgage Loans and (b) provides for payment by its issuer to its holder of specified principal installments and/or a fixed or floating rate of interest on the unpaid balance and for all prepayments to be passed through to the holder, in book entry form and issued by Ginnie Mae.

"Governmental Entity" means any federal, state, or local governmental authority, agency, commission, court, or self-regulatory authority or commission, including any Agency and any Regulator.

"HUD" means the United States Department of Housing and Urban Development and any successor to its functions.

"Indebtedness" means, for any Person: (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business, so long as such trade accounts payable are payable within ninety (90) days after the date the respective goods are delivered or the respective services are rendered; (c) indebtedness to others secured by a Lien on the Property of such Person, whether or not the respective indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Capital Expenditures of such Person; (f) obligations of such Person under repurchase agreements, sale/buy-back agreements, early purchase agreements, or like arrangements; (g) indebtedness of others guaranteed by such Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; (i) indebtedness of general partnerships of which such Person is a general partner; and (j) to the extent not already included in clauses (a) through (i) above, any amounts either existing or reported on the financial statements of Borrower, that Lender determines, in its sole discretion, are obligations of such Person that should be included as "Indebtedness" hereunder.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indebtedness Limit" means $50,000,000.

"Indemnitee" as defined in Section 11.7.

Detroit_13383011_7

"Initial Financial Statement" means the financial statements of the Borrower most recently delivered to Lender on or prior to the date of this Agreement.

"Insolvent" or "Insolvency" means one or more of the following events with respect to a Person has occurred: death; dissolution; liquidation; termination of existence; "insolvent" or "insolvency" within the meaning of the United States Bankruptcy Code or other applicable statute; such Person's inability to pay its debts as they come due or failure to have adequate capital to conduct its business; such Person's failure to have assets having a fair saleable value net of any cost to dispose of such assets in excess of the amount required to pay the probable liability on its then existing debts (including unmatured, unliquidated and contingent debts); appointment of a receiver of any part of the property of, execution of a trust mortgage or any assignment for the benefit of creditors by, or the filing of a petition in bankruptcy or the commencement of any proceedings under any bankruptcy or insolvency laws or any laws relating to the relief of debtors, readjustment of indebtedness or reorganization of debtors by or against such Person, or the offering of a plan to creditors or such Person for composition or extension, except for any involuntary proceeding commenced against such Person that is dismissed within 60 days after the commencement thereof without the entry of an order for relief or the appointment of a trustee.

"Judgment Threshold" means $10,000,000.

"Late Payment Fee" means five percent (5%) of the required payment.

"Law" means any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any governmental entity, agency, division of department, foreign or domestic.

"Lenders' Expenses" means all fees, costs and out-of-pocket disbursements incurred by Lender, including fees of counsel and court costs, in any way arising from or in connection with this Agreement, any Loan Document, any of the Collateral, any of the Obligations or the business relationship between the Lender, on the one hand, and any one or more of the Borrower, on the other hand, including, without limitation, (a) all fees and expenses (including recording fees and insurance policy fees) of Lender and/or its counsel for the preparation, examination, approval, negotiation, execution and delivery of, or the closing of any of the transactions contemplated by, this Agreement and any Loan Documents, including but not limited to the costs of conducting searches for (and obtaining copies of) UCC filings, tax liens, and judgments, filing fees; (b) all charges for wire transfers and check processing charges, security delivery fees, charges for overnight delivery, recording fees, and overdraft charges; (c) all fees and out-of-pocket disbursements incurred by Lender, including attorneys' fees, in any way arising from or in connection with any action taken by Lender to enforce or collect any of the Obligations under this Agreement, any Loan Documents or any other obligations of the Borrower, whether joint, joint and several, or several, under this Agreement (or any Loan Documents); and (d) all other fees described in this Agreement.

"Lien" means any security interest in or lien on or against any property arising from any pledge, assignment, hypothecation, mortgage, security interest, deposit arrangement, trust

7

receipt, conditional sale or title retaining contract, sale and leaseback transaction, capitalized lease, consignment or bailment for security, or any other type of lien, charge, encumbrance, title exception, preferential or priority arrangement affecting property (including with respect to stock, any stockholder agreements, voting rights agreements, buy-back agreements and all similar arrangements), whether based on common law or statute.

"Litigation Threshold" means $10,000,000.

"Loan Documents" means, collectively, this Agreement, the Revolving Note, the Control Agreement, any intercreditor agreement and any and all notes, instruments, certificates, documents, guarantees and agreements at any time evidencing, governing, securing or otherwise relating to any Advance and/or any of the Obligations, and all schedules and exhibits thereto, and any other agreements, instruments or documents referred to herein or therein and/or delivered in connection herewith or therewith (including, without limitation, any subordination agreement), in each case as any of the foregoing may be amended, restated or supplemented from time to time.

"Material Adverse Effect" means a material adverse effect on (a) the condition (financial or otherwise), business operations or properties of the Borrower, (b) the ability of Borrower to perform its obligations under this Agreement, the Revolving Note or any other Loan Document to which it is a party, (c) the validity or enforceability of this Agreement, the Revolving Note or any of the other Loan Documents or the rights or remedies of the Lender hereunder or thereunder or (d) a material adverse effect on the marketability, collectability, value or enforceability of a material portion of the Collateral in case of any of (a), (b) or (c), as such material adverse effect is determined by Lender in its reasonable good faith determination; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Borrower operates; (iii) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required by this Agreement; or (vi) any changes in applicable Laws or accounting rules, including GAAP.

"Market Value" means, with respect to the Ginnie Mae Bonds held in the Custodial Account, the fair value as determined by Interactive Data Corporation or other independent third party reasonably acceptable to the Lender, to be provided by the Custodian.

"Mortgage" means a mortgage, deed of trust, deed to secure debt, or similar security instrument covering real property improved by a completed one-to-four family dwelling unit, including all related fixtures and equipment, located in the United States that secures the repayment of a Mortgage Loan and, if applicable, the lien noted on the certificate of title for the structure that has been affixed to the real property described in the Mortgage.

"Mortgage Loan" means any one-to-four family residential mortgage loan evidenced by a Mortgage Note and secured by a Mortgage, including (a) the Mortgage Note evidencing the indebtedness of the obligor thereon, (b) the Mortgage securing, guaranteeing or otherwise related thereto, (c) all rights to payment thereunder, (d) all rights in the real property, improvements and other tangible and intangible property and rights securing payment of the indebtedness of the

Detroit_13383011_7

obligor thereon, or that are the subject of such Mortgage Loan, (e) all rights under documents related thereto, such as guaranties and insurance policies (issued by governmental agencies or otherwise), including, without limitation, mortgage and title insurance policies, binders and commitments, fire and extended coverage insurance policies (including the right to any return premiums) and, if applicable, flood and earthquake insurance policies, participation certificates or agreements, FHA insurance and VA guaranties, and (f) all rights in cash deposits consisting of impounds, insurance premiums or other funds held on account thereof.

"Mortgage Note" means a promissory note that evidences the indebtedness covered by a Mortgage Loan.

"Net Income" means, as of the date of any calculation thereof, net income determined in accordance with GAAP.

"Net Worth" means, as of the date of any determination thereof, total equity as determined in accordance with GAAP.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Obligations" means and includes:

(a)     all indebtedness and liabilities of any kind, nature or description whatsoever owed to Lender by Borrower pursuant to the terms hereof or any transactions contemplated hereby, whether direct or indirect, absolute or contingent, due or to become due or whether now existing or hereafter arising, and howsoever evidenced or acquired relating to the terms of this Agreement;

(b)     all future advances that Lender at any time may, but shall not be required to, make for the protection or preservation of Lender's rights and interests arising hereunder, including, without limitation, advances for taxes, levies, assessments, insurance, and reasonable attorneys' fees; and

(c)     all of Lenders' Expenses, subject to Section 2.8.

Notwithstanding anything to the contrary herein, or in any guaranty of other Loan Documents executed and delivered by any guarantor in connection herewith, Obligations (as used in any such guaranty or other Loan Document executed and delivered by such guarantor) shall not include Excluded Hedging Obligations.

"Organizational Documents" means the corporate charter and by-laws, the articles of organization and operating agreement and the partnership certificate and partnership agreement, as applicable of a Person.

"Other Connection Taxes" means, with respect to a Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security

9

interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest hereunder).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"Permitted Liens" means:

(a)     Liens on Collateral in favor of the Lender;

(b)     Liens on Collateral for Taxes, to the extent that payment of the same is not required in accordance with the provisions of Section 7.4; and

(c)     Liens on Collateral incurred or deposits made in the ordinary course of the Borrower's business in connection with workers' compensation, unemployment insurance, social security and other similar laws.

"Person" means an individual, estate, corporation, partnership, limited liability company, association, joint stock company, trust, unincorporated organization or other entity.

"Plans" means, collectively, each "employee pension benefit plan" and each "employee welfare benefit plan" (each as defined in ERISA) maintained by the Borrower or its Affiliates.

"Proceeds" has the meaning ascribed to such term under the UCC.

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Regulator" means the Office of the Comptroller of the Currency or any successor thereto or other Governmental Entity having jurisdiction over Lender or the Borrower, including the Consumer Financial Protection Bureau.

"Reportable Compliance Event" means that any Covered Entity becomes a Sanctioned Person, or is charged by indictment, criminal complaint or similar charging instrument, arraigned, or custodially detained in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or has knowledge of facts or circumstances to the effect that it is reasonably likely that any aspect of its operations is in actual or probable violation of any Anti-Terrorism Law.

"Request for Advance" means a completed request for an Advance submitted to Lender in accordance with Lender's then-current procedures.

"Revolving Loan" means the revolving mortgage warehousing credit facility described in Section 2.1.

"Revolving Loan Maturity Date" means March 29, 2022, subject to acceleration of repayment of the Obligations pursuant to this Agreement.

"Revolving Loan Maximum Amount" means $50,000,000.

"Revolving Note" means a promissory note made by Borrower to Lender, in form satisfactory to Lender, in face amount equal to the Revolving Loan Maximum Amount, as evidence of the Revolving Loan.

"Sanctioned Country" means a country subject to a sanctions program maintained under any Anti-Terrorism Law.

"Sanctioned Person" means any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

"Subsidiary" means, with respect to a Person, any Person of which more than fifty percent (50%) of the outstanding ownership interests having general voting power under ordinary circumstances to elect a majority of the board of directors or the equivalent of such Person, regardless of whether or not at the time ownership interests of any other class or classes will have or might have voting power by reason of the happening of any contingency, is at the time directly or indirectly owned by such Person.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Entity, including any interest, additions to tax or penalties applicable thereto.

"Total Assets" means the Borrower's assets as of the relevant date, determined in accordance with GAAP.

"Total Liabilities" means total liabilities, determined in accordance with GAAP, as of the date of any calculation thereof.

"UCC" means the Uniform Commercial Code of the State of Michigan as in effect from time to time.

"Unrestricted Cash and Cash Equivalents" means unrestricted cash and investments of the types permitted under clauses (a) through (d) of Section 8.1 hereof, owned by Borrower and not subject to any Lien.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

1.2     Conventions; Interpretation. For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires:

1.2.1     References to any Person refer to such Person and its successor in title and assigns or (as the case may be) its successors, assigns, heirs, executors, administrators and other legal representatives;

11

1.2.2   References to this Agreement refer to such document as originally executed and as may be amended, restated or otherwise modified from time to time in accordance with the provisions hereof;

1.2.3   Words importing the singular only will include the plural and vice versa, and words importing the masculine gender will include the feminine gender and vice versa, and all references to dollars will be to United States Dollars;

1.2.4   All accounting terms will be construed, applied and determined in accordance with GAAP; and

1.2.5   An Event of Default shall be deemed to be continuing unless it is expressly waived by the Lender in writing.

SECTION 2.   CREDIT FACILITIES.

2.1   <u>Revolving Loan Facility</u>. Upon the terms and subject to the conditions of this Agreement, the Lender agrees to make Advances of the Revolving Loan to the Borrower, from time to time, from and after the date hereof and prior to the Revolving Loan Maturity Date, provided that the aggregate principal amount of Advances of the Revolving Loan outstanding at any time, will not exceed the lesser of (i) the Revolving Loan Maximum Amount, and (ii) the Borrowing Base; provided, further, that at the time of any such request for an advance of the Revolving Loan and after giving effect to the making thereof there has not occurred and is not continuing any Default or Event of Default. The Borrower agrees that it will be an Event of Default (as to which no grace or cure period will apply) if at any time the aggregate principal amount of all outstanding Revolving Loan advances, then outstanding, will exceed the lesser of (a) the Revolving Loan Maximum Amount and (b) the Borrowing Base, unless the Borrower will, within three (3) Business Days after receipt of notice of such excess from the Lender, pay cash to the Lender in the amount of such excess. All requests for Advances of the Revolving Loan will be in the form of Exhibit D hereto. The Revolving Loan will be evidenced by the Revolving Note.

2.2   <u>Prepayment; Maturity</u>. Subject to the provisions of the Revolving Note, the Borrower may prepay the outstanding Revolving Loan in whole or in part at any time without premium or penalty. Provided no Default or Event of Default exists and is continuing, amounts so prepaid may be borrowed and re-borrowed from time to time as provided in this Section. On the Revolving Loan Maturity Date, the Borrower will repay all Obligations then outstanding with respect to the Revolving Loan.

2.3   <u>Revolving Loan Unused Fee</u>. The Borrower will pay to the Lender, in arrears on the first Business Day of each calendar month beginning November 1, 2017 and on the Revolving Loan Maturity Date, an unused commitment fee equal to twenty five (25) basis points per annum times the average daily amount by which the Revolving Loan Maximum Amount exceeds the outstanding principal amount of advances under the Revolving Credit Loan during the month just ended. The unused commitment fees will be deemed fully earned and nonrefundable on each date that it is due and payable.

Detroit_13383011_7

2.4     Closing Fee. In consideration of the Lender's agreement to extend the Revolving Loan, the Borrower will pay a closing fee to the Lender in the amount of Five Hundred Thousand Dollars ($500,000), which fee will be deemed to be earned in full and non-refundable as of the date hereof.

2.5     Yield Maintenance and Breakage. To the extent applicable under the Revolving Note, the Borrower will pay the fees and additional compensation, break funding costs and prepayment premiums, if any, set forth in the Revolving Note.

2.6     Default Interest. If any Default or Event of Default occurs and is continuing, then the Borrower's right, if applicable, to select interest rate options or interest rate periods under the Revolving Note will immediately terminate without notice to Borrower and the unpaid principal balance of all outstanding Advances will bear interest at the Default Rate applicable thereto.

2.7     Late Payment Fee. If the entire amount of any required principal and/or interest payment is not paid in full within ten (10) days after the same is due, including following any demand therefor in connection with acceleration of the same pursuant to Section 9.2, the Borrower will pay to the Lender a late fee equal to the Late Payment Fee.

2.8     Lender's Expenses. The Borrower will pay and indemnify the Lender, and hold the Lender harmless against, all Lender's Expenses. All Lender's Expenses will (a) be paid at execution of this Agreement or, to the extent incurred thereafter, be paid on written demand therefor, (b) bear interest at the Default Rate from the 15th day following demand therefor until paid in full, and (c) constitute Obligations secured by the Collateral.

2.9     Borrower Payments; Automatic Debit. The Borrower shall timely pay each principal or interest payment due with respect to any Advance(s), and any other Obligations from time to time due and payable hereunder, on the due date therefor. If the Borrower fails to make any such payment, the Borrower authorizes the Lender to automatically debit any such payment on the due date therefor from any deposit account that the Borrower maintains with the Lender, without prior notice to the Borrower. If the funds in such deposit account are insufficient to satisfy the payment then due and payable, the Lender may (but shall not be obligated to) advance funds (including by Advance of the Revolving Loan) to cover the shortfall. The failure of the Lender to so charge any account will not affect the Borrower's obligation hereunder to pay any payment when the same is due and payable.

SECTION 3.   YIELD PROTECTION AND TAXES.

3.1     Increased Costs.

(a)     Increased Costs Generally. If any change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of

13

Detroit_13383011_7

Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Advances made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, continuing or maintaining any Advance or of maintaining its obligation to make any such Advance, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements. If any Lender determines that any change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Advances made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to the Borrower, shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 3.1 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

3.2     Taxes.

(a)     Payments Free of Taxes. Any and all payments by or on account of any obligation of the Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of the Borrower) requires the deduction or withholding of any Tax from any such

14

Detroit_13383011_7

payment by the Borrower, then the Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Entity in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     Payment of Other Taxes by the Borrower. The Borrower shall timely pay to the relevant Governmental Entity in accordance with applicable law, or at the option of the Lender, timely reimburse it for the payment of, any Other Taxes.

(c)     Indemnification by the Borrower. The Borrower shall indemnify the Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Lender or required to be withheld or deducted from a payment to such Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Entity. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender shall be conclusive absent manifest error.

(d)     Evidence of Payments. As soon as practicable after any payment of Taxes by the Borrower to a Governmental Entity pursuant to this Section 3.2, the Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Entity evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(e)     Status of Lender. If Lender is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document it shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding.

(f)     Survival. Each party's obligations under this Section 3.2 shall survive any assignment of rights by a Lender and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 4.   CONDITIONS OF CLOSING/ADVANCES.

4.1     Conditions to Closing. The obligation of the Lender to consummate the transactions contemplated hereby is subject to the fulfillment to the reasonable satisfaction of the Lender on the date hereof of the following conditions precedent (or the written waiver thereof by the Lender):

4.1.1   Receipt by the Lender of all of the agreements, documents, instruments, certificates and opinions listed or described on the Closing Agenda, each of which will be in form and substance satisfactory to the Lender, and duly executed and delivered by the parties

Detroit_13383011_7

thereto, along with such additional instruments, certificates, opinions and other documents as the Lender will reasonably request.

4.1.2    The representations and warranties contained herein will be true and accurate in all material respects on and as of the date hereof, the Borrower will have performed and complied with all covenants and conditions required herein to be performed or complied with by it on or prior to date hereof, and no Default or Event of Default will exist and be continuing on the date hereof.

4.1.3    Payment of (i) the closing fee described in Section 2.4 and (ii) all invoiced Lender Expenses incurred by Lender to the date of this Agreement.

4.1.4    No event or condition will have occurred that could reasonably be expected to have a Material Adverse Effect.

4.1.5    Borrower shall have provided such other documents as Lender or its counsel have reasonably requested.

4.1.6    Lender shall have been granted online access to Custodial Account information (including daily valuations of the Ginnie Mae Bonds in the Custodial Account).

4.2    <u>Conditions to All Extensions of Credit</u>. The obligation of Lender to make any Advance is subject to the satisfaction of the following conditions precedent on the date of making such Advance:

(a)    <u>Representations and Warranties</u>. The representations and warranties herein and in the other Loan Documents, or that are contained in any certificate furnished at any time under or in connection herewith, shall be true and correct in all material respects on and as of the date of such extension of credit as if made on and as of such date.

(b)    <u>No Default or Event of Default</u>. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Advance to be made.

SECTION 5.   SECURITY.

5.1    <u>Security Interest</u>. As security for the payment and performance of all Obligations (including, without limitation, all Advances and credit accommodations extended hereunder), the Borrower hereby grants to the Lender a continuing first priority (subject only to Permitted Liens) Lien in, on and to the Collateral.

5.2    <u>No Liens</u>. The Borrower will not grant a Lien to any Person in or otherwise encumber all or any part of the Collateral, except with respect to Permitted Liens.

5.3    <u>Location of Records and Collateral</u>. The Borrower will keep the Collateral and records pertaining to Collateral at the location set forth on the signature page hereto and at any other location described in writing, and consented to by, to the Lender.

5.4 <u>Status of Collateral</u>. At the time any Collateral becomes subject to the Lender's Lien, the Borrower will be the lawful owner thereof and will have the right to pledge, sell, assign, transfer or grant a security interest in the same to the Lender.

5.5 <u>Perfection Information</u>. The Borrower's correct legal name, jurisdiction of organization and federal taxpayer identification number are set forth on the signature page hereto. The Borrower will not change any such name, jurisdiction or its legal structure as a corporation without giving at least 30 days' prior written notice thereof to the Lender.

5.6 <u>Perfection, Third Parties, Further Assurances</u>. The Borrower authorizes the Lender to file all UCC financing statements, and amendments thereto and continuations thereof, describing the Collateral necessary to perfect Lender's security interest hereunder. Where Collateral is in the possession of a third party, if requested by the Lender, the Borrower will join with the Lender in notifying the third party of the Lender's security interest and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of the Lender. The Borrower will cooperate with the Lender in obtaining control with respect to Collateral consisting of deposit accounts, investment property, letter of credit rights and electronic chattel paper. The Borrower agrees to take whatever other actions are reasonably requested by the Lender to perfect and continue the perfection of the Lender's security interest in the Collateral. Upon request of the Lender, the Borrower will deliver to the Lender any and all of the documents evidencing or constituting the Collateral. The Borrower hereby appoints the Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the perfection of the security interest granted in this Agreement.

5.7 <u>Termination; Revival</u>. At such time as all Obligations have been paid in full (other than unasserted indemnity claims that survive termination) and no further credit can be extended to Borrower under this Agreement or any other Loan Document, the security interest granted herein will terminate and, at the expense of the Borrower, the Lender will release its security interest in, and will duly assign, transfer and deliver to the Borrower such of the Collateral as has not theretofore been sold or otherwise applied or released pursuant to this Agreement. To the extent that the Borrower makes a payment or other transfer to the Lender, or the Lender receives any payment of Proceeds of Collateral, which is later invalidated, declared to be a fraudulent transfer or preference, set aside or required to be repaid under any bankruptcy law, other law or equitable principle, the Lender's security interest in the Collateral will be revived and continue as if the payment, transfer or Proceeds had never been received by the Lender.

5.8 <u>Borrower Remains Liable</u>. The Borrower shall remain liable for the performance of its obligations under the contracts and agreements included in the Collateral to the same extent as if this Agreement had not been executed, and Lender's exercise of any of its rights with respect to the Collateral or otherwise under this Agreement shall not release the Borrower from any of such obligations. Moreover, regardless of Lender's security interest in the Collateral or Lender's exercise of (or failure to exercise) any of its rights with respect to any such Collateral, in no event shall Lender have any obligation or liability under any of such contracts or agreements, and Lender shall have no obligation or duty to take any action to collect or enforce any claim for payment with respect to any of the Collateral.

SECTION 6.   REPRESENTATIONS AND WARRANTIES.

17

The Borrower represents and warrants to Lender on the Closing Date and on each day that an Advance is outstanding hereunder:

6.1   <u>Organization and Qualification</u>. Borrower is a corporation duly organized, validly existing and in good standing under the laws of Delaware and: (a) has all requisite power and authority to own its property and conduct its business as now conducted and as presently contemplated; (b) is duly qualified and in good standing in each jurisdiction where the failure to be so qualified would have a Material Adverse Effect; and (c) has no Subsidiaries.

6.2   <u>Authority, Valid Obligations; Approvals</u>.  The execution, delivery and performance of this Agreement and the other Loan Documents, and the transactions and other documents contemplated hereby and thereby, are within the corporate authority and power of Borrower, and have been authorized by all necessary proceedings on the part of Borrower and its directors and shareholders, and do not and will not (a) contravene any provision of law or Borrower's Organizational Documents (b) contravene any provisions of, or constitute a breach or default under, any other material agreement, instrument, judgment, order, decree, permit, license or undertaking binding upon or applicable to Borrower or any of its properties, or (c) result in the creation, other than in favor of the Lender, of any Lien upon any of the properties or assets of Borrower. The Loan Documents have been duly executed and delivered and constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their terms, subject to bankruptcy, insolvency and similar laws affecting creditors' rights in general and to the availability of equitable remedies. The execution, delivery and performance of this Agreement and the other Loan Documents, and the transactions and other documents contemplated hereby and thereby, also do not require any approval or consent of, or filing or registration with, any Person or governmental authority, except for the filing of UCC financing statements to perfect the Lender's security interests in the Collateral.

6.3   <u>Title to the Collateral; Absence of Liens</u>. Borrower and each of its Subsidiaries has good and marketable title to the Collateral, free from all liens, charges and encumbrances whatsoever except for insubstantial and immaterial defects in title and Permitted Liens.

6.4   <u>Compliance</u>. Borrower and each of its Subsidiaries: (a) has all necessary permits, approvals, authorizations, consents, licenses, franchises, registrations and other rights and privileges (including, without limit, patents, trademarks, trade names and copyrights) to allow it to own and operate its business without any violation of law or the rights of others; (b) is duly authorized, qualified and licensed under and in compliance with all applicable laws, regulations, authorizations and orders of public authorities (including, without limitation, laws relating to hazardous materials, hazardous waste, oil, and protection of the environment and laws relating to ERISA (to the extent applicable) or to employee benefit plans generally); and (c) has performed all obligations required to be performed by it under, and is not in default under or in violation of, its Organizational Documents or any agreement, lease, mortgage, note, bond, indenture, license or other instrument or undertaking to which it is a party or by which any of it or any of its properties are bound, in each case, except for any such violations, defaults or failures to comply, individually or in the aggregate, which would not have a Material Adverse Effect. Neither Borrower nor any of its Subsidiaries has received any notice by any governmental authority or Person with respect to the generation, storage, or disposal or release or threat of release of hazardous substances or hazardous materials or with respect to any violation of any federal, state or local environmental, health or safety statute or regulation.

18

6.5 <u>Financial Statements</u>. The Borrower has furnished to the Lender its audited consolidated and consolidating financial statements of the Borrower for the fiscal year ended December 31, 2015 and the management-prepared consolidated and consolidating financial statements balance sheet and statement of income as of September 30, 2016 and for the 9-month period then ended, which fairly present the financial position of the Borrower and its Subsidiaries in all material respects for such periods as at the close of business on such dates and the results of its operations for the 9-month period then ended (subject to the absence of footnotes and normal year-end adjustments with respect to the interim statements). At the date hereof, the Borrower and its Subsidiaries have no material Indebtedness or other liabilities, whether accrued, absolute, contingent or otherwise, and whether due or to become due, that are not set forth on the Initial Financial Statement or incurred in the ordinary course of business since the date thereof. Since the last day of the latest fiscal period covered by the Initial Financial Statements, no event has occurred that could reasonably be expected to have a Material Adverse Effect.

6.6 <u>Events of Default: Solvency</u>. No Default or Event of Default exists, and Borrower is not now, or immediately after giving effect to any Advances of the Revolving Loan, Insolvent.

6.7 <u>Taxes</u>. Borrower and each of its Subsidiaries has filed all federal, state and other tax returns required to be filed for all Taxes, and has fully paid all Taxes due from them, except those being contested in good faith through appropriate proceedings and with respect to which adequate reserves have been established and are being maintained to the extent required by GAAP and the Lender. Neither Borrower nor any of its Subsidiaries has executed any waiver that would have the effect of extending the applicable statute of limitations in respect of any Tax, and each of them has established on its books reserves adequate for the payment of all Taxes.

6.8 <u>Labor Relations; Litigation</u>. Neither Borrower nor any of its Subsidiaries is engaged in any unfair labor practice and there is no litigation, proceeding, governmental investigation (administrative or judicial) or labor dispute, pending or, to the best knowledge of the Borrower, threatened against Borrower or any Subsidiary, which, if decided adversely, would have a Material Adverse Effect.

6.9 <u>[Reserved]</u>.

6.10 <u>ERISA</u>. The Borrower, each of its Affiliates, and each Plan (as applicable) are in compliance in all material respects with ERISA and the provisions of the Code applicable to the Borrower, such Affiliates or such Plan. None of the Borrower, any Affiliate or any Plan has engaged in a "prohibited transaction" (as defined in ERISA and the Code) that would subject such Person or Plan to a material tax or penalty imposed on a "prohibited transaction." Neither the Borrower nor any Affiliate has failed to satisfy the minimum funding standards of Section 302 of ERISA or Section 412 of the Code, nor applied for or obtained a waiver thereunder, with respect to any Plan. The aggregate current value of all assets of any Plan of the Borrower or any Affiliate that is subject to Title IV of ERISA or Section 412 of the Code is at least equal to the aggregate current value of all accrued benefits under such Plan calculated in accordance with actuarial assumptions current as of the date of this representation and warranty on an ongoing Plan basis. Neither the Borrower nor any of Affiliate has incurred any material liability to the Pension Benefit Guaranty Corporation over and above premiums required by law, and neither the Borrower nor any Affiliate has terminated any Plan in a manner that could result in the

19

imposition of a lien on the property of such entity. Borrower is not (i) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA, (ii) a "plan" as defined in and subject to Section 4975 of the Code, or (iii) an entity deemed to hold the plan assets of any of the foregoing pursuant to 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA. None of the transactions contemplated by this Agreement are in violation of any statutes applicable to Borrower that regulate investments of, and fiduciary obligations with respect to, governmental plans and that are similar to the provisions of Section 406 of ERISA or Section 4975 of the Code.

6.11    Capitalization. The outstanding equity of the Borrower and each of its Subsidiaries is comprised of capital stock, membership interests, or other equity interests, as applicable, all of which has been duly and validly issued and is fully paid and, with respect to the Borrower and each Subsidiary thereof that is a corporation, is non-assessable. No Person other than Michael C. Hild owns more than 2

0% of the issued and outstanding capital stock, membership interests or similar equity interests of the Borrower or any of its Subsidiaries and except as set forth in the Organizational Documents of the Borrower, or the similar Organizational Documents of any of its Subsidiaries, and except for options to purchase shares of Borrower capital stock granted pursuant to a stock incentive plan, which options in the aggregate are not exercisable for shares of capital stock constituting more than a 10% ownership interest in Borrower, (a) there are no rights to acquire any equity interests in the Borrower or any of its Subsidiaries, and (b) there are no outstanding commitments, options, warrants, calls or other agreements (whether written or oral) binding on the Borrower or any of its Subsidiaries that require or could require the Borrower or any of its Subsidiaries to sell, grant, transfer, assign, mortgage, pledge or otherwise dispose of any equity interests or other securities of the Borrower or any of its Subsidiaries.

6.12    [Reserved].

6.13    Environmental and Regulatory Compliance. The operations of Borrower and its Subsidiaries and each of the real properties owned by them and, to the Borrower's best knowledge, each of the real properties leased by any of them, are presently in compliance in all material respects with, and has in full force and effect, all material permits or approvals required by all applicable building, zoning, antipollution, hazardous substance, hazardous material, oil, environmental, health, safety or other laws, ordinances or regulations, and the Borrower has not received notification that any of them or any of such properties is in violation of any of the foregoing provisions. No inquiry, notice or threat to give notice by any governmental authority or third party has been received by Borrower or any of its Subsidiaries with respect to the generation, storage, disposal, release or threat of release of any hazardous substance or hazardous material, or with respect to any violation of any federal, state or local environmental, health or safety statute or regulation. This Section 6.13 does not apply to any real property in which the Borrower or any of its Subsidiaries has an interest solely as a result of the exercise of remedies afforded to a mortgagee in the event of a default under the terms of a mortgage loan.

6.14    Anti-Money Laundering/International Trade Law Compliance. No Covered Entity is a Sanctioned Person. No Covered Entity, either in its own right or through any third party, (a) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (b) does business in or with, or

Detroit_13383011_7

derives any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (c) engages in any dealings or transactions prohibited by any Anti-Terrorism Law.

6.15    Accuracy of Representations; Survival. No representation or warranty made herein or in any other Loan Document contains, or at the time of delivery will contain, any untrue statement of material fact or omits, or will omit at the time of delivery, a material fact necessary to make such representation or warranty not misleading. All representations and warranties made herein or in the any other Loan Document will survive the execution of this Agreement and the other Loan Documents.

6.16    Borrower Name and Address. Borrower's exact name is the name set forth in this Agreement. Borrower's principal place of business is located at the Address for Notices. Borrower is a registered organization organized under the laws of the State of Delaware.

6.17    Agency Approvals; Compliance with Agency Guides. Borrower is (i) a Fannie Mae and Ginnie Mae approved seller(issuer)/servicer, an FHA approved lender, and a HUD direct endorsement lender, and in each case, in good standing; (ii) in compliance with the terms and requirements of each Agency Guide applicable to it, except to the extent noncompliance would not have a Material Adverse Effect; and (iii) duly qualified and licensed as a mortgage banker or mortgage broker in each jurisdiction where such qualification is required in order for the Borrower to transact its business as presently conducted.

6.18    [Reserved].

6.19    Compliance With Law, Etc. Borrower has complied in all material respects with all Laws. None of Borrower or any Affiliate of Borrower (a) is an "enemy" or an "ally of the enemy" as defined in the Trading with the Enemy Act of 1917, (b) is in violation of any Anti-Terrorism Laws, (c) is a blocked person described in Section 1 of Executive Order 13224 or to its knowledge engages in any dealings or transactions or is otherwise associated with any such blocked person, (d) is in violation of any country or list based economic and trade sanction administered and enforced by OFAC, (e) is a Sanctioned Person or Sanctioned Country, (f) has more than 10% of its assets located in Sanctioned Countries or with Sanctioned Persons, or (g) derives more than 10% of its operating income from investments in or transactions with Sanctioned Persons or Sanctioned Countries. The proceeds of any transaction have not been and will not be used to fund any operations in, finance any investments or activities in or make any payments to a Sanctioned Person or Sanctioned Country. None of Borrower or any Affiliate of Borrower (a) is a "broker" or "dealer" as defined in, or could be subject to a liquidation proceeding under, the Securities Investor Protection Act of 1970, or (b) is subject to regulation by any Governmental Entity limiting its ability to incur the Obligations. Borrower and all of its Affiliates are in compliance with the Foreign Corrupt Practices Act of 1977 and any foreign counterpart thereto. None of Borrower or any Affiliate of Borrower has made, offered, promised or authorized a payment of money or anything else of value (a) in order to assist in obtaining or retaining business for or with, or directing business to, any foreign official, foreign political party, party official or candidate for foreign political office, (b) to any foreign official, foreign political party, party official or candidate for foreign political office, or (c) with the intent to induce the recipient to misuse his or her official position to direct business wrongfully to

Detroit_13383011_7

Borrower, any Affiliate of Borrower or any other Person, in violation of the Foreign Corrupt Practices Act of 1977.

6.20   Investment Company Act Compliance. Borrower is not required to be registered as an "investment company" as defined under the Investment Company Act of 1940, as amended nor as an entity "controlled" by an "investment company" as defined under the Investment Company Act of 1940, as amended.

6.21   No Broker. Borrower has not dealt with any broker, investment banker, agent, or other person, except for Lender, who may be entitled to any commission or compensation in connection with the transactions provided for in this Agreement.

SECTION 7.   AFFIRMATIVE COVENANTS.

During the term of this Agreement and so long as any Obligations remain outstanding:

7.1   Financial Statements and Other Reporting Requirements. The Borrower will furnish to the Lender:

7.1.1   as soon as available to the Borrower, but in any event within one hundred twenty (120) days after each of the Borrower's fiscal years, the audited balance sheet of the Borrower as at the end of, and related statements of income, retained earnings and cash flow for such year prepared in accordance with GAAP (and on a Consolidated and consolidating basis) and audited by independent certified public accountants reasonably satisfactory to the Lender, accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall have no "going concern" and shall state that said financial statements fairly present the financial condition and results of operations of Borrower, if applicable, as at the end of, and for, such fiscal year in accordance with GAAP;

7.1.2   within forty five (45) days after the end of each of the Borrower's fiscal quarters (other than the fourth fiscal quarter of each fiscal year), the balance sheet of the Borrower as at the end of, and related statements of income for, the portion of the year then ended and for the quarter then ended, prepared by the Borrower's management on a Consolidated and consolidating basis and in accordance with GAAP applied in a manner consistent with the audited financial statements required by Section 7.1.1 above (subject to normal year-end audit adjustments, none of which will be materially adverse, and the absence of footnotes);

7.1.3   concurrently with each delivery of financial statements pursuant to Sections 7.1.1 and 7.1.2 hereof, a Compliance Certificate certified by Borrower's chief financial officer;

7.1.4   within fifteen (15) days after receipt of each agency audit that could reasonably be expected to result in a Material Adverse Effect, including HUD, Ginnie Mae, and Fannie Mae audits, a copy of such audit and, within fifteen (15) days of any response by Borrower thereto, a copy of such response;

22

7.1.5   within ten (10) Business Days after the end of each calendar month, a Borrowing Base Certificate, and, at Borrower's discretion, with any request for Advance under Section 21;

7.1.6   unless otherwise set forth herein within five (5) Business Days after obtaining knowledge of the existence thereof, notice of (a) immediately, the occurrence of any Default or Event of Default, (b) the occurrence of any condition or event with respect to the Borrower or any Affiliate of the Borrower that could reasonably be expected to have a Material Adverse Effect, (c) any litigation or any investigative proceedings of a federal, state or local governmental agency or authority commenced or threatened in writing against the Borrower, any Affiliate of the Borrower or any Plan reasonably, the foreseeable losses from which would be in excess, individually or in the aggregate of the Litigation Threshold, or the issuance of any judgment, award, decree, order or other determination in or relating to any such litigation or proceedings, (d) the occurrence of a reportable event (as defined in ERISA) (e) any communications given or received by the Borrower or any Subsidiary of the Borrower to or from any federal, state or local governmental agency or authority in any way relating to any investigation of, compliance with, any violation or potential violation of, or any potential liability under, any environmental law or regulation (including those relating to pollution control, hazardous materials and hazardous wastes), along with copies of all such communications;

7.1.7   within five (5) Business Days give written notice to Lender of (a) any litigation affecting any of the Collateral that is commenced or threatened in writing, (b) the receipt of any notice from any Agency, the Consumer Financial Protection Bureau, or any other Governmental Entity having jurisdiction over the Borrower or its property that any such Agency or Governmental Entity intends to put the Borrower or any officer or employee of Borrower on probation or other supervisory review status, (c) the receipt of any notice from any insurer or guarantor of, or Agency that purchases, residential mortgage loans that such insurer, guarantor, or Agency will cease insuring, guaranteeing, or purchasing, as applicable, residential mortgage loans from the Borrower, (d) any notice from FHA that the Borrower may lose its status as an approved mortgagee or lender in good standing eligible to participate in the FHA insurance program, (e) the receipt of any written notification from the Consumer Financial Protection Bureau, any other Governmental Entity, or any Agency that the Borrower has violated any Law and (f) any investigation, subpoena or civil investigative demands with respect to Borrower or any Collateral from the Consumer Financial Protection Bureau, any Agency or any other Governmental Entity; and

7.1.8   from time to time, within ten (10) Business Days such other financial data and information about Borrower and any of its Subsidiaries and their Affiliates as the Lender may reasonably request.

7.2   <u>Conduct of Business</u>. The Borrower will, and will cause each of its Subsidiaries to: (a) maintain its corporate, limited liability company or other organizational existence, as applicable; (b) continue to have a fiscal year ending December 31st of each year (or such other fiscal year-end as may be deemed acceptable to the Lender in its reasonable discretion); (c) remain or engage in substantially the same business as that in which it is now engaged or proposed to be engaged as of the date hereof (or, in the case of a Subsidiary formed or organized after the date hereof, as of the date such Subsidiary is formed or organized); (d) duly observe and comply with all applicable laws and all requirements of any governmental authorities relative to

it, its assets or to the conduct of its business, including the Secure and Fair Enforcement for Mortgage Licensing Act, 12 USC 5101-5116, all state mortgage loan originator licensing acts and all other state laws mandated by such Act, and all laws relating to the environment, pollution control, hazardous materials and hazardous waste; (e) maintain and keep in full force and effect all licenses and permits necessary to the proper conduct of its business as presently conducted or reasonably related thereto and, without limiting the foregoing; (f) do or cause to be done all things necessary to preserve and keep in full force and effect Borrower's corporate or other applicable existence, rights, franchises, licenses and approvals, including without limitation, its status as a Fannie Mae and Ginnie Mae approved seller(issuer)/servicer, an FHA approved lender, and a HUD direct endorsement lender, in each case in good standing, and comply with the terms and requirements of each Agency Guide applicable to it.

7.3    <u>Maintenance and Insurance</u>. The Borrower will, and will cause each of its Subsidiaries to: (a) maintain and keep its properties in good repair, working order and condition (normal wear and tear and casualty excepted) so that its business may be properly and advantageously conducted at all times; (b) comply with the provisions of all material leases to which it is a party or under which it occupies property so as to prevent any material loss or forfeiture thereof or thereunder; and (c) maintain insurance with such insurance companies, in such amounts (including, without limitation, so-called "all-risk" coverage at replacement value and "broad form" liability coverage), against such hazards and liabilities and for such purposes as is customary in the industry for companies of established reputation engaged in the same or similar businesses and owning or operating similar properties including, without limitation, hazard, general liability, fidelity, errors and omissions, and blanket bond coverages in conformity with the requirements set forth in <u>Exhibit B</u> to this Agreement. The Lender will be named as loss payee and/or additional insured, as appropriate, under the insurance policies and will be given 30 days' advance written notice of any cancellation, refusal to renew thereof or material modification of coverage thereunder. If the Borrower fails to provide such insurance, the Lender, in its sole discretion, may provide such insurance and charge the cost (plus applicable interest) to the Borrower's deposit accounts with the Lender. Any payment by the Lender for insurance under this Section not recovered from the Borrower within ten (10) Business Days after the Borrower's receipt of an invoice therefor will, until reimbursed, bear interest at the Default Rate from the date Lender incurs such expense. The Lender will not, by virtue of the fact of the Lender's approving, disapproving, accepting, obtaining or failing to obtain any such insurance, incur any liability including, without limitation, for the form or legal sufficiency of insurance contracts, solvency of insurance companies or payment of lawsuits, and the Borrower hereby expressly assumes full responsibility therefor and liability, if any, thereunder. Upon request of the Lender from time to time, the Borrower will furnish to the Lender certificates or other evidence satisfactory to the Lender of compliance with the foregoing insurance provisions.

7.4    <u>Taxes</u>. The Borrower will, and will cause each of its Subsidiaries to, pay or cause to be paid all Taxes on or assessed against it or its properties prior to such Taxes becoming delinquent, except for any Taxes that are being contested in good faith through appropriate proceedings and with respect to which adequate reserves, if and to the extent required by GAAP and the Lender, have been established and are being maintained, provided that no enforcement action to enforce a lien has been commenced against the Borrower or any Subsidiary with respect to any such tax, assessment or charge that is material in amount.

7.5    [Reserved].

24

7.6    Security Interest. Borrower shall do all things necessary to preserve the Collateral so that it remains subject to a first priority perfected security interest hereunder. Without limiting the foregoing, Borrower will comply with all rules, regulations and other laws of any Governmental Entity.

7.7    Inspection by the Lender; Books and Records. The Borrower will, and will cause each of its Subsidiaries to, permit the Lender or its designees, from time to time, but not less frequently than annually, during normal business hours, upon one (1) Business Days prior written notice, to visit and inspect their properties pertaining to Collateral, to examine and make copies of their books and records pertaining to Collateral, and to discuss their affairs, finances and accounts pertaining to Collateral with appropriate officers. The Borrower will, and will cause each of its Subsidiaries to, keep adequate books and records of account in which true and complete entries will be made reflecting all of its business and financial transactions, and such entries will be made in accordance with GAAP and applicable law.

7.8    Use of Proceeds. The Borrower will use the proceeds of the Revolving Loan for general corporate purposes. No portion of any advance of any Loan will be used for the purpose of purchasing or carrying any "margin security" or "margin stock" as such terms are used in Regulations T, U or X of the Board of Governors of the Federal Reserve System.

7.9    [Reserved].

7.10    No Amendments to Organizational Documents. The Borrower will not at any time cause or permit its Organizational Documents or the Organizational Documents of any of its Subsidiaries to be modified or supplemented in any respect that would materially affect the Lender's rights hereunder and with respect to the Collateral and under the other Loan Documents or affect in any manner the Borrower's ability to pay the Obligations when due.

7.11    [Reserved].

7.12    Name, Location. Borrower will give Lender not less than ninety (90) days' prior written notice of all contemplated changes in Borrower's name, location, jurisdiction of organization, chief executive office, principal place of business, and/or location of any Collateral, but the giving of this notice shall not cure any Event of Default caused by this change.

7.13    Applicable Law. Borrower shall comply with the requirements of all Law and orders of any Governmental Entity.

7.14    Online Access to Custodial Account Information. Borrower shall take all action necessary to assure that Lender is granted online access to information regarding the Custodial Account, including daily valuations of the Ginnie Mae Bonds in the Custodial Account.

SECTION 8.  NEGATIVE COVENANTS.

During the term of this Agreement and so long as any Obligations remain outstanding:

8.1    Investments. Borrower will not, and will not permit any of its Subsidiaries to, use the proceeds of the Revolving Loan to make any investments (whether by capital contribution or by loan or other Indebtedness) except for investments in: (a) direct obligations of the United

States of America, maturing within one year of their issuance; (b) time certificates of deposit or repurchase agreements, maturing within one year of their issuance, from banks in the United States having capital, surplus and undivided profits in excess of $1,000,000,000; (c) short-term commercial paper carrying the highest rating by Moody's or Standard and Poor's Rating Services and issued by corporations headquartered in the United States, in currency of the United States; (d) shares of money-market mutual funds having assets in excess of $100,000,000 and substantially all of the assets of which consist of investments referred to in clauses (a) through (c), inclusive, above; (e) Subsidiaries, provided that such investments will not exceed $500,000; (f) obligations of the Lender and its Affiliates and/or investments otherwise sponsored by the Lender or its Affiliates; and (g) financial instruments of the type that constitute Collateral.

8.2   Merger and Acquisitions; Asset Sales. The Borrower will not, and will not permit any of its Subsidiaries to: (a) merge with or into, or consolidate, with any other Person; or (b) sell all or substantially all of its assets or all or substantially all of its capital stock if as a result of any such transaction Persons who controlled a majority of the voting securities of Borrower or any of its Subsidiaries do not control a majority of the voting securities of the purchaser of assets or other surviving Person.

8.3   Change in Ownership. Borrower will continue to own a majority of the issued and outstanding voting equity interests of each of its Subsidiaries. Michael Hild will continue to own not less than 26% of the issued and outstanding voting equity interests of the Borrower.

8.4   [Reserved].

8.5   Restrictions on Liens. The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Liens upon or with respect to the Collateral, except for Permitted Liens.

8.6   [Reserved].

8.7   Financial Covenants. The Borrower will comply with the Financial Covenants.

8.8   [Reserved].

8.9   Anti-Money Laundering/International Trade Law Compliance. No Covered Entity will become a Sanctioned Person. No Covered Entity, either in its own right or through any third party, will (a) have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (b) do business in or with, or derive any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; (c) engage in any dealings or transactions prohibited by any Anti-Terrorism Law or (d) use the Advances to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law. The funds used to repay the Obligations will not be derived from any unlawful activity. Each Covered Entity shall comply with all Anti-Terrorism Laws. The Borrowers shall promptly notify the Agent in writing upon the occurrence of a Reportable Compliance Event.

26

    8.10    <u>FHA Insurance</u>. The Borrower shall not commit or suffer to be committed any act that would adversely affect its eligibility to participate as an FHA-approved mortgagee with direct endorsement approval.

    8.11    <u>No Plan Assets</u>. Borrower shall not take any action or omit to take any action that would result in it becoming (i) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA, (ii) a "plan" as defined in and subject to Section 4975 of the Code, (iii) an entity deemed to hold the plan assets of any of the foregoing pursuant to 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA, or (iv) subject to any statute that regulates investments of, and fiduciary obligations with respect to, governmental plans, that is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and that would be violated by the transactions contemplated by this Agreement.

    8.12    <u>ERISA Compliance</u>. None of the Borrower, any of its Affiliates, any Plan or any fiduciary thereof will (a) engage in any "prohibited transaction" or apply for or obtain a waiver of the minimum funding standard of Section 412 of the Code, (b) fail to satisfy any additional funding requirements set forth in Section 412 of the Code and Section 302 of ERISA, or (c) terminate or withdraw from participation in any Plan in a manner that could result in the imposition of a lien on any property of, or impose a substantial withdrawal liability on, the Borrower or any Affiliate of the Borrower. The Borrower, each Affiliate of the Borrower and each Plan will comply in all material respects with ERISA, to the extent applicable.

SECTION 9.   EVENTS OF DEFAULT; ACCELERATION.

    9.1    <u>Events of Default</u>. The following will each constitute an "Event of Default":

    9.1.1   (a) default in the payment when due of any principal or interest on any Obligation, or (b) default in the payment of any other Obligation and such default continues for three (3) Business Days beyond the date when payment was due and payable;

    9.1.2   Borrower's failure to comply with the covenants described in <u>Sections 7.1</u>, <u>7.3</u> or <u>7.11</u>, the covenants set forth in <u>Sections 8.1</u> through <u>8.9</u> or the covenants set forth in <u>Sections 8.11</u> and <u>8.12</u> hereof;

    9.1.3   default in the performance or observance of or compliance with the Borrower's agreements and covenants set forth in the Loan Documents (other than those described in <u>Sections 9.1.1</u> and <u>9.1.2</u>), and such default continues for more than three (3) Business Days after written notice to Borrower from the Lender;

    9.1.4   any representation or warranty at any time made by or on behalf of the Borrower or any guarantor in any Loan Document is untrue or otherwise is or becomes false or misleading in any material respect;

    9.1.5   Borrower or any Subsidiary or any guarantor will be in default or breach of any Indebtedness exceeding in excess of the Indebtedness Limit and such default or breach continues uncured or unwaived beyond any applicable grace or cure period;

    9.1.6   issuance of any injunctions that have a Material Adverse Effect, or issuance of any attachments that in the aggregate exceed $10,000,000 in value, against the

27

Borrower or any Subsidiary or any guarantor that are not dismissed or bonded, to the reasonable satisfaction of the Lender, within thirty (30) days after issuance;

      9.1.7   offering of a composition or extension to creditors by, for or with the consent or acquiescence of Borrower or any Subsidiary or any guarantor;

      9.1.8   Insolvency of the Borrower, any Subsidiary or any guarantor;

      9.1.9   death or mental incapacity of any guarantor;

      9.1.10  any money judgments aggregating in excess of the Judgment Threshold are entered against the Borrower, any Subsidiary or any guarantor which has or have become non-appealable and shall remain undischarged, unsatisfied by insurance and unstayed for more than sixty (60) days, whether or not consecutive;

      9.1.11  any garnishment, levy or execution is issued and served upon the Lender, which garnishment, levy or execution covers any material portion of property of the Borrower, any Subsidiary or any guarantor in the possession of the Lender;

      9.1.12 (a) any Loan Document, or any covenant, agreement or obligation contained therein or evidenced thereby, ceases in any material respect to be legal, valid, binding or enforceable in accordance with its terms, or is cancelled, terminated, revoked or rescinded other than in accordance with the terms hereof or thereof, (b) any action at law, suit in equity or other legal proceeding to cancel, revoke or rescind any Loan Document will be commenced by or on behalf of Borrower or any Subsidiary, or (c) any court or any other governmental or regulatory authority or agency of competent jurisdiction will make a determination that, or will issue a judgment, order, decree or ruling to the effect that, any one or more of the Loan Documents, or any one or more of the obligations of Borrower or any Subsidiary thereunder, are illegal, invalid or unenforceable in any material respect in accordance with the terms thereof.

      9.1.13  the security interests granted by the Borrower or any Subsidiary under the Loan Documents cease to be valid, first priority security interests (subject only to Permitted Liens) or fail to be perfected, or any Person successfully contests the validity, priority, enforceability or perfection of such security interests;

      9.1.14  the occurrence of any event or condition that the Lender reasonably determines, would be likely to have a Material Adverse Effect.

      9.1.15  if any regulatory enforcement action, an adverse outcome of which would have a Material Adverse Effect, is instituted against the Borrower or any guarantor by any Governmental Entity;

      9.1.16  [Reserved];

      9.1.17  the occurrence or existence of any default or event of default under any other Loan Document that would have a Material Adverse Effect on the Borrower's ability to perform the Obligations; or

9.1.18  the occurrence of a Change of Control or either Michael C. Hild or Eric G. Rohr ceases to be an employee of Borrower.

9.2      Remedies. If an Event of Default occurs and is continuing, the Lender may, at its option (and will be automatically deemed to have done so without any further action on its part in the case of an Event of Default pursuant to Sections 9.1.7 or 9.1.8 hereof) do one or more of the following: (a) declare any or all of the Obligations to be immediately due and payable, whereupon the same will become immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby waived by the Borrower, (b) limit, suspend or terminate the Borrower's right to borrow hereunder, and (c) exercise any rights and remedies under the Loan Documents and applicable law.

9.3      Certain Remedies with Respect to Collateral. Without limiting the foregoing, upon the occurrence of any Event of Default and at any time thereafter during the continuation thereof, the Lender will have the right to take exclusive control of the Custodial Account. The Borrower waives demand and notice with respect to and assent to any repossession of Collateral. The Lender may dispose of Collateral in any order and in any manner it chooses and may refrain from the sale of any real property held as Collateral until the sale of personal property. The Lender will give to the Borrower at least five (5) Business Days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. The residue of any proceeds of collection or sale, after satisfying all Obligations in such order of preference as the Lender may determine and making proper allowance for interest on Obligations not then due, if any, will be credited to any deposit account that the Borrower may maintain with the Lender, or, if there is no such account, held pending instructions from the Borrower. The Borrower will remain liable for any deficiency.

9.4      Certain Rights with Respect to Collateral. Upon the occurrence and during the continuation of an Event of Default the Lender may at any time in its sole discretion (a) transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for Obligations or apply it on principal or interest due on Obligations, (b) without notice to or demand on the Borrower, demand and collect Collateral consisting of accounts receivable or instruments as the Lender may determine, and (c) for the purpose of realizing the Lender's rights therein, the Lender may receive, open and dispose of mail addressed to the Borrower and endorse notes, checks, drafts, money orders, documents of title or other evidences of payment, shipment or storage or any form of Collateral on behalf of and in the name of the Borrower. The powers conferred on the Lender by this Section are solely to protect the interest of the Lender and will not impose any duties on the Lender to exercise any powers.

9.5      Rights of Secured Party Under UCC. In addition to all other rights and remedies provided hereunder or by law, the Lender will have in any jurisdiction where enforcement hereof is sought the rights and remedies of a secured party under the UCC.

SECTION 10. SET OFF.

The Borrower hereby grants to the Lender a continuing lien, security interest and right of setoff as security for all of the Obligations, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody,

safekeeping or control of the Lender or any Affiliate of the Lender (and their respective successors and assigns) or in transit to any of them. At any time after the occurrence and during the continuance of an Event of Default, without demand or notice (any such notice being expressly waived by the Borrower), the Lender may set off the same or any part thereof and apply the same to any of the Obligations even though unmatured and regardless of the adequacy of any other collateral securing the Obligations.

ANY AND ALL RIGHTS TO REQUIRE THE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL THAT SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

SECTION 11. GENERAL.

11.1    [Reserved].

11.2    Written Notices. Any notices expressly required or permitted by this Agreement will be in writing, and will be deemed to have been given when delivered by hand, when sent by facsimile, 1 day after delivery to any national overnight delivery service (delivery charges prepaid) for next day delivery, or 3 days after deposit in the U.S. mails (postage prepaid, certified and return receipt requested), and addressed to the parties at the addresses set forth on the signature pages hereto, or, in either case, to such other address as a party may designate in a written notice to the other party given in accordance with this Section.

11.3    Term of Agreement. This Agreement will continue in force and effect until such time as all of the Obligations have been paid in full (other than unasserted indemnity claims that survive termination) and no further credit can be extended to Borrower under this Agreement or any other Loan Document.

11.4    No Waivers. No failure or delay by the Lender in exercising any right, power or privilege hereunder will operate as a waiver thereof; nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law.

11.5    Further Assurances. The Borrower will do, make, execute and deliver all such additional and further acts, things, assurances, and instruments as the Lender may reasonably require more completely to vest in and assure to the Lender its rights hereunder and under the other Loan Documents, and in the Collateral, and to carry into effect the provisions and intent of this Agreement and the other Loan Documents.

11.6    Governing Law; Jurisdiction.

(a)    This Agreement shall be binding and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Borrower acknowledges that the obligations of Lender hereunder or otherwise are not the subject of any guaranty by, or recourse to, any direct or indirect parent or other Affiliate of Lender. THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO OR IN

30

CONNECTION WITH THIS AGREEMENT, THE RELATIONSHIP OF THE PARTIES, AND/OR THE INTERPRETATION AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES WILL BE GOVERNED BY THE LAWS OF THE STATE OF MICHIGAN.

(b)     LENDER AND BORROWER HEREBY WAIVE TRIAL BY JURY. LENDER, AND BORROWER HEREBY IRREVOCABLY CONSENT TO THE EXCLUSIVE JURISDICTION OF ANY COURT OF THE STATE OF MICHIGAN, OR IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, ARISING OUT OF OR RELATING TO THE PROGRAM AGREEMENTS IN ANY ACTION OR PROCEEDING. EACH OF LENDER AND BORROWER HEREBY SUBMITS TO, AND WAIVES ANY OBJECTION THEY MAY HAVE TO, EXCLUSIVE PERSONAL JURISDICTION AND VENUE IN THE COURTS OF THE STATE OF MICHIGAN AND THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, WITH RESPECT TO ANY DISPUTES ARISING OUT OF OR RELATING TO THE PROGRAM AGREEMENTS.

(c)     TO THE EXTENT PERMITTED BY REQUIREMENTS OF LAW, LENDER AND BORROWER HEREBY WAIVE ANY RIGHT TO CLAIM OR RECOVER IN ANY LITIGATION WHATSOEVER INVOLVING ANY INDEMNIFIED PARTY, ANY SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND OR NATURE WHATSOEVER OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES, WHETHER SUCH WAIVED DAMAGES ARE BASED ON STATUTE, CONTRACT, TORT, COMMON LAW OR ANY OTHER LEGAL THEORY, WHETHER THE LIKELIHOOD OF SUCH DAMAGES WAS KNOWN AND REGARDLESS OF THE FORM OF THE CLAIM OF ACTION. NO INDEMNIFIED PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY UNINTENDED RECIPIENTS OF ANY INFORMATION OR OTHER MATERIALS DISTRIBUTED BY IT THROUGH TELECOMMUNICATIONS.

(d)     LENDER AND BORROWER ACKNOWLEDGE THAT THE WAIVERS IN THIS SECTION 11.6 ARE A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT SUCH PARTY HAS ALREADY RELIED ON SUCH WAIVERS IN ENTERING INTO THE PROGRAM AGREEMENTS, AND THAT SUCH PARTY WILL CONTINUE TO RELY ON SUCH WAIVERS IN THEIR RELATED FUTURE DEALINGS UNDER THE PROGRAM AGREEMENTS.

(e)     THE PROVISIONS OF THIS SECTION 11.6 SHALL SURVIVE TERMINATION OF THE PROGRAM AGREEMENTS AND THE PAYMENT IN FULL OF THE OBLIGATIONS.

11.7     Indemnification. The Borrower hereby absolutely and unconditionally indemnifies and holds the Lender and its Affiliates (and the shareholders, directors, officers, employees and agents of the Lender or its Affiliates) (each, an "Indemnitee") harmless against any and all claims, demands, suits, actions, causes of action, damages, losses, settlement payments, obligations, costs, expenses and all other liabilities whatsoever that will at any time or times be incurred or sustained by an Indemnitee (except any of the foregoing incurred or sustained as a result of the gross negligence or willful misconduct on account of, or in relation to, or in any way in connection with, associated with or ancillary to this Agreement, the other Loan

31

Documents and the other documents executed or delivered in connection herewith, and the arrangements or transactions contemplated therein.

11.8    Amendments, Waivers, Etc. This Agreement and the other Loan Documents, and any provision hereof or thereof, may be waived only by an instrument in writing signed by the Lender and may be amended only by an instrument in writing signed by the Borrower and the Lender.

11.9    Binding Effect of Agreement; Assignment. This Agreement will be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns. The Lender may sell, assign, grant participations in or otherwise transfer all or any portion of its right, title and interest in, and its obligations under, this Agreement and the other Loan Documents to any Person with the consent of the Borrower, which consent shall not be unreasonably withheld, provided that no such consent shall be required upon the occurrence and during the continuance of an Event of Default. The Lender may disclose to prospective assignees, participants, purchasers or transferees, their agents and attorneys, any financial or other information in the Lender's possession regarding the Borrower, provided that the Lender will require such information to be maintained as confidential by any proposed assignee, purchaser or transferee. In connection with any such sale, assignment or transfer: the Borrower will execute and deliver, and cause its Subsidiaries to execute and deliver, such documents, instruments and agreements as the Lender or its proposed assignee may reasonably request to affect such sale, assignment or transfer but, for the avoidance of doubt, not any such document, instrument or agreement that would, without the Borrower's consent, amend the terms of any Loan Document (other than to effect the contemplated sale, transfer or assignment). The Lender will be released from its obligations hereunder. The Borrower may not sell, assign or transfer its rights or obligations hereunder. Borrower shall maintain a register for the recordation of the names and addresses of the assignees or participants and the principal amounts owing to each of them. The entries in this register shall be conclusive absent manifest error, and the Borrower and the Lender shall treat each person whose name is recorded in the register as an assignee or participant, as applicable, for purposes of all Loan Documents.

11.10    Computation of Interest and Fees, Payments, Etc. Interest, fees and charges will be computed daily on the basis of a year of 360 days and paid for the actual number of days for which due. If the due date for any payment of principal is extended by operation of law, interest will be payable for such extended time. If any payment required by this Agreement becomes due on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension will be included in computing interest in connection with such payment. All payments required of the Borrower hereunder will be made by the Borrower to the Lender at the address specified for payment in the Lender's invoices to the Borrower (or at such other place as the Lender may from time to time specify in writing) in lawful money of the United States of America in federal or other funds immediately available to the recipient thereof at the prescribed place of payment without counterclaim or setoff.

11.11    Interest Limitations. If, at any time, the rate of interest together with all amounts that constitute interest and that are reserved, charged or taken by the Lender as compensation for fees, services or expenses incidental to the making, negotiating, or collection of the Obligations, are deemed by any competent court of law, governmental agency or tribunal to exceed the maximum rate of interest permitted to be charged by the Lender to the Borrower under

32

applicable law, then, during such time as such rate of interest would be deemed excessive, that portion of each sum paid attributable to that portion of such interest that exceeds the maximum rate of interest so permitted will be deemed a voluntary prepayment of principal of the Obligations, to be applied as determined by the Lender in its sole and absolute discretion. As used herein the term "applicable law" means the law in effect from time to time; provided, however, that, in the event that there is a change in the law that results in a higher permissible rate of interest, then this Agreement and the Revolving Loan will be governed by such new law as of its effective date.

11.12   No Marshalling. Borrower, on its own behalf and on behalf of its successors and assigns hereby expressly waives all rights, if any, to require a marshalling of assets by Lender or to require that Agent or Lenders first resort to some or any portion of the Collateral before foreclosing upon, selling or otherwise realizing on any other portion thereof.

11.13   Table of Contents and Section Headings. The table of contents and the Section and subsection headings herein are intended for convenience only and shall be ignored in construing this Agreement.

11.14   USA Patriot Act. Lender, pursuant to the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), hereby notifies Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow Lender to identify each Borrower in accordance with the Act.

11.15   [Reserved].

11.16   Entire Agreement; Miscellaneous. This Agreement and the other Loan Documents, including the exhibits hereto and thereto, set forth the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and supersedes all prior agreements, promises, covenants, arrangements, communications, representations, warranties, whether oral or written, by any officer, employee or representative of any party hereto. The captions of the Sections of this Agreement are for ease of reference only and are not an integral part of this Agreement. This Agreement may be signed in any number of counterparts with the same effect as if the signatures hereto and thereto were upon the same instrument. The provisions of this Agreement are severable, and if any of these provisions will be held by any court of competent jurisdiction to be unenforceable under a particular circumstances, such holdings will not affect or impair such provisions under different circumstances or any other provision hereof.

11.17   Federal Reserve. The Lender may at any time pledge or assign all or any portion of its rights under this Agreement and the other Loan Documents to any of the twelve Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341 or any Federal House Loan Bank, provided that no such pledge or assignment or enforcement thereof will release the Lender from its obligations under any of the Loan Documents.

11.18   Signature Counterparts. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, and all of which taken together shall

Detroit_13383011_7

constitute one and the same agreement. A scanned or facsimile signature counterpart shall be deemed an original.

11.19   [RESERVED].

11.20   WAIVER OF JURY TRIAL, SERVICE OF PROCESS AND DAMAGES. EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF THE LENDER RELATING TO THE ADMINISTRATION OF THE REVOLVING LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS. THE BORROWER HEREBY AGREES IT WILL NOT SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY CANNOT BE OR HAS NOT BEEN WAIVED.

IN ANY ACTION OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR THE INTERPRETATION OR ENFORCEMENT HEREOF OR THEREOF, THE BORROWER HEREBY ABSOLUTELY AND IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT, DECLARATION OR OTHER PROCESS AND HEREBY ABSOLUTELY AND IRREVOCABLE AGREES THAT THE SERVICE THEREOF MAY BE MADE IN THE MANNER AND TO THE ADDRESS SPECIFIED FOR NOTICES IN SECTION 11.2 HEREOF.

EXCEPT AS PROHIBITED BY LAW, THE BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.

THE BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS AND AGREEMENTS, EACH OF WHICH CONSTITUTE A MATERIAL INDUCEMENT FOR THE LENDER TO ACCEPT THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND TO MAKE THE REVOLVING LOAN.

*[Signatures on following page.]*

IN WITNESS WHEREOF, the parties have caused this Loan and Security Agreement to be executed under seal by their respective duly authorized officers as of the date first above written.

Live Well Financial, Inc., a Delaware
corporation

By: _Michael C Hild_
     (Signature)

Its: _Chairman & CEO_
     (Printed Name and Title)

Jurisdiction of Organization:  Delaware

Address for Notices:

1011 Bolder Springs Drive, Suite 420
Richmond, VA 23225
Attention: _Eric Rohr_
Telephone: _804 - 665 - 1659_
Facsimile:
Email: _Eric Rohr @ LiveWellFinancial.com_


FLAGSTAR BANK, FSB

By: _____
     (Signature)

Its: _____
     (Printed Name and Title)

Address for Notices:

5151 Corporate Drive
Troy, MI 48098
Attention: Kelly Hamrick
Facsimile: 248-250-5845
Telephone No.: 248-312-2593
Email: Kelly.Hamrick@flagstar.com

[SIGNATURE PAGE TO LOAN AND SECURITY AGREEMENT (13383011)]

IN WITNESS WHEREOF, the parties have caused this Loan and Security Agreement to be executed under seal by their respective duly authorized officers as of the date first above written.

Live Well Financial, Inc., a Delaware corporation

By:_____
    (Signature)

Its:_____
    (Printed Name and Title)


Jurisdiction of Organization:  Delaware

Address for Notices:

1011 Bolder Springs Drive, Suite 420
Richmond, VA 23225
Attention: _____
Telephone: _____
Facsimile: _____
Email: _____


FLAGSTAR BANK, FSB

By: _____
    (Signature)

Its: _Kelly M Hamrick , FVP____
    (Printed Name and Title)


Address for Notices:

5151 Corporate Drive
Troy, MI 48098
Attention: Kelly Hamrick
Facsimile: 248-250-5845
Telephone No.: 248-312-2593
Email: Kelly.Hamrick@flagstar.com

[SIGNATURE PAGE TO LOAN AND SECURITY AGREEMENT (13383011)]

EXHIBIT A:  FORM OF COMPLIANCE CERTIFICATE

Compliance Certificate

This Certificate is furnished pursuant to Section 7.1.3 of the Loan and Security Agreement dated as of March 29, 2017 by and between Live Well Financial, Inc., a Delaware corporation (the "Borrower") and Flagstar Bank, FSB, a federally chartered savings bank (together with its successors and assigns, the "Lender") (as amended, supplemented or otherwise modified from time to time, the "Agreement"). Unless otherwise defined herein, the terms used in this Certificate and Schedule 1 attached hereto have the meanings ascribed to them in the Agreement.

As required by Section 7.1.1 or Section 7.1.2 of the Agreement, financial statements of the Borrower for the year and/or quarter and/or month ended _____ ___, 20__ (the "Financial Statements") prepared on a consolidated basis, or consolidated and consolidating basis, as applicable, in accordance with GAAP (subject, in the case of quarterly and monthly statements, to normal year-end audit adjustments, none of which are materially adverse, and the absence of footnotes) accompany this Certificate. The Financial Statements present fairly the financial position of the Borrower and its Subsidiaries in all material respects for such periods as at the date thereof and the results of operations of the Borrower for the period covered thereby.

Schedule 1 attached hereto sets forth financial data and computations evidencing the compliance by the Borrower and its Subsidiaries with the financial covenants of the Agreement set forth in Section 8.7 thereof, all of which data and computations, to the best of the knowledge and belief of the chief financial officer (the "Officer") executing and delivering this Certificate on behalf of the Borrower, are true, complete and correct.

The activities of the Borrower during the period covered by the Financial Statements have been reviewed by the Officer and by employees or agents under the Officer's immediate supervision. Based on such review, to the best knowledge and belief of the Officer, during the period covered by the Financial Statements, and as of the date of this Certificate, (a) the Borrower and its Subsidiaries have kept, observed, performed and fulfilled each and every covenant and condition of the Agreement (except to the extent waived by Lender in writing) and the other Loan Documents in all material respects, and (b) no Default or Event of Default, has occurred and is continuing.

IN WITNESS WHEREOF, the undersigned has caused this Compliance Certificate to be executed under seal by its duly authorized officer as of the date first above written.

Live Well Financial, Inc., a Delaware corporation

By: _____
    (Signature)

Its: _____
    (Printed Name and Title)

A-1

<u>EXHIBIT B:  FIDELITY & MORTGAGE ERRORS / OMISSIONS
INSURANCE REQUIREMENTS</u>

***All policies <u>required</u> to be underwritten by Lloyd's of London, Aspen Specialty or Liberty
Mutual***

<u>FIDELITY BOND</u>:
    Minimum Coverage limits as shown below

<u>REQUIRED ENDORSEMENTS</u>:
    Theft of Warehouse Lender Money & Collateral – naming Flagstar Bank
    Direct Loss Payee/Right of Action – naming Flagstar Bank
    Specific Warehouse Lender Loss Payee / Right of Action – naming Flagstar Bank
    Definition of Employee
    Loan Closing Agent
    Forged Documents
    Computer Systems Fraud
    Independent Contractor Endorsement

<u>MORTGAGEE'S ERRORS & OMISSIONS/MORTGAGE IMPAIRMENT</u>:
    Minimum Coverage limits as shown below

<u>POLICY MUST COVER EXPOSURES SUCH AS</u>:
    Failure to obtain or maintain fire and extended coverage perils
    Failure to obtain or maintain flood insurance
    Failure to determine that a property is in a flood zone
    Failure to obtain PMI Insurance, FHA Insurance or VA Guaranty as well as follow their
        instructions in connection with the liquidation of a loan
    Failure to pay real estate taxes

<u>REQUIRED ENDORSEMENT</u>:
    Direct Loss Payee/Right of Action – naming Flagstar Bank

<u>RECOMMENDED COVERAGES</u>: (Lender does NOT require these but highly recommends
them)
    Cyber Liability
    Professional Liability Errors & Omissions

NOTE: For those servicing loans you may need mortgage impairment. Please consult your
    Lender Representative

Detroit_13383011_7

# INSURANCE COVERAGE REQUIRED

## FIDELITY BOND

| Warehouse Line Size (millions) | Minimum Coverage | Maximum Deductible |
|---|---|---|
| $1 – 5 | $300,000 | $15,000 |
| $6 – 9 | $500,000 | $50,000 |
| $10 – 19 | $1,000,000 | $100,000 |
| $20 – 35 | $1,500,000 | $150,000 |
| $36 – 49 | $2,000,000 | $200,000 |
| $50 and over | $2,500,000 | $250,000 |

## MORTGAGE ERRORS & OMISSIONS

| Warehouse Line Size (millions) | Minimum Coverage | Maximum Deductible |
|---|---|---|
| $1 – 5 | $300,000 | $15,000 |
| $6 – 9 | $500,000 | $25,000 |
| $10 and over | $1,000,000 | $75,000 |

Additional Requirements:
Insurer must include rider that such insurance policies shall in no event be terminated or materially modified without 30 days prior written notice to Flagstar Bank. Flagstar Bank is also to be notified if you file a claim with your carrier

Renewals and Policy Expiration Notices:
Flagstar Bank customers shall provide Flagstar Bank with written evidence of renewal of such insurance policies on the expiration date of such policies. A binder of insurance shall be valid proof of insurance. A binder is only acceptable for a maximum of 60 days from the date on the binder. After that time, Flagstar Bank requires a copy of the full policies including all riders/ endorsements along with evidence of paid premium. Flagstar Bank does NOT accept Certificates of Insurance as valid proof of coverage.

Approved Insurance Carriers:
Each insurer must have and maintain at least the following rating by either Standard & Poors (S&P) or A.M. Best Co.:

Policyholder's rating of "A-" or better; provided that an insurer with a lesser rating shall be permitted if such insurer presents a reinsurance agreement, containing a direct access clause, with one or more insurers which hold a policyholder's rating of "A-" or better. If your insurance provider is unable to write the coverages required, please contact us for a referral to an insurance broker that can assist you with our requirements.

B-2

**EXHIBIT C:  FORM OF BORROWING BASE CERTIFICATE**

**[See Attached]**

Detroit_13383011_7

## EXHIBIT D:  FORM OF REQUEST FOR ADVANCE

Dated: _____, 20__

TO: Flagstar Bank, FSB ("Lender")

RE: Loan and Security Agreement dated as of March 29, 2017 (as amended, restated or otherwise modified from time to time, the "Loan Agreement"), by and between Live Well Financial, Inc., a Delaware corporation ("Borrower"), and Lender

      Pursuant to the terms and conditions of the Loan Agreement, the undersigned Borrower hereby requests an Advance from Lender, as described herein:

(A)    Date of Advance: _____

(B)    Amount of Advance:

        $_____

(C)    Disbursement Instructions

        ☐ Flagstar Bank Account No. _____
        ☐ Other:_____
        _____

The undersigned Borrower certifies that the conditions to lending set forth in Section 3.2 of the Loan Agreement have been satisfied.

Capitalized terms used herein, except as defined to the contrary, have the meanings given them in the Loan Agreement.

                LIVE WELL FINANCIAL, INC.

                By:_____

                Its:_____

Lender Approval:_____

**EXECUTION VERSION**

## AMENDMENT NO. 1 TO LOAN AND SECURITY AGREEMENT
## AND
## AMENDMENT NO. 1 TO REVOLVING NOTE

This Amendment No. 1 to Loan and Security Agreement and Amendment No. 1 to Revolving Note, dated as of October 26th, 2017 (this "*Amendment*"), is entered into by and between Live Well Financial, Inc., a Delaware corporation ("*Borrower*"), and Flagstar Bank, FSB ("*Lender*"). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Loan Agreement (as defined below).

## RECITALS

A.    Borrower and Lender are parties to that certain Loan and Security Agreement dated as of March 29, 2017, (as amended, restated, supplemented, or otherwise modified from time to time, the "*Loan Agreement*").

B.    In connection with the Loan Agreement, Borrower executed in favor of Lender a Revolving Credit Note dated as of March 29, 2017, in the principal amount of $50,000,000.00 (as amended, restated, supplemented, or otherwise modified from time to time, the "*Revolving Note*").

C.    Borrower and Lender wish to amend the Loan Agreement and the Revolving Note as provided in this Amendment.

**THEREFORE**, in consideration of the Recitals and other valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows.

Section 1.    **Amendment to Loan Agreement**.

(a)    Section 1.1 of the Loan Agreement is amended by amending and restating, in its entirety, the following definition.

"Revolving Loan Maximum Amount" means Seventy Million and 00/100 Dollars ($70,000,000.00).

Section 2.    **Amendments to Revolving Note**. The Revolving Note is amended as follows.

(a)    The heading of the first page of the Revolving Note is amended by replacing "$50,000,000.00" with "$70,000,000.00."

(b)    The introductory paragraph on the first page of the Revolving Note is amended by deleting the phrase "the principal amount of Fifty Million and 00/100 Dollars ($50,000,000.00) (or so much of such sum as has been advanced by Lender to Borrower and is outstanding under this Note)" with the phrase "the principal amount of Seventy Million and 00/100 dollars

($70,000,000.00) (or so much of such sum as has been advanced by Lender to Borrower and is outstanding under this Note)".

Section 3.    <u>Fees and Expenses</u>.  Borrower hereby agree to pay to Lender, on demand, any and all reasonable out-of-pocket fees, costs and expenses (including reasonable fees and expenses of counsel) incurred by Lender in connection with the development, preparation and execution of this Amendment.

Section 4.    <u>Conditions Precedent</u>.  This Amendment shall become effective as of the date hereof upon (a) each party's receipt of this Amendment, executed and delivered by a duly authorized officer of each of the other parties hereto and (b) Lender's receipt of a non-refundable amendment fee of $200,000.00.

Section 5.    <u>Limited Effect</u>.  Except as expressly amended and modified by this Amendment, each of the Existing Loan Agreement and the Existing Revolving Note shall continue to be, and shall remain, in full force and effect in accordance with its respective terms.

Section 6.    <u>Counterparts</u>.  This Amendment may be executed by each of the parties hereto on any number of separate counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument.

Section 7.    <u>Severability</u>.  Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

Section 8.    <u>GOVERNING LAW</u>.  **THE AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**

[Signature Page Follows]

**IN WITNESS WHEREOF**, the parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

**LIVE WELL FINANCIAL, INC.**

By: _____
    (Signature)

Its: _____
    Michael E. Hild, Chairman and CEO

**FLAGSTAR BANK, FSB**

By: _____
    (Signature)

Its: _____
    (Printed Name and Title)

**IN WITNESS WHEREOF**, the parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

**LIVE WELL FINANCIAL, INC.**

By:_____
　　　　　　(Signature)

Its:_____
　　　　Michael E. Hild, Chairman and CEO

**FLAGSTAR BANK, FSB**

By:_____
　　　　　　(Signature)

Its:_____Kelly M. Hanrock, First Vice President_____
　　　　(Printed Name and Title)

WAIVER, AMENDMENT NO. 2 TO LOAN AND SECURITY AGREEMENT, AND
AMENDMENT NO. 2 TO REVOLVING NOTE

This **Waiver, Amendment No. 2 to Loan and Security Agreement, and Amendment No. 2 to Revolving Note** (this "***Waiver and Amendment***") is made as of February 11, 2019 by and between Live Well Financial, Inc., a Delaware corporation (the "***Borrower***") and Flagstar Bank, FSB, a federal savings bank (the "***Lender***").

## **RECITALS**

A.     The Borrower and the Lender are parties to that certain Loan and Security Agreement dated as of March 29, 2017, (as amended, restated, supplemented, or otherwise modified from time to time, the "***Loan Agreement***") under which the Lender agreed to extend credit to the Borrower as set forth therein.

B.     In connection with the Loan Agreement, the Borrower executed in favor of the Lender a Revolving Credit Note dated as of March 29, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "***Revolving Note***"), in a current maximum principal amount of $70,000,000.

C.     The Borrower has informed the Lender that it will not be in compliance with the Net Income covenant in the definition of "Financial Covenants" and Section 8.7 of the  Loan Agreement as of December 31, 2018 and has requested that the Lender waive any Default or Event of Default arising from that lack of compliance. The Lender is willing to provide such a waiver but only on the terms and conditions set forth in this Waiver and Amendment.

D.     The Borrower and the Lender wish to amend the Loan Agreement and the Revolving Note as provided in this Waiver and Amendment.

THEREFORE, in consideration of the Recitals and other valuable consideration, the receipt and sufficiency of which are acknowledged, the Borrower and the Lender agree as follows:

1.     **Amendment to Loan Agreement**.

(a)     Section 1.1 of the Loan Agreement is amended by amending and restating the definition of "Revolving Loan Maturity Date" as follows;

"Revolving Loan Maturity Date" means May 1, 2019, subject to acceleration of repayment of the Obligations pursuant to this Agreement.

(b)     Section 2.1 of the Loan Agreement is amended by adding the following at the end of that Section:

Notwithstanding the foregoing, on and after February 11, 2019, (i) no further borrowings will be permitted under the Revolving Loan and (ii) at any time the aggregate principal amount of all outstanding Revolving Loan advances then outstanding exceeds the lesser of (x) the Revolving Loan Maximum Amount and (y) the Borrowing Base, the Borrower must prepay the principal balance of the Revolving Loan in an amount equal to such excess upon demand therefor from the Lender.   In addition, the Borrower may not substitute Ginnie Mae Bond Collateral without the Lender's consent.

(c)     Section 2.2 of the Loan Agreement is amended by deleting the second sentence thereof.

(d)     Section 8.7 of the Loan Agreement is amended by adding the following sentence at the end of the Section:

Notwithstanding the foregoing, or any other provision of the Loan Agreement, the Financial Covenants will not be tested as of December 31, 2018 or March 31, 2019.

2.     **Amendment to Revolving Note**.  The Revolving Note is amended by changing the "Revolving Loan Maturity Date" to May 1, 2019.

3.     **Waiver**. The Lender waives any Default or Event of Default arising from Borrower's failure to comply with the Net Income covenant in the definition of "Financial Covenants" and Section 8.7 of the Loan Agreement as of December 31, 2018.

4.     **Effectiveness**. This Waiver and Amendment shall become effective (the "Waiver and Amendment Effective Date") upon Lender's receipt of counterparts of (a) this Waiver and Amendment, duly executed and delivered by the Borrower and the Lender and (b) a covenant waiver fee of $105,000.

5.     **Representations and Warranties**. The Borrower hereby represents and warrants that, after giving effect to this Waiver and Amendment (a) execution and delivery of this Waiver and Amendment, and the performance by the Borrower of its obligations under the Loan Agreement as amended hereby (herein, as so amended, the "Amended Loan Agreement") are within the Borrower's corporate powers, have been duly authorized, are not in contravention of applicable law or the terms of its certificate of incorporation, bylaws,  or other organizational documents of the Borrower and except as have been previously obtained do not require the consent or approval, material to the amendments contemplated in this Waiver and Amendment or the Amended Loan Agreement, of any governmental body, agency or authority, and this Waiver and Amendment and the Amended Loan Agreement, will constitute the legal, valid and binding obligations of the Borrower enforceable in accordance with their terms, except as enforcement thereof may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (whether enforcement is sought in a proceeding in equity or at law), (b) the representations and warranties set forth in the Amended Loan Agreement are true and correct on

2

and as of the date hereof, and (c) no Default or Event of Default has occurred and is continuing as of the Waiver and Amendment Effective Date.

6.      **Continuing Effect**. Except as specifically set forth above, this Waiver and Amendment shall not be deemed to amend or alter in any respect the terms and conditions of the Loan Agreement (including without limitation all financial covenants), the Note issued thereunder or any of the other Loan Documents, or to constitute a waiver or release by the Lender of any right, remedy, Default or Event of Default under or a consent to any transaction not meeting the terms and conditions of the Loan Agreement, the Note issued thereunder or any of the other Loan Documents.

7.      **Definitions**. Unless otherwise defined to the contrary herein, all capitalized terms used in this Waiver and Amendment shall have the meaning set forth in the Loan Agreement.

8.      **Counterparts**. This Waiver and Amendment may be executed in counterparts.

9.      **Choice of Law**. This Waiver and Amendment shall be governed by and construed in accordance with and governed by the laws of the State of Michigan.

**[SIGNATURES BEGIN ON FOLLOWING PAGE]**

3

WITNESS the due execution hereof as of the day and year first above written.

**LENDER:**                                                **BORROWER:**

**FLAGSTAR BANK, FSB**                          **LIVE WELL FINANCIAL, INC.**

By:_____            By:_____
    John Antonczak, Senior Vice President     Name:
                                                             Title:

[Signature Page to Waiver and Amendment (15914992)]

WITNESS the due execution hereof as of the day and year first above written.

**LENDER:**                                **BORROWER:**

**FLAGSTAR BANK, FSB**                     **LIVE WELL FINANCIAL, INC.**


By:_____              By:_____
                                          Name: Glen Haddock
Its:_____             Title: Chief Financial Officer

[Signature Page to Waiver and Amendment (15914992)]

AMENDMENT NO. 3 TO LOAN AND SECURITY AGREEMENT, AND
AMENDMENT NO. 3 TO REVOLVING NOTE

This **Amendment No. 3 to Loan and Security Agreement, and Amendment No. 3 to Revolving Note** (this "***Amendment***") is made as of April ̅, 2019 by and between Live Well Financial, Inc., a Delaware corporation (the "***Borrower***") and Flagstar Bank, FSB, a federal savings bank (the "***Lender***").

## **RECITALS**

A.     The Borrower and the Lender are parties to that certain Loan and Security Agreement dated as of March 29, 2017, (as amended, restated, supplemented, or otherwise modified from time to time, the "***Loan Agreement***") under which the Lender agreed to extend credit to the Borrower as set forth therein.

B.     In connection with the Loan Agreement, the Borrower executed in favor of the Lender a Revolving Credit Note dated as of March 29, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "***Revolving Note***"), in a current maximum principal amount of $69,094,299.87.

C.     The Borrower and the Lender wish to amend the Loan Agreement and the Revolving Note as provided in this Amendment.

THEREFORE, in consideration of the Recitals and other valuable consideration, the receipt and sufficiency of which are acknowledged, the Borrower and the Lender agree as follows:

1.     **Amendment to Loan Agreement**.

(a)     Section 1.1 of the Loan Agreement is amended by amending and restating the definition of "Revolving Loan Maturity Date" as follows;

"Revolving Loan Maturity Date" means June 1, 2020, subject to acceleration of repayment of the Obligations pursuant to this Agreement.

(b)     Section 1.1 of the Loan Agreement is further amended by amending and restating paragraphs (a) and (c) of the definition of Financial Covenants as follows:

(a)     Minimum Adjusted Tangible Net Worth. The Borrower will not permit its Adjusted Tangible Net Worth to be less than $70,000,000, tested quarterly beginning with the fiscal quarter ending on June 30, 2019.

(c)     Net Income. The Borrower will not permit its Net Income to be less than $1, tested as of the end of each June 30 (for the six-

Detroit_16040695_2

month period then ending) and December 31 (for the twelve-month period then ending) beginning June 30, 2019.

2. **Amendment to Revolving Note**. The Revolving Note is amended by changing the "Revolving Loan Maturity Date" to June 1, 2020.

3. **Effectiveness**. This Amendment shall become effective (the "Amendment No. 3 Effective Date") upon Lender's receipt of counterparts of this Amendment, duly executed and delivered by the Borrower and the Lender.

4. **Representations and Warranties**. The Borrower hereby represents and warrants that, after giving effect to this Amendment (a) execution and delivery of this Amendment, and the performance by the Borrower of its obligations under the Loan Agreement as amended hereby (herein, as so amended, the "Amended Loan Agreement") are within the Borrower's corporate powers, have been duly authorized, are not in contravention of applicable law or the terms of its certificate of incorporation, bylaws,  or other organizational documents of the Borrower and except as have been previously obtained do not require the consent or approval, material to the amendments contemplated in this Amendment or the Amended Loan Agreement, of any governmental body, agency or authority, and this Amendment and the Amended Loan Agreement, will constitute the legal, valid and binding obligations of the Borrower enforceable in accordance with their terms, except as enforcement thereof may be limited by applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (whether enforcement is sought in a proceeding in equity or at law), (b) the representations and warranties set forth in the Amended Loan Agreement are true and correct on and as of the date hereof, and (c) no Default or Event of Default has occurred and is continuing as of the Amendment No. 3 Effective Date.

5. **Continuing Effect**. Except as specifically set forth above, this Amendment shall not be deemed to amend or alter in any respect the terms and conditions of the Loan Agreement (including without limitation all financial covenants), the Note issued thereunder or any of the other Loan Documents, or to constitute a waiver or release by the Lender of any right, remedy, Default or Event of Default under or a consent to any transaction not meeting the terms and conditions of the Loan Agreement, the Note issued thereunder or any of the other Loan Documents.

6. **Definitions**. Unless otherwise defined to the contrary herein, all capitalized terms used in this Amendment shall have the meaning set forth in the Loan Agreement.

7. **Counterparts**. This Amendment may be executed in counterparts.

8. **Choice of Law**. This Amendment shall be governed by and construed in accordance with and governed by the laws of the State of Michigan.

**[SIGNATURES BEGIN ON FOLLOWING PAGE]**

2

Detroit_16040695_2

WITNESS the due execution hereof as of the day and year first above written.

**LENDER:**                                      **BORROWER:**

**FLAGSTAR BANK, FSB**                           **LIVE WELL FINANCIAL, INC.**

By: _____                   By: _____

Name: __R. Joseph Lathrop__                      Name: __Michael C. Hild__

Title: __SVP__                                   Title: __Chairmon & CEO__

[Signature Page to Amendment No. 3 (16040695)]