**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| FLAGSTAR BANK, FSB,<br>a Federally Chartered Savings Bank,<br>                                    Plaintiff,<br>v.<br>LIVE WELL FINANCIAL, INC.,<br>a Delaware corporation,<br>MICHAEL C. HILD, an individual,<br>ERIC ROHR, an individual, and<br>CHARLES DARREN STUMBERGER, an<br>individual,<br>                                    Defendants. | Case No. 19-11512<br>Hon. Matthew F. Leitman |

**DEFENDANT MICHAEL C. HILD'S MOTION FOR LEAVE TO CONDUCT ADDITIONAL DISCOVERY**

Defendant Michael C. Hild, proceeding pro se ("Defendant Hild"), respectfully moves this Court pursuant to Federal Rule of Civil Procedure 16(b)(4) for leave to conduct additional discovery outside the deadlines set forth in the Court's Scheduling Order [ECF No. 77].[1] In support of this Motion, Defendant Hild states as follows:

**I. INTRODUCTION**

Defendant Hild, previously represented by Mr. Charles Brown, was unable to complete discovery within the time limits prescribed by the Scheduling Order due to Mr. Brown's failure to conduct or follow through with meaningful discovery, followed by his withdrawal after the

---

[1] Defendant Hild has prepared and filed this document *pro se* but it is written in third person for the sake of clarity when reading. Defendant Hild is not an attorney. Defendant Hild does not waive the right to maintain the confidential treatment of his attorney-client privileged communications.

discovery period closed. Mr. Brown led Defendant Hild to believe that discovery was actively proceeding, only for Defendant Hild to discover upon belated receipt of the case file months later—and after nearly half a year of withholding following a formal written request—that essentially no discovery had occurred in this case.

It bears repeating that Mr. Brown informed Defendant Hild verbally and in writing (see email already supplied to this Court as part of Defendant Hild's Response to Mr. Brown's Motion to Withdraw as ECF No. 144 Exhibit B subexhibit D) that his personal eldercare responsibilities, including the death of his father and the resultant care for his recently widowed mother, prevented Mr. Brown from working diligently on the case, but this was only conveyed to Defendant Hild after discovery closed. This communication is again repeated here for the Court's ease of reference:

*"I have had a number of recent personal issues from my recently widowed mother having a kitchen fire (with me being the only sibling that is local to having to take my to the ER two weekends ago to more recently breaking a bone in foot (with multiple doctor visits including this morning) that have led to conclude that it would be best for you to obtain new counsel. None of those issues would be overwhelming in themselves but combined have been rather overwhelming and with trying to keep up with everything during that period has been a bit too much."*

Despite Mr. Brown's rationalizations articulated at the recent hearing for his lack of action in performing discovery—which Defendant Hild respectfully submits are inconsistent with prior communications and were likely influenced by Mr. Brown's concerns over potential litigation from Defendant Hild pertaining to Mr. Brown's negligence (as evidenced by Mr. Brown's already referenced correspondence and requests of Defendant Hild to supply questions to ask of several witnesses in preparation for depositions, to which Defendant Hild supplied to Mr. Brown in a timely manner in October and November of 2023, but for which said depositions

inexplicably never occurred [again please see ECF No. 144 Exhibit B, subexhibit E])—good cause exists to reopen discovery.[2]

Mr. Brown's claim at the September 26, 2025 hearing attempting to rationalize his lack of discovery is as follows:

*"I mean, there were concerns about Mr. Hild's participation in civil litigation prejudicing his appeal rights and, particularly if he was successful in appeal, a new trial and what would, you know, come from that. I – candidly, Your Honor, I don't have a whole lot of experience in representing people that are in Mr. Hild's procedural posture – or the procedural posture at that time. I can't think of another case where, you know, there was a huge concern about the pending criminal matter or still ongoing criminal matter. You know – potentially, you know, we could have taken, you know, 50 depositions. I would not have taken 50 depositions in this case. We did take the deposition of a Flagstar representative."*

Taking discovery from third parties would not have adversely affected Defendant Hild's criminal case. To the contrary, it would have helped, as Defendant Hild was denied access to key evidence in violation of *Brady* in the criminal case, further exacerbated by the conflict of Defendant Hild's former counsel, Mr. Benjamin Dusing, who has been jailed twice and suspended from practicing law for his actions as outlined in Mr. Hild's bar complaints (and others). Defendant Hild has been diligently seeking the truth from witnesses and stakeholders despite years of challenges in this case, the companion Delaware case, and the related criminal case, since they all involve similar allegations pertaining to "fraud" and duties to disclose.

Despite Defendant Hild wanting the depositions to occur, Mr. Brown did not hold depositions from any of the key third party witnesses: not Mr. Stumberger, not Live Well's accountants/auditors (Matt McDonald of Keiter), not Mr. Foster (the person at Live Well who

---

[2] Depositions that Mr. Brown was to hold, never occurred in this case or the companion case in Delaware Bankruptcy Court, even for the witnesses upon whom Mr. Brown served subpoenas, and for those Defendant Hild was requested to supply questions (and Defendant Hild in turn supplied to Mr. Brown in October and November of 2023).

was creating the bond valuations IDC requested), not IDC (the third party pricing service), not Bloomberg, not Mr. Haddock, not Mr. Kirk Evans, not Mr. Hild's former attorneys upon whom he relied for counsel (William Donnelly, Tom McGonigle, and Kevin Muldowney), and not the Securities and Exchange Commission. Mr. Brown conducted almost no discovery whatsoever.

Making matters worse, the deposition of Mr. Marsh of Flagstar Bank was of limited utility, as Mr. Marsh claimed lack of knowledge on key questions, stating that the executives of Flagstar Bank held the relevant information, not Mr. Marsh.

Given this, Mr. Brown's after-the-fact rationalizations are inconsistent with his earlier communications to Defendant Hild about pursuing discovery (production and depositions) which never occurred, and regarding his conflicting eldercare responsibilities.

This Motion is made in good faith, demonstrates Defendant Hild's diligence since proceeding *pro se*, and will cause no undue prejudice to Plaintiff. Granting this relief is necessary to ensure a fair adjudication on the merits and to prevent prejudice to Defendant Hild resulting from his former counsel's limitations. Otherwise, this case risks being resolved without consideration of the evidence necessary for Defendant Hild's defense, which would result in a sham trial.

## II. STATEMENT OF FACTS

1. This action was filed on May 22, 2019, with a second amended and restated complaint filed November 14, 2019 alleging breach of contract, fraud, and related claims arising from mortgage-backed securities transactions.

2. Defendant Hild was initially represented by Charles Brown, Esq., who entered an appearance on or about June 13, 2023.

3. Mr. Brown communicated to Defendant Hild that discovery was commencing immediately, with ongoing communication thereafter. By way of example, a copy of the email communication from June 23, 2023 from Mr. Brown is provided as **Attachment A**, outlining an initial set of subpoenas to be issued to various financial institutions involved in the matter, along with research. However, it appears that none of these subpoenas were actually issued by Mr. Brown in this case.

4. The Court issued a Scheduling Order on August 1, 2023 [ECF No. 77], setting a discovery deadline and other pretrial deadlines.

5. According to the recently supplied discovery inventory spreadsheet, immediately following the issuance of the Scheduling Order on August 1, 2023, Mr. Brown apparently issued numerous subpoenas, but for only a subset of the witnesses to be subpoenaed in this case in a flurry of activity, but inexplicably only in the companion Delaware case in Bankruptcy Court, not in this Michigan case (e.g., Customers Bank, ICE Data Pricing, Industrial and Commercial Bank, and Mirae Asset Securities all on 8/3/23, and Flagstar Bank on 8/4/23).

6. Mr. Brown continued issuing subpoenas (with little to no follow through), but inexplicably only in the companion Delaware case in Bankruptcy Court, not in this Michigan case (e.g., Bloomberg on 12/15/23, William Donnelly 1/17/24, Baird on 8/19/24, the SEC on 12/8/24, and Dan Foster on 5/9/24).

7. During the discovery period, Mr. Brown repeatedly assured Defendant Hild that discovery was being conducted, including requests of Defendant Hild to supply questions to ask of several witnesses in preparation for depositions, to which Defendant Hild supplied to Mr.

Brown in a timely manner in October and November of 2023, but for which said depositions inexplicably never occurred (again please see ECF No. 144 Exhibit B, subexhibit E).

8. In a written communication dated October 7, 2024 [previously supplied to this Court in Response to Mr. Brown's Motion to Withdraw as ECF No. 144 Exhibit B subexhibit D], Mr. Brown informed Defendant Hild that his personal eldercare responsibilities had prevented him from working on the case, but this disclosure came only after discovery had already closed. In a follow up communication Mr. Brown attempted to allay Mr. Hild's concerns, stating that he was still pursuing discovery, but that did not occur (see below).

9. Suspecting that there were problems with the lack of discovery conducted in this case, Defendant Hild promptly requested the case file from Mr. Brown, specifically in the form of the discovery inventory spreadsheet with links to pertinent discovery production on May 12, 2025. However, Mr. Brown withheld the discovery spreadsheet and files for almost half a year, providing them only one and a half business days before the September 26, 2025 hearing, keeping Defendant Hild in the dark as to the lack of discovery conducted.

10. After the discovery deadline passed, Mr. Brown filed a Motion to Withdraw on September 8, 2025 [ECF No. 142], citing conflicts that rendered continued representation impossible. The Court granted the Motion on September 29, 2025 [ECF No. 146], leaving Defendant Hild without counsel.

11. Review of the file revealed that almost no requests for production or depositions had been served on Defendant Hild's behalf during the discovery period, with the exceptions of depositions of Mr. Robert Marsh and Mr. Chris Bowman, contrary to Mr. Brown's representations to Defendant Hild.[3]

---

[3] In fact, it appears according to Mr. Brown having completed the discovery inventory spreadsheet that Mr. Brown has only issued a subpoena to Flagstar Bank in the companion Delaware case, but for which no production

12. Mr. Brown has since offered rationalizations for the lack of discovery at the September 26, 2025 hearing which conflict with Mr. Brown's communications with Defendant Hild regarding his conflicting eldercare responsibilities, and his communications regarding his pursuit of production and depositions.

13. Defendant Hild is unable to obtain new counsel due to the case's complexity and financial constraints. Defendant Hild now proceeds *pro se* and seeks an extension—specifically, a 180-day period—to serve targeted requests for production and conduct depositions on Plaintiff, co-Defendants, and essential third parties regarding key issues, including the valuation of securities, communications between parties, and financial records supporting the claims. Based on historical experience, certain witnesses and document holders (e.g., Dan Foster, the Securities and Exchange Commission, Bloomberg, the Southern District of New York, Baird, etc.) may employ evasion tactics as demonstrated in prior proceedings [see ECF No. 144 Exhibits B, D, E1-E6, F]. Such parties may not cooperate without compulsion, necessitating the 180-day period. Even 180 days may require a potential extension if delays occur through avoidance, motion practice, or hearings, as seen in the companion Delaware case.

14. Defendant Hild notified Plaintiff of this intent via email dated October 7, 2025, and conferred in good faith pursuant to Local Rule 7.1(a), but no agreement was reached. A copy of the email correspondence is included as **Attachment B**.

## III. LEGAL ARGUMENT

---

whatsoever has been supplied to Defendant Hild as part of the discovery inventory spreadsheet or associated case files. If production has been supplied to Mr. Brown from Flagstar Bank, it has not been supplied to Defendant Hild as part of the discovery inventory spreadsheet and associated case files. Defendant Hild has reached out to Mr. Brown for clarification, including any case files that he mistakenly failed to supply (if any), but have received no response.

Under Federal Rule of Civil Procedure 16(b)(4), a scheduling order "may be modified only for good cause and with the judge's consent." The Sixth Circuit interprets "good cause" primarily through the lens of the moving party's diligence in attempting to comply with the order, while also considering potential prejudice to the opposing party. Leary v. Daeschner, 349 F.3d 888, 906 (6th Cir. 2003) ("[T]he primary measure of Rule 16's 'good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements."). Additional factors include when the movant learned of the need for discovery, how it would affect the case, the length of the original discovery period, whether the movant was dilatory, and the opponent's responsiveness. Marie v. Am. Red Cross, 771 F.3d 344, 366 (6th Cir. 2014) (citing Inge v. Rock Fin. Corp., 281 F.3d 613, 625 (6th Cir. 2002)). The "overarching inquiry" remains diligence. Courts also weigh prejudice, ensuring modifications promote fairness without undue burden. In re Nat'l Prescription Opiate Litig., 956 F.3d 838, 844-45 (6th Cir. 2020).

Here, good cause exists, as supported by the following precedent, particularly from the Eastern District of Michigan and Sixth Circuit, addressing situations involving attorney withdrawal, limitations in representation, withholding of information, and *pro se* litigants. Defendant Hild was diligent in relying on counsel's assurances and acted promptly upon discovering the issues, distinguishing this from cases where negligence is solely attributable to the party.

1. **Attorney Limitations or Misconduct as Good Cause Where Client is Not at Fault**: Defendant Hild's inability to complete discovery stems from Mr. Brown's negligence, misleading representations, and post-closure disclosure of personal eldercare conflicts, not any lack of diligence by Defendant Hild himself. The Sixth Circuit recognizes that attorney failures, such as neglect or abandonment, can constitute good cause or excusable neglect

8

warranting relief, especially when the client was misled and acts diligently upon discovery of the issue. See Yeschick v. Mineta, 675 F.3d 622, 629-30 (6th Cir. 2012) (applying excusable neglect under Rule 60(b)(1) and extraordinary circumstances under Rule 60(b)(6) to attorney abandonment; factors include fault, prejudice, and good faith; principles extend to Rule 16 modifications via similar equitable considerations). See also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993) (excusable neglect encompasses attorney negligence if not egregious, considering danger of prejudice and reason for delay; adopted in Sixth Circuit). In this district, where counsel's inaction prejudices a client without fault, extensions are granted to avoid injustice. See Century Prod., Inc. v. S. Home Designs, Inc., No. 10-12251, 2011 WL 4404062, at *3 (E.D. Mich. Sept. 22, 2011) (granting discovery extension post-withdrawal, noting denial would prejudice the unprepared party without benefiting opponent). Here, Mr. Brown's withholding of files for nearly half a year exacerbates the issue, satisfying Marie's factors. Unlike cases where attorney negligence alone bars relief due to lack of party diligence (e.g., In re Nat'l Prescription Opiate Litig., 956 F.3d at 843-44), Defendant Hild was misled and demonstrated personal diligence by promptly requesting files and filing this motion.

2. **Unanticipated Attorney Withdrawal, Delayed Disclosure, and Client Diligence Post-Withdrawal**: The withdrawal after discovery closed, coupled with the delayed disclosure of conflicts and file withholding, justifies reopening. The Sixth Circuit emphasizes context, including unforeseen disruptions like withdrawal and attorney-imposed delays. Rodriguez v. Hirshberg Acceptance Corp., 62 F.4th 270, 281 (6th Cir. 2023) (extensions under Rule 16(b)(4) assess full context, including external factors affecting compliance). In Leary, the court permitted modification where the movant acted promptly post-issue. 349 F.3d at 907-

08. Eastern District cases similarly grant relief post-withdrawal for pro se parties showing diligence. See Andre v. Bodi, No. 13-251, 2014 WL 1320320, at *2 (E.D. Mich. Apr. 2, 2014) (finding good cause for extension after withdrawal where no prejudice and movant diligent in seeking relief). Defendant Hild acted promptly upon receiving the file on September 15, 2025, filing this Motion within weeks (as directed by and in full compliance with this Court's instructions), and identifying targeted discovery needs.

3. *Pro Se* **Status and Equitable Considerations**: While *pro se* status does not automatically excuse non-compliance, Jourdan v. Jabe, 951 F.2d 108, 110 (6th Cir. 1991), courts afford reasonable accommodations post-withdrawal, holding *pro se* filings to less stringent standards. Haines v. Kerner, 404 U.S. 519, 520 (1972). In Fuller v. Quire, 916 F.2d 358, 360 (6th Cir. 1990), the court implied excusable neglect could apply where a party's neglect was not willful. Here, Defendant Hild's *pro se* efforts satisfy diligence under Marie's factors: he learned of the issue post-withholding, additional discovery would allow merits-based defenses, the original period was not underutilized due to counsel's failures, Defendant Hild was not personally dilatory, and little to no discovery occurred as a result).

4. **No Prejudice to Plaintiff**: Severe Prejudice to Defendant Hild if Denied: An extension causes no undue prejudice, as the case is not at summary judgment or trial, and discovery can be narrowly tailored to essential issues. Leary, 349 F.3d at 909 (prejudice considered only after diligence shown). Denying relief would severely prejudice Defendant Hild by foreclosing evidence, potentially leading to adverse rulings. In re Nat'l Prescription Opiate Litig., 956 F.3d at 845 (modifications promote fairness). Courts have granted extensions to avoid case-dispositive outcomes even in close calls, prioritizing justice over strict adherence

where diligence is shown (see, e.g., Ikona v. AHC of Overland Park, LLC, 2022 WL 4245478, at *7-8 (D. Kan. Sept. 15, 2022)).

5. **Compliance with Local Rules**: This Motion complies with E.D. Mich. LR 7.1(a) (meet-and-confer) and LR 83.25(c) (post-withdrawal obligations).

## IV. CONCLUSION

For the foregoing reasons, Defendant Hild respectfully requests that the Court grant this Motion and allow a 180-day extension to conduct additional discovery, including the retrieval of documents and depositions from the following essential parties, each of whom possesses unique information central to defending against the allegations in Counts II-VI of the complaint:[4]

- Mr. Darren Stumberger: Codefendant with documents and information related to all allegations; essential for valuation disputes.

- Mr. Glen Haddock: Former CFO of Live Well, referenced in the complaint, with documents and information related to all counts. Defendant Hild seeks to address inconsistencies in prior testimony.[5]

---

[4] Flagstar Bank refers to criminal activity and continuously mentions and relies upon the testimony and outcome of the criminal case in this case. As one of numerous examples, in Count V of the complaint Flagstar Bank alleges "*Hild, Stumberger, and Rohr acted in concert to accomplish a criminal or unlawful purpose or to accomplish a lawful purpose by criminal or unlawful means. Namely, defendants acted in concert to defraud Flagstar*"). However, these same allegations went unaddressed by Mr. Hild's former, and now suspended, criminal attorney Mr. Ben Dusing. Mr. Dusing did not enter a single piece of evidence during Mr. Hild's direct testimony, did not subpoena witnesses, did not call key witnesses, and missed important disclosure deadlines for notifying opposing counsel of the intention to rely on the advice of counsel defense, essentially rendering the trial as a sham.

[5] Mr. Haddock testified untruthfully in the companion criminal case, (upon which Flagstar Bank relies and refers to continuously in filings in this case, see Footnote 4). Defendant Hild must ask Mr. Haddock about the evidence which has already been provided in this case in Response to Mr. Brown's Motion to Withdraw [ECF No. 144 Exhibit E1, E4, E5].

- Mr. Dan Foster: Developer of bond valuations at Live Well, source of conflicting quotes to Bloomberg.[6]

- Mr. Kirk Evans: Live Well employee and interface with Flagstar Bank and Mr. Rohr; testimony expected to contradict Mr. Rohr's prior testimony.[7]

- Matt McDonald (and Keiter): Audit principal for Live Well; testimony to address Mr. Rohr's prior testimony and audited financials, essential for valuation disputes.[8]

- Mr. Chris Krupa (and IDC/ICE): Developer of IDC bond valuations; point of contact with the Securities and Exchange Commission ("SEC"); essential for valuation disputes.[9]

---

[6] Mr. Foster is in possession of documents and information that must be obtained in document production and via deposition related to the allegations in the complaint. It has recently been discovered that Mr. Foster was the source of the conflicting bond quotes which were supplied to Bloomberg, and upon which Bloomberg relied when producing valuations for Live Well's bonds, which in turn were i) used to place Live Well into default with Flagstar Bank, ii) then place Live Well into bankruptcy, iii) used to "evidence" the alleged inflated IDC valuation in the criminal trial which led to conviction (upon which Flagstar Bank relies and refers to continuously in filings in this case, see Footnote 4). Defendant Hild must ask Mr. Foster about the evidence which includes evidence already provided in this case in Response to Mr. Brown's Motion to Withdraw [ECF No. 144 Exhibit B, D, E1-E6, F, G].

[7] Mr. Evans will be able to supply testimony that Defendant Hild believes will contradict Mr. Rohr's evasive and misleading testimony in more recent sworn civil depositions and on the stand in the criminal case which led to conviction (upon which Flagstar Bank relies and refers to continuously in filings in this case, see Footnote 4). Defendant Hild must ask Mr. Evans about the veracity of Mr. Rohr's testimony and present evidence which will show that Mr. Rohr intentionally attempted to cause Live Well to be torpedoed (with Mr. Evans unwittingly performing key actions at Mr. Rohr's direction) and forced into default with Flagstar, and placed into bankruptcy, in hopes for leniency by the Securities and Exchange Commission.

[8] Mr. McDonald will be able to supply testimony (consistent with interviews in the criminal case) that contradict Mr. Rohr's evasive and misleading testimony in more recent sworn civil depositions and on the stand in the criminal case which led to conviction (upon which Flagstar Bank relies and refers to continuously in filings in this case, see Footnote 4). Defendant Hild must ask Mr. McDonald about the veracity of Mr. Rohr's testimony and present evidence which will show Mr. Rohr intentionally attempted to cause Live Well to be torpedoed and forced into default with Flagstar Bank and placed into bankruptcy, in exchange for leniency by the Securities and Exchange Commission.

[9] Mr. Krupa was the primary individual who developed, posted, and supplied bond valuations at IDC which Flagstar alleges to be inflated. IDC and Mr. Krupa are in possession of documents and information that must be obtained in document production and via deposition related to the allegations in the complaint. It has recently been discovered that Mr. Krupa was the point of contact with the Securities and Exchange Commission, who under its influence and control and under false pretenses, ceased publishing bond valuations in order for the conflicting Bloomberg quotes (relying upon Mr. Foster) to be relied upon, which in turn were used to i) place Live Well into default with Flagstar Bank, ii) then place Live Well into bankruptcy, iii) and to "evidence" the alleged inflated IDC valuation in the criminal trial which led to conviction (upon which Flagstar Bank relies and refers to continuously in filings in this case, see Footnote 4). Defendant Hild must ask Mr. Foster about the evidence which has already been provided in this case in Response to Mr. Brown's Motion to Withdraw [ECF No. 144 Exhibit B, E4-5].

- SEC and its Staff (Greg Smolar, Reid Muoio, Jeffrey Leisure, Jay Clayton): Alleged orchestrators of events leading to default and bankruptcy; documents and testimony on communications and pressures exerted; essential for valuation disputes.[10]

- Dani James: Former counsel to Mr. Foster; acted as a proxy for Mr. Foster in SEC meetings; essential for valuation disputes.[11]

- Wedbush Securities and its Staff (Scott Skyrym, Jim Kearney, David Weaver), Industrial and Commercial Bank of China, Mirae Asset Securities, Mizuho Bank, Customers Bank: Involved in bond trades and repo agreements central to the case, including movement of bonds between counterparties, including Flagstar Bank; communications with SEC.[12]

---

[10] The SEC and its Staff (Greg Smolar, Reid Muoio, Jeffrey Leisure and Jay Clayton (former head of SEC and now head of SDNY) were the individuals who orchestrated the torpedoing of Live Well by i) pressuring/encouraging Mr. Stumberger to resign,  ii) pressuring/encouraging Mr. Rohr to resign, and prior to leaving the company, secretly directing his staff (without Board or CEO knowledge or approval) to surreptitiously change the repo tracking settings in the federal banking system for the company's bond portfolio causing the company's monthly bond coupon cash to be sent to the lenders rather than the US Bank securities control account, so Live Well would be deprived of access (in violation of its lending agreements) in order starve Live Well of cash and send it spiraling into default with Flagstar Bank, iii) pressuring/encouraging Mr. Foster, (including through/via his counsel Dani James) to set Bloomberg up with conflicting HECM IO bond valuations, and iv) pressuring/encouraging IDC to stop posting Live Well's bond valuations (which Flagstar Bank alleges to be inflated). The SEC and its Staff are in possession of documents and information that must be obtained in document production and via depositions related to the allegations in the complaint. It has recently been discovered that the aforementioned individuals were used by the Securities and Exchange Commission Actors in order to place i) Live Well into default with Flagstar Bank, ii) then place Live Well into bankruptcy, iii) and to "evidence" the alleged inflated IDC valuations in the criminal trial which led to conviction (upon which Flagstar Bank relies and refers to continuously in filings in this case, see Footnote 4). Defendant Hild must ask the Securities and Exchange Commission Actors about this evidence, including that which has already been provided in this case in Response to Mr. Brown's Motion to Withdraw [ECF No. 144 Exhibit B, D, Exhibit E1-E6, F].

[11] Dani James, former counsel to Mr. Foster, is in possession of documents and information that must be obtained in document production and via deposition related to the allegations in the complaint. Defendant Hild must ask Ms. James about the evidence which has already been provided in this case in Response to Mr. Brown's Motion to Withdraw [ECF No. 144 Exhibit E1-E6]. Per these documents Ms. James acted as a proxy for Mr. Foster in many of the meetings with the Securities and Exchange Commission without Mr. Foster present (see Footnote 4).

[12] Wedbush Securities (Scott Skyrym, Jim Kearney, and David Weaver), Industrial and Commercial Bank, Mirae Asset Securities, Mizuho Bank and Customers Bank as listed in **Attachment A**, but for which Mr. Brown never followed through and actually issued subpoenas in this case. Bond trades via the Repo and lending agreements between Live Well, Flagstar Bank and these financial institutions, and at the bond valuations therein, are at the very heart of this case. Without this information, including communications/directives from the SEC with these parties (which have been hidden until recently and which the Bankruptcy Trustee has alleged in companion litigation precipitated the movement of bonds between trading partners/lenders, including Flagstar Bank, ultimately leading to default with Flagstar Bank, but was originally instigated by secret communications/actions of the SEC with the Repo Parties/Lenders starting in early 2017, perhaps even as far back as the 4th quarter of 2016).

- Flagstar Bank and its executive management (Jim Ciroli CFO, Alessandro DiNello CEO, Toby Thomas CIO, Lee Smith COO): Holders of key decision-making information per Mr. Marsh's deposition (which Mr. Marsh testified he did not possess).[13]

- Helios Strategic Advisors LLC (Oliver Dupiton, Tol Ho): Alleged supplier of bond quotes to Bloomberg; to verify lack of evidence produced; essential for valuation disputes.[14]

- Bloomberg's Lawrence "Larry" Mattera Jr.: Corresponded with Mr. Foster on valuations; essential for conflicting BVAL postings.[15]

- David Carickhoff, Live Well Trustee: Possesses emails, chat messages, and corporate documents of key individuals.[16]

---

[13] Flagstar Bank and its Executive Management (Jim Caroli CFO, Alessandro DiNello CEO, Toby Thomas CIO, and Lee Smith COO) are in possession of direct information/knowledge that Mr. Marsh did not have as he stated in his sworn deposition testimony in reply to Mr. Brown's questions: i) "*Q. Okay.  Who ultimately made the decision to run the Article 9 sale and to sell the Live Well bonds? "It would have been the CEO, the CFO, the COO. So Jim Ciroli was our CFO. Alessandro DiNello, CEO. Lee Smith, COO.";* ii) *"Q. Do you know who at Flagstar reviewed the proposed trade tickets when the bonds were sold? A. It would be Toby Thomas. Q. And what's their title? A. Chief investment officer."* These decisions made by Flagstar Bank and its Executive Management caused the losses in question which directly impacted all counts in the case.

[14] Helios Strategic Advisors LLC (Mr. Oliver Dupiton & Mr. Tol Ho) is in possession of documents and information that must be obtained in document production and via deposition related to the allegations in the complaint. According to Bloomberg's counsel, Helios was allegedly a supplier of bond quotes to Bloomberg on HECM IO bonds, yet Bloomberg failed to produce any evidence in its production to Defendant Hild of Helios having produced broker quotes; only evidence of Mr. Dan Foster was supplied by Bloomberg, thereby contradicting Bloomberg's story, as conveyed by its counsel.

[15] Bloomberg's Lawrence "Larry" Mattera Jr. is in possession of documents and information that must be obtained in document production and via deposition related to the allegations in the complaint. Mr. Mattera is the individual at Bloomberg who corresponded with Mr. Dan Foster and accepted/used Mr. Foster's broker quotes in posting conflicting valuations at approximately half the value of IDC's valuations in Bloomberg's BVAL system, which in turn were used in order to place i) Live Well into default with Flagstar Bank, ii) then place Live Well into bankruptcy, iii) and then were used to "evidence" the alleged inflated IDC valuations in the criminal trial which led to conviction (upon which Flagstar Bank relies and refers to continuously in filings in this case, see Footnote 4). Defendant Hild must ask Mr. Mattera about this evidence, including some of which has already been provided in this case in Response to Mr. Brown's Motion to Withdraw [ECF No. 144 Exhibit B and Exhibit E1-E6].

[16] David Carickhoff, Live Well Trustee, is in possession of documents and information that must be obtained in document production and via deposition related to the allegations in the complaint. All of Defendant Hild's, Mr. Stumberger's, Mr. Haddock's, Mr. Foster's, Mr. Evans' and Mr. Rohr's emails, Bloomberg chat messages, and corporate documents are in Mr. Carickhoff's possession. Defendant Hild cannot defend this case without access to these communications.

- William Donnelly, Tom McGonigle, Kevin Muldowney: Former counsel to Defendant Hild; advice relied upon for actions alleged in the complaint, and is also essential for valuation disputes.[17]

- Xavier Donaldson: Former counsel to Mr. Stumberger; recipient of alleged threats from the Southern District of New York ("SDNY").[18]

- SDNY and its staff: Documents and testimony pertaining to all Counts (which parrot the allegations in the criminal case), as well as communications and alleged threats related to Mr. Stumberger's plea.[19]

If discovery from the above leads to identification of additional essential witnesses or document holders, Defendant Hild respectfully requests the right to seek further leave upon showing good cause.

---

[17] William Donnelly and Tom McGonigle, and Kevin Muldowney, Defendant Hild's former counselors, are in possession of documents and information that must be obtained in document production and via deposition related to the allegations in the complaint. Mr. Hild relied on counsel for the action, or lack thereof, which Flagstar Bank alleges in its complaint and which were used to "evidence" the alleged fraud in the criminal trial which led to conviction (upon which Flagstar Bank relies and refers to continuously in filings in this case, see Footnote 4).

[18] Xavier Donaldson, former counsel to Mr. Stumberger (a codefendant in the case) is in possession of documents and information that must be obtained in document production and via deposition specifically as it pertains to Mr. Stumberger's claim that Mr. Donaldson is the person to whom the SDNY has communicated threats related to participating in the defense of this case as it pertains to Mr. Stumberger's apparently coerced/cajoled guilty plea and corresponding admission to commit fraud, which has now been controverted with conflicting statements by Mr. Stumberger related to communications made in this case as has already been supplied to this Court in Response to Mr. Brown's Motion to Withdraw [ECF No. 144 Exhibit B], DEFENDANT STUMBERGER'S STATEMENT REGARDING THREATS AND INABILITY TO FULLY DEFEND filed on October 7, 2025 [ECF 148] and the September 26, 2025 hearing transcript [ECF 147].

[19] SDNY and its staff is in possession of documents and information that must be obtained in document production and via deposition related to the allegations in the complaint, and also more recently pertaining to the communications which Mr. Stumberger has cited from the SDNY at the September 26th, 2025 hearing who threatened him via his former attorney, Xavier Donaldson, related to participating in the defense of this case as it pertains to Mr. Stumberger's apparently coerced/cajoled guilty plea, and corresponding admission to allegedly commit "fraud" which has now been controverted with conflicting statements by Mr. Stumberger related to communications and statements made in this case, and has already been supplied to this Court in Response to Mr. Brown's Motion to Withdraw [ECF No. 144 Exhibit B], DEFENDANT STUMBERGER'S STATEMENT REGARDING THREATS AND INABILITY TO FULLY DEFEND filed on October 7, 2025 [ECF 148] and the September 26, 2025 hearing transcript [ECF 147].

A proposed order is attached hereto as **Attachment C.** Defendant Hild is available for a hearing if deemed necessary.

Respectfully submitted,

Michael C. Hild

Pro Se Defendant

2302 E Marshall Street

Richmond, VA 23223

804.306.4314

Date: October 10, 2025

# CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2025, a true copy of the foregoing was served via email to Mr. Joseph Shannon and Mr. Darren Stumberger and via the Court's pro se upload system.

Michael C. Hild

Pro Se Defendant

2302 E Marshall Street

Richmond, VA 23223

804.306.4314

Date: October 10, 2025