**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

FLAGSTAR BANK, FSB,
Plaintiff,

v.                                                          Case No. 19-cv-11512

MICHAEL C. HILD, et al.,                                    Hon. Matthew F. Leitman
Defendants.

---

**DEFENDANT MICHAEL C. HILD'S RENEWED MOTION TO REOPEN LIMITED DISCOVERY PURSUANT TO RULE 16(b)(4) AND FOR RELATED RELIEF UNDER RULE 56(d)**

---

Defendant Michael C. Hild, pro se, respectfully moves for limited reopening of discovery. This renewed motion is filed in response to the Court's April 27, 2026 ruling denying prior relief without prejudice and expressly permitting a renewed motion addressing the standards identified by the Court.

This renewed motion rests not solely on prior counsel's discovery failures, but independently on newly surfaced evidence materially bearing on liability, causation, valuation, and defense theories central to this action.

## I. INTRODUCTION

This motion is narrower and differently grounded than Defendant's prior motion.

Consistent with the Court's guidance, Defendant prioritizes discovery in two phases and relies principally on newly surfaced evidence unavailable during the original discovery period.

Two developments independently warrant targeted reopening:

1

The first development was previously identified in ECF No. 144, ¶ 14, where Defendant submitted the related Delaware Companion Case filings collectively as Exhibit E, subdivided as Exhibits E1–E6.

First, that newly surfaced pricing-related evidence, previously presented in Exhibit E to ECF No. 144, materially bears on whether the bond valuations alleged to have been "inflated" were themselves distorted through later collusive pricing conduct. These developments bear directly on causation, falsity, damages, and impeachment.

Second, newly surfaced tax-concealment evidence reflected in **Exhibits A and B**—including sworn testimony and related materials concerning longstanding undisclosed tax liabilities, Eric Rohr's knowledge of those issues, and later-discovered evidence creating a material inconsistency between Rohr's sworn nondisclosure and tax-treatment change documentation purportedly presented for Defendant's signature immediately following Rohr's departure— materially bears not only on concealment and witness credibility, but also on causation. As reflected in **Exhibits A and B**, this evidence supports a defense theory that liquidity-management decisions, including repo-tracking conduct associated with cash starvation, operated in connection with concealment of the tax issue, and that implementation of the later tax-treatment change triggered an immediate payable tax obligation that bears on the asserted causes of insolvency later attributed principally to bond pricing.

## II. GOOD CAUSE EXISTS UNDER RULE 16(b)(4)

Defendant satisfies diligence under *Leary* and the five-factor framework identified by the Court in *Benkowski*.

The factors favor reopening:

**(1) When Defendant learned of the issue.**

 Defendant acted promptly after learning the extent of prior counsel's discovery failures and again promptly after newer evidence surfaced, as reflected in ECF No. 144 and **Exhibits A–C**.

**(2) How the requested discovery would affect the ruling.**

 The requested discovery bears directly on causation, valuation, falsity, damages, impeachment, and defenses central to liability issues in this case, including whether insolvency and damages attributed principally to valuation events were also affected by concealed tax liabilities and related liquidity-management conduct.

**(3) Length of the discovery period previously available.**

 Although discovery formally existed, Defendant has shown substantial gaps in meaningful merits discovery, compounded by later-surfacing evidence unavailable during that period.

**(4) Whether Defendant was diligent.**

 For reasons reflected in ECF No. 144 and **Exhibits A–C**, Defendant acted diligently both in seeking relief and in bringing newly surfaced evidence to the Court.

**(5) Whether the request is specific rather than a fishing expedition.**

 This renewed motion prioritizes phased discovery directed to specifically identified witnesses and subjects, precisely to address the Court's concern regarding scope.

Moreover, prior counsel's conduct, as reflected in ECF No. 144, materially differs from ordinary attorney neglect because Defendant's showing concerns alleged abandonment and affirmative misrepresentations regarding discovery, not mere missed deadlines or tactical error.

3

Even assuming attorney abandonment alone were insufficient, however, this renewed motion rests independently on evidence that surfaced only after discovery closed.

This materially distinguishes the cases cited by the Court (*Baber, Garrison,* and *Blume*), which addressed attorney neglect without supervening newly surfaced evidence materially affecting the merits.

## III. ALTERNATIVELY, TARGETED RELIEF IS WARRANTED UNDER RULE 56(d)

To the extent additional witness-by-witness subject matter descriptions were previously set forth in Defendant's prior motion and reply, Defendant incorporates those descriptions only insofar as consistent with the narrowed phased discovery sought here.

Even if the Court concludes broader reopening under Rule 16(b)(4) is unwarranted, limited targeted discovery is independently appropriate under Rule 56(d).

Defendant does not seek a wholesale restart of ordinary discovery. Consistent with the Court's guidance, Defendant seeks prioritized and phased discovery directed to newly surfaced evidence likely to bear directly on disputed issues of liability, causation, valuation, and defenses.

That discovery falls into two independent but related evidentiary categories.

### A. Pricing / Valuation Discovery (Tier One)

Newly surfaced evidence previously identified in ECF No. 144, including related federal litigation materials submitted therewith as Exhibit E (E1–E6), supports limited discovery directed to pricing conduct and valuation evidence bearing directly on Defendant's defenses and Plaintiff's claims.

The witness categories identified below incorporate, by reference, the more particularized descriptions of document discovery, deposition subjects, and defense relevance previously set forth in Defendant's Motion for Leave to Conduct Additional Discovery (ECF No. 149) and Defendant's Reply, except as reprioritized herein and supplemented by **Exhibits A–B**.

Priority Tier One discovery targets in this category are:

1. Dan Foster;

2. Christopher Krupa and IDC/ICE;

3. Lawrence Mattera and Bloomberg;

4. Glen Haddock;

5. Darren Stumberger;

6. Securities and Exchange Commission personnel, including Greg Smolar, Reid Muoio, Jeffrey Leisure, and Jay Clayton.

Discovery sought as to the foregoing witnesses and entities includes narrowly tailored document discovery and depositions concerning, as applicable: pricing inputs and quote submissions; IDC/ICE and Bloomberg valuation methodologies; communications concerning valuation sourcing, regulatory inquiries, and SEC interactions; custodial and collateral valuation communications; and testimony bearing on causation, impeachment, and asserted inflation theories.

This discovery bears directly on valuation methodology, alleged inflation, causation, and impeachment concerning prior testimony.

**B. Tax Concealment and Liquidity-Causation Discovery (Tier One)**

Independently, newly surfaced evidence reflected in **Exhibits A and B** supports limited discovery directed to internal tax-concealment and liquidity-causation issues involving:

7. Keiter and Matt McDonald.

Discovery sought includes targeted document discovery and depositions concerning tax-treatment change documentation, related communications, liquidity-management and repo-tracking conduct, disclosure obligations, and causation issues associated with asserted insolvency drivers.

These witnesses are not collateral. Their testimony bears on concealment, liquidity-management conduct, causation, scienter-related defenses, and newly surfaced inconsistencies concerning the causes of insolvency alleged in this case.

**C. Tier Two Discovery (If Necessary)**

Only if warranted after substantial completion of Tier One discovery, Defendant requests leave for more limited second-tier discovery concerning:

8. Kirk Evans;
9. Dani James;
10. Wedbush Securities personnel (including Scott Skyrym, Jim Kearney, and David Weaver), Industrial and Commercial Bank of China, Mirae Asset Securities, Mizuho Bank, and Customers Bank;
11. Flagstar executive management, including Jim Ciroli, Alessandro DiNello, Toby Thomas,

and Lee Smith;

12. Helios Strategic Advisors LLC and associated custodians;

13. Trustee David Carickhoff;

14. William Donnelly, Tom McGonigle, and Kevin Muldowney;

15. Xavier Donaldson;

16. Southern District of New York personnel.

The foregoing discovery bears not merely on generalized impeachment, but on specific defense theories previously raised, including absence of falsity, lack of causation, superseding or intervening causes of loss, challenges to damages and valuation methodology, witness credibility and bias, comparative fault or misconduct of third parties, scienter-related defenses, mitigation-related issues, and defenses bearing on whether insolvency and resulting losses were attributable in whole or part to factors other than those principally alleged by Plaintiff.

## IV. PRIORITIZED RELIEF

Consistent with the Court's suggestion that discovery be prioritized, Defendant proposes:

**Tier One:** discovery directed to the seven categories identified in Sections III.A and III.B.

**Tier Two:** contingent discovery limited to the nine categories identified in Section III.C, only if warranted by information developed in Tier One.

Defendant does not seek a full restart of ordinary discovery, but phased, prioritized discovery directed to newly surfaced evidence.

This phased structure is intended specifically to address the Court's concern, and anticipated

Plaintiff objection, that reopened discovery be tailored rather than fulsome.

## V. DECLARATION

A supporting declaration appears as **Exhibit D**, verifying:

- when the evidence surfaced,

- why unavailable earlier,

- why material,

- and why the requested discovery is tailored to those developments.

Pursuant to E.D. Mich. LR 7.1, Defendant sought concurrence from Plaintiff's counsel, but concurrence was not obtained.

## VI. RELIEF REQUESTED

Defendant respectfully requests entry of the proposed order attached as **Exhibit E**, reopening limited phased discovery and granting such further relief as justice requires.

DATED: April 28, 2026

Respectfully submitted,

Michael C. Hild, pro se
2302 E. Marshall Street
Richmond, VA 23223
michaelchristopherhild@gmail.com
804.306.4314

8

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2026, a true copy of the foregoing was served via email to Mr. Joseph Shannon and Mr. Darren Stumberger and via the Court's pro se upload system.

Michael C. Hild

Pro Se Defendant

2302 E Marshall Street

Richmond, VA 23223

804.306.4314

**Exhibit A**

Motion for Leave to File First Amended Complaint, with attached Proposed First Amended
Complaint and incorporated exhibits reflecting Eric Rohr's sworn testimony and related tax-issue
nondisclosure evidence

IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND, VIRGINIA

Civil Division



MICHAEL C. HILD,
  Plaintiff, pro se,

v.

ERIC ROHR;
ILYA KLEYMAN;
KEITER, STEPHENS, HURST, GARY & SHREAVES, P.C.;
MATT MCDONALD, CPA;
and DOES 1–25,
  Defendants.

Case No. CL25006092-00



RECEIVED AND FILED
CIRCUIT COURT
11:0L
FEB 20 2026
EDWARD F. JEWETT, CLERK
BY_____D.C.

**PLAINTIFF'S MOTION FOR LEAVE TO FILE PROPOSED FIRST AMENDED
COMPLAINT**

Plaintiff Michael C. Hild, pro se, moves this Court for leave to file the attached Proposed First

Amended Complaint ("PFAC"), attached as **Exhibit A**, pursuant to Rule 1:8 and in the interests

of justice. A Proposed Order granting this Motion is attached hereto as **Exhibit B**.

In support, Plaintiff states:

1. Plaintiff filed his original Complaint on December 23, 2025.

2. After Defendants filed and/or noticed threshold pleadings (including demurrers and pleas in

bar), and because no prior amendment has been sought, Plaintiff seeks leave to amend to: (a)

plead additional detail and chronology; (b) clarify the direct, personal nature of Plaintiff's

injuries (and avoid any misconstruction that Plaintiff is attempting to assert claims belonging to a

bankruptcy estate or a third party); (c) plead tolling and accrual facts with greater specificity; and

1

(d) streamline and clarify the issues for decision. This is Plaintiff's first requested amendment and is filed promptly after Defendants' threshold pleadings. No discovery has commenced, and no trial date has been set.

3. The PFAC does not add new parties; it clarifies factual allegations and refines the theory of injury and damages in a manner intended to address the issues raised by Defendants' threshold pleadings.

The proposed amendments arise from the same conduct, transactions, and occurrences pleaded in the original Complaint and are intended to relate back as permitted by Virginia law.

Plaintiff seeks damages only to the extent they arise from injuries unique to Plaintiff (including personal guaranty exposure and losses, and injuries arising from Defendants' direct professional relationship with Plaintiff), and not for generalized injury to Live Well, its creditors, or any bankruptcy estate, nor for recovery of corporate claims as such.

4. Leave to amend should be freely granted where justice so requires. The case remains in its early stages; Defendants will suffer no unfair prejudice from an amendment that clarifies the operative facts and legal theories before merits discovery.

5. Plaintiff requests that, upon granting leave, the PFAC be deemed the operative pleading and that any pending demurrer or plea in bar directed at the original Complaint be deemed moot.

6. Plaintiff respectfully requests that the Court decide this Motion on the papers without hearing, as the issues are fully presented in the Motion and attached Proposed First Amended Complaint, and no evidentiary presentation is required.

WHEREFORE, Plaintiff respectfully requests entry of the Proposed Order attached hereto as **Exhibit B** granting leave to file the Proposed First Amended Complaint (**Exhibit A**), and for such other relief as the Court deems just.

2

Dated: February 20, 2026

Respectfully submitted,

Michael C. Hild
Plaintiff, pro se
2302 East Marshall Street
Richmond, VA 23223
(804) 306-4314
michaelchristopherhild@gmail.com

## CERTIFICATION OF SERVICE

I hereby certify that on February 20, 2026, a true and correct copy of the foregoing was served

by electronic mail upon counsel for Defendants Eric Rohr, Keiter, Stephens, Hurst, Gary &

Shreaves, P.C., and Matt McDonald, CPA, and by first-class U.S. Mail upon Defendant Ilya

Kleyman.

_Michael C. Hild_

Michael C. Hild, pro se

4

**EXHIBIT A**

PROPOSED FIRST AMENDED COMPLAINT

**IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND, VIRGINIA**

**Civil Division**

MICHAEL C. HILD,
  Plaintiff, pro se,

v.                                                                    Case No. CL25006092-00

ERIC ROHR;
ILYA KLEYMAN;
KEITER, STEPHENS, HURST, GARY & SHREAVES, P.C.;
MATT MCDONALD, CPA;
and DOES 1–25,
  Defendants.

**PROPOSED FIRST AMENDED COMPLAINT**

Plaintiff Michael C. Hild ("Plaintiff"), pro se, alleges as follows:

**I. NATURE OF ACTION**

1.  This is an action for damages and equitable relief arising from (i) the coordinated concealment and suppression by Defendants Rohr, Keiter, and McDonald of an IRS-locked tax payment obligation tied to Live Well Financial, Inc.'s ("Live Well") bond portfolio and dealer-status determination; (ii) related diversion and misuse of corporate cash and reporting controls (including diversion of bond-related liquidity to ICBC without approval or knowledge of Plaintiff or the Board); and (iii) retaliatory regulatory coordination and insider sabotage by Defendant Kleyman while Live Well remained a going concern and dependent on repo financing supported by Plaintiff's personal guaranties, as described below.

1

2.  Plaintiff seeks compensatory damages, statutory treble damages and attorneys' fees where authorized by law, punitive damages where permitted, and appropriate equitable relief, including declaratory and injunctive relief.

3.  Plaintiff does not sue to recover on behalf of Live Well or any bankruptcy estate, creditor body, or third party. Plaintiff seeks recovery only for direct injuries to Plaintiff—including personal contractual and economic injuries, personal guaranty exposure and losses, personal tax/professional consequences, and other direct consequential damages proximately caused by Rohr, Keiter, and McDonald's misconduct as alleged herein, and by Kleyman's retaliatory regulatory coordination and insider sabotage as alleged herein.

4.  To the extent Plaintiff references ownership value, it is pleaded only as a consequential measure of Plaintiff's personal injury arising from the concealment and inducement directed at Plaintiff by Rohr, Keiter, and McDonald in connection with Plaintiff's personal guaranties, and not as a claim to recover Live Well's losses or to assert estate-owned causes of action.

## II. JURISDICTION AND VENUE

5.  Jurisdiction lies in this Court pursuant to Va. Code § 17.1-513.

6.  Venue is proper in the City of Richmond because substantial acts and omissions giving rise to the claims occurred here and Defendants transact business and/or committed actionable conduct in this jurisdiction.

## III. PARTIES

7.  Plaintiff Michael C. Hild is a Virginia resident. Plaintiff founded Live Well and served as its Chairman/CEO and as a principal guarantor of company financing.

8.  Defendant Eric Rohr ("Rohr") served as Live Well's Chief Financial Officer and occupied a

2

position of trust requiring loyalty, candor, and reasonable care in reporting material risks and financial matters to Plaintiff and the Board.

9.  Defendant Keiter, Stephens, Hurst, Gary & Shreaves, P.C. ("Keiter") and Defendant Matt McDonald, CPA ("McDonald") served as Live Well's accountants/auditors/tax professionals and also provided Plaintiff with personal tax and accounting services. The professional relationship between Plaintiff and Keiter/McDonald was direct and independent of their engagement by Live Well, giving rise to duties owed personally to Plaintiff.

10. Defendant Ilya Kleyman ("Kleyman") engaged in retaliatory regulatory coordination and insider sabotage while Live Well remained a going concern and dependent on repo financing supported by Plaintiff's personal guaranties, and acted in coordination with, or to aid, the broader misconduct described herein.

11. DOES 1–25 are persons/entities presently unknown who participated in, aided, or conspired in the misconduct.

## IV. FACTUAL ALLEGATIONS

**A. The concealed dealer determination, IRS method change, and locked-in payment obligation**

12. Beginning no later than 2017 (and tied to activities dating back to 2014–2015), Live Well's bond portfolio tax treatment triggered a material and company-threatening issue: Live Well was determined to constitute a "dealer in securities" under the Internal Revenue Code for federal tax purposes, which meant Live Well could not continue carrying certain instruments at cost for tax purposes and instead faced recognition of built-in gains through a required method change and related adjustments.

13. As a direct result of the dealer determination, Live Well (through its finance leadership and tax professionals) pursued and implemented an IRS accounting method change. Upon information and belief, the company applied to the IRS for approval of that method change (including a Form 3115), obtained IRS approval, and the plan required that Live Well's 2018 tax return would be the first return filed under the new method and would reflect a material § 481(a) adjustment.

14. The approved method change carried a locked-in payment obligation: Live Well would pay the resulting excess tax attributable to the method change and adjustment over a four-year period, beginning with the tax associated with the 2018 tax year return that would be filed and paid in 2019.

15. Plaintiff did not learn of the dealer determination, the method-change application, the IRS approval, the four-year payment plan, or the § 481(a) adjustment framework until April 2021, when federal disclosures produced materials including interview memoranda and related records reflecting the above facts. A true and correct excerpt reflecting these admissions and descriptions is attached as **Exhibit 1.**

16. Critically, none of the following were ever disclosed to Plaintiff or to Live Well's Board of Directors at the time they mattered:

(a) that Live Well had been determined to be a dealer in securities;

(b) that an IRS method-change application (including Form 3115) had been filed or would be filed;

(c) that IRS approval had been obtained;

(d) that a four-year payment plan was established and would govern payment of the resulting tax;

4

(e) that the 2018 return would reflect a § 481(a) adjustment under the new method;

(f) the amount of the adjustment;

(g) the annual payment schedule; or

(h) any liquidity plan to fund those payments without collapsing the business.

17. Defendant Rohr, as Live Well's Chief Financial Officer, knew this obligation existed and knew it was not a theoretical footnote. Rohr's own statements to Live Well's auditors and professionals reflected that if the tax impact were recognized in a single year, Live Well would have to liquidate the bond portfolio, and he questioned whether the portfolio could be sold in the market at the values being carried given its size and market constraints. Rohr's statements reflected that the tax issue presented an immediate and existential liquidity problem. See **Exhibit 1**.

**B. Impossibility of payment, Rohr's daily liquidity knowledge, and deliberate concealment**

18. Plaintiff alleges as fact, and will prove through contemporaneous company records, that Live Well had depleted cash by the end of 2018. This was nowhere near sufficient to both (i) operate the business and (ii) satisfy a four-year tax payment obligation measured in the tens of millions of dollars, plus associated penalties and interest exposure.

19. Rohr knew Live Well could not pay. As CFO, Rohr reviewed and monitored Live Well's liquidity reports and projections daily. He knew the company did not have the cash to fund the IRS-locked tax obligation and knew that the bond portfolio could not be liquidated in the market at carried values to generate cash sufficient to satisfy the obligation without catastrophic impairment.

20. Rohr nevertheless concealed the dealer determination, IRS method change, IRS approval, four-year payment plan, and § 481(a) adjustment framework from Plaintiff and the

Board—ensuring Plaintiff could not implement corrective governance actions, preserve liquidity, renegotiate financing terms, halt bond portfolio growth, stop transactions that depleted cash, or prevent continued personal guaranty exposure.

21. The concealment was not passive oversight or an isolated nondisclosure. It operated over multiple years as a deliberate suppression of material, solvency-threatening information while Plaintiff continued to execute and maintain personal guaranties and make strategic capital-allocation decisions under materially false assumptions. At all relevant times, Rohr, Keiter, and McDonald knew that Live Well's continued access to credit was expressly conditioned upon Plaintiff's ongoing personal guaranties, and that withdrawal of those guaranties would trigger immediate lender action and likely enterprise collapse. Rohr, Keiter, and McDonald further knew that timely disclosure—when the dealer-status issue first arose—would have caused Plaintiff to sequester liquidity, recalibrate guaranty exposure, curtail bond portfolio expansion, and implement restructuring or protective measures designed to preserve enterprise solvency and Plaintiff's guarantor-backed equity position. By allowing the exposure to compound for years without disclosure, while liquidity declined and obligations expanded, Rohr, Keiter, and McDonald ensured that by the time the tax framework became unavoidable the company lacked the financial capacity to resolve it without collapse. The destruction of Plaintiff's equity, compensation, and financial position was therefore the foreseeable and direct consequence of Rohr, Keiter, and McDonald's induced and prolonged concealment.

**C. Liquidity diversion to ICBC while withholding the tax payment cliff**

22. In the second half of 2018—while the dealer determination and IRS-approved method change created an unavoidable tax payment obligation that would begin with the 2018 return filed in 2019—Rohr caused and/or permitted substantial liquidity associated with the bond

6

portfolio and related financing arrangements to be redirected to Industrial and Commercial Bank of China ("ICBC").

23. Plaintiff alleges as fact that this redirection occurred without approval or knowledge of Plaintiff or the Board, materially reduced Live Well's available cash position, and contributed to Live Well's depleted cash condition by year-end 2018.

24. Rohr's conduct—depleting liquidity while simultaneously concealing the locked-in tax obligation— foreclosed timely corrective action and substantially increased the likelihood of corporate failure, insolvency, lender action, and the triggering of Plaintiff's personal guaranties.

**D. Rohr's December 2018 departure timed to the payment cliff and subsequent non-filing**

25. Rohr departed Live Well in December 2018, immediately before the first return year under the IRS-approved method change would be filed and paid in 2019. Plaintiff alleges Rohr left with knowledge that the method change and § 481(a) framework would require substantial tax payments and that Live Well lacked the liquidity to fund them.

26. The company subsequently collapsed before the 2018 return could be filed in 2019. Plaintiff alleges that the concealed dealer determination and method change, combined with depleted cash and the inability to liquidate the bond portfolio for sufficient cash, were central drivers of that collapse dynamic.

27. Plaintiff first learned the above facts in April 2021 through federal disclosures, including interview memoranda and related materials reflecting McDonald's statements regarding the dealer determination, the IRS-approved method change, and the four-year payment plan framework. The concealment prevented Plaintiff from discovering these facts earlier.

**E. Keiter/McDonald's role and duties to Plaintiff personally**

28. Keiter and McDonald were not merely detached professionals. They served as Live Well's accountants/auditors/tax professionals and also served Plaintiff personally as tax/accounting professionals.

29. Because of that relationship, Keiter/McDonald owed Plaintiff duties of reasonable professional care and candor regarding material tax/compliance matters that placed Plaintiff at direct risk—including risk of personal guaranty calls, personal financial exposure, and professional harm.

30. Keiter and McDonald knew (or in the exercise of reasonable professional care should have known) that the dealer determination, the IRS method change and approval, and the four-year payment framework were material solvency-related facts that required escalation and disclosure to the Board and to Plaintiff as Chairman and principal guarantor.

31. Keiter and McDonald concealed these facts from Plaintiff at the relevant time(s) and coordinated with, or enabled, Rohr's nondisclosure—depriving Plaintiff of the opportunity to protect himself and to take corporate action when it mattered.

32. Keiter and McDonald were engaged not only as Live Well's auditors and tax professionals, but also as Plaintiff's personal tax preparers during the same time period. They prepared Plaintiff's individual federal and state income tax returns while simultaneously handling the disputed corporate tax treatment and its correction mechanisms at issue.

33. Keiter and McDonald knew that substantially all of Plaintiff's income derived from Live Well and that Plaintiff had executed substantial personal guaranties securing company indebtedness, which were disclosed in the audited financial statements they prepared.

34. Under these circumstances, Keiter and McDonald owed Plaintiff direct professional duties of

8

reasonable care, candor, and disclosure independent of their engagement by Live Well.

35. Any engagement language purporting to limit Keiter and McDonald's duties to Live Well does not negate duties independently owed to Plaintiff, including duties arising from (i) their preparation of Plaintiff's personal tax returns during the same tax years at issue, (ii) their issuance of audited financial statements addressed to the Board and stockholders, including Plaintiff, and (iii) their knowledge that Plaintiff was a principal guarantor expressly identified in the audited financial statements. Keiter and McDonald were engaged by Plaintiff personally (separate from Live Well) to provide tax/accounting services to Plaintiff, and Plaintiff relied on them for advice and disclosure regarding material tax matters affecting Plaintiff's personal financial exposure.

**F. Retaliatory Regulatory Coordination and Insider Sabotage (Kleyman)**

36. Defendant Ilya Kleyman was employed by Live Well and initially reported directly to Plaintiff. Due to performance deficiencies, insubordination, and failure to appear for work, Plaintiff reassigned Kleyman to report to Vice President of Finance George Scott for supervision and performance management.

37. Kleyman continued to resist supervision and failed to meet performance expectations. Plaintiff directed that Kleyman be terminated. The termination was carried out by George Scott. Kleyman knew Plaintiff was the decision-maker responsible for his removal.

38. Shortly after his termination, Kleyman initiated contact with the Securities and Exchange Commission concerning Live Well. Trial testimony reflects that Kleyman informed former employee Hayden Novikoff that he had contacted the SEC and expected to receive a percentage of any financial recovery arising from enforcement action.

9

39. Trial testimony further reflects that Kleyman discussed with Novikoff the prospect of sharing anticipated whistleblower proceeds and described a hypothetical in which such proceeds could fund travel to the Maldives. (See **Exhibit 5**.)

40. At the time of these events, Live Well remained a going concern and was heavily dependent upon repo financing secured by its bond portfolio. Plaintiff was the 51% owner, Chairman, Chief Executive Officer, and principal personal guarantor of approximately $1 billion in cumulative company debt. Kleyman knew or reasonably should have known that Live Well's continued financing depended upon Plaintiff's ongoing personal guaranties.

41. Upon information and belief, Kleyman communicated with Hayden Novikoff regarding Live Well's pricing practices and regulatory exposure while Live Well remained operational. At trial, Novikoff admitted under oath that he raised certain bond prices "by exactly one point" and did so "so that if this was wrong or illegal, to get Live Well caught." (See **Exhibit 5** at Appendix A-271, Tr. 869.)

42. Days before testifying at Plaintiff's criminal trial, Novikoff admitted under oath that Kleyman contacted him and that they spoke despite Novikoff's understanding that they should not be communicating due to his status as a witness. (**See Exhibit 5**.)

43. The combination of (i) anticipated personal financial gain tied to enforcement recovery, (ii) discussions of sharing such proceeds, (iii) insider communications regarding pricing conduct, and (iv) pre-testimony communications between Kleyman and a witness, demonstrate motive, coordination, and the use of improper means in furtherance of regulatory escalation directed at Live Well while it remained dependent upon financing structures personally guaranteed by Plaintiff.

44. Kleyman knew that destabilization of Live Well would foreseeably trigger repo lender

10

reactions, liquidity contraction, and enforcement actions that would directly expose Plaintiff under his personal guaranties. The mechanism of injury was corporate destabilization, but the intended and foreseeable target of that destabilization was Plaintiff personally as majority owner and guarantor.

## G. When Plaintiff discovered the concealed wrongdoing

45. Rohr, Keiter, and McDonald's concealment prevented timely discovery.

46. Plaintiff first discovered the existence and magnitude of the concealed dealer-status / method-change / payment obligation facts in or about April 2021 in connection with disclosures made during federal criminal proceedings, including materials reflecting communications and admissions about the tax and payment framework.

47. Prior to that time, Plaintiff exercised reasonable diligence and had no access to internal communications or information sufficient to place him on notice of the concealed tax exposure, as Rohr, Keiter, and McDonald had affirmatively withheld the information from audit reports, Board presentations, and personal tax preparation communications.

48. Plaintiff could not reasonably have discovered the concealed tax exposure earlier because Rohr, Keiter, and McDonald exclusively controlled the relevant accounting communications, audit disclosures, and tax analysis, and no written or verbal disclosure of the dealer determination, the IRS approval, the § 481(a) framework, the payment schedule, or any liquidity plan was made to Plaintiff or the Board during the relevant time.

## H. Direct injury to Plaintiff (not derivative)

49. Rohr, Keiter, and McDonald directly and proximately injured Plaintiff personally and

11

individually—not as a generalized shareholder grievance, but as the specific person whose ongoing personal guaranties and personal credit support were a known and necessary condition of Live Well's continued financing and operations. By concealing the dealer determination, IRS-approved method change, § 481(a) adjustment framework, and locked multi-year tax payment obligations, Rohr, Keiter, and McDonald induced Plaintiff to continue executing and maintaining substantial personal guaranties, to refrain from protective liquidity and governance measures, and to make capital-allocation and guaranty decisions under materially false solvency assumptions. As a direct and foreseeable result, Plaintiff suffered unique injuries including (i) expanded and prolonged personal guaranty exposure and lender claims against him; (ii) loss of personal income, guaranty-related compensation, and other individual economic benefits dependent upon his continued guaranty participation; (iii) impairment of his personal credit and net worth; and (iv) destruction in value of Plaintiff's personally held equity position as a consequential result of the induced guaranty exposure and resulting collapse dynamics—not as a claim to recover corporate losses or to assert causes of action belonging to Live Well or any bankruptcy estate. These injuries arise from Plaintiff's individual contractual obligations and reliance and are not common to Live Well's equity holders generally.

50. Plaintiff does not seek recovery of damages belonging to Live Well, its creditors, or any bankruptcy estate, and does not assert causes of action that are derivative of Live Well's rights. Plaintiff seeks recovery only for damages unique to Plaintiff and proximately caused by Defendants' misconduct, including (i) the concealment by Rohr, Keiter, and McDonald of material solvency-threatening obligations that foreseeably increased Plaintiff's personal guaranty exposure and destroyed his guarantor-backed equity position, and (ii) Kleyman's retaliatory regulatory coordination and insider sabotage described above.

12

## V. FRAUDULENT CONCEALMENT AND TOLLING

51. The claims asserted herein are timely.

52. Beginning no later than 2016 and continuing through at least 2021, Defendants Rohr, Keiter, and McDonald engaged in affirmative acts of concealment designed to prevent Plaintiff from discovering the existence and magnitude of the disputed tax exposure and, critically, the fact that it had been operationalized into an IRS-approved, locked-in payment obligation.

53. Those affirmative acts included:

   • withholding internal written tax escalation communications (**Exhibit 2**);

   • omitting disclosure from audited financial statements and audit presentations (**Exhibit 4**);

   • failing to disclose the dealer determination, IRS approval, § 481(a) framework, and four-year payment schedule during annual Board presentations;

   • preparing Plaintiff's personal tax returns during the same period without disclosure of the disputed corporate tax treatment and its solvency implications; and

   • Rohr's failure, as CFO, to elevate the issue to the Board despite repeated internal escalation.

54. The tax analyses, escalation memoranda, and related communications were exclusively within the control of Rohr, Keiter, and McDonald. Plaintiff had no access to internal accounting communications, auditor files, or private email systems, and had no reasonable basis to suspect that the dealer determination, IRS approval, and payment framework were being withheld.

55. Plaintiff is not a tax professional and reasonably relied upon:

   (a) the Chief Financial Officer responsible for tax reporting; and

   (b) independent auditors retained specifically to identify and disclose material financial risks.

56. The audited financial statements presented annually to the Board contained no disclosure of any material tax dispute or contingent liability relating to the bond portfolio and did not disclose

13

an IRS-locked payment cliff of the type described herein (**Exhibit 4**). The absence of disclosure in audited reports reasonably reinforced the belief that no such exposure existed.

57. Plaintiff first discovered the existence and magnitude of the concealed dealer-status/method-change/payment framework in or about April 2021, when materials obtained and produced during federal criminal proceedings— including documents and information compelled or received from Keiter and related parties—were disclosed to Plaintiff through his defense counsel in the Southern District of New York proceedings.

58. Prior to those April 2021 federal disclosures, Plaintiff had not been informed by Rohr, Keiter, or McDonald of the internally escalated tax dispute or the IRS-approved payment framework, and had no access to the written communications reflecting those facts.

59. Under Va. Code § 8.01-229(D), the applicable limitations periods were tolled because Defendants' intentional concealment prevented discovery of the causes of action.

60. Plaintiff specifically pleads that Defendants' concealment extended not only to the existence of a tax exposure, but to the completed implementation of the exposure through an IRS-approved method change and locked-in four-year payment obligation. Defendants never disclosed the dealer determination, the filing or approval of the method-change application, the § 481(a) adjustment framework, the payment schedule, or any plan to fund it—facts uniquely within Defendants' control and not reasonably discoverable by Plaintiff until April 2021 federal disclosures produced interview memoranda and related materials reflecting those facts (**Exhibit 1**).

61. Each cause of action accrued no earlier than April 2021, when Plaintiff first obtained knowledge of the concealed dealer-status/method-change/payment facts through federal disclosures.

14

62. Plaintiff filed this action on December 23, 2025, well within:

• the five-year limitations period applicable to statutory business conspiracy (Va. Code § 8.01-243(B));

• the two-year period applicable to fraud, measured from discovery pursuant to Va. Code § 8.01-229(D); and

• the applicable limitations periods for fiduciary breach and professional negligence as measured from discovery and tolling.

63. Defendants are equitably estopped from asserting any statute of limitations defense because their affirmative acts of concealment directly prevented timely discovery.

## VI. CAUSES OF ACTION

### COUNT I — Breach of Fiduciary Duty

(Against Rohr)

64. Plaintiff incorporates the foregoing allegations.

65. At all relevant times, Rohr owed Plaintiff fiduciary duties of loyalty, candor, good faith, and full disclosure arising from his role as Chief Financial Officer of Live Well and his position of trust in reporting material financial and tax matters to the Board and to Plaintiff as Chairman and principal personal guarantor. Rohr knew that Live Well's continued access to financing was expressly dependent upon Plaintiff's ongoing execution and maintenance of personal guaranties, and that Plaintiff's personal financial exposure would be directly and foreseeably affected by concealment of solvency-threatening obligations. Under these circumstances, Rohr owed Plaintiff a duty to disclose fully and timely any material tax, liquidity, or accounting developments—including the dealer determination, IRS-approved method change, § 481(a)

15

adjustment framework, and related payment obligations—that materially increased Plaintiff's personal guaranty risk.

66. Rohr breached his fiduciary duties of loyalty, candor, and good faith by knowingly failing to disclose to the Board of Directors and to Plaintiff in his governance capacity the material dealer determination, the IRS-approved accounting method change, the § 481(a) adjustment framework, and the locked four-year tax payment obligation tied to the 2018 return. Rohr further breached those duties by failing to disclose the magnitude of the obligation, the annual payment schedule, and the absence of any viable liquidity plan to satisfy the obligation; by permitting and/or causing substantial bond-related liquidity to be redirected to ICBC while knowing the company faced an imminent cash-demand cliff; and by withholding these material solvency-threatening facts at a time when corrective governance action, liquidity preservation, and restructuring decisions were required. Rohr's nondisclosure occurred despite his knowledge that Plaintiff, as Chairman and principal guarantor, would be directly and foreseeably exposed to personal financial harm if the concealed obligations were not disclosed and addressed.

67. Rohr reviewed Live Well's liquidity reports daily. He knew Live Well had depleted cash toward the end of 2018. He knew the company could not fund the locked-in tax obligation (including exposure to penalties and interest) while continuing operations. His concealment deprived Plaintiff and the Board of the ability to halt bond expansion, preserve liquidity, restructure financing, renegotiate terms, and mitigate Plaintiff's personal guaranty exposure. Rohr reported directly to Plaintiff as Chairman/CEO and knew Plaintiff was a principal guarantor whose personal exposure would be directly affected by concealment of solvency-threatening obligations.

68. Rohr's breaches directly and proximately caused Plaintiff substantial direct damages.

16

**COUNT II — Professional Negligence / Breach of Duty (Against Keiter and McDonald)**

69. Plaintiff incorporates the foregoing allegations.

70. Keiter and McDonald owed Plaintiff direct duties of reasonable professional care and candor arising independently of any duties owed to Live Well, including:

   (a) their direct and independent engagement to prepare Plaintiff's personal federal and state income tax returns during the same tax years in which the disputed corporate tax treatment and method-change framework were at issue;

   (b) their role as independent auditors issuing audited financial statements addressed to and intended for reliance by the Board of Directors and stockholders of Live Well, including Plaintiff in his capacity as Chairman and majority owner;

   (c) their knowledge, reflected in the audited financial statements they prepared, that Plaintiff had executed substantial personal guaranties securing Live Well's indebtedness; and

   (d) their knowledge that nondisclosure of a solvency-threatening tax framework would foreseeably expose Plaintiff to catastrophic personal financial harm.

71. Plaintiff was not a remote third party. Plaintiff was:

   • the Chairman of the Board to whom audit reports were addressed and presented;

   • the majority owner whose guaranties were expressly disclosed in the audited financial statements; and

   • a direct personal tax client of Keiter and McDonald during the same period.

72. Keiter and McDonald were engaged by Plaintiff personally (separate from Live Well) to provide tax/accounting services to Plaintiff, and Plaintiff relied on them for advice and disclosure regarding material tax matters affecting Plaintiff's personal financial exposure. Keiter/McDonald

17

prepared Plaintiff's personal returns during the relevant period and communicated directly with Plaintiff regarding tax matters.

73. Keiter and McDonald knew, or in the exercise of reasonable professional care should have known, that Live Well's continued financing was expressly dependent upon Plaintiff's ongoing execution and maintenance of substantial personal guaranties, that Plaintiff's income and net worth were evaluated by lenders in connection with those guaranties, and that nondisclosure of a solvency-threatening dealer determination, IRS-approved method change, § 481(a) adjustment framework, and related payment obligations would materially increase Plaintiff's personal financial exposure. Under these circumstances, and given their direct professional relationship with Plaintiff, Keiter and McDonald owed Plaintiff a duty to disclose material tax and solvency risks that foreseeably affected his personal guaranty obligations and financial position.

74. Keiter and McDonald breached those duties by:

• failing to disclose to Plaintiff and the Board the dealer-status determination, IRS-approved method change, § 481(a) framework, and four-year payment obligation described in **Exhibit 1**;

• failing to disclose to Plaintiff and the Board the existence and magnitude of internally escalated tax exposure reflected in **Exhibit 2**;

• issuing audited financial statements that omitted disclosure of any material tax dispute, contingent liability, or payment cliff of the type described herein (**Exhibit 4**);

• delivering annual audit presentations without disclosing these matters; and

• preparing Plaintiff's personal tax returns while withholding disclosure that the corporate tax treatment underlying Plaintiff's income carried solvency-threatening correction and payment risk.

75. The harm suffered by Plaintiff is personal and direct, including exposure under personal

18

guaranties, loss of personal compensation and economic interests, and personal financial damage resulting from reliance on professional audit and tax services.

76. Plaintiff does not seek recovery for corporate injury or diminution in corporate value as such; Plaintiff seeks recovery only for direct personal damages proximately caused by Defendants' professional negligence.

77. As a direct and proximate result of these breaches, Plaintiff suffered substantial personal financial damages.

### COUNT III — Fraud / Fraudulent Concealment

#### (Against Rohr, Keiter, and McDonald)

78. Plaintiff incorporates the foregoing allegations.

79. This Count is asserted against Rohr, Keiter, and McDonald based on their concealment of (i) the dealer determination, (ii) the IRS-approved method change, (iii) the § 481(a) adjustment framework, and (iv) the locked four-year payment plan, and related audit/tax nondisclosures.

80. Rohr knowingly and intentionally concealed material facts including:

   • that Live Well had been determined to be a dealer in securities;

   • that an IRS method change application (including Form 3115) had been filed or would be filed;

   • that IRS approval had been obtained;

   • that the 2018 return would be the first return under the new method and would include a § 481(a) adjustment;

   • that a four-year payment plan was locked in and would begin with the 2018 return filed and paid in 2019;

   • the magnitude of the obligation and the annual payment schedule; and

19

• the absence of any liquidity plan, despite knowing Live Well had depleted cash and could not pay.

81. Keiter and McDonald knowingly concealed the same facts, despite their roles as audit and tax professionals and despite their direct relationship with Plaintiff as a personal tax client. Keiter and McDonald also internally escalated written concerns regarding Live Well's bond-related tax treatment and substantial exposure (**Exhibit 2**) while issuing audited financial statements and presentations omitting disclosure of any such exposure or payment cliff (**Exhibit 4**).

82. Rohr, Keiter, and McDonald had duties to disclose because:

• Rohr was a fiduciary to Plaintiff and the Board;

• Keiter and McDonald were independent professionals issuing audit reports intended for Board and stockholder reliance, including Plaintiff;

• Keiter and McDonald were simultaneously engaged as Plaintiff's personal tax preparers; and

• Rohr, Keiter, and McDonald possessed superior knowledge of solvency-threatening facts not reasonably discoverable by Plaintiff.

83. Rohr, Keiter, and McDonald intended Plaintiff to rely on the absence of disclosure and on clean or incomplete audit/tax communications so Plaintiff would continue to maintain and execute personal guaranties, refrain from emergency governance action, and refrain from liquidity-preservation actions that would have exposed the tax framework and created immediate consequences.

84. Plaintiff reasonably relied upon:

• the audited financial statements and annual audit presentations;

• the tax and accounting services provided to Plaintiff personally; and

• Rohr's fiduciary obligation of full disclosure.

20

85. Had Rohr, Keiter, and McDonald disclosed the dealer determination, IRS approval, § 481(a) framework, and four-year payment obligation, Plaintiff would have taken immediate corrective action to preserve liquidity, restructure obligations, halt expansion, and protect himself from personal guaranty exposure.

86. As a direct and proximate result of Rohr, Keiter, and McDonald's intentional concealment, Plaintiff suffered substantial personal financial harm, including exposure under personal guaranties, loss of compensation and economic interests, lender actions, and cascading financial and reputational damage.

### COUNT IV — Statutory Business Conspiracy (Va. Code §§ 18.2-499, 18.2-500)

**(Against Rohr, Keiter, McDonald, Kleyman, and Does)**

87. Plaintiff incorporates the foregoing allegations.

88. Beginning no later than 2016 and continuing through at least 2021, Rohr, Keiter, McDonald, Kleyman, and Does combined, associated, agreed, or mutually undertook courses of conduct intended to injure Plaintiff in his reputation, trade, business, and profession.

89. As to Kleyman, the combination included communications with Hayden Novikoff during the period Live Well remained operational and dependent upon repo financing supported by Plaintiff's personal guaranties. Novikoff admitted under oath that he intentionally raised certain bond prices by exactly one point "to get Live Well caught." (**Exhibit 5**.) Novikoff further admitted he had a financial interest in regulatory recovery and that Kleyman had discussed anticipated SEC-related remuneration and personal benefit tied to enforcement outcomes. (**Exhibit 5**.)

90. Upon information and belief, Kleyman and Novikoff agreed, encouraged, or acted in concert to promote regulatory scrutiny of Live Well while the company remained reliant on financing

21

structures personally guaranteed by Plaintiff.

91. The object of this combination was to destabilize Live Well through regulatory exposure and financing disruption, knowing that such destabilization would foreseeably and directly injure Plaintiff as majority owner and principal guarantor.

92. Defendants acted with legal malice, meaning intentional and purposeful conduct undertaken without lawful justification and with knowledge that injury to Plaintiff's business and financial interests was the natural and probable consequence. As to Kleyman, the unlawful means include his retaliatory regulatory coordination for personal financial gain and his concerted actions with an insider to promote or facilitate intentional pricing submissions designed to cause Live Well to "get caught," together with related improper witness communications. (**Exhibit 5**.)

93. Overt acts in furtherance of the conspiracy include, but are not limited to:

 • withholding and suppressing the facts described in **Exhibit 1**;

 • internal written tax escalation communications withheld from Plaintiff and the Board (**Exhibit 2**);

 • issuance of audited financial statements omitting disclosure of the material tax framework and payment cliff (**Exhibit 4**);

 • sworn admission by Rohr that he did not disclose the issue to Plaintiff (**Exhibit 3**);

 • continued nondisclosure during audit presentations;

 • redirection of substantial bond-related liquidity to ICBC without approval or knowledge of Plaintiff or the Board;

 • Kleyman's initiation of SEC contact and promotion of anticipated whistleblower proceeds tied to enforcement recovery (**Exhibit 5**); and

 • Kleyman's communications with Novikoff during the period of Live Well's ongoing operations

22

and financing dependence, including the "get caught" pricing conduct and improper pre-testimony witness communications (**Exhibit 5**).

94. As a direct and proximate result of the conspiracy, Plaintiff suffered injury in his reputation, trade, business, and profession within the meaning of Va. Code §§ 18.2-499 and 18.2-500, including injury to his business relationships, contractual guaranty obligations, economic interests, professional standing, and personal financial position.

95. Plaintiff is therefore entitled to relief under Va. Code §§ 18.2-499 and 18.2-500, including treble damages and reasonable attorneys' fees as permitted by law.

### COUNT V — Tortious Interference with Contract/Business Expectancy

**(Against Rohr, Keiter, McDonald, Kleyman, and Does)**

96. Plaintiff incorporates the foregoing allegations.

97. Plaintiff had valid contractual relationships and business expectancies, including those tied to Plaintiff's compensation, financing/guaranty relationships, and business relationships requiring accurate financial and tax disclosures.

98. Rohr, Keiter, McDonald, Kleyman, and Does knew of these relationships and expectancies. Rohr, Keiter, and McDonald knew Plaintiff's guaranty-backed financing relationships were essential to Live Well's survival and that concealment of solvency-threatening obligations would foreseeably injure Plaintiff personally.

99. Kleyman likewise knew Plaintiff's guaranties were a critical condition of Live Well's financing and that destabilizing Live Well through retaliatory regulatory escalation, coordinated insider misconduct, and "get caught" pricing conduct would foreseeably trigger repo lender reactions and injure Plaintiff personally through guaranty exposure and loss of guaranty-dependent compensation and economic interests.

23

100. By (i) concealing the material dealer-status/method-change/payment framework and issuing incomplete or misleading audit communications (Rohr, Keiter, McDonald), and (ii) initiating or promoting retaliatory regulatory scrutiny and coordinated insider conduct intended to cause Live Well "to get caught" while the company remained dependent on repo financing supported by Plaintiff's guaranties (Kleyman and Does), Defendants intentionally and improperly interfered with Plaintiff's contractual guaranty relationships and economic expectancies, thereby exposing Plaintiff to catastrophic personal financial harm.

101. The concealed IRS-approved method change and locked four-year payment obligation created an unavoidable cash-demand cliff beginning with the 2018 return due in 2019. Because Live Well had depleted cash by year-end 2018, and because the bond portfolio could not be liquidated at carried values to generate sufficient cash, Rohr, Keiter, McDonald, and Does' concealment foreseeably forced collapse dynamics that directly injured Plaintiff through guaranty exposure, loss of compensation and economic interests, lender actions, and cascading financial and reputational harm.

102. Plaintiff suffered direct damages.

## VII. DAMAGES

103. Plaintiff's damages are personal and direct and arise from two distinct categories of misconduct:

   (a) As a direct and proximate result of Rohr, Keiter, and McDonald's concealment and coordinated misconduct described above, Plaintiff suffered damages unique to him, including but not limited to: (i) exposure and loss arising from substantial personal guaranties executed and maintained in reliance upon incomplete or misleading financial and tax disclosures; (ii) loss of compensation, guaranty-related income, and economic interests that depended upon Plaintiff's

24

continued personal credit support of Live Well; (iii) impairment of Plaintiff's personal net worth and borrowing capacity relied upon by lenders; (iv) legal and financial costs arising from lender actions and collapse dynamics triggered by the concealed payment obligations; (v) reputational and professional injury; and (vi) consequential economic losses flowing from the inducement of Plaintiff to remain personally obligated under materially false solvency assumptions.

(b) Separately, as a direct and proximate result of Kleyman's retaliatory regulatory coordination and insider sabotage described herein, Plaintiff suffered additional consequential damages, including investigation costs and litigation-related harm proximately caused by that misconduct.

(c) As a direct and foreseeable result of Kleyman's retaliatory initiation of regulatory contact, coordination with an insider who admitted intentional IDC pricing manipulation designed to cause Live Well to "get caught," and financial incentive structure tied to enforcement recovery, regulatory scrutiny intensified while Live Well remained dependent upon repo financing supported by Plaintiff's personal guaranties. In a capital structure dependent upon lender confidence and pricing integrity, such scrutiny foreseeably triggered lender reactions, liquidity contraction, margin pressures, and collapse dynamics that directly exposed Plaintiff to substantial personal guaranty liability, lender claims against him individually, impairment of his personal credit and net worth, loss of guaranty-dependent compensation, and destruction of the value of his personally held equity. These injuries were a natural and probable consequence of destabilizing a repo-financed enterprise supported by personal guaranties.

104. The damages exceed $900,000,000, subject to proof at trial.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants, jointly and severally

25

where applicable, for:

A. Compensatory damages in an amount to be proven at trial;

B. Treble damages and attorneys' fees as permitted under Va. Code § 18.2-500;

C. Punitive damages against the appropriate Defendants in an amount to be determined at trial;

D. Pre- and post-judgment interest;

E. Costs;

F. Equitable relief, including such declaratory and injunctive relief as the Court deems just and

proper; and

G. Such other and further relief, at law or in equity, as the Court deems just and proper.


JURY TRIAL DEMANDED


Dated: February 20, 2026

Respectfully submitted,

Michael C. Hild
Plaintiff, pro se
2302 East Marshall Street
Richmond, VA 23223
(804) 306-4314
michaelchristopherhild@gmail.com

26

**Exhibit 1**

July 31, 2019 Federal Interview Memorandum / Notes of Matt McDonald

(dealer determination; IRS method change; IRS approval; four-year payment plan; 2018 return as first under new method; § 481(a) framework)

July 31, 2019

Interview of Matt McDonald,

Counsel: James Walker

AUSAs Scott Hartman and Jordan Estes

SEC Greg Smolar


Went to college William mary business admin degree with concentration in accounting. Six months consumer credit counseling service of Virginia, assistant to the controller and got a positon at keiter as a first year associate since November 1993. Graduated in 1993 from William and mary. Licensed cpa in Virginia and nowhere else. When first started, was responsible for the entire client engagement as keiter was relatively smaller; keiter has grown where they have more designated groups. Was put into the audit group, business assurance group, typical client base are closely held business with not a lot of shareholders. Worked on HUD related projects such as annual reviews, and cost certification and governmental audits, A133 audits. Focuses on audits of HUD entities and performs governmental audits for non profits. Mc also does construction and real estate, manufacturing a little bit of everything; also has his certified fraud examiner license early 2000s, CFF was approx. 2010-2015. CFE is issued by association of certified fraud examiners, based out of Austin texas. CFF is certified financial forensics, through the American institute of certified public accounts. Mc rolled onto live well in approx. 2013; apart of the initial client interview when live well came to keiter in 2005 when they started their business; 2013, first year mc was the engagement partner; the year before started off as the EQCR – engagement quality control review for the audit in 2012. In 2013, the live well engagement was about 50 – 100 hours of Mc's time on an annual basis – not a full time engagement. No quarterly reviews for live well; would have client meetings in terms for the audit process. Would also field questions from live well when needed, but much is engagement focused around the audit, from planning execution to wrap-up.

Any engagement would be planned by scheduling the year end audits in approx. july to ensure proper resources for each client assignment; by the end of august, they will assign most of staff to clients. Early October would be initial meeting with the client in regard to the audit. Typically then nov/dec will do some interim testing such as internal control processes; live well has a lot of regulatory compliance and would try to get a lot of this testing out of the way as early as possible. At the end, try to have a document request list to provide for year end field work; mid to late February for the year end field work. Typically a staff of two or three people at live well staying there for about two weeks or so. Live well did not provide everything keiter asked for and would have a list of items still needed after leaving the field; mid march would have most documents to create the financial statements which would typically be issued around the last week of march. For the field work, it was mcdonald, the partner and two other members of the team working on live well. EQCR partner was Richard louis for approx. two or three years; doug nickerson got promoted to partner, prior to being a manger on the live well team. Meridith Wilson and Collin Hannifin were managers for the engagement on live well. 18, 17, 16 and 15 hannifin was the manger on the live well team.

3526-002
McDonald, Matt

Financial statements are live well's work product. Eric rohr was evaluated as the CFO of live well; eric had previous cpa firm experience, and keiter saw the process through his comments where he was taking ownership and understanding everything within the financial statements, making suggestions and edits that were more in line to what he saw in the operations; this gave keiter the comfort that rohr had the skills to attest to the financial statements.

Scope of the engagement ; u.s based gaap financial statements, us and govt auditing standards and then the opinion – the opinion is saying they believe the financial statements are materially presented fairly based on the balance sheet, income statement, etc. additional paragraphs that refer to other reports issued as apart of the financial statements as well. Within the audit reports acknowledges keiter is auditing the client's financial statements.

Keiter relies on management to provide accurate information as part of their audit and for the financial statements, also receive a management representation letter from the management saying they attest to providing all information truthfully; the rep letter is a sanity check to the client saying this is my information and I'm being honest in what I'm providing to you and there are certain things that were asked of them and they are not holding back on. Do not do  a forensic review of the companies financials as a part of the audit; the audit is providing an opinion that the financial statements are material; for example for a cash reconciliation, they find out the reconciliation is 100 dollars, for a business like live well, this would not be material or for example the difference was 500,000, they would say that is material and would ask management to determine why the number was off so much and try to determine more of what caused the misstatement and then how to fix it to get it properly recorded which would result in a journal entry; looking at financial statements overall at a material level.

For forensic audits, materiality is a much lower threshold and are testing more transactions in this kind of audit; evaluation of risk is more a part of a forensic audit; tend to be looking at more transactions overall to understand the flow of the process. The testing process is much different between a forensic and financial statement audit.

Within the engagement letter, the issue of detecting fraud is not a part of the audit and the overall objective of the audit is not identifying fraud, but is identifying whether or not the financial statements are presented fairly. If keiter is provided inaccurate information, there is a chance there is fraud that will not be detected; this is also part of the reason for having the rep letter for the company to attest to the information provided by them.

Two key people were paula foster, controller and eric rohr; would see hild every once in awhile, but everything was funneled through eric with audit and tax engagements; knew eric had conversations with hild, because rohr would report conversations with hild to keiter. In 2005 in initial interview, seemed like hild had a good understanding of what was going on; questions funneled through eric would convey hild had an understanding of the financials at live well.

2005 was a fairly typical client onboarding engagement for keiter; met hild at keiter office what his oplans were, his funding levels and main reason for the meeting he was looking for an initial audit of the capitalization of the company to prove to hud that he had a certain net worth to start the application process to become a lender. Hild came from capital one, mc believed somewhere in mid level at capital one, was not a junior person there; had experience through financial transactions through work at capital one.

Rohr understood debits and credits well. Paula struggled conceptually but handled the basic transactions well. Mc did not know about paula's background and did not believe she was a cpa. She was the gatekeeper for documents in keiters interactions with live well. Paula had medical issues at time which slowed things down and other times mc thought she felt overwhelmed which would slow things down from keiter's perspective as well. Paula was making journal entries for live well; had a staff of approx. 6-12 people as well; an assistant, ap clerks, an analyst and these types of transactions as well. George scott was on the team where mc had conference calls with him, but mc not much interaction with scott. Typically would not talk directly with hild, but would do debrief with board of directors to deliver the audit results and communications to live well and hild would be apart of this debrief. Keiter Like to keep client boards up to date of client developments and would not prepare decks, but would be in a letter form.

Board at live well was just hild and stuart cantor in more recent years. When there were preferred shareholders, there would be Richard sharp or rep for him, a fund up in boston had one or two seats as well as a preferred shareholder as well. Board at live well was somewhat engaged, but not the most engaged board or disengaged board that mc deals with on a regular basis; ask the right questions and probing questions from time to time. After the board changed, cantor did a nice job asking questions; mc never witness to any disagreements among board members.

Primary risk areas keiter focused on, was anything reported at fair value; when looking at live wells assets, a lot of their assets are reported at fair value, loans held for sale, loans held for investment, mortgage service rights and the ginnie mae bonds. Fair value looks at what a willing buyer and willing seller would exchange in an orderly transaction, not a rushed sale, as of the measurement date.

Keiters understanding of how live well was valuing the bonds; bonds were new in 2014 where live well had about 50mm in ginnie mae bonds; mc did not remember the exact discussion about the acquisition of the bond portfolio at live well. Part of the process was gaining an understanding of the bonds and how they were going to be valued because io bonds are a unique type of investment not seen day to day. Gained an understanding of live well using idc and that was used to produce the values for 12312014 audit; that was the same process for 2015 but starting in 2016, US BANK became the custodian of the bonds and they would start reporting the value. Documentation received from US BANK showed they used ICE for their valuations. US BANK provided the confirmations for the last several years.

Keiter understood ICE was a competing pricing service from idc from a discussion within keiter. Mc did not remember conversations with rohr about fair value; there were calls about how live well was valuing the bonds; within statements it indicates they are a fair value measure. Rohr did not mention ever to mc about what was being reported was not fair value, but were intrinsic value.

The discount rate in the fair value items can have a significant impact on the values. Mc remembered a conversation with rohr where rohr indicated where if they had to do a wholesale sale of the entire portfolio, he would not be able to produce the value that was being reported for the portfolio in approx. 2016/2017 timeframe.

Workpapers associated with 2014 audit; 53.7

First two columns identifies the bond itself; ticker and cusip; oface is original face amount; the amount the interest is being paid on will change, there are tails and prepayments that will get built into it. Cface is the current face amount. Factor is what live well paid for it – original face times factor gives idc px is the idc is the year end price 12/31 pricings; market value is current face times idc pricing. Keiter recalculated the mathematics of the valuation. Everything in black is provided by live well and everything in red is work performed by keiter. Pbc is called prepared by client and shows keiter notations in red. Checking to see live well is accurately reporting the oface and the factor. Multiplying price times cface to get the market value of the bonds.

At a later point, US BANK was reporting the values which gave keiter a better comfort level, similar to reviewing a marketable security portfolio, as US BANK didn't have any motivation to misstate the values of what they were holding on behalf of a client. Mc understanding was that some of lenders involved wanted a third party involved in holding the bonds, in terms of US BANK. us bank became custodians of the loan files for the live well bonds. Us bank did not have a reason to misreport the value of the bonds; mc was not aware of us bank having exposure to the live well bonds. Us bank was relying on ICE, is what they indicated to keiter, within communications with us bank. Did not know if us bank was doing their own valuation work.

Discussion with rohr was rohr telling keiter that us bank was becoming the keeper of the bonds and that us bank could provide the independent price for the bonds. Keiter's interpretation the pricing was independent of live well. Mc did not remember specific conversations about idc being an independent pricing service.

53.7.1 reviewed

From the 2014 audit. Attempting to establish what the value of the interest receivable is on the bonds. Interest isn't always funded on a month to month basis, so there ends up being an accrual so this work paper looks at how much interest should be earned looking at the current face amount to come to the interest accrual. To see if live well is accurately reporting the cash from the interest income, which is what the keiter calculations are.

53.7.2 reviewed

Also from 2014 audit. This was keiter's gaining an understanding of idc and comfort level from them. In 2015, the second year as more information was obtained by keiter, there were more in depth with conversations from idc in terms of the model they were using to produce the values. Keiter concerns were more of if idc was producing a clean or dirty price, referencing what they were doing with accrued interest on a month to month basis. Information as provided by adam ayers on this document, and shows his title on this document. Conversations between Collin and adam ayers regarding this document. It was alluded in 2018 audit when it was disclosed of the wells notice from the SEC that live well was providing the prices to idc; mc was surprised to learn this. mc would hope someone from live well would flag the source of the prices as this would change how mc would look at the valuations of the bonds because this would remove an objective third party providing a valuation and in mc's opinion he would want to perform additional procedures some of the inputs of what goes into the valuation of the bonds.

4

Conversation between mc and rohr about how the market was pricing the hecm ios. In regards to an issue dealt with during the 2017 year end audit that came up; during 2017, keiter learned that because of the activities live well was involved in, they were considered a dealer of securities under the irs code. Certain instruments that companies might have as considered a dealer, cannot be carried at amortized or historic cost and would have to be reported at fair value. What would have happened if live well had to pay the entire tax on when those bonds were marked to value as that value was higher than what they paid for the bonds and would have a significant tax impact. Rohr's indication was that if it all occurred in one year, they would have to get rid of the bond portfolio and wasn't sure if they could sell the entire thing at the value he was carrying it at. Mc recalled rohr saying that that volume of bonds on the market could not generate the level of pricing they were priced at, being it was 500mm in bonds in the portfolio. Rohr did not mention about the bonds not being marked at exit prices.

In 2017, live well constitutes a dealer in securities and were carrying the bonds for tax purposes at purchase price as IRS allows to use cost basis if not a dealer and do not have to pay capital gains tax on them after selling them; used another valuation for the bonds in the financial statements.

Bonds held to maturity is what the accounting standard requires in terms of how you account for the value of the bond. Held to maturity is something that is very hard to establish through accounting literature. Also had trader in securities, which live well was not a licensed security trader and would not qualify for this accounting. Third on is available for sale, which is how live well accounted for the bonds and required them to be reported at fair value. Held to maturity would be valued at amortized cost and would be more similar to the tax accounting. held to maturity accounting would have leveled out some of their financial statements in regards to their spikes in the fair values of the bonds. The gains built their equity, but if trying to show a consistent earnings to earnings, this affected their ability to do that.

The tax issue, live well applied for the change in method and was approved and the 2018 tax return was the first tax return under the new method. Approved by the IRS. They will pay the excess tax over a four year period and would not go into effect until 2018 tax returns.

Mc did not recall conversations with rohr about the market not properly pricing the bonds.

Prepayment is a factor of the payoff of the loans as well as the speed of continued draws on existing mortgages occur. Time value of money would determine the discount rate being used.

Mc was trying to understand and gain more knowledge about idc, as one concern of keiter was clean vs dirty pricing related to the interest accrual. At some point, the bond fair value should pick up the amount of accrued interest that hasn't been paid. The accrued interest on the ginnie mae bonds significantly increased from 2014 to 2015. risk saw by keiter was that there was a gain within the fair value adjustment of the ginnie mae bonds plus a large accrued interest amount increase. Interest receivable component for the 2015 audit was approx. 4.2mm. the valuation of the bond would then include some unpaid interest of the component. Mc's concern was there was double dipping, as the interest the bond has to pay out was apart of the valuation in addition to the initial expected accrued unpaid interest. And the fair value already picking up the interest component earned but not received yet. Live well was accruing a receivable for the unpaid interest from the bond portfolio and keiter was concerned that this accrual was duplicative of what was being captured in the statement of the fair value. The work around idc was trying to see if idc incorporated this unaccrued interest.

2015 audit workpapers 52.5

Comparing the cface and recalculating the market value by looking at cface and the price. Using a confirm as opposed to idc pricing. Went to counterparties such as wedbush and mizuho to confirm the prices. Collin audited this document.

70.11 is wedbush doc reviewed

This was used to confirm the value that live well was marking the bonds at. Rohr would know keiter sought the confirmations from the counterparties such as wedbush and mizuho.

70.10 nomura reviewed

Received client approval from live well to obtain the confirmations. These requests for client approval were signed by rohr.

MC remembered rohr saying most people used idc. mc did not remember rohr saying anyone who did not use idc. keiter is getting an outside party's acknowledgement for a value, higher level of confidence in the prices received.

70.9 is mizuho

Also sent out letter for live well's approval for this.

70.LS

This document is the notes payable for each counterparty and is referenced in the nomura doc 70.10 under the mark of 1,084,000.

 52.6 reviewed

Beefed up testing of the interest receivable portion. This talks through the purpose, where information came from, what the scope was, procedures performed. Reviewing it and looking at the calculations.

Sold bonds tab was to check the value of the bonds for the component going into the income statement. General expectation over time is that the fair value will drop off, so part of this exercise is seeing what is happening in their bond portfolio is meeting keiter's expectations.

53.7.2 for 2015

A note about confirmations from wedbush and mizuho.

52.6.2 2015

Provides more background of idc and the methodology and what it does for particular types of instruments. Talks about methodology used for US CMOs. Rohr provided this document in connection with the 2015 audit, so provided at beginning of 2016. Mc did not recall what rohr said about this document. Mc has seen where broker quotes have been referenced, but did not remember where it was seen in the context to live well. At the time of the audit, mc's understanding was that idc had a model that was used to price the bonds. "idc has their black box" was term used in conversations between keiter and rohr which was a model or system of aggregating a lot of different data and assumptions to produce what they anticipated was a discounted cash flow, which is what an io bond really is. Mc did not

6

get the indication from discussions with rohr that he knew the specifics to how idc was modelling the prices. Rohr did not ever state that idc ever changed the way they price bonds. mc did not recall any conversation with anyone at live well about the broker quote methodology of prices. Recent transactions were part of the model and market color as part of the model as well, and mc understanding was that idc was running the models to calculate prices. Mc did not have conversations with live well about live well sending the prices to idc via a broker quote methodology.

Keiter did not have in house expertise to value the bonds themselves.

KEI_0004632 doc reviewed

Around the issue of clean vs dirty pricing. GAAP dynamics consultation letter to keiter is attached. Surrounding the issue of accrued vs unacrrued interest. Keiter's concern was along the lines of the interest accrual component that live well was reporting. The outcome was that this was not an issue with the idc pricing.

KEI_0099881 reviewed

Mc remembered having the calls and they would go back to the questions surrounding the clean vs dirty pricing issue. Mc remembered basic stuff about the idc model, but not the specifics, as idc was close to the chest about their proprietary process. Conversation would not have been with respect to the live well securities and would not have identified live well or provided particular cusips to idc.

52.3 from 2016 audit reviewed

Did not have contact with repo providers outside of the confirms discussed before.

52.5 from 2016 reviewed

LIVE WELL was received a copy of the Mizuho and ICBC statements and providing them to keiter.

52.5.1 from 2016

Confirmation with US BANK; keiter starts using US BANK as a separate source of confirming the valuations of the bonds. this was the year doug and mc shared partner responsibility.

70.10 from 2016

In the confirms, the letter says the confirm is for the fair value in the debt section. Did not remember issues with nomura providing prices. Did not remember conversations with people at live well about nomura doing something different with the pricing of the bonds.

MSRs at live well became a focus when lw got afocus to do the ginnie mae securitizations in approx. 2012.

KEI_0006107 doc reviewed keiter memo 62 Memo.2 from 2016 audit and KEI_0000582 doc reviewed is 62 Memo.1. 62.Memo from 2016 audit

This talks about the background of the MSRs and why keiter is paying attention to them. The additional memo goes through the prepayments and draw curves and look at major assumptions used within the model. Live well sells mortgage bonds and retain the servicing rights. Msr is amortized over the period

7

of the life of the mortgage and would do an impairment calculation in the third quarter; straight line amortizing through the impairment analysis. The gain recognized could only go up to the amortized value. 62.memo discussed this exercise.

62.memo.1

On page four, talks about the discounted rate calculation. Mc's sense is the us swaps rate is the rate in which live well selected they believe appropriately equates to the risk that msr's and the bonds present which is the appropriate one they are using in formulating the yield curve they are expecting the msrs to produce. Mc would have been more concerned with significant changes in the rates as opposed to which specific one they decided to implement. Mc likes consistency and if they are using a 3% and that is too low, but then go to 1.5%, there are questions mc would raise in terms of why would it change so much when interest rate market is typically holding steady. Mc knew of changes in rates that live well was using, but it was significant to a higher rate which would have decreased the value of the msrs. Prepayment curve, draw curve, mc would expect to be consistent.

62_Memo_2 from 2016

Impairment during the 2016 audit. Mc remembered the impairment, but did not remember the discussions surrounding it.

Live well listed the hecm portfolio under bonds held available for sale which is different in accounting to bonds held for maturity. Held to maturity is carried at amortized cost. Keiter's response was that live well didn't believe live well qualified for held to maturity because they hadn't established any intent to hold the security to maturity and they have identified they may buy or sell the bonds as well, which meant to keiter that the bonds were available for sale; mc had these discussions with live well about this, eric rohr in particular.  Mc felt it was important to rohr and that the discussion warranted a face meeting or at least a phone call. Mc was not aware of hild's involvement or lack of involvement in this discussion.

KEI_0123217 was an attachment from an email from kirk evans, bates KEI_0123215

Mc did not remember seeing these spreadsheets. Tab SC14, mc was not sure what that stood for. Mc did not remember hearing of scenario 14.

KEI_0049424 attachment from email

Mc did not remember engaging in the numbers on the spreadsheet or this spreadsheet.

KEI_0077126

2015 and 2016 is presenting comparative financial statements; two years of balance sheets and two years of resulting operations. 2015 numbers imported from prior audit to present with the 2016 numbers. Single year presentation in 2018 because so much changed in the balance sheet and wasn't very comparable after they sold off their msrs, which was a 100mm change from 2017 to 2018.

2016 audit, bonds available for sale increased from live well acquiring more bond holdings. Also, part of the increase was from a fair value adjustment showing in the gain on investments available for sale – increase of 76,277,766 which was a pure mark to market increase. Mc did not remember a discussion about how the bonds were performing or why the increases were occurring. In 2016, live well had 54

bonds; 2015 they had 34 bonds. The gain was a year over year gain in fair value or the markup of what they paid for the bonds to the measurement date within the year.

12.TB in workpapers trial balance document – reviewed by mcdonald.

Mc knew there was a subpoena from the sec through legal. Mc did not have conversations with people at live well in regard to the sec investigation. Mc believed Collin had conversations with live well. Mc had more direct conversations about the wells notice in 2019. Attorney letters keiter sends out to look for loss contingencies. Mc gained insight to the sec investigation from the attorney letters. Mc did not have conversations with rohr or hild about the sec investigation. Mc's understanding was that the investigation was specific to individuals at live well and not live well in particular.

Mc learns there are individuals at live well under sec investigation; mc did not have a complete understanding of what the investigation was about; mc had the knowledge from the attorney letters or reviews of legal invoices.

2017 audit workpaper 91.2

Matt st. George had a conversation with rohr. The documentation section was from conversations with rohr and matt st. George. 2017 investigation was regarding the broker dealer issue at live well.

2017 audit 10.5 reviewed.

Live well gets a wells notice and mc did not have conversations with live well regarding the notice. Live well sent mc directly to their attorney regarding having conversations about the wells notice.

KEI_0114478 email reviewed

Mc was directed to the live well attorneys after sending this email.

KEI_0019340

This is mc's memo to the audit file. Mc's understanding of the wells notice is that the sec has sufficient information to start a formal inquiry and it is the beginning of the process. Mc's largest concern was that he learned about it through an attorney letter on march 23 when the notice itself was back in February and the audit was due in a week; mc upset he hadn't heard about it from live well management. Live well not providing this to mc had him question integrity of management of live well. Rohr was not at the company at this point.

Mc heard that rohr had decided he wanted to open a franchise similar to visiting angels and his approval came through faster than he initially expected which precipitated his leaving of live well. Mc found out this from the engagement team and believed they received the notice from paula foster when they showed up to do the field work. Jen Flinchum handled personal work for rohr and received a consistent reason about rohr's departure.

Mc knew of hild taking guarantee fees but did not hear of this being a source of contention between rohr and hild.

Mc was not aware of live well recording lower values in its books compared to idc values.

keiter would not dive into specific details of what a bond would have been valued at and would look high level at numbers.

Mc found out live well was providing pricing information to idc, which he found out from the wells notice. Mc did not have conversations about live well providing pricing information to idc.

It appeared to keiter that the methodology was being consistently applied by live well, from the fact that us bank was a third party perceived as objective and independent of both live well and idc. Keiter received confirmations of the value that they perceived was objective, being us bank, and because of these factors, they felt they had sufficient audit evidence the value was an appropriate value. US bank said they used ICE and that the valuations of the bonds were coming from ICE. There was consternation at keiter, but mc knew there was a regulatory deadline for HUD to meet for continued business from live well. Live well has to be signed off by march 31, but found out about the wells notice on march 23.

KEI_0099658

Live well asked keiter to make changes to the financials; haddock asked for changes to the footnotes. Haddock asked to move the leveling of the fair value of the assets from level 2 to level 3; level 1 is a pure quoted proce from an active market; level 2 is inactive markets and model driven valuations and inputs and drivers from active markets and keiter's understanding that there were inputs being used by idc from active markets which would make the securities level 2. Live well wanted the securities level 1 – discussion person to person with rohr around 2014; did not know rohr's reasoning for wanting the securities level 1 and then seriously debated level 2 versus 3. Decision was made to quote them as level 2. In this document, live well wanted it moved to level 3; this move was not made. Haddock also wanted keiter to change the text on page 20; mc did not believe it was changed to the extent live well wanted. Keiter's response back was that if they did change to level 3, there would be additional disclosures added; when change from level 2 to level 3 asset, there is additional disclosure as to why the leveling is changing and that what is happening throughout the year in terms of beginning value and how you get to the ending value, a leveling table, that needs to be provided. Also need to describe more of the key factors that go into the specific valuation methodology. mc was not concerned about the removal of the word independent. Mc did not believe it changed the definition a third party used by other industry participants and they are modelling it at a fair value. Mc saw this as more of a cosmetic change and not materially changing the definition of the paragraph.

KEI_0100853

Keiter issued two versions of the financial statements; the long form statement and the second statement was the short form that deletes all the supplemental reporting out from the long form, but adds in a supplemental schedule that presents the results of operations in a form that is presenting EDBITDA, but EBITDA is not a gaap concept and cannot be certified as gaap. Live well had wanted to change the statements that had been submitted to hud, and live well now was requesting to change the footnotes which would result in withdrawing the initial submission.

Keiter's recollection of the additional comments coming from murphy and mcgonigle were cosmetic and nothing that gave mc complete consternation.

Reps from flagstar came to see mc. Mc learned, through either softball or kickball team, someone had a spouse working for live well and made the comment to a keiter employee about live well laying off

10

employees. This news got passed to Collin and that was the day the news came out in a reverse mortgage daily about them ceasing their mortgage operations. When it came out publicly, mc sent message to glenn and hild to confirm if it was true and if they needed help from an accounting perspective they would help. Hild responded they could use the help and to reach out to glenn; mc never gotten a returned call from glenn at all. Mc has never spoken to anyone at live well since the news and there have not been conversations with management as to whats going on right now from keiter.

Flagstar showed up to keiter and started asking questions, but keiter maintained client confidentiality and said they couldn't respond to flagstar. Ryan Beethoven Wilson is tax manager that handles Michael huild's personal taxes and he had spoken to flagstar at first; flagstar sent questions which were forwarded to management at keiter who responded to maintain client confidentiality on the matter.

KEI_0078157

Item 1 was SEC subpoena received from greg. Item 2 was in regards to flagstar. Mc did not interact with flagstar.

Point E – mc was not aware of Bloomberg doing their own pricing. Mc knew there was a service where comparable pricing could be obtained, but did not recall if it was Bloomberg. Mc was not aware of idc stopping the carry of these prices for a number of days in early 2019. US Bank showed aggregate value of the bonds and had details on individual cusips as well. Mc not aware that idc prices for bonds did not change for over a year in 2018. No trading in 2018, so no reason for keiter to ask for trade tickets.

Mc not aware of live well marking up the price of the bonds within a week of purchasing them. In 2014 or 2015, mc remembered conversation with rohr about live well buying the bonds at a lower value than what they truly believed the bonds were worth.

The 2015 financial statements on page 29 – 2015 audit 10.6

Realized live well was marking up the bonds in a short time period as evidenced here. Mc did not have conversations about these markups. Mc thought this was weird looking back at it now after rereading the statement; at the time, mc did not remember feeling weird about it during the time. There may have been a conversation about this situation, but mc did not recall any specifics. Mc believed the seller of the product was pricing it lower than live well saw the prices being and this was the investment strategy of live well.

Mc was never told that live well influenced the prices in idc. mc also did not remember hearing anything about live well manipulating the factors in which idc was using to determine the prices. Keiter believed that idc was independent and objectively determining the value of the bonds. this was keiter's view until the wells notice and no one told mc anything differently about this at live well.

Idc is the one providing the final fair value and keiter believed the value provided by idc was a price developed by idc.

Mc was not ever told that idc did not provide prices for the bonds until live well acquired the bonds.

Mc was not ever told that as of mid 2015 idc was taking prices live well provided and republishing them.

Mc was not ever told prices in live wells financials were being dictated by live well and not idc.

Mc was never told that live well exerted influence on idc for prices.

Mc was never told live well had written down their bond portfolio by 200mm.

Mc not aware us bank has decreased its published valuation of the bonds since april 2019.

Mc never told live well shutdown because glenn haddock refused to sign the interim quarterly financials.

**Live Well Financial, Inc.**
**Year End: December 31, 2015**
**Notes Payable Leadsheet**

**70.LS**

| | Prepared by | Reviewed by | Reviewed by | Reviewed by |
|---|---|---|---|---|
| | ESH 2/24/2016 | MWW 3/10/2016 | | |

| Account | Prelim | Adj's | Reclass | Rep | Annotation | Rep 12/14 | Amount Chg | %Chg |
|---|---|---|---|---|---|---|---|---|
| 2102 Wells Fargo Credit Line | 0 | 0 | 0 | 0 | ¹ 70.LS | (50,000) | 50,000 | (100) |
| 2105 Xenith Warehouse Line of Credit | 0 | 0 | 0 | 0 | ² 70.LS | (29,377,003) | 29,377,003 | (100) |
| 2106 Customers Bank Warehouse Line | (24,202,066) | 0 | 0 | (24,202,066) | 70. 1 70. 2 | (38,385,337) | 14,183,271 | (37) |
| 2108 Xenith Unsecured Line of Credit | 0 | 0 | 0 | 0 | ² 70.LS | (2,000,000) | 2,000,000 | (100) |
| 2109 Mizuho Debt Facility | (39,678,000) | 0 | 0 | (39,678,000) | 70. 1 70. 9 | 0 | (39,678,000) | 0 |
| 2110 Guggenhiem Debt Facility | 0 | 0 | 0 | 0 | ² 70.LS | (10,395,000) | 10,395,000 | (100) |
| 2111 Duncan Williams Repo Facility | 0 | 0 | 0 | 0 | ² 70.LS | (7,610,072) | 7,610,072 | (100) |
| 2113 Republic Bank | (31,522,432) | 0 | 0 | (31,522,432) | 70. 1 70. 7 | 0 | (31,522,432) | 0 |
| 2114 Wedbush Securities Line | (140,970,000) | 0 | 0 | (140,970,000) | 70. 1 70.11 | 0 | (140,970,000) | 0 |
| 2115 Nomura Repo Facility | (1,084,000) | 0 | 0 | (1,084,000) | 70. 1 70.10 | 0 | (1,084,000) | 0 |
| 2112.00 First Tennessee Warehouse Line | (46,754,288) | 0 | 0 | (46,754,288) | 70. 1 70. 8 70. | 0 | (46,754,288) | 0 |
| 2112.01 First Tennessee 0.98 MC Line | (2,538,063) | 0 | 0 | (2,538,063) | 70. 1 70. 8 70. | 0 | (2,538,063) | 0 |
| **2273  Lines of credit** | **(286,748,849)** | **0** | **0** | **(286,748,849)** | | **(87,817,412)** | **(198,931,437)** | **227** |
| | (286,748,849) | 0 | 0 | (286,748,849) | | (87,817,412) | (198,931,437) | 227 |

1.  Keiter notes this Wells Fargo account was closed on January 5, 2015.

2.  Keiter notes some of the PY Warehouse lines of credit and debt facilities were closed in 2015 and opened with new financial institutions. PDW management, the previous accounts were closed due to better terms with other lenders.  Appears reasonable.

**8/12/2019**
**6:39 PM**

13

**Page   1**

**Live Well Financial, Inc.**
Year End: December 31, 2016
**Working Trial Balance**

**12.TB**

| | Prepared by | Reviewed by | Reviewed by |
|---|---|---|---|
| | CMH 3/22/2017 | | MOM 3/22/2017 |
| | Reviewed by | Reviewed by | |
| | RWL 3/26/2017 | | |

| Account | Prelim | Adj's | Reclass | Rep | Annotation | Rep 12/15 | Amount Chg | %Chg |
|---|---|---|---|---|---|---|---|---|
| 1000 Wells Fargo Business Checking | 4,282,661 | 0 | 0 | 4,282,661 | 50. 2 | 457,023 | 3,825,638 | 837 |
| 1001 Capital One Money Market | 0 | 0 | 0 | 0 | | 1,629 | (1,629) | (100) |
| 1003 Wells Fargo Reverse Escrows | 10,108 | 0 | 0 | 10,108 | 50. 2 | 10,540 | (432) | (4) |
| 1006 BB&T Funding | 0 | 0 | 0 | 0 | | 508 | (508) | (100) |
| 1012 Wells Fargo GNMA P&I Account | 0 | 0 | 0 | 0 | | 22,384,572 | (22,384,572) | (100) |
| 1018 Customers Bank | 1,683,534 | 0 | 0 | 1,683,534 | 50. 2 70. 2 | 9,978,667 | (8,295,133) | (83) |
| 1025 Xenith Money Market Acct 4798 | 0 | 0 | 0 | 0 | | 0 | (0) | (100) |
| 1029 RJ O'Brien Trading Account | 0 | 0 | 0 | 0 | | 1,793 | (1,793) | (100) |
| 1030 US Bank Funding Account | 346,000 | 0 | 0 | 346,000 | IMM | 0 | 346,000 | 0 |
| 1031 First Tennessee Bank | 155,895 | 0 | 0 | 155,895 | IMM | 73,259 | 82,636 | 113 |
| 1033 First Tennessee Bank MIP Acct | 73,682 | 0 | 0 | 73,682 | IMM | 395,009 | (321,327) | (81) |
| 1035 Republic Bank Funding | 105,167 | 0 | 0 | 105,167 | 70. 7 | 768,877 | (663,710) | (86) |
| 1036 First Tennessee Forward Escrow | 7,902 | 0 | 0 | 7,902 | IMM | 9,039 | (1,137) | (13) |
| 1037 Republic Bank Pledged | 650,609 | 0 | 0 | 650,609 | 50. 2 | 650,089 | 520 | 0 |
| 1038 Customers Bank GNMA P&I Account | 411 | 0 | 0 | 411 | 70. 2 IMM | 91,875 | (91,464) | (100) |
| 1039 WedbushTrading Account | 14,954 | 0 | 0 | 14,954 | IMM | 0 | 14,954 | 0 |
| 1041 BB&T IDP Account | 2,500,121 | 0 | 0 | 2,500,121 | 50. 2 50. 3 | 0 | 2,500,121 | 0 |
| 1043 ICS Depositor Republic Bank | 2,502,344 | 0 | 0 | 2,502,344 | 50. 2 | 0 | 2,502,344 | 0 |
| 1044 Republic Bank GNMA P&I Acct | 57,565,647 | 0 | 0 | 57,565,647 | 50. 2 70. 7 | 0 | 57,565,647 | 0 |
| 1045 Republic Bank Benefits Escrow | 11,062 | 0 | 0 | 11,062 | 70. 7 | 0 | 11,062 | 0 |
| 1047 Republic Bank Business Checking | 1,696,753 | 0 | 0 | 1,696,753 | 50. 2 70. 7 | 0 | 1,696,753 | 0 |
| 1048 Flagstar Bank Funding | 2,030 | 0 | 0 | 2,030 | 50. 3 IMM | 0 | 2,030 | 0 |
| 1049 Flagstar Bank WarehouseClearing | 5,025 | 0 | 0 | 5,025 | 50. 3 IMM | 0 | 5,025 | 0 |
| 1050 Flagstar Bank Pledged Acct | 50,012 | 0 | 0 | 50,012 | 50. 2 50. 3 | 0 | 50,012 | 0 |
| 1051 Republic Bank- EverBank Trust | 2,798,665 | 0 | 0 | 2,798,665 | 50. 2 | 0 | 2,798,665 | 0 |
| 1042.01 Customers Bank ICS Account | 16 | 0 | 0 | 16 | 70. 2 | 0 | 16 | 0 |
| 1042.02 ICS Depositor Customers Bank | 7,510,580 | 0 | 0 | 7,510,580 | 50. 2 | 0 | 7,510,580 | 0 |
| **1201 Cash and cash equivalents** | **81,973,178** | **0** | **0** | 81,973,178 | | 34,822,882 | 47,150,296 | 135 |
| | | | | | | | | |
| 1240 Premium Eligible for Recapture | 23,941 | 0 | 0 | 23,941 | 53. 1 | 18,862 | 5,080 | 27 |
| 1510 Employee Advances | 12,655 | 0 | 0 | 12,655 | | 10,656 | 1,999 | 19 |
| 1660 Due from LWF Investors | 535 | 0 | 0 | 535 | [1] | 0 | 535 | 0 |
| 1725 Title Claim Receivable | 28,626 | 0 | 0 | 28,626 | | 9,583 | 19,043 | 199 |
| 1201.08 Due From Loan Care | 99,840 | 0 | 0 | 99,840 | 53. 1 54.LS | 85,636 | 14,204 | 17 |
| 1201.11 Litigation Receivable | 2,679 | 0 | 0 | 2,679 | | 0 | 2,679 | 0 |
| 1201.16 Due from LWF Investors | 0 | 0 | 0 | 0 | 53. 1 54.LS | 48,453 | (48,453) | (100) |
| 1502.00 HUD Claim Receivable | 161,106 | 0 | 0 | 161,106 | 54.LS | 11,916 | 149,190 | 1252 |
| 1502.01 Reserve for HUD Claim Receivabl | (10,762) | 0 | 0 | (10,762) | | (10,762) | 0 | 0 |
| **1206.190 Other receivables** | **318,620** | **0** | **0** | **318,620** | | **174,344** | **144,276** | **83** |
| | | | | | | | | |
| 1230.00 HUD Loans Held for Assignment | 3,247,060 | 0 | 0 | 3,247,060 | 53. 1 54. 1 | 9,529,247 | (6,282,187) | (66) |
| 1230.03 HUD Loans Held - Unassignable | 11,415,255 | 0 | 0 | 11,415,255 | [2] 53. 1 54. 1 | 0 | 11,415,255 | 0 |
| **1206.199 Other Receivables -HUD loans held for assignment** | **14,662,315** | **0** | **0** | **14,662,315** | | **9,529,247** | **5,133,068** | **54** |
| | | | | | | | | |
| 1201.13 Income Tax Receivable - State | 193,432 | 380,978 | 0 | 574,410 | 53. 1 | 644,976 | (70,566) | (11) |
| 1201.14 Income Tax Receivable - Federal | 505,742 | 0 | 0 | 505,742 | 53. 1 | 3,425,373 | (2,919,631) | (85) |
| **1206.200 Income Taxes Receivable** | **699,174** | **380,978** | **0** | **1,080,152** | | **4,070,349** | **(2,990,197)** | **(73)** |
| | | | | | | | | |
| 1700.00 Real Estate Owned | 3,607,554 | 0 | 0 | 3,607,554 | 65. 1 | 815,311 | 2,792,243 | 342 |
| **1210 Investments** | **3,607,554** | **0** | **0** | **3,607,554** | | **815,311** | **2,792,243** | **342** |
| | | | | | | | | |
| 1350 GNMA Bonds Held for Sale | 386,127,735 | 0 | 0 | 386,127,735 | 52. 5 | 217,859,066 | 168,268,669 | 77 |
| 1351 Derivative Instruments - IO | 3,640,568 | 0 | 0 | 3,640,568 | 52. 2 | 250,740 | 3,389,828 | 1352 |
| 1201.12 GNMA Bond Interest Receivable | 5,769,243 | 0 | 0 | 5,769,243 | 53. 1 | 4,226,408 | 1,542,835 | 37 |
| 1350.01 GNMA Bond Mark to Market | 134,240,597 | 0 | 0 | 134,240,597 | [3] 52. 5 | 0 | 134,240,597 | 0 |
| 1351.02 Deriv. Instr. Mark to Market IO | (3,651,574) | 0 | 0 | (3,651,574) | 52. 2 | 0 | (3,651,574) | 0 |
| **1210.340 U.S Treasury and government agencies** | **526,126,569** | **0** | **0** | **526,126,569** | | **222,336,214** | **303,790,355** | **137** |
| | | | | | | | | |
| 1230 Reverse Mortgages Receivable | 65,009,136 | 0 | 0 | 65,009,136 | 53. 1 53. 5 | 76,126,528 | (11,117,392) | (15) |
| 1231 Forward Mortgages Receivable | 2,501,784 | 0 | 0 | 2,501,784 | 53. 1 | 2,279,627 | 222,157 | 10 |
| 1750 Loans Held for Investment | 2,259,745 | 0 | 0 | 2,259,745 | 53. 1 | 1,799,818 | 459,927 | 26 |
| 1201.03 Broker Premium Forward | 23,254 | 0 | 0 | 23,254 | 53. 1 | 28,907 | (5,653) | (20) |
| 1201.04 Broker Premium Reverse | 6,977,760 | 0 | 0 | 6,977,760 | 53. 1 53. 5 | 7,037,716 | (59,956) | (1) |
| 1201.09 Lender Credit - Reverse | 363,858 | 0 | 0 | 363,858 | 53. 1 | 966,558 | (602,700) | (62) |
| 1201.10 Lender Credit - Forward | 8,179 | 0 | 0 | 8,179 | 53. 1 | 7,288 | 891 | 12 |
| 1260.00 Forward FV on LHS | 4,242 | 0 | 0 | 4,242 | 53. 1 53. 4 | 1,724 | 2,518 | 146 |
| 1270.00 HECM FV on Loans HFS | (50,748) | 0 | 0 | (50,748) | 53. 1 53. 5 | (1,003,710) | 952,962 | (95) |

**Live Well Financial, Inc.**
Year End: December 31, 2016
**Working Trial Balance**

**12.TB-1**

| Prepared by | Reviewed by | Reviewed by |
|---|---|---|
| CMH 3/22/2017 | | MOM 3/22/2017 |
| **Reviewed by** | **Reviewed by** | |
| RWL 3/26/2017 | | |

| Account | Prelim | Adj's | Reclass | Rep | Annotation | Rep 12/15 | Amount Chg | %Chg |
|---|---|---|---|---|---|---|---|---|
| 1750.01 Loss Reserves for LHI | (88,000) | 0 | 0 | (88,000) | 53. 1  53. 3 | (185,071) | 97,071 | (52) |
| **1260   Loans held for sale** | **77,009,210** | **0** | **0** | **77,009,210** | | **87,059,385** | **(10,050,175)** | **(12)** |
| | | | | | | | | |
| 1261 Fair Value on Fees | 2,705 | 0 | 0 | 2,705 | 53. 1 | 5,624 | (2,919) | (52) |
| 1263 Fair Value on Hedges | 0 | 0 | 0 | 0 | | 3,204 | (3,204) | (100) |
| 1260.01 Forward FV on Pipeline | (178) | 0 | 0 | (178) | 53. 1 | 4,651 | (4,829) | (104) |
| 1270.01 HECM FV on Pipeline | 573,981 | 0 | 0 | 573,981 | 53. 1  53. 5 | (67,837) | 641,818 | (946) |
| **1260. 02   Loan committments at FV** | **576,508** | **0** | **0** | **576,508** | | **(54,358)** | **630,866** | **(1161)** |
| | | | | | | | | |
| 1601 Prepaid Bonding | 34,598 | 0 | 0 | 34,598 | 58. 1 | 37,140 | (2,542) | (7) |
| 1602 Prepaid Licenses and Permits | 130,422 | 0 | 0 | 130,422 | 58. 1 | 73,182 | 57,240 | 78 |
| 1603 Prepaid Insurance | 17,340 | 0 | 0 | 17,340 | 58. 1 | 19,632 | (2,292) | (12) |
| 1605 Prepaid Professional Fees | 0 | 0 | 0 | 0 | IMM | 5,000 | (5,000) | (100) |
| 1607 Prepaid Dues & Subscriptions | 31,880 | 0 | 0 | 31,880 | 58. 1 | 3,609 | 28,271 | 783 |
| 1609 Prepaid Consulting | 5,500 | 0 | 0 | 5,500 | 58. 1 | 0 | 5,500 | 0 |
| 1613 Prepaid Bank Charges | 2,000 | 0 | 0 | 2,000 | 58. 1 | 0 | 2,000 | 0 |
| 1614 Prepaid Marketing Expense | 166,700 | 0 | 0 | 166,700 | 58. 1 | 13,200 | 153,500 | 1163 |
| 1615 Prepaid Leases | 12,238 | 0 | 0 | 12,238 | 58. 1 | (79,372) | 91,610 | (115) |
| 1618 Prepaid Expenses - Other | 45,745 | 0 | 0 | 45,745 | 58. 1 | 46,063 | (318) | (1) |
| 1619 Prepaid GNMA Committment Fees | 26,785 | 0 | 0 | 26,785 | 58. 1 | 66,950 | (40,165) | (60) |
| 1505.00 Tax Service Fees | 785,528 | 0 | 0 | 785,528 | 58. 1 | 505,724 | 279,804 | 55 |
| 1505.01 Accum Amort - Tax Service Fees | (151,337) | 0 | 0 | (151,337) | 58. 1 | (60,148) | (91,189) | 152 |
| **1276   Prepaid expenses and other current assets** | **1,107,399** | **0** | **0** | **1,107,399** | | **630,980** | **476,419** | **76** |
| | | | | | | | | |
| 1851.1 Network | 172,683 | 0 | 0 | 172,683 | 60. 1 | 172,683 | (0) | 0 |
| **1500.140   Network** | **172,683** | **0** | **0** | **172,683** | | **172,683** | **(0)** | **0** |
| | | | | | | | | |
| 1801 Furniture & Fixtures | 43,759 | 0 | 0 | 43,759 | 60. 1 | 43,759 | 0 | 0 |
| **1500.150   Furniture and fixtures** | **43,759** | **0** | **0** | **43,759** | | **43,759** | **0** | **0** |
| | | | | | | | | |
| 1871 Telephone Equipment | 17,014 | 0 | 0 | 17,014 | 60. 1 | 17,014 | 0 | 0 |
| 1854.1 Copier Workcentre 7775P | 19,491 | 0 | 0 | 19,491 | 60. 1 | 19,491 | 0 | 0 |
| 1855.1 Copier Xerox Color SC570 | 22,784 | 0 | 0 | 22,784 | 60. 1 | 22,784 | 0 | 0 |
| **1500.160   Office equipment** | **59,289** | **0** | **0** | **59,289** | | **59,288** | **1** | **0** |
| | | | | | | | | |
| 1861 Computers | 36,630 | 0 | 0 | 36,630 | 60. 1 | 36,630 | (0) | 0 |
| 1853.1 Exchange Server | 43,081 | 0 | 0 | 43,081 | 60. 1 | 43,081 | 0 | 0 |
| **1500.190   Computer equipment** | **79,711** | **0** | **0** | **79,711** | | **79,711** | **(0)** | **0** |
| | | | | | | | | |
| 1851.2 Accum Dep-Network | (172,683) | 0 | 0 | (172,683) | 60. 1 | (141,329) | (31,354) | 22 |
| **1500.240   Network - Accumulated Depreciaton** | **(172,683)** | **0** | **0** | **(172,683)** | | **(141,329)** | **(31,354)** | **22** |
| | | | | | | | | |
| 1802 Accum Dep-Furniture/Fixtures | (31,421) | 0 | 0 | (31,421) | 60. 1 | (27,817) | (3,604) | 13 |
| **1500.250   Furniture and fixtures - Accumulated Depreciation** | **(31,421)** | **0** | **0** | **(31,421)** | | **(27,817)** | **(3,604)** | **13** |
| | | | | | | | | |
| 1872 Accum Dep-Telephone Equipment | (17,014) | 0 | 0 | (17,014) | 60. 1 | (16,329) | (685) | 4 |
| 1854.2 Accum Deprec - Workcentre 7775P | (19,491) | 0 | 0 | (19,491) | 60. 1 | (19,491) | 0 | 0 |
| 1855.2 Accum Deprec - Xerox SC570 | (10,253) | 0 | 0 | (10,253) | 60. 1 | (5,696) | (4,557) | 80 |
| **1500.260   Machinery and equipment - Accumulated Depreciation** | **(46,758)** | **0** | **0** | **(46,758)** | | **(41,516)** | **(5,242)** | **13** |
| | | | | | | | | |
| 1862 Accum Dep-Computers | (36,630) | 0 | 0 | (36,630) | 60. 1 | (35,279) | (1,351) | 4 |
| 1853.2 Accum Deprec Exchange Server | (41,305) | 0 | 0 | (41,305) | 60. 1 | (34,654) | (6,651) | 19 |
| **1500.290   Computer equipment - Accumulated Depreciation** | **(77,935)** | **0** | **0** | **(77,935)** | | **(69,933)** | **(8,002)** | **11** |
| | | | | | | | | |
| 1900 Security Deposit | 45,434 | 0 | 0 | 45,434 | | 31,984 | 13,450 | 42 |
| 1901 Equipment Deposits | 13,620 | 0 | 0 | 13,620 | | 13,620 | (0) | 0 |
| **1803   Other assets, net** | **59,054** | **0** | **0** | **59,054** | | **45,604** | **13,450** | **29** |
| | | | | | | | | |
| 1201.02 FNMA 571 Receivable | 1,683,482 | 0 | 0 | 1,683,482 | 53. 1 | 1,198,968 | 484,514 | 40 |
| 1201.17 Reserve for FNMA Receivable | (614,384) | 0 | 0 | (614,384) | 53. 1 | (119,335) | (495,049) | 415 |
| 1201.20 Promissory Note Receivable | 13,754 | 0 | 0 | 13,754 | | 0 | 13,754 | 0 |
| 1201.21 Reserve for Promissory Note | (13,754) | 0 | 0 | (13,754) | | 0 | (13,754) | 0 |
| **1804   Loan Servicing Receivables** | **1,069,098** | **0** | **0** | **1,069,098** | | **1,079,633** | **(10,535)** | **(1)** |
| | | | | | | | | |
| 1290.00 Unsecuritized Advances | 311,766,107 | 0 | 0 | 311,766,107 | | 200,263,419 | 111,502,688 | 56 |
| 1290.01 Unsecuritized Prepays | (9,825,450) | 0 | 0 | (9,825,450) | 53. 2 | (5,593,741) | (4,231,709) | 76 |
| 1290.02 Unsecuritized MIP Clearing | 98,632,689 | 0 | 0 | 98,632,689 | 53. 2 | 61,699,152 | 36,933,537 | 60 |

**Live Well Financial, Inc.**
Year End: December 31, 2016
**Working Trial Balance**

**12.TB-2**

| Prepared by | Reviewed by | Reviewed by |
|---|---|---|
| CMH 3/22/2017 | | MOM 3/22/2017 |
| **Reviewed by** | **Reviewed by** | |
| RWL 3/26/2017 | | |

| Account | Prelim | Adj's | Reclass | Rep | Annotation | Rep 12/15 | Amount Chg | %Chg |
|---|---|---|---|---|---|---|---|---|
| 1290.03 Unsecuritized Interest Clearing | 33,525,664 | 0 | 0 | 33,525,664 | 53. 2 | 21,324,010 | 12,201,654 | 57 |
| 1290.04 Unsecuritized Service Fees | 579,023 | 0 | 0 | 579,023 | 53. 2 | 409,766 | 169,257 | 41 |
| 1290.05 Unsecuritized Tails | (416,833,991) | 0 | (60,711) | (416,894,702) | 53. 2 | (263,039,117) | (153,855,585) | 58 |
| 1290.06 Suspense | 326,643 | 0 | 60,711 | 387,354 | 53. 2 | (474,866) | 862,220 | (182) |
| **1805   Unsecuritized UPB** | **18,170,685** | **0** | **0** | **18,170,685** | 53. 1 | **14,588,623** | **3,582,062** | **25** |
| | | | | | | | | |
| 1960 GNMA Reverse Servicing Rights | 132,477,633 | 0 | 0 | 132,477,633 | 62. 1. 1 | 97,841,028 | 34,636,605 | 35 |
| 1971 FNMA Forward Servicing Rights | 1,331,558 | 0 | 0 | 1,331,558 | 62. 1. 2 | 1,069,252 | 262,306 | 25 |
| 1972 GNMA Forward Servicing Rights | 329,754 | 0 | 0 | 329,754 | 62. 1. 2 | 335,919 | (6,165) | (2) |
| 1960.00 Accum Amort GNMA Reverse MSRs | (43,716,962) | 0 | 0 | (43,716,962) | 62. 1. 1 | (25,635,611) | (18,081,351) | 71 |
| 1960.01 GNMA MSR Impairment | (8,911,433) | 0 | 0 | (8,911,433) | 62. 4 | (4,177,194) | (4,734,239) | 113 |
| 1971.00 Accum Amort FNMA Forward MSRs | (474,659) | 0 | 0 | (474,659) | 62. 1. 2 | (150,677) | (323,982) | 215 |
| 1972.00 Accum Amort GNMA Forward MSRs | (148,212) | 0 | 0 | (148,212) | 62. 1. 2 | (82,473) | (65,739) | 80 |
| **1830.155   Mortgage servicing rights, net** | **80,887,679** | **0** | **0** | **80,887,679** | | **69,200,245** | **11,687,434** | **17** |
| | | | | | | | | |
| 1915.1 Accum Amortization 2006 Q4 | (92,975) | 0 | 0 | (92,975) | | (88,946) | (4,029) | 5 |
| 1916.1 Accum Amortization 2007 Q1 | (108,744) | 0 | 0 | (108,744) | | (102,660) | (6,084) | 6 |
| 1917.1 Accum Amortization 2007 Q2 | (176,718) | 0 | 0 | (176,718) | | (164,550) | (12,168) | 7 |
| 1918.1 Accum Amortization 2007 Q3 | (216,236) | 0 | 0 | (216,236) | | (200,073) | (16,163) | 8 |
| 1919.1 Accum Amortization 2007 Q4 | (206,565) | 0 | 0 | (206,565) | | (191,565) | (15,000) | 8 |
| 1920.1 Accum Amortization 2008 Q1 | (166,475) | 0 | 0 | (166,475) | | (153,800) | (12,675) | 8 |
| 1921.1 Accum Amortization 2008 Q2 | (171,624) | 0 | 0 | (171,624) | | (156,609) | (15,015) | 10 |
| 1922.1 Accum Amortization 2008 Q3 | (110,124) | 0 | 0 | (110,124) | | (99,418) | (10,706) | 11 |
| 1923.1 Accum Amortization 2008 Q4 | (124,722) | 0 | 0 | (124,722) | | (112,562) | (12,160) | 11 |
| 1926.1 Accum Amortization 2009  Q1 | (189,420) | 0 | 0 | (189,420) | | (170,710) | (18,710) | 11 |
| 1927.1 Accum Amortization 2009 Q2 | (513,507) | 0 | 0 | (513,507) | | (457,188) | (56,319) | 12 |
| 1928.1 Accum Amortization 2009 Q3 | (275,640) | 0 | 0 | (275,640) | | (246,355) | (29,285) | 12 |
| 1929.1 Accum Amortization 2009 Q4 | (146,797) | 0 | 0 | (146,797) | | (129,853) | (16,944) | 13 |
| 1930.1 Accum Amortization 2010 Q1 | (63,050) | 0 | 0 | (63,050) | | (54,940) | (8,110) | 15 |
| 1931.1 Accum Amortization 2010 Q2 | (20,762) | 0 | 0 | (20,762) | | (18,444) | (2,318) | 13 |
| 1932.1 Accum Amortization 2010 Q3 | (3,319) | 0 | 0 | (3,319) | | (2,982) | (337) | 11 |
| 1915.00 MSR 2006 Q4 | 93,993 | 0 | 0 | 93,993 | | 93,993 | (0) | 0 |
| 1916.00 MSR 2007 Q1 | 114,537 | 0 | 0 | 114,537 | | 114,537 | (0) | 0 |
| 1917.00 MSR 2007 Q2 | 190,075 | 0 | 0 | 190,075 | | 190,075 | 0 | 0 |
| 1918.00 MSR 2007 Q3 | 236,541 | 0 | 0 | 236,541 | | 236,541 | 0 | 0 |
| 1919.00 MSR 2007 Q4 | 225,498 | 0 | 0 | 225,498 | | 225,498 | (0) | 0 |
| 1920.00 MSR 2008 Q1 | 177,529 | 0 | 0 | 177,529 | | 177,529 | 0 | 0 |
| 1921.00 MSR 2008 Q2 | 193,841 | 0 | 0 | 193,841 | | 193,841 | (0) | 0 |
| 1922.00 MSR 2008 Q3 | 127,972 | 0 | 0 | 127,972 | | 127,972 | 0 | 0 |
| 1923.00 MSR 2008 Q4 | 148,474 | 0 | 0 | 148,474 | | 148,474 | (0) | 0 |
| 1926.00 MSR 2009 Q1 | 227,766 | 0 | 0 | 227,766 | | 227,766 | 0 | 0 |
| 1927.00 MSR 2009 Q2 | 619,208 | 0 | 0 | 619,208 | | 619,208 | 0 | 0 |
| 1928.00 MSR 2009 Q3 | 334,396 | 0 | 0 | 334,396 | | 334,396 | 0 | 0 |
| 1929.00 MSR 2009 Q4 | 182,908 | 0 | 0 | 182,908 | | 182,908 | 0 | 0 |
| 1930.00 MSR 2010 Q1 | 79,690 | 0 | 0 | 79,690 | | 79,690 | (0) | 0 |
| 1931.00 MSR 2010 Q2 | 25,812 | 0 | 0 | 25,812 | | 25,812 | (0) | 0 |
| 1932.00 MSR 2010 Q3 | 4,060 | 0 | 0 | 4,060 | | 4,060 | (0) | 0 |
| **1830.156   06-10 MSR, net** | **395,622** | **0** | **0** | **395,622** | 62. 4 | **631,643** | **(236,021)** | **(37)** |
| | | | | | | | | |
| 2000 Accounts Payable | (258,027) | 0 | 0 | (258,027) | 71. 1  71. 3 | (442,779) | 184,752 | (42) |
| 2001 Accounts Payable - Accrued | (171,400) | 0 | 0 | (171,400) | 71. 1  71. 3 | (148,831) | (22,569) | 15 |
| 2021 American Express | (3,304) | 0 | 0 | (3,304) | 71. 1 | (196,542) | 193,238 | (98) |
| 2100 Payroll Liabilities | (10,582) | 0 | 0 | (10,582) | | (4,093) | (6,489) | 159 |
| 2130 Legal - Wholesale Loan Reserve | (1,879) | 0 | 0 | (1,879) | | (1,879) | 0 | 0 |
| 2152 Document Preparation Fee | (10,025) | 0 | 0 | (10,025) | | (18,100) | 8,075 | (45) |
| 2153 Due to/from Celink | (908,719) | 0 | (60,711) | (969,430) | 65. LS | (168,485) | (800,945) | 475 |
| 2156 Georgia fee payable | (150) | 0 | 0 | (150) | | (240) | 90 | (38) |
| 2161 Bond Interest Payable | (516,694) | 0 | 0 | (516,694) | 72. LS | (176,619) | (340,075) | 193 |
| 2164 Derivative Interest Payable | (234,731) | 0 | 0 | (234,731) | 72. LS  52. 4 | (893,821) | 659,090 | (74) |
| 2171 Attorney Reviews Payable | (88) | 0 | 0 | (88) | | 1,063 | (1,151) | (108) |
| 2172 Guarantee Fees Payable | (5,845,358) | 0 | 0 | (5,845,358) 4 | 72. 2 | 0 | (5,845,358) | 0 |
| 2173 VA Funding Fees Payable | (21,373) | 0 | 0 | (21,373) | | 0 | (21,373) | 0 |
| 2174 Directors Fees Payable | (1,904,400) | 0 | 0 | (1,904,400) | 72. 2 | 0 | (1,904,400) | 0 |
| 2175 Benefits Payable (HSA/FSA) | (10,964) | 0 | 0 | (10,964) | | 0 | (10,964) | 0 |
| 2176 Due to EverBank | (2,782,209) | 0 | 0 | (2,782,209) 5 | 72. LS | 0 | (2,782,209) | 0 |
| **2215   Accounts payable and accrued expenses** | **(12,679,903)** | **0** | **(60,711)** | **(12,740,614)** | | **(2,050,327)** | **(10,690,287)** | **521** |

**Live Well Financial, Inc.**
Year End: December 31, 2016
**Working Trial Balance**

**12.TB-3**

| Prepared by | Reviewed by | Reviewed by |
|---|---|---|
| CMH 3/22/2017 | | MOM 3/22/2017 |
| Reviewed by | Reviewed by | |
| RWL 3/26/2017 | | |

| Account | Prelim | Adj's | Reclass | Rep | Annotation | Rep 12/15 | Amount Chg | %Chg |
|---|---|---|---|---|---|---|---|---|
| 1775 Loss Reserves Other Than Pools | (948,573) | 0 | 0 | (948,573) | 53. 1  53. 3 | (1,132,656) | 184,083 | (16) |
| 2800 Loss Reserves for Pools | (32,366,484) | 0 | 368,596 | (31,997,888) | 53. 1  53. 3 | (10,553,481) | (21,444,407) | 203 |
| **2216  Loss Reserves for Pools** | **(33,315,057)** | **0** | **368,596** | **(32,946,461)** | | **(11,686,137)** | **(21,260,324)** | **182** |
| | | | | | | | | |
| 2503 Vanessa & Brandon Homuth | (50,000) | 0 | 0 | (50,000) [6] 80.LS | 0 | (50,000) | 0 |
| 2504 Preferred Shareholder Liability | (11,000,000) | 0 | 0 | (11,000,000) [7] 85. 1 | 0 | (11,000,000) | 0 |
| 2165.01 Vanessa & Brandon Homuth | (50,000) | 0 | 0 | (50,000) [6] 70.LS | 0 | (50,000) | 0 |
| 2165.02 Therese Cosgrave | (100,000) | 0 | 0 | (100,000) [6] 70.LS | 0 | (100,000) | 0 |
| **2271  Loan payable** | **(11,200,000)** | **0** | **0** | **(11,200,000)** | | **0** | **(11,200,000)** | **0** |
| | | | | | | | | |
| 2106 Customers Bank Warehouse Line | (25,227,612) | 0 | 0 | (25,227,612) 70. 1  70. 2 | (24,202,066) | (1,025,546) | 4 |
| 2109 Mizuho Debt Facility | (84,082,000) | 0 | 0 | (84,082,000) 70. 1  70. 9 | (39,678,000) | (44,404,000) | 112 |
| 2113 Republic Bank | (41,808,751) | 0 | 0 | (41,808,751) 70. 1  70. 7 | (31,522,432) | (10,286,319) | 33 |
| 2114 Wedbush Securities Line | (225,000,000) | 0 | 0 | (225,000,000) 70. 1  70.11 | (140,970,000) | (84,030,000) | 60 |
| 2115 Nomura Repo Facility | (6,508,000) | 0 | 0 | (6,508,000) 70. 1  70.10 | (1,084,000) | (5,424,000) | 500 |
| 2117 ICBC Debt Facility | (100,113,086) | 0 | 0 | (100,113,086) 70. 1  70.13 | 0 | (100,113,086) | 0 |
| 2118 Flagstar Bank Debt Facility | (585,747) | 0 | 0 | (585,747) 50. 3  70. 1 | 0 | (585,747) | 0 |
| 2112.00 First Tennessee Warehouse Line | (39,006,642) | 0 | 0 | (39,006,642) 70. 1  70. 8 | (46,754,288) | 7,747,646 | (17) |
| 2112.01 First Tennessee 98% MC Line | (2,023,582) | 0 | 0 | (2,023,582) 70. 1  70. 8 | (2,538,063) | 514,481 | (20) |
| **2273  Lines of credit** | **(524,355,420)** | **0** | **0** | **(524,355,420)** | | **(286,748,849)** | **(237,606,571)** | **83** |
| | | | | | | | | |
| 2700.00 Deferred Tax Liability YTD | (67,937,100) | (380,978) | 0 | (68,318,078) | (37,765,287) | (30,552,791) | 81 |
| **2282  Deferred income taxes** | **(67,937,100)** | **(380,978)** | **0** | **(68,318,078)** | | **(37,765,287)** | **(30,552,791)** | **81** |
| | | | | | | | | |
| 2158 Forward Escrows Payable | (11,917) | 0 | 0 | (11,917) | (2,344) | (9,573) | 408 |
| 2159 Due to GNMA | (57,681,941) | 0 | (307,885) | (57,989,826) 72. 1  72.LS | (22,578,848) | (35,410,978) | 157 |
| 2160 Due to HUD | (172,656) | 0 | 0 | (172,656) 72.LS | 0 | (172,656) | 0 |
| 2150.00 Initial MIP | (337,140) | 0 | 0 | (337,140) 72.LS | (614,095) | 276,955 | (45) |
| 2150.01 Monthly MIP | (3,353,021) | 0 | 0 | (3,353,021) 72.LS | (2,660,244) | (692,777) | 26 |
| **2290  Mortgage escrows payable** | **(61,556,675)** | **0** | **(307,885)** | **(61,864,560)** | | **(25,855,531)** | **(36,009,029)** | **139** |
| | | | | | | | | |
| 2140 Accrued Bonuses - Corporate | (1,937,126) | 0 | 0 | (1,937,126) 92. 1 | (6,855,103) | 4,917,977 | (72) |
| 2141 Accrued Bonuses - HMBS Trading | (657,441) | 0 | 0 | (657,441) 92. 1 | (545,000) | (112,441) | 21 |
| **2291  Accrued compensation** | **(2,594,567)** | **0** | **0** | **(2,594,567)** | | **(7,400,103)** | **4,805,536** | **(65)** |
| | | | | | | | | |
| 1520 Common Stock | (926,500) | 0 | 0 | (926,500) 85. 1 | (926,500) | 0 | 0 |
| **3200  Common stock** | **(926,500)** | **0** | **0** | **(926,500)** | | **(926,500)** | **0** | **0** |
| | | | | | | | | |
| 1522 Preferred Stock | 0 | 0 | 0 | 0 | (10,008,419) | 10,008,419 | (100) |
| **3300  Preferred stock** | **0** | **0** | **0** | **0** | | **(10,008,419)** | **10,008,419** | **(100)** |
| | | | | | | | | |
| 1521 Capital in excess of stated val | (2,437,628) | 0 | 0 | (2,437,628) 85. 1 | (2,228,096) | (209,532) | 9 |
| **3400  Capital in excess of stated value** | **(2,437,628)** | **0** | **0** | **(2,437,628)** | | **(2,228,096)** | **(209,532)** | **9** |
| | | | | | | | | |
| 1110 Retained Earnings | (41,344,118) | 0 | 0 | (41,344,118) 85. 1 | (32,575,178) | (8,768,940) | 27 |
| **3601  Retained earnings (Accumulated Deficit)** | **(41,344,118)** | **0** | **0** | **(41,344,118)** | | **(32,575,178)** | **(8,768,940)** | **27** |
| | | | | | | | | |
| 3010 Origination Fees | (94,700) | 0 | 0 | (94,700) | (204,090) | 109,390 | (54) |
| 3087 Underwriting Fee | (29,324) | 0 | 0 | (29,324) | (133,519) | 104,195 | (78) |
| 3089 Discount Points | (12,708) | 0 | 0 | (12,708) | (43,161) | 30,453 | (71) |
| 3154 Forward FNMA MSR Income | (213,231) | 0 | 0 | (213,231) 62. 1.  2 | (782,577) | 569,346 | (73) |
| 3155 Forward GNMA MSR  Income | (42,911) | 0 | 0 | (42,911) | (37,382) | (5,529) | 15 |
| 3300.00 Retail Origination Fees | (3,176,065) | 0 | 0 | (3,176,065) | (3,033,343) | (142,722) | 5 |
| 3300.01 Retail Appraisal Fees | 159,590 | 0 | 0 | 159,590 | 91,696 | 67,894 | 74 |
| 3300.02 Retail Credit Report Fee | (26,973) | 0 | 0 | (26,973) | (22,453) | (4,520) | 20 |
| 3300.03 Retail Flood Certification Fees | (11,914) | 0 | 0 | (11,914) | (11,424) | (490) | 4 |
| 3300.04 Retail Zero Tolerance Credits | 4,111 | 0 | 0 | 4,111 | 1,162 | 2,949 | 254 |
| 3301.00 Forward Retail Origination Fees | (30,823) | 0 | 0 | (30,823) | 0 | (30,823) | 0 |
| 3301.01 Forward Retail Appraisal-Inspec | (1,030) | 0 | 0 | (1,030) | (960) | (70) | 7 |
| 3301.02 Forward Retail Credit Report | (6,038) | 0 | 0 | (6,038) | (511) | (5,527) | 1082 |
| 3301.03 Forward Retail Flood Fees | (1,275) | 0 | 0 | (1,275) | (132) | (1,143) | 866 |
| 3301.04 Forward Retail  Processing Fee | (46,930) | 0 | 0 | (46,930) | (4,930) | (42,000) | 852 |
| 3301.05 Forward Retail Underwriting Fee | (77,108) | 0 | 0 | (77,108) | (9,764) | (67,344) | 690 |
| 3301.06 Forward Retail Discount | (24,854) | 0 | 0 | (24,854) | (4,451) | (20,403) | 458 |
| 3301.07 Forward Retail Lender Credit | 170,549 | 0 | 0 | 170,549 90.LS | 10,320 | 160,229 | 1553 |
| **4400.200  MORTGAGE FEES** | **(3,461,634)** | **0** | **0** | **(3,461,634)** | | **(4,185,520)** | **723,886** | **(17)** |

**Live Well Financial, Inc.**
Year End: December 31, 2016
**Working Trial Balance**

**12.TB-4**

| Prepared by | Reviewed by | Reviewed by |
|---|---|---|
| CMH 3/22/2017 | | MOM 3/22/2017 |
| Reviewed by | Reviewed by | |
| RWL 3/26/2017 | | |

| Account | Prelim | Adj's | Reclass | Rep | Annotation | Rep 12/15 | Amount Chg | %Chg |
|---|---|---|---|---|---|---|---|---|
| 3019 Fair Value on Fees | 2,919 | 0 | 0 | 2,919 | | 1,519 | 1,400 | 92 |
| 3075 Reverse GNMA MSR Income | (34,636,604) | 0 | 0 | (34,636,604) | 62. 1. 1 | (32,923,499) | (1,713,105) | 5 |
| 3092.1 Premium Paid for Purchases | 0 | 0 | 0 | 0 | | 115,431 | (115,431)(100) | |
| 3016.00 Forward FV on LHS | (2,518) | 0 | 0 | (2,518) | | 11,901 | (14,419)(121) | |
| 3016.01 Forward FV on Pipeline | 4,829 | 0 | 0 | 4,829 | 53. 1 | 17,380 | (12,551) | (72) |
| 3016.02 CMC Dividend | (35) | 0 | 0 | (35) | | (3,966) | 3,931 | (99) |
| 3017.00 HECM FV on LHS | (952,962) | 0 | 0 | (952,962) | 53. 5 | 1,167,983 | (2,120,945)(182) | |
| 3017.01 HECM FV on Pipeline | (641,818) | 0 | 0 | (641,818) | 53. 1 | 302,926 | (944,744)(312) | |
| 3017.02 HECM FV - Hedging | 3,204 | 0 | 0 | 3,204 | 53. 1 | 29,955 | (26,751) | (89) |
| 3090.01 Broker Premium Contra | 279,605 | 0 | 0 | 279,605 | 90.LS | 1,171,844 | (892,239) | (76) |
| 3090.03 Lender Paid MIP | 18,529 | 0 | 0 | 18,529 | | 89,924 | (71,395) | (79) |
| 3090.06 Pairoff from Hedging | 188,819 | 0 | 0 | 188,819 | 90.LS | (288,737) | 477,556 | (165) |
| 3090.08 Lender Credit to Borrower | 125,156 | 0 | 0 | 125,156 | 90.LS | 575,547 | (450,391) | (78) |
| 3090.11 Post PA Premium Adjustments | 3,192 | 0 | 0 | 3,192 | | 6,578 | (3,386) | (51) |
| 3090.99 Premium Income | (743,624) | 0 | 0 | (743,624) | | (599,450) | (144,174) | 24 |
| 3092.01 Broker Premium Contra | 68,792,442 | 0 | 0 | 68,792,442 | 90.LS | 67,574,341 | 1,218,101 | 2 |
| 3092.08 Lender Credit to Borrower | 3,934,247 | 0 | 0 | 3,934,247 | 90.LS | 8,228,305 | (4,294,058) | (52) |
| 3092.09 Repurchase/Indemnification Fees | (328,858) | 0 | 0 | (328,858) | | (124,154) | (204,704)165 | |
| 3092.12 Discounts/Incentives | 2,073,258 | 0 | 0 | 2,073,258 | 90.LS | 1,439,358 | 633,901 | 44 |
| 3092.99 Premium Income | (81,211,148) | 0 | 0 | (81,211,148) | 90. 1 | (77,761,778) | (3,449,370) | 4 |
| 3300.07 Retail Lender Credit | 5,036,790 | 0 | 0 | 5,036,790 | 90.LS | 0 | 5,036,790 | 0 |
| **4400.300  Gain on mortgage loans** | **(38,054,577)** | **0** | **0** | **(38,054,577)** | | **(30,968,592)** | **(7,085,985)** | **23** |
| | | | | | | | | |
| 3081 Mortgage Interest Income | (924,235) | 0 | 0 | (924,235) | | (759,022) | (165,213) | 22 |
| 3086 Interest Income - Other | (25,182) | 0 | 0 | (25,182) | | (103) | (25,079)24320 | |
| 3088 Mortgage Interest Other | (1,339,790) | 0 | 0 | (1,339,790) | | (1,006,495) | (333,295) | 33 |
| 3092 GNMA Bond Interest | (43,844,304) | 3,101,784 | 0 | (40,742,520) | 52. 6 | (14,704,107) | (26,038,413)177 | |
| 3093 Derivative Instr. Interest - IO | 0 | 0 | 0 | 0 | | (17,293) | 17,293 (100) | |
| 3094 Derivative Instr. Interest-MSRs | 0 | 0 | 0 | 0 | | (35,547) | 35,547 (100) | |
| **4400.400  Interest Income** | **(46,133,511)** | **3,101,784** | **0** | **(43,031,727)** | | **(16,522,567)** | **(26,509,160)160** | |
| | | | | | | | | |
| 3021 Fair Value of GNMA  Bonds | (82,470,191) | (3,101,784) | 0 | (85,571,975) | 52. 6 | (48,391,481) | (37,180,494) | 77 |
| 3095 Realized Gain/Loss on Hedges-IO | 2,956,289 | 0 | 0 | 2,956,289 | 52. 4 | 2,239,027 | 717,262 | 32 |
| 3096 Realized Gain/Loss on Hedge-MSR | 0 | 0 | 0 | 0 | | 277,783 | (277,783)(100) | |
| 3015.01 FV of Derivative  Instruments | 6,337,920 | 0 | 0 | 6,337,920 | 52. 4 | (1,192,065) | 7,529,985 | (632) |
| **4400.500  Gain/loss in investments AFS** | **(73,175,982)** | **(3,101,784)** | **0** | **(76,277,766)** | | **(47,066,735)** | **(29,211,031)** | **62** |
| | | | | | | | | |
| 3076 Servicing Fees | (648,342) | 0 | 0 | (648,342) | | (674,121) | 25,779 | (4) |
| 3078 Premium on Tail Pools | (12,801,188) | 0 | 0 | (12,801,188) | 90. 1 | (9,337,412) | (3,463,776) | 37 |
| 3083 Servicing Spread | (11,921,088) | 0 | 0 | (11,921,088) | 90.LS | (8,732,959) | (3,188,129) | 37 |
| 3151 Forward Late Fees Income | (10,967) | 0 | 0 | (10,967) | | (13,823) | 2,856 | (21) |
| 3153 Forward Servicing Spread | (33,654) | 0 | 0 | (33,654) | | (35,993) | 2,339 | (6) |
| 3156 Forward Servicing Fees | (311,918) | 0 | 0 | (311,918) | | (223,674) | (88,244) | 39 |
| **4401  Servicing Income** | **(25,727,157)** | **0** | **0** | **(25,727,157)** | | **(19,017,982)** | **(6,709,175)** | **35** |
| | | | | | | | | |
| 6951 MSR Amortization Scheduled | 18,707,094 | 0 | 0 | 18,707,094 | 91. 3 | 12,542,892 | 6,164,202 | 49 |
| 6951.01 MSR Impairment | 4,734,240 | 0 | 0 | 4,734,240 | [8] 62. 4 | 3,821,376 | 912,864 | 24 |
| **5001  MSR AMORTIZATION_IMPAIRMENT** | **23,441,334** | **0** | **0** | **23,441,334** | | **16,364,267** | **7,077,067** | **43** |
| | | | | | | | | |
| 7160 Bonuses - Corporate | 4,463,258 | 0 | 0 | 4,463,258 | 92. 1 | 7,500,000 | (3,036,742) | (40) |
| 7161 Bonuses - HMBS Trading | 3,580,965 | 0 | 0 | 3,580,965 | 92. 1 | 1,694,986 | 1,885,979 111 | |
| 7231 Share-based compensation | 209,532 | 0 | 0 | 209,532 | 85. 1 | 209,532 | 0 | 0 |
| 7232 Commissions | 1,753,628 | 0 | 0 | 1,753,628 | 92. 1 | 1,838,399 | (84,771) | (5) |
| 7233 Sales Bonuses | 0 | 0 | 0 | 0 | | 9,250 | (9,250)(100) | |
| 7230.00 Wages - Administration | 2,094,955 | 0 | 0 | 2,094,955 | 92. 1 | 1,927,105 | 167,850 | 9 |
| 7230.01 Wages - Origination | 160,000 | 0 | 0 | 160,000 | 92. 1 | 198,885 | (38,885) | (20) |
| 7230.02 Wages - Funding & Closing | 842,005 | 0 | 0 | 842,005 | 92. 1 | 663,661 | 178,344 | 27 |
| 7230.03 Wages - Account Executives | 202,825 | 0 | 0 | 202,825 | 92. 1 | 140,733 | 62,092 | 44 |
| 7230.04 Wages - Mortgage Loan Officers | 3,411,822 | 0 | 0 | 3,411,822 | 92. 1 | 4,324,450 | (912,628) | (21) |
| 7230.05 Wages - Processing | 2,533,855 | 0 | 0 | 2,533,855 | 92. 1 | 1,719,589 | 814,266 | 47 |
| 7230.06 Wages - Branch Managers | 387,926 | 0 | 0 | 387,926 | 92. 1 | 448,500 | (60,574) | (14) |
| 7230.07 Wages - Servicing | 335,618 | 0 | 0 | 335,618 | 92. 1 | 205,087 | 130,531 | 64 |
| 7230.08 Wages - Sales Support | 314,462 | 0 | 0 | 314,462 | 92. 1 | 102,696 | 211,767 206 | |
| 7230.09 Wages - HMBS Trading | 713,021 | 0 | 0 | 713,021 | 92. 1 | 700,000 | 13,021 | 2 |
| **5120.021  Salaries** | **21,003,872** | **0** | **0** | **21,003,872** | | **21,682,872** | **(679,000)** | **(3)** |
| | | | | | | | | |
| 7220 Payroll Taxes | 1,077,559 | 0 | 0 | 1,077,559 | 92. 1 | 986,944 | 90,615 | 9 |

**Live Well Financial, Inc.**
Year End: December 31, 2016
**Working Trial Balance**

**12.TB-5**

| Prepared by | Reviewed by | Reviewed by |
|---|---|---|
| CMH 3/22/2017 | | MOM 3/22/2017 |
| **Reviewed by** | **Reviewed by** | |
| RWL 3/26/2017 | | |

| Account | Prelim | Adj's | Reclass | Rep | Annotation | Rep 12/15 | Amount Chg | %Chg |
|---|---|---|---|---|---|---|---|---|
| **5120.022  Payroll taxes** | **1,077,559** | **0** | **0** | **1,077,559** | | **986,944** | **90,615** | **9** |
| 6270 Professional Development | 8,111 | 0 | 0 | 8,111 | | 19,387 | (11,276) | (58) |
| 7110 401(K) ER Contribution | 132,691 | 0 | 0 | 132,691 | | 19,260 | 113,431 | 589 |
| 7130 Dental Insurance | 49,975 | 0 | 0 | 49,975 | | 42,993 | 6,982 | 16 |
| 7140 Medical Insurance | 489,384 | 0 | 0 | 489,384 | | 499,014 | (9,630) | (2) |
| 7150 Life & Disability | 58,085 | 0 | 0 | 58,085 [9] | | 50,668 | 7,417 | 15 |
| 7180 Education & Seminars | 595 | 0 | 0 | 595 | | 1,689 | (1,094) | (65) |
| 7250 Employee Screenings | 35,539 | 0 | 0 | 35,539 | | 13,379 | 22,160 | 166 |
| **5120.023  Employee benefits** | **774,380** | **0** | **0** | **774,380** | | **646,390** | **127,990** | **20** |
| 5875 Trade Shows | 3,812 | 0 | 0 | 3,812 | | 12,508 | (8,696) | (70) |
| 6308 Broker Background Checks | 168,421 | 0 | 0 | 168,421 | | 206,457 | (38,036) | (18) |
| 6310 Secondary Marketing | 91,655 | 0 | 0 | 91,655 | | 91,179 | 476 | 1 |
| 6311 Office Relo/Expansions | 3,702 | 0 | 0 | 3,702 | | 90,395 | (86,693) | (96) |
| 6340 Employee Recruiting | 3,062 | 0 | 0 | 3,062 | | 12,157 | (9,095) | (75) |
| **5120.901  Administrative** | **270,652** | **0** | **0** | **270,652** | | **412,696** | **(142,044)** | **(34)** |
| 5000 Marketing | 73,900 | 0 | 0 | 73,900 | | 65,165 | 8,735 | 13 |
| 5500 Internet Advertising | 1,532,556 | 0 | 0 | 1,532,556 | | 3,662,856 | (2,130,300) | (58) |
| 5850 Reverse Marketing | 383,769 | 0 | 0 | 383,769 | | 1,341,515 | (957,746) | (71) |
| 5870 Advertising | 3,818,644 | 0 | 0 | 3,818,644 | | 1,473,638 | 2,345,006 | 159 |
| 5880 Lead Purchases | 3,046,789 | 0 | 0 | 3,046,789 | | 2,798,740 | 248,049 | 9 |
| 5900 Television | 1,500 | 0 | 0 | 1,500 | | 282,884 | (281,384) | (99) |
| **5120.903  Advertising** | **8,857,158** | **0** | **0** | **8,857,158** | 91. 1 | **9,624,799** | **(767,641)** | **(8)** |
| 6117 Provision For Loan Loss | 23,116,899 | 0 | 0 | 23,116,899 [10] | 53. 3 | 3,323,813 | 19,793,086 | 595 |
| **5120.907  Bad debt** | **23,116,899** | **0** | **0** | **23,116,899** | 91. 1 | **3,323,813** | **19,793,086** | **595** |
| 6120 Bank Service Charges | 269,882 | 0 | 0 | 269,882 | | 116,113 | 153,769 | 132 |
| **5120.909  Bank charges** | **269,882** | **0** | **0** | **269,882** | | **116,113** | **153,769** | **132** |
| 6306 Janitorial Services | 6,278 | 0 | 0 | 6,278 | | 4,500 | 1,778 | 40 |
| **5120.919  Cleaning and sanitation** | **6,278** | **0** | **0** | **6,278** | | **4,500** | **1,778** | **40** |
| 6372 Computer Repairs | 11,915 | 0 | 0 | 11,915 | | 20,950 | (9,035) | (43) |
| 6390 Software | 768,646 | 0 | 0 | 768,646 | | 584,378 | 184,268 | 32 |
| 6402 Computer Supplies | 21,798 | 0 | 0 | 21,798 | | 18,023 | 3,775 | 21 |
| 6451 Tech Support | 130,396 | 0 | 0 | 130,396 | | 213,209 | (82,813) | (39) |
| 6452 Web Development | 10,022 | 0 | 0 | 10,022 | | 33,434 | (23,412) | (70) |
| 6453 Data & Related | 20 | 0 | 0 | 20 | | 2,126 | (2,106) | (99) |
| **5120.922  Computer supplies and maintenance** | **942,797** | **0** | **0** | **942,797** | | **872,120** | **70,677** | **8** |
| 6150 Processing & U/W Expenses | 10,150 | 0 | 0 | 10,150 | | 6,159 | 3,991 | 65 |
| 6151 Flood Cert | 25,870 | 0 | 0 | 25,870 | | 22,128 | 3,742 | 17 |
| 6152 Credit Report | 104,593 | 0 | 0 | 104,593 | | 61,069 | 43,524 | 71 |
| 6158 Recording Fees | 4,991 | 0 | 0 | 4,991 | | 7,833 | (2,842) | (36) |
| 6159 FNMA Desktop Underwriting | 0 | 0 | 0 | 0 | | 11,621 | (11,621) | (100) |
| 6801 Processing Fees | 14,069 | 0 | 0 | 14,069 | | 6,024 | 8,045 | 134 |
| **5120.924  Credit and collection** | **159,673** | **0** | **0** | **159,673** | | **114,834** | **44,839** | **39** |
| 6140 Contributions | 1,000 | 0 | 0 | 1,000 | | 0 | 1,000 | 0 |
| **5120.928  Donations** | **1,000** | **0** | **0** | **1,000** | | **0** | **1,000** | **0** |
| 6160 Dues and Subscriptions | 617,371 | 0 | 0 | 617,371 | | 499,775 | 117,596 | 24 |
| **5120.930  Dues and subscriptions** | **617,371** | **0** | **0** | **617,371** | | **499,775** | **117,596** | **24** |
| 6170 Equipment Rental | 93,312 | 0 | 0 | 93,312 | | 65,691 | 27,621 | 42 |
| **5120.934  Equipment lease** | **93,312** | **0** | **0** | **93,312** | | **65,691** | **27,621** | **42** |
| 6181 Business Insurance | 7,858 | 0 | 0 | 7,858 | | 6,712 | 1,146 | 17 |
| 6186 Workers Compensation Insurance | 48,618 | 0 | 0 | 48,618 | | 58,609 | (9,991) | (17) |
| 6187 Fidelity Bond/ E&O Insurance | 157,294 | 0 | 0 | 157,294 | | 90,064 | 67,230 | 75 |
| 6189 Directors & Officers Insurance | 28,052 | 0 | 0 | 28,052 | | 29,508 | (1,456) | (5) |
| **5120.942  Insurance** | **241,822** | **0** | **0** | **241,822** | | **184,893** | **56,929** | **31** |
| 6154.00 Forward Tax Service Fees | 11,007 | 0 | 0 | 11,007 | | 14,956 | (3,949) | (26) |

8/12/2019
6:45 PM

19

Page   6

**Live Well Financial, Inc.**
Year End: December 31, 2016
**Working Trial Balance**

**12.TB-6**

| Prepared by | Reviewed by | Reviewed by |
|---|---|---|
| CMH 3/22/2017 | | MOM 3/22/2017 |
| Reviewed by | Reviewed by | |
| RWL 3/26/2017 | | |

| Account | Prelim | Adj's | Reclass | Rep | Annotation | Rep 12/15 | Amount Chg | %Chg |
|---|---|---|---|---|---|---|---|---|
| 6382.00 Forward Boarding Fees | 1,833 | 0 | 0 | 1,833 | | 2,414 | (581) | (24) |
| 6383.00 Forward Servicing Fees | 46,981 | 0 | 0 | 46,981 | | 39,667 | 7,314 | 18 |
| 6385.00 Forward GNMA Guaranty Fees | 10,624 | 0 | 0 | 10,624 | | 13,980 | (3,356) | (24) |
| 6388.01 Forward Valuation Services | 0 | 0 | 0 | 0 | | 2,500 | (2,500) | (100) |
| 6388.02 Forward Default Fees | 9,036 | 0 | 0 | 9,036 | | 8,727 | 309 | 4 |
| 6388.03 Forward Reporting Fees | 1,271 | 0 | 0 | 1,271 | | 3,508 | (2,237) | (64) |
| 6388.04 Forward System Access Fees | 9,276 | 0 | 0 | 9,276 | | 7,924 | 1,352 | 17 |
| 6388.05 Forward Servicing Fees - Other | 4,349 | 0 | 0 | 4,349 | | 3,554 | 795 | 22 |
| **5120.943  Servicing Fees** | **94,377** | **0** | **0** | **94,377** | | **97,229** | **(2,852)** | **(3)** |
| | | | | | | | | |
| 6130 Bonding | 59,567 | 0 | 0 | 59,567 | | 70,590 | (11,023) | (16) |
| 6190 Licenses and Permits | 453,814 | 0 | 0 | 453,814 | 91. 1 | 1,040,730 | (586,916) | (56) |
| 6384 MIP Late Fees | 657 | 0 | 0 | 657 | | 8,587 | (7,930) | (92) |
| 6386 Custodial Fees | 7,424 | 0 | 0 | 7,424 | | 21,522 | (14,098) | (66) |
| 6802 Tax Service Fees | 1,317 | 0 | 0 | 1,317 | | 1,645 | (328) | (20) |
| 6805 NY Fee | 1,031 | 0 | 0 | 1,031 | | 4,242 | (3,211) | (76) |
| 6930 Property | 18,745 | 0 | 0 | 18,745 | | 11,776 | 6,969 | 59 |
| 6190.00 Licensing Late Fees/Fines | 0 | 0 | 0 | 0 | | 5,100 | (5,100) | (100) |
| 6388.06 Loss Mitigation/Draft Claims | 1,076 | 0 | 0 | 1,076 | | 2,811 | (1,735) | (62) |
| **5120.944  Licenses, permits and fees** | **543,631** | **0** | **0** | **543,631** | | **1,167,003** | **(623,372)** | **(53)** |
| | | | | | | | | |
| 6601 Entertainment | 33,698 | 0 | 0 | 33,698 | | 36,215 | (2,517) | (7) |
| 6602 Meals | 10,501 | 0 | 929 | 11,430 | | 18,317 | (6,888) | (38) |
| **5120.946  Meals and entertainment** | **44,199** | **0** | **929** | **45,128** | | **54,533** | **(9,405)** | **(17)** |
| | | | | | | | | |
| 6210 Office Supplies | 100,070 | 0 | 0 | 100,070 | | 141,691 | (41,621) | (29) |
| 6304 Shredding Services | 16,191 | 0 | 0 | 16,191 | | 18,504 | (2,313) | (12) |
| 6380 Security Services | 409 | 0 | 0 | 409 | | 432 | (23) | (5) |
| 6701 Gas and Electric | 2,005 | 0 | 0 | 2,005 | | 2,518 | (513) | (20) |
| **5120.952  Office** | **118,675** | **0** | **0** | **118,675** | | **163,145** | **(44,470)** | **(27)** |
| | | | | | | | | |
| 6153 Appraisals & Inspections | 32,735 | 0 | 0 | 32,735 | | 34,012 | (1,277) | (4) |
| 6156 Doc Prep | 288,784 | 0 | 0 | 288,784 | | 235,464 | 53,320 | 23 |
| 6305 Temporary Services | 710,245 | 0 | 0 | 710,245 | | 1,111,714 | (401,469) | (36) |
| 6383 Servicing Active Loans | 3,660,762 | 0 | 0 | 3,660,762 | 91. 1 | 2,987,277 | 673,485 | 23 |
| 6385 GNMA Guaranty Fee | 1,780,517 | 0 | 0 | 1,780,517 | 72. 2 | 1,330,912 | 449,605 | 34 |
| 6803 GNMA Commitment Fee | 163,365 | 0 | 0 | 163,365 | | 163,495 | (130) | 0 |
| **5120.956  Outside labor** | **6,636,408** | **0** | **0** | **6,636,408** | | **5,862,874** | **773,534** | **13** |
| | | | | | | | | |
| 6250 Postage and Delivery | 259,795 | 0 | 0 | 259,795 | | 170,060 | 89,735 | 53 |
| **5120.962  Postage** | **259,795** | **0** | **0** | **259,795** | | **170,060** | **89,735** | **53** |
| | | | | | | | | |
| 6260 Printing and Reproduction | 167,712 | 0 | 0 | 167,712 | | 149,977 | 17,735 | 12 |
| **5120.964  Printing and stationery** | **167,712** | **0** | **0** | **167,712** | | **149,977** | **17,735** | **12** |
| | | | | | | | | |
| 6301 Accounting | 125,619 | 0 | 0 | 125,619 | | 128,539 | (2,920) | (2) |
| 6302 Consulting | 10,000 | 0 | 0 | 10,000 | | 7,520 | 2,480 | 33 |
| 6303 Legal Fees | 663,523 | 0 | 0 | 663,523 | 91. 2 | 281,455 | 382,068 | 136 |
| 6309 Quality Control Services | 140,154 | 0 | 0 | 140,154 | | 162,361 | (22,207) | (14) |
| 6312 Commissions on Securities | 34,115 | 0 | 0 | 34,115 | | 55,103 | (20,988) | (38) |
| 6313 Directors Fees | 2,004,400 | 0 | 0 | 2,004,400 | [11] 72. 2 | 0 | 2,004,400 | 0 |
| 6804 Security Settlement Fees | 505,739 | 0 | 0 | 505,739 | [12] | 785,436 | (279,697) | (36) |
| 7170 Employee Screening | 635 | 0 | 0 | 635 | | 0 | 635 | 0 |
| 7210 Payroll Fees | 79,210 | 0 | 0 | 79,210 | | 59,540 | 19,670 | 33 |
| **5120.966  Professional fees** | **3,563,395** | **0** | **0** | **3,563,395** | **91. 1** | **1,479,955** | **2,083,440** | **141** |
| | | | | | | | | |
| 6360 Rent | 752,678 | 0 | 0 | 752,678 | 81. 1 | 627,110 | 125,569 | 20 |
| **5120.972  Rent** | **752,678** | **0** | **0** | **752,678** | | **627,110** | **125,569** | **20** |
| | | | | | | | | |
| 6900 Income Taxes | 29,296,325 | 0 | 0 | 29,296,325 | | 17,014,513 | 12,281,812 | 72 |
| **5120.986  Taxes - Other** | **29,296,325** | **0** | **0** | **29,296,325** | **91. 1** | **17,014,513** | **12,281,812** | **72** |
| | | | | | | | | |
| 6500 Telephone & Internet | 440,818 | 0 | 0 | 440,818 | | 239,106 | 201,712 | 84 |
| 6502 Cell Phone | 0 | 0 | 0 | 0 | | 921 | (921) | (100) |
| **5120.988  Telephone** | **440,818** | **0** | **0** | **440,818** | | **240,027** | **200,791** | **84** |
| | | | | | | | | |
| 6603 Travel | 156,167 | 0 | (929) | 155,238 | | 223,339 | (68,101) | (30) |

**Live Well Financial, Inc.**
Year End: December 31, 2016
**Working Trial Balance**

**12.TB-7**

| | Prepared by | Reviewed by | Reviewed by |
|---|---|---|---|
| | CMH 3/22/2017 | | MOM 3/22/2017 |
| | Reviewed by | Reviewed by | |
| | RWL 3/26/2017 | | |

| Account | Prelim | Adj's | Reclass | Rep | Annotation | Rep 12/15 | Amount Chg | %Chg |
|---|---|---|---|---|---|---|---|---|
| **5120.994  Travel** | **156,167** | **0** | **(929)** | **155,238** | | **223,339** | **(68,101)** | **(30)** |
| 6960 Depreciation | 48,201 | 0 | 0 | 48,201 | 13 60. 1 | 88,724 | (40,523) | (46) |
| **5250.200  Depreciation** | **48,201** | **0** | **0** | **48,201** | | **88,724** | **(40,523)** | **(46)** |
| 6950 Tax Service Fee Amortization | 91,188 | 0 | 0 | 91,188 | | 45,406 | 45,782 | 101 |
| **5250.300  Amortization** | **91,188** | **0** | **0** | **91,188** | | **45,406** | **45,782** | **101** |
| 6925 Sales Tax | 36,590 | 0 | 0 | 36,590 | | 37,133 | (543) | (1) |
| **5350.976  Sales tax** | **36,590** | **0** | **0** | **36,590** | | **37,133** | **(543)** | **(1)** |
| 6980 Interest | 240 | 0 | 0 | 240 | | 477 | (237) | (50) |
| 6981 Finance Charge | 0 | 0 | 0 | 0 | | (1,610) | 1,610 | (100) |
| 6982 Loan Interest | 7,127 | 0 | 0 | 7,127 | 70. 1 | 26,688 | (19,561) | (73) |
| 6984 Warehouse Interest | 5,895,142 | 0 | 0 | 5,895,142 | 93. 1 | 2,548,558 | 3,346,584 | 131 |
| 6985 GNMA Shortfall Interest | 610,826 | 0 | 0 | 610,826 | 93.LS | 450,127 | 160,699 | 36 |
| 6987 Interest for loans purchased | 872,942 | 0 | 0 | 872,942 | 93.LS | 663,295 | 209,647 | 32 |
| 6988 Servicing Interest Expense | 4,716 | 0 | 0 | 4,716 | | 3,750 | 966 | 26 |
| 6989 GNMA Bond Interest | 6,589,182 | 0 | 0 | 6,589,182 | 70. 1 | 2,756,403 | 3,832,779 | 139 |
| 6990 Int on Derivative Instr. - IO | 941,196 | 0 | 0 | 941,196 | 93.LS | 1,185,705 | (244,509) | (21) |
| 6991 Int on Derivative Instr. - | 0 | 0 | 0 | 0 | | 46,746 | (46,746) | (100) |
| 6992 Int Exp Preferred ShareholdNote | 165,000 | 0 | 0 | 165,000 | 14 93.LS | 0 | 165,000 | 0 |
| **5951  Interest expense** | **15,086,371** | **0** | **0** | **15,086,371** | | **7,680,140** | **7,406,232** | **96** |
| | **0** | **0** | **0** | **0** | | **0** | **0** | **0** |
| Net Income (Loss) | 48,342,342 | | | 48,342,342 | | 27,760,521 | 20,581,821 | 74 |

1. included in Other Receivables for tax return mapping

2. Shown as other asset "HUD Loans Held", TR mapping also includes

3. On TR mapping, added to Government bonds available for sale (not showing mark separate)

4. shown as its own mapping on tax return

5. shown as its own mapping on TR

6. Shown as "Notes Payable" separate mapping on TR (along with several accounts listed in L17 in Caseware)

7. shown as separate mapping on tax return, apart from L17.

8. MRS impairment should not be mapped with bad debt. Instead, it is an Other Deduction.

9. Includes $923 of keyman life insurance; that portion is shown as separate expense on tax return.

10. Per WP 53.3 and discussion w/ Colin: LWF at times is required to repurchase loans from pools that are in default. In order to collect the principal balance, LWF determined that the cost of holding the loans and going through foreclosure was higher than selling these loans to another party at a slight discount. In 2016, LWF booked an additional reserve in a/c 2800 for $20M to account for this new procedure. Once LWF sells these loans to a third party at a discount, the loss is realized and then deductible for tax. The deductible amount is the difference in the expense and the change in the balance sheet reserves.

11. shown as separate deduction

12. shown separately on other deduction stmt on TR

13. amortization exp for tax of $503

14. Line 18 for tax mapping

**Exhibit 2**

Internal Tax Escalation Communications

| | |
|---|---|
| **From:** | Yanick, Marcia K. |
| **Sent:** | Tuesday, January 13, 2015 7:25 PM |
| **To:** | Nickerson, Doug; McDonald, Matthew O. |
| **Cc:** | Cureton, Patrick; Wallace, Gary G. |
| **Subject:** | LWF |

Matt and Doug,

LWF had us prepare a full-blown tax provision for November to give Eric a good rate he can use for his earnings release. It turns out that the 38% rate he's been using in 2014 s/b good.  The 2013 rate was lower, but with their increased presence in CA, which has a tax rate of 10.84% vs. 6% in VA, the effective rate is back up near 38%.  I left Eric a vm to use 38% and reduce the provision by $150K for prior-year true-ups.  As we discussed in our meeting with LWF, they have an overaccrual in deferred taxes of approx. $174K, which will remain.

Wanted to keep you in the loop and also let you know that they are recording a FMV adj. for the new bond investment in p&l.  Through November, they had recorded 514,542 in expense.   Per discussion with Doug, it may be that such amount will be adjusted to OCI and not hit income.  Should you talk with Eric about this before he releases his numbers?

Let me know if ques.

Thanks,

Marcia



**Marcia K. Yanick, CPA, CFP  | Tax Manager | Keiter**
4401 Dominion Boulevard, 2nd Floor, Glen Allen, VA 23060
phone: 804-565-6033 | fax: 804-747-3632 | www.keitercpa.com

**Experience |  Knowledge |  Relationships | Insight**

The content of this email is limited to the matters specifically addressed herein and is not intended to address other potential tax consequences or the potential application of tax penalties to this or any other matter. All written advice provided is based on reasonable factual and legal assumptions, exercises reasonable reliance, and uses reasonable efforts to identify and ascertain the facts relevant to the Federal tax matters.

This communication, including any attachments, may contain privileged or other confidential information.  If you are not the intended recipient, or believe you have received this communication in error, do not print, copy, retransmit, disseminate, or otherwise use the information contained within.  Any unauthorized review, use, disclosure, or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**DEFENSE EXHIBIT**

**A.73**

KEI-0034344

**From:** Nickerson, Doug
**Sent:** Thursday, July 2, 2015 5:09 PM
**To:** Wallace, Gary G.; McDonald, Matthew O.
**Cc:** Cureton, Patrick
**Subject:** RE: Live Well I/O Strip Accounting

Gary,
See FS disclosures.
Also audit WPs 53.7-53.7.1 have additional description.
Summary: investments are marked to FV at each reporting period. Estimated interest income is accrued monthly based on the CFace value (current face value of pool, as obtained from GNMA) X the known coupon rates (as obtained from GNMA). Interest receivable is reduced by actual interest only payments received by LWF. The FV calculation is done by an independent specialist (IDC) based on the CFace value (as obtained from GNMA) and IDC's valuation adjustment. The FV adjustment offsets the interest income calculation in the FS presentation; net amount. There was some discussion regarding FV and OCI, but was concluded that the OCI amount may be difficult to estimate, immaterial, and therefore took the conservative approach and adjusted through the P&L annually.

Matt, let me know if I left out anything or accuracy thereof.

Thanks,
Doug

**From:** Wallace, Gary G.
**Sent:** Thursday, July 02, 2015 10:57 AM
**To:** Nickerson, Doug; McDonald, Matthew O.
**Cc:** Cureton, Patrick
**Subject:** Live Well I/O Strip Accounting

Doug/Matt,
We are having a call with Eric this afternoon to discuss the tax accounting of the I/O strips. (the continuing saga).
Is there a good description of the accounting treatment for these in the file?

1

DEFENSE EXHIBIT A.141

KEI-0155709

Patrick



**Patrick Cureton, CPA | Supervisor | Keiter**
4401 Dominion Boulevard, 2nd Floor, Glen Allen, VA 23060
phone: 804-565-6017 | fax: 804-273-0048 | www.keitercpa.com

**Experience | Knowledge | Relationships | Insight**

Keiter Web Tax Guide
Keiter Web Estate Guide



Unless the above message ("this message") expressly provides that the statements contained therein and in any attachments thereto ("the statements") are intended to constitute written tax advice within the meaning of IRS Circular 230 § 10.37, the sender intends by this message to communicate general information for discussion purposes only, and you should not, therefore, interpret the statements to be written tax advice or rely on the statements for any purpose. The sender will conclude that you have understood and acknowledged this important cautionary notice unless you communicate to the sender any questions you may have in a direct electronic reply to this message

Note: This communication, including any attachments, may contain privileged or other confidential information. If you are not the intended recipient, or believe you have received this communication in error, do not print, copy, retransmit, disseminate, or otherwise use the information contained within. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

2

KEI-0155697

| | |
|---|---|
| **From:** | Gracik, L.Michael |
| **Sent:** | Wednesday, November 16, 2016 1:26 PM |
| **To:** | McDonald, Matthew O.; Nickerson, Doug; Wallace, Gary G. |
| **Cc:** | Gustavsson, Julie; Gracik, L.Michael |
| **Subject:** | top client meeting LIVE WELL FINANCIAL |

Very good meeting with Eric Rohr yesterday  Very complimentary about the audit in recent years.   Really likes the continuity of the audit team in recent years.   Really likes Meredith.  NO complaints about the service

Asked a lot of questions about the health and size of the Firm.

Pleased with both Matt and Doug as AUDIT partners, BUT , does not want to pay for 2 partners .  we need to discuss going forward

Very happy with tax services.  Spoke highly of Travis and Gary.  TAX CONCERN: He is very concerned about the deferred tax liability that they have on the books .  Wants us to be very proactive in trying to find a solution.  He mentioned that there may not anything that can be done about it,  but he wants to hear that from us.  My take is that this is one of those items where we need to have constant touches to let him know that we have not forgotten the issue and are continuing to address it

Big concern:  as you know they use QuickBooks for their accounting system. One or their internal accounting issues is doing cost allocations.   Is there a software package out there for mortgage bankers that has automated cost allocation features?  Can they get more out of QUICKBOOKS?  What does CAPCENTER USE?

He would welcome the opportunity to be more involved with us in the audit planning process.

You saw my emails yesterday about CYBER security

1



**DEFENSE EXHIBIT**

**A.264**

KEI-0156752

**From:** Gustavsson, Julie
**Sent:** Friday, July 14, 2017 6:34 PM
**To:** Wallace, Gary G.
**Cc:** Gracik, L.Michael; McDonald, Matthew O.
**Subject:** Re: Live Well Status

Never to early to give heads up to Camico, we should make sure they are aware of a potential issue. I will forward to Michael.

Julie

On Jul 14, 2017, at 12:04 PM, Wallace, Gary G. <GWallace@Keitercpa.com> wrote:

I mentioned this matter to Mike this morning that its early on but may have a potential issue with Live Well. It's a long long story but I had persuaded them to engage KPMG to assist on a tax matter and during the course of our analysis, they may be considered a "dealer" for income tax purposes which would mean they would need to market to market their assets for tax purposes. Huge exposure so of course Eric Rohr, CFO is pissed! We are going to continue with further analysis. We have some research that goes back to 2006 on the subject. See CW Section 260 K:\2006\08xxxx\083320\CW083320_000_12-06\CW083320_000_12-06.ac

Its probably too early to say it's a potential claim, but how early is too early? For now, I will continue to monitor until further facts but if we want to float it up to Camico, ok with that as well. Thoughts?

*Gary*

×<Picture (Device Independent Bitmap) 1.jpg>

**Gary G. Wallace | Partner**
4401 Dominion Boulevard, Glen Allen, VA 23060
phone: 804.565.6025 | fax: 804.273.0048 | **www.keitercpa.com**

**Experience | Knowledge | Relationships | Insights**



×<Picture (Device Independent Bitmap) 2.jpg>  ×<Picture (Device Independent Bitmap) 3.jpg>  ×<Picture (Device Independent Bitmap) 4.jpg>  ×<Picture (Device Independent Bitmap) 5.jpg>  ×<Picture (Device Independent Bitmap) 6.jpg>

---

**From:** Wallace, Gary G.
**Sent:** Thursday, July 13, 2017 9:16 PM
**To:** Coyner, Travis <TCoyner@keitercpa.com>; 'Zelnik, Jonathan' <jzelnik@KPMG.com>; Eric Rohr <EricRohr@livewellfinancial.com>; Paula Foster <PaulaFoster@livewellfinancial.com>; 'George Scott' <GeorgeScott@livewellfinancial.com>
**Subject:** RE: Live Well Status

1

DEFENSE EXHIBIT

**A.329**

KEI-0157607

Eric, Paula and George,

We have had several calls with Jon and the KPMG team this week regarding the tax treatment of the I/O strips. One question that is complicating the situation is the overall status of LWF as a "dealer" in securities for tax purposes and if designated as such then the accounting method related to the I/O strips may also require consideration of mark to market adjustments under Code Section 475 unless LWF designates each I/O strip as held for investment when acquired but the rub in so doing is that any losses on such instruments would be "capital losses". You may recall that we had similar discussions regarding the derivative instruments that LWF acquire.

While Eric has indicated that KPMG should keep their efforts focused on the I/O matter, we will need to consider this to further any decisions so I wanted to outlne the issue. These rules are very complicated but this is a brief overview to think about in advance of our call.

## What confers as a dealer for purposes of Sect. 475?

The rules are very complex. However, generally, a dealer regularly purchases securities from or sells securities to customers in the ordinary course of a trade or business or regularly offers to enter into, assume, offset, assign or otherwise terminate positions in securities with customers in the ordinary course of a trade or business.

### Questions for LWF consideration:

- Does the "reverse mortgage activity/trading desk" convey dealer status as to the ordinary trade or business?

- Does LWF's creation of HECM-Backed Securities cause them to be a dealer?

- E.G>, "a bank or thrift that regularly originates and sells loans is a dealer and must mark to market at year-end all of its loans and other securities that are not covered by one of the exceptions"

- Generally, once considered a dealer, all other activities within the "taxpayer" follow that status unless specifically exempted or a statutory exception.

## One exception to the required mark of Sect. 475 rules, allows a taxpayer to make specified identifications to exclude

The exception regarding identification requires the instrument be identified as one of the three excepted categories in IRC Sect. 475(b)(1). The statute requires specified identification requirements.

- The records must clearly indicate the specific security being identified and must clearly indicate that it is being "held for investment" and made for purposes of Sect. 475.

- The general concern for held for investment categorization is that losses on disposition are treated as capital losses and are only available for offset of capital gains and subject to only 5 year carryover of utilization.

Lets plan to discuss this item on Friday.

x  <Picture (Device Independent Bitmap) 7.jpg>

**Gary G. Wallace | Partner**
4401 Dominion Boulevard, Glen Allen, VA 23060
phone: 804.565.6025 | fax: 804.273.0048 | www.keitercpa.com

2

KEI-0157608

**From:** Wallace, Gary G.
**Sent:** Monday, September 4, 2017 3:38 PM
**To:** McDonald, Matthew O.; Nickerson, Doug; Coyner, Travis
**Cc:** Gracik, L.Michael
**Subject:** FW: Live Well

Summary of what I plan to tell Eric tomorrow at 2pm. You are welcome to join us if you want to....
Travis, Art is advising to compute OID on the 2016 return for all issuances for which we have calculations. This is different from what we used for the provision and extension so lets discuss what data we have.

---

**From:** Wallace, Gary G.
**Sent:** Monday, September 04, 2017 8:54 AM
**To:** 'Arthur Pearson' <APearson@MPBF.com>
**Subject:** RE: Live Well

Art,
For my call with Live Well CFO tomorrow, here is my preliminary talking points pending our discussion this morning:

1. LWF is a dealer under Section 475. Therefore all assets must be MTM for tax purposes unless exception applies
2. MSRs appear to meet IRS exceptions since servicing is in the ordinary course.
3. I/O strips still have issues as to appropriate identification. We can get to a tax return position that books and records include designation but would be challenging to get to more likely than not standard which is required under ASC 740/FIN 48 for GAAP tax reporting
4. Requesting appropriate accounting method change (non automatic Form 3115) in early 2018 is recommended course of action to resolve the issue. However, it is unknown whether the IRS National office will raise the issue of identification for I/O strips and if so what there conclusion would be.
5. The filing of the Form 3115 will provide IRS exam protection from penalties for earlier years and will allow any unfavorable adjustments to be amortized into taxable income over 4 years.
6. By waiting until 2018, there is a risk that the IRS could contact for examination before then and no protection would be provided.
7. If the Form 3115 is filed prior to issuance of 2017 financial statements, we could rely on the 3115 to not accrue tax and penalties for 2017.
8. We can file 2016 return on the current method which is even if incorrect, is the taxpayer's method. So we would not report MTM assuming all I/Os were marked to market and report OID for any issuances to which OID calculations were available at the time of filing the return. This is consistent with what was done for 2015 and 2014. Note 2015 we filed early so no OID calculations were available.

*Gary*



**Gary G. Wallace | Partner**
4401 Dominion Boulevard, Glen Allen, VA 23060
phone: 804.565.6025 | fax: 804.273.0048 | **www.keitercpa.com**

Experience | Knowledge | Relationships | Insights

1

DEFENSE EXHIBIT

A.347

KEI-0156007

**From:** Arthur Pearson [mailto:APearson@MPBF.com]
**Sent:** Thursday, November 30, 2017 2:37 PM
**To:** 'Tish Rosales' <trosales@camico.com>; 'Donna P. Genco' <dgenco@camico.com>
**Cc:** Wallace, Gary G. <GWallace@Keitercpa.com>; 'MStorti@keitercpa.com.' <MStorti@keitercpa.com.>
**Subject:** LIVE WELL : KEITER 2017B000753

We had the second of two conference calls late afternoon yesterday with Keiter (Gary Wallace, audit partners) Crowe Horwath (Conrad Davis, David Strong, Jim Goeller) and me. The purpose of the calls was to talk through the accounting method change issues, strategies to mitigate taxes or financial loss, and the best approach to take with Live Well so they understand the problems, the solutions, and the fallout from each.

The first of the two discussions focused on the 3115 change and Crowes expert in this area David Strong walked us through the process which was generally familiar to all participants. The critical item was the IO Strips which have perhaps $100 million in appreciation within them. Because these securities had not been "identified" as held for investment and not held for sale to customers under IRC §475(b)(1)(A) and §475(b)(1)(B) they would be subjected to realization and recognition under the Mark To Market (MTM) accounting method the accounting change would apply. This change of accounting method would trigger realization of the inherent gain in these IO Strips but would allow it to be recognized ratably over 4 years under IRC §481(a). That is a big number even if spread over years (See my 9-5-17 letter report "Interim Findings and Conclusions - L."). The positive side of this is that once the 3115 was filed it would provide audit protection for prior years and eliminate the prospect of penalties.

These conclusions were similar to those of KPMG who Live Well had retained earlier in 2017 and Keiter's request. KPMG's findings were not well received by Live Well's CFO. Gary Wallace felt these conclusions didn't address Live Well's concerns or create a platform to engage Live Well in the process to resolve the problems created by using the wrong accounting method.

The second of the two discussions focused on mitigation strategies which dovetailed with the need to create the appropriate platform to engage Live Well . Jim Goeller of Crowe led this discussion based on his familiarity with this industry, securities, and MTM. The starting point is the value of the IO Strips. We know that that Live Well has used a third party vendor to provide FMV information on these which value is apparently computer generated. In other words Keiter has no involvement in the generation of a FMV opinion but uses the vendor's information for tax and financial statement purposes. Goeller recommends that Live Well solicit bids its IO Strips and sell them if it wishes it can immediately reinvest in them the wash sale rule won't apply here.

This accomplishes several things: (1) it raises cash to pay taxes; (2) it generates a real bid to purchase from a ready and willing buyer and will allow all to test the third party's opinion of FMV; (3) it will be carried out close in time to the MTM (IRC §481(a)) adjustment.

Recent events may assist us in going down this path. First, Gary Wallace reports that the Live Well CFO spoke with him recently about his concern over interest rates impacting the value of the IO Strips and wondering what they should do with them; Second, there is talk that the Fed will raise interest rates in 2018 (possibly several times) which Keiter says will have a negative impact on the value of the IO Strips; Third, the federal tax law changes before Congress may reduce corporate tax rates making this an opportune time to sell; Fourth, increases in interest rates may create market volatility again making a sale a safe choice.

The discussion turned to whether it was better to file the 3115 accounting method change in 2017 or 2018 and before or after seeking to sell the IO Strips. The 3115 can only be filed in the same tax year in which the method change will first occur so we can't file now for a 2018 method change. There was no consensus on this but it seemed that filing the 3115 in 2018 (for the year beginning 1-1-18) this may capture lower tax rates and perhaps lower valuations.

2



DEFENSE
EXHIBIT

**A.364**

KEI-0155831

Keiter raised a question whether waiting until 2018 would create a FIN 48 issue for the 2017 Live Well financial statements for which Keiter does the audit. Dave Strong opined that the tax issues were timing differences (what year is the gain taxable) and the tax penalties and interest will be eliminated by the 3115 filing.  +

I am drafting talking points for Gary Wallace as a framework for his discussion with the Live Well CFO. He wants to approach Live Well soon so we (Crowe) can start the process of gearing up for the method change.

If you have any questions please contact me.

---

**Arthur V. Pearson**
Founding Shareholder

88 Kearny Street, 10th Floor
San Francisco, CA 94108
Office:    415.788.1900
Mobile:  415.596.2772
Fax:       415.393.8087

MURPHY PEARSON
BRADLEY & FEENEY

550 South Hope Street, Suite 650
Los Angeles, CA 90071
Office:    213.327.3500
Fax:       213.627.2445

*Licensed in California and Minnesota*

website | bio | vCard | map | email

| San Francisco | Sacramento | Los Angeles | Seattle |

*Voted "Best Legal Malpractice Specialty" by readers of The Recorder for the seventh consecutive year in 2016!*

CONFIDENTIALITY - This e-mail message and any attachments thereto are for the sole use of the intended recipient(s) and contains a private, confidential communication protected by the attorney client privilege and the attorney work product doctrine. Any unauthorized review, use, disclosure or distribution of this e-mail is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

3

KEI-0155832

**Exhibit 3**

April 2021 Sworn Testimony of Eric Rohr (Admission of Non-Disclosure)

A-436

---

1521

L4N1HIL5                    Rohr - Cross

records; is that it?

A. Yes, that's correct.

Q. And Mr. Hild has no formal background in accounting, right?

A. Not that I'm aware of.

Q. Okay. And so, I mean, you were the -- fair to say you were the first CFO at the company?

A. I believe that's the case, yes.

Q. And excluding the limited period of your successor CFO after you left, during the time that the company was open, after you left, more or less the only CFO for the entire life of the company; is that fair?

A. Well, excluding that period after I left, yes.

Q. Which is only a five-month period, right?

A. I'm not quite sure; five or six months, yes.

Q. Fair enough. The company changed a lot from when you joined in 2009 until you left at the end of 2018, right?

A. That is correct.

Q. The role changed a lot; you would agree?

A. Yes, I would agree.

Q. I think you testified earlier the company went from so many people to, I mean, 250 plus employees, something like that?

A. That is correct.

Q. You had a lot more to do at the end than you did at the beginning, I guess; is that fair?

A. Yes, I did.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

---

1522

L4N1HIL5                    Rohr - Cross

Q. Hard to keep up with stuff at that pace, fair?

A. Yeah, but I also had a team -- I built a team over time as well. From the beginning it was -- I really didn't have a very big team, so we tried to manage that with building a team and so I could delegate duties to other individuals.

Q. Okay. And you had a team with respect to your compliance functions, did you not, sir?

A. I did.

Q. All right. And one of those team members was a person by the name of Chris Bowman, perhaps?

A. Mr. Bowman was the internal auditor, and he reported directly to Mr. Hild.

Q. Okay. But there was a point in time when he reported directly to you, correct?

MR. ESTES: Objection, relevance.

THE COURT: I'll allow it.

Q. At some point in time Mr. Bowman reported directly to you, correct?

A. I don't recall him reporting directly to me. I recall him being -- we made him our internal auditor. He may have. I'm not saying -- but I don't really recall that period.

Q. All right. Mr. Rohr, let me just state it directly. Over the years, I mean, you hid some stuff from Mr. Hild, did you not, sir?

A. I don't know what you mean.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

---

1523

L4N1HIL5                    Rohr - Cross

Q. Well, weren't there a series of compliance issues that you did not make Mr. Hild aware of that would have significantly impacted, if not threatened the company's existence?

A. I don't recall that. We had regulatory licensing issues that we would try to resolve, but then we would -- we would go to report those to Mr. Hild.

Q. Okay. Well, at some point in time Mr. Hild himself decided that Mr. Bowman, your internal auditor, would report to Mr. Hild, not to you, so that he could kind of make sure he got the straight scoop; isn't that right, sir?

MR. ESTES: Objection. Relevance.

A. Oh, no. Gosh, no.

THE COURT: Sorry. Just give me one second.

Sustained.

Q. Okay. I'll move on.

Mr. Rohr, as well, wasn't it the case that at some point it was discovered that there had been an accounting decision made by you that had significant tax consequences for the business, sir?

A. That I had made -- I did not make any decision that resulted in tax implications for the company.

Q. At some point before you left there was some issue that was raised by the auditors that involved potentially a $40 million tax liability; isn't that right?

A. Potentially.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

---

1524

L4N1HIL5                    Rohr - Cross

Q. Right. That issue had dated back to 2014, 2015, did it not?

A. Correct, and I wasn't notified by our tax preparers of that until 2017.

Q. In any event, at no point in time did you ever make Mr. Hild aware of the fact of this potential $40 million tax liability, did you, sir?

A. I didn't believe it --

MR. ESTES: Objection, relevance.

THE COURT: Overruled.

Q. Is that a -- the question simply is: You'd never made him aware of this, correct, Mr. --

A. Because we were researching it to see if it was really an issue.

Q. Is that a yes?

A. I disagreed with the tax preparers as whether it was an issue, so we were trying to resolve that issue.

Q. All right. Mr. Rohr, again, you're testifying pursuant to a cooperation agreement with the government, are you not, sir?

A. Yes, I am.

Q. All right. And you're seeking to help yourself out through your testimony, yes, sir?

A. I'm -- I'm cooperating and telling the truth is what I'm doing.

MR. DUSING: All right. Your Honor, no further

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300