# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

FLAGSTAR BANK, FSB, a Federally Chartered Savings Bank,

Plaintiff,

v.

MICHAEL C. HILD, an individual,

ERIC ROHR, an individual, and

DARREN STUMBERGER, an individual,

Defendants.

Case No. 2:19-cv-11512

Hon. Matthew F. Leitman

---

## DEFENDANT DARREN STUMBERGER'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT

(Filed Pro Se by Defendant Darren Stumberger)

# PRELIMINARY STATEMENT

I submit this opposition to Flagstar's Motion for Judgment and alleged damages claim based upon several critical factual and legal issues that directly bear upon causation, valuation, mitigation, and the reliability of Flagstar's alleged damages.

On April 27, 2026, this Court granted summary judgment against me on liability only with respect to Flagstar's common-law conspiracy claim. All other claims were denied, and Flagstar now moves to avoid litigation of those alleged claims in exchange for a premature final judgment. **On May 12, 2026, I filed a NOTICE OF INTENT TO SEEK APPELLATE REVIEW UPON ENTRY OF FINAL JUDGMENT,** preserving my right to challenge the summary judgment ruling on liability—including the legal standards applied, the procedural posture, the extent to which I had a meaningful opportunity to develop the factual record, and any other issues appropriate for appellate review. I continue to maintain that significant legal and factual issues exist concerning liability; however, this opposition is directed solely toward Flagstar's request for entry of judgment on damages.

For the record: Flagstar's Motion for Judgment against me was once again delivered to a fake email address, yet Flagstar attests to the Court otherwise. Documents continue to be intentionally sent or addressed to old or erroneous addresses. There has never been proper service in this case as demonstrated in multiple docket submissions. Flagstar continues to send filings to addresses and email accounts previously identified as inaccurate despite repeated notice.

This opposition is solely focused on Flagstar's alleged 'losses', the extraordinary orchestrated events tied to those alleged losses, and how the law denies Flagstar's attempt to levy restitution from United States v. Michael Hild, Case No. 1:19-cr-602 (S.D.N.Y.), against me.

The Court should be aware by now of the remarkable chain of events involving numerous individuals, financial institutions, valuation providers, and professional advisors whose actions materially affected the valuation and disposition of the securities at issue. To my knowledge, none of this information was presented during the 2021 trial in *United States v. Hild*. I am certain none of it was available to me when I entered my plea agreement in 2019. While the 'Dan Foster' matters have been addressed in Hild's related proceedings from a notice perspective (or Hild's counsel had a chance to investigate), they have never been investigated, examined, or fully litigated. The shocking chain of events related to Foster and others has only been introduced to this Court's docket and record in 2025.

Central to these newly developed facts is Dan Foster, a former Vice President of Live Well Financial who was identified by the Government as a cooperating witness and an unnamed co-conspirator in *United States v. Hild*. Following his departure from Live Well, Foster became involved in supplying HECM Interest-Only ("HECM IO") bond valuations to Bloomberg under extreme pressure to obtain a Non-Prosecution Agreement from the Government—which he ultimately received. Evidence now demonstrates that the valuations Foster supplied to Bloomberg differed materially from those he previously supplied to Interactive Data Corporation ("IDC") while at Live Well. These discrepancies raise substantial questions regarding the accuracy, methodology, and integrity of the valuation process itself. To the extent Flagstar's alleged damages theory relies upon valuations derived from, influenced by, or otherwise connected to Foster's pricing submissions, the reliability of those damages calculations is directly called into question.

Further evidence reveals that Murphy & McGonigle, a highly prominent Washington DC law firm serving as outside counsel to Live Well, expressly prohibited Live Well and IDC from valuing the bond portfolio for more than two years during the critical period of July 2017 through August 2019. As any market participant knows, this directly harmed bond valuations due to the seasoning effect—normal and customary monthly adjustments were explicitly forbidden, leaving the portfolio unattended for more than 24 consecutive months during the SEC investigation. Murphy McGonigle's directive and motive is highly relevant to the Court's assessment of Flagstar's alleged damages.

The record further demonstrates that Flagstar sought valuation guidance from BlackRock despite BlackRock not being a participant or expert in the HECM market. I was an active participant in the HECM market from 2006 through the Live Well Financial period—over 10 years—and BlackRock did not surface once as a market participant. Flagstar thus relied upon opinions from an entity lacking direct transactional involvement in these highly illiquid and specialized securities.

Most significantly, Flagstar was not compelled to liquidate the government-guaranteed securities. Rather, Flagstar independently elected to sell the bonds through what can fairly be characterized as a failed or rigged auction process conducted by Bank of America Merrill Lynch—a voluntary exercise of Flagstar's own business judgment. This is central to co-defendant Eric Rohr's declaration that Flagstar is responsible for its own alleged damages. Rohr, after declining to admit Flagstar's allegations and declaring those alleged losses were of no fault but Flagstar's own in whole or in part, was secretly removed from this lawsuit with prejudice in 2024. The failed BAML auction raises serious concerns about Foster's Bloomberg valuations that warrant full discovery. Based on my direct experience working on BAML's HECM Sales and Trading Desk and my familiarity with how Wall Street institutions operate in thinly traded markets, the auction

result raises significant questions about whether BAML, seeing valuations it believed to be distorted, identified an opportunity to outbid its own customers and retain the bonds for its own account. That question—and the assumptions, bids, and internal communications underlying it—has never been examined and requires discovery.

Co-Defendant Rohr was not wrong—further evidenced by all claims being dismissed with prejudice against him. Flagstar elected to rely upon pricing information influenced by the embattled Foster valuations, proceeded with a forced liquidation through an institution with no participation in the market, and ultimately sold the bonds to a Wall Street Bank who mysteriously outbid their customers slightly in a failed auction (warranting thorough investigation) — despite readily available alternatives including continued ownership of these government-insured securities or a Collateralized Mortgage Obligation (CMO) resecuritization of the interest-only cashflows.

Accordingly, the evidence supports the conclusion that Flagstar's alleged damages were caused, in whole or in part, by independent intervening acts, reliance upon disputed valuation information, and Plaintiff's own voluntary decision to liquidate. These facts create substantial factual disputes that preclude entry of judgment.

Flagstar seeks entry of a civil judgment exceeding $16 million against me based solely upon a restitution calculation developed in *United States v. Hild*—a case in which I was not a named defendant and not a represented party during restitution proceedings. The Court has not yet conducted an evidentiary hearing on alleged damages in this action, nor have I been afforded any discovery concerning Flagstar's loss calculations, valuation methodologies, mitigation efforts, settlement recoveries, offsets, or the assumptions underlying the alleged damages figure now sought. The Court's April 27, 2026 Order expressly acknowledged it had not yet seen evidence establishing the amount of alleged damages. The law does not permit Flagstar's shortcut.

Fundamental principles of due process require notice and a meaningful opportunity to be heard before a party may be deprived of property. The constitutional violations relevant to this civil proceeding are twofold: first, I was afforded no notice, participation, or representation in the *United States v. Hild* restitution proceedings that produced the figure Flagstar now seeks to use against me; and second, I have not been afforded a meaningful opportunity to litigate alleged damages in this proceeding, before this Court, on Flagstar's civil claims. Both deprivations independently support denial of Flagstar's motion. Liability does not automatically establish damages. Where substantial factual disputes remain concerning valuation, causation, mitigation, offsets, and the amount of loss, entry of judgment is improper.

I was deprived of any opportunity to participate in the Hild restitution proceedings. I did not litigate the alleged loss amount, conduct discovery, cross-examine witnesses, present expert testimony on valuation, or receive notice of the proceedings. I did not waive my right or authorize any attorney to represent my interests. Flagstar nevertheless seeks to import that figure wholesale into this proceeding. The request should be denied.

The alleged damages amount Flagstar seeks was litigated entirely within Hild's case—argued by Hild's counsel on submissions by the Government and Flagstar—and then the ultimate restitution order included a line stating the obligation was joint and several as to Hild, Rohr, and myself. I learned of that line by reading about it after the fact. I never received official notice, was never given an opportunity to be present during evidentiary hearings, never signed any waiver, and never authorized Hild's attorney—or anyone else—to represent me. Flagstar's attempt to bind me to a determination reached in proceedings where I neither participated nor was represented is contrary to longstanding Supreme Court precedent: *Mullane v. Central Hanover Bank & Trust Co.*; *Mathews v. Eldridge*; *Hansberry v. Lee*; *Richards v. Jefferson County*; and *Taylor v. Sturgell*.

The April 27, 2026 Order (ECF No. 159) granted summary judgment on liability only, and the Court stated on the record that it had "not yet seen evidence of the amount of damages here." A restitution figure ordered in a case I did not litigate, by a lawyer I did not authorize, cannot discharge Flagstar's burden of proof. The Court should deny the motion, or defer any alleged damages proceedings pending an evidentiary hearing and full discovery on damages, setoff, and public disclosure of the prior settlement with co-defendant Rohr. The factual story about Flagstar should be transparent to the public—not covered up via Flagstar's only strategies: hope and non-litigated judgments.

## PRELIMINARY ARGUMENT

### I.  THE RESTITUTION ORDER DOES NOT ESTABLISH CIVIL DAMAGES AGAINST ME

Flagstar's motion depends almost entirely upon a restitution figure determined in *United States v. Hild*. That figure cannot serve as conclusive proof of damages against me in this civil action. It is a fundamental principle of due process that a person is not bound by a judgment rendered in litigation in which he was neither a party nor adequately represented. *Hansberry v. Lee*, 311 U.S. 32, 40 (1940); *Taylor v. Sturgell*, 553 U.S. 880, 892-95 (2008); *Richards v. Jefferson County*, 517 U.S. 793, 798-802 (1996). None of the recognized exceptions permitting non-party preclusion

applies. The fact that my name ultimately appeared in a restitution order cannot substitute for the notice, participation, and representation required by due process.

Moreover, criminal restitution and civil damages serve different purposes and are governed by different procedures. Restitution proceedings frequently involve approximations under sentencing standards; civil damages require proof of causation, mitigation, foreseeability, and recoverable loss under civil law. The restitution proceedings themselves—by Flagstar's own description involving multiple months and rounds of briefing, revised submissions, evidentiary hearings, supplemental calculations, and ongoing disputes regarding methodology—confirm that valuation and loss were actively contested subjects. The Court should decline to treat the restitution order as dispositive proof of alleged damages in this case.

**A.  The alleged loss amount was litigated in Hild's case, by Hild's counsel—not by or on behalf of me.**

By Flagstar's own description, the restitution amount was the product of "several rounds of briefing, updated submissions from the Government and the involved parties, an evidentiary hearing lasting approximately four hours, supplementary filings and calculations, and revised billing records." ECF No. 167 at 3. That entire adversarial process unfolded in Hild's criminal case. Hild's counsel argued the numbers. I was not a party to that process.

**B.  I received no notice and never authorized anyone to represent me in the restitution proceeding.**

My counsel never informed me that a restitution process was underway. I never signed any waiver of my right to notice or to be heard on the loss amount, and I never authorized Hild's attorney—or any other attorney—to represent me or appear on my behalf in the *United States v. Hild* restitution litigation. No one with authority to act for me, and no one charged with protecting my distinct interests, participated in the proceedings that led to the figure Flagstar now seeks to impose on me.

**C.  Due process forbids binding me to a determination I had no opportunity to contest.**

It is a foundational principle of due process that one is not bound by a judgment in a proceeding in which one was neither a party nor adequately represented and had no opportunity to be heard. See *Hansberry v. Lee*, 311 U.S. 32, 40 (1940); *Taylor v. Sturgell*, 553 U.S. 880, 884, 892-95

(2008); *Richards v. Jefferson County*, 517 U.S. 793, 798-802 (1996). Hild's counsel did not represent my interests, was not an adequate representative of me, and never purported to act on my behalf. Whether or not the alleged loss amount was "actually litigated" in Hild's proceeding is beside the point as to me, because it was not litigated by me or by anyone authorized to protect my interest. The appearance of my name on the final order does not retroactively supply the notice, participation, and representation that due process requires. A figure I had no chance to contest cannot be treated as conclusive—or even as competent—evidence of my civil damages in this Court.

### D.  A criminal restitution figure is not, by itself, proof of civil damages.

Even setting aside the participation and constitutional due process violation, criminal restitution and civil damages are governed by different standards. Restitution focuses on loss under the criminal sentencing framework; it does not require proof of the civil elements of reliance, causation, foreseeability, and mitigation as to a particular defendant. The restitution court itself described the number only as "a reasonable approximation of losses." ECF No. 167 at 4. A "reasonable approximation" reached under a criminal standard, in a proceeding I did not litigate, is not the proof of damages required to enter a final civil judgment against me.

### E.  Flagstar's own exhibits show the restitution figure was repeatedly revised, disputed, and methodology-dependent.

Flagstar's own submissions defeat its premise that the loss figure is fixed and undisputed. By Flagstar's account, the restitution amount emerged only after multiple rounds and months of briefing, updated and revised submissions, a multi-hour evidentiary hearing, supplementary calculations, and revised records. A number that required that much contested—albeit lacking and insufficient—litigation to produce, and that shifted over the course of it, is not a fixed, mechanically transferable figure. Flagstar cannot selectively invoke the final restitution number while disregarding the lengthy, disputed valuation process that generated it. That process is itself evidence that valuation and causation were, and remain, genuinely disputed.

### F.  The Mandatory Victims Restitution Act Independently Required My Participation in the Restitution Determination — and That Participation Never Occurred.

Beyond the constitutional due process principles established in *Hansberry v. Lee*, *Taylor v. Sturgell*, and *Mathews v. Eldridge*, the restitution process that produced the figure Flagstar now seeks to use against me was independently deficient under the express statutory procedural

requirements of the Mandatory Victims Restitution Act, 18 U.S.C. §§ 3663A and 3664 (the "MVRA").

The MVRA has been continuously in force since its enactment in 1996 — well before my 2019 plea and through the present date. It applies mandatorily to offenses including securities fraud, wire fraud, and bank fraud, the precise offenses stated in my plea agreement. The MVRA does not merely authorize restitution. It establishes a mandatory procedural framework governing how restitution amounts must be determined, and that framework vests specific rights in the defendant whose conduct is at issue.

Under 18 U.S.C. § 3664, the statute required, at minimum, that I receive notice of: the offenses of which I was convicted; the amounts being submitted to the probation officer as subject to restitution; the opportunity to submit information concerning those amounts; and the scheduled date, time, and place of the hearing at which restitution would be determined. The statute further required that I prepare and file a financial affidavit, that the court review presentence materials and evidence from both parties, and that the court make independent factual findings regarding the extent of any victim's losses. The government bears the burden of establishing loss amounts by a preponderance of the evidence, and defendants are entitled to challenge both the methodology and the amount.

None of these statutory requirements were met as to me in connection with the restitution proceedings in *United States v. Hild*.

The restitution amount was determined entirely within Hild's case — litigated by Hild's counsel, on submissions by the government and Flagstar, in a proceeding to which I was not a party. I received no MVRA-required notice. I was not provided an opportunity to appear, to submit information, to file a financial affidavit, or to challenge the loss calculations. No probation officer in my own case solicited restitution information in connection with a determination as to me. My sentencing court in the Southern District of New York does not appear to have conducted the independent restitution hearing the MVRA contemplates for each defendant subject to its obligations. The resulting figure was applied to me jointly and severally through the Hild order, without any of the procedural protections the MVRA independently requires.

The prejudice resulting from these omissions is not abstract or speculative — it is specific and demonstrable. The entire Foster-Bloomberg pricing chain — the IDC cessation, Foster's government cooperation, the Bloomberg pricing submissions, Murphy McGonigle's directive, the BAML auction process, and BlackRock's unproduced valuation — constitutes evidence directly

relevant to the accuracy of the loss calculation that underlies the restitution figure. That evidence was not available in the Hild restitution proceedings. It has surfaced only in 2025 filings on this Court's docket. I could not have challenged the loss methodology with evidence that did not yet exist in the record. The inability to present that evidence to any proceeding that has ever evaluated the alleged loss amount is precisely the kind of actual, concrete prejudice that courts require.

The MVRA's procedural requirements reflect Congress's recognition that restitution amounts require adversarial testing — that loss calculations developed by governments and victims must be subjected to challenge before they may be imposed on a defendant. That adversarial testing never occurred as to me, in any proceeding, in any court.

Accordingly, the restitution figure Flagstar seeks to import into this civil proceeding is deficient not only under the constitutional due process principles described above, but independently under the mandatory statutory framework that governs how such figures must be produced. A number that was never subjected to the MVRA's required procedural protections as to me carries no evidentiary weight in a civil proceeding in which Flagstar bears the independent burden of proving its damages.

## II. FLAGSTAR BEARS THE BURDEN OF PROVING ALLEGED DAMAGES IN THIS PROCEEDING

The Court's April 27 Order preliminarily resolved liability only. Liability and damages are separate elements: even where liability has been established, a plaintiff bears the burden of proving damages with competent evidence. *Carey v. Piphus*, 435 U.S. 247, 254-55 (1978); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-63 (1931). Flagstar has not carried that burden. Instead of presenting evidence developed in this litigation, Flagstar relies primarily upon the restitution order and supporting materials generated elsewhere—materials I have never had the opportunity to test, through discovery, examine, or challenge. Nor has Flagstar established that the liquidation proceeds it relies upon accurately reflected fair market value or actual economic loss. Where damages depend upon disputed assumptions and unresolved factual issues, entry of judgment is inappropriate. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946). At a minimum, Flagstar must establish any alleged damages through evidence presented and tested in this proceeding, not merely by reference to a restitution figure developed elsewhere in which I was not afforded an opportunity to participate.

### III.  MATERIAL FACTUAL DISPUTES CONCERNING THE FOSTER-BLOOMBERG PRICING CHAIN PRECLUDE ENTRY OF JUDGMENT

Flagstar's alleged damages theory depends upon the assumption that the liquidation price obtained for the HECM-IO securities accurately reflected fair market value and therefore constituted recoverable economic loss. The present record does not support that conclusion. Substantial factual disputes exist concerning the valuation process that produced the prices relied upon by Flagstar—involving the cessation of IDC pricing, the emergence of Bloomberg pricing, the role of embattled former Live Well VP and government cooperator Dan Foster, the assumptions underlying those valuations, and the extent to which those valuations influenced both market participants and Flagstar's own liquidation decisions. These issues have never been fully litigated in this action and require discovery and an evidentiary hearing before any damages can be determined.

**A.  IDC's Cessation of Pricing Fundamentally Altered the Valuation Environment.**

IDC historically served as the primary pricing source for HECM-IO securities. U.S. Bank reporting relied upon IDC values, and lenders, custodians, and market participants used those values in evaluating collateral and portfolio performance. Flagstar's own employee Robert Marsh acknowledged that IDC was the required valuation source within the applicable reporting structure. That framework changed dramatically when IDC ceased publishing prices for HECM-IO securities.

As reflected in Exhibit C filed in the Delaware bankruptcy proceeding and later attached as part of Exhibit E to ECF No. 144, Hild alleged that Krupa advised Live Well the SEC had concerns regarding HECM IO pricing and that IDC would no longer accept updated broker quotes or values from Live Well—after which Bloomberg became the pricing source appearing in the U.S. Bank reports relied upon by repo lenders. Exhibit D further shows that on February 7, 2019, the SEC conducted an extensive interview of Krupa concerning IDC's HECM IO pricing methodology and Live Well's role in supplying pricing information, and that IDC ceased accepting Live Well pricing shortly thereafter. The inference is further supported by Exhibit C's citation of the SEC's subsequent enforcement action and cease-and-desist order against ICE Data Pricing & Reference Data LLC arising from the same practices. Taken together, the public record supports that SEC concerns caused IDC to cease accepting and publishing Live Well values, after which Bloomberg became the operative pricing source—the precise mechanism through which the alleged losses were created.

**B.  The Record Raises Substantial Questions Concerning Government Cooperator Dan Foster's Role in Bloomberg Pricing.**

After departing Live Well, Foster associated with Baird and developed a formal pricing relationship with Bloomberg for HECM collateralized mortgage obligations and interest-only securities. Those communications are significant because Bloomberg itself acknowledged it was seeking data and pricing inputs in this specialized sector—"starved for data" in the HECM space, in Bloomberg's own words—confirming the absence of a deep, transparent market capable of independently validating prices. Bloomberg requested recurring submissions from Foster, and the extent to which Bloomberg's resulting valuations relied upon those submissions remains disputed and has never been subjected to discovery in this case.

**C.  Foster's Pricing Activities Occurred During Active Government Cooperation.**

Foster entered into a proffer agreement with the SEC in 2017 and later obtained a non-prosecution agreement in connection with investigations involving Live Well Financial in 2019. The timing of his involvement presents factual issues directly relevant to valuation reliability. A pricing contributor who supplied valuations to Bloomberg while simultaneously cooperating with federal investigators and seeking a non-prosecution agreement presents obvious questions concerning the independence and reliability of those valuations. Whether Foster's cooperation status influenced his pricing submissions, the assumptions he used, or the resulting Bloomberg benchmark values are all unresolved factual questions that have never been subjected to discovery in this case. Those facts provide a legitimate and compelling basis for targeted discovery into the assumptions, methodologies, and judgments underlying the pricing information Foster supplied to Bloomberg.

**D.  The Record Indicates Material Differences Between Prior IDC Valuations and Later Bloomberg Pricing.**

The pricing levels associated with Foster's Bloomberg submissions—made while he was under extreme government pressure—differed materially from the valuation levels utilized during his tenure at Live Well. The reasons for those differences remain disputed and have never been tested through discovery. Whether they resulted from changing market conditions, different modeling assumptions, altered methodologies, contributor judgment, or the Murphy McGonigle directive are all unresolved factual questions. Until those issues are examined, the Court cannot simply assume that the Bloomberg valuations accurately reflected economic value.

**E.  Murphy McGonigle's Directive and the Suspension of Valuation Adjustments Raise Additional Questions.**

Live Well was explicitly advised against making valuation changes during a prolonged period encompassing the entire SEC investigation. This advice effectively prevented ordinary valuation adjustments that market participants would typically employ when maintaining a bond portfolio. When no adjustments are made for an extended period such as this, questions naturally arise regarding the polluted relationship between historical valuations, subsequent embattled Foster Bloomberg valuations, and the liquidation values ultimately obtained. Those questions bear directly upon the reliability of Flagstar's claimed damages.

**F.  The Foster-Bloomberg Pricing Chain Was Never Litigated During the Restitution Proceedings.**

To my knowledge, the Foster-Bloomberg pricing chain and extraordinary chain of events in its entirety was never examined during the restitution proceedings upon which Flagstar now relies. Those proceedings focused primarily upon arriving at a reasonable approximation of loss for sentencing purposes—they did not involve the discovery, expert analysis, or evidentiary development necessary to evaluate the complex valuation issues now presented. The evidence concerning Foster, Bloomberg, IDC, valuation methodology, and pricing substitution has surfaced more fully only in recent filings on this Court's docket. These issues remain unresolved and cannot be disregarded because a restitution figure was entered in a separate case in which I was neither noticed nor involved.

**G.  The Existence of These Valuation Disputes Precludes Entry of Judgment.**

Flagstar's alleged damages theory requires the Court to accept a series of assumptions—none of which the present record supports:

- that Bloomberg's valuations accurately reflected fair value;
- that the transition from IDC pricing had no material impact;
- that contributor-supplied pricing inputs accurately reflected market value;
- that Foster's role had no effect upon resulting lower valuations;
- that the assumptions underlying Bloomberg's pricing were sound; and
- that liquidation proceeds necessarily reflected actual economic loss.

The present record does not compel those conclusions. Rather, it reveals substantial factual disputes concerning the entire valuation chain underlying Flagstar's alleged losses—disputes that

go directly to the amount of alleged damages and cannot be resolved on the present record. Accordingly, entry of judgment should be denied.

## IV.  INDEPENDENT INTERVENING EVENTS, VALUATION DISPUTES, AND FLAGSTAR'S OWN BUSINESS DECISIONS PRECLUDE ENTRY OF JUDGMENT

Flagstar must establish that the damages it seeks were proximately caused by the conduct at issue. It has not done so. The record demonstrates that numerous independent events, valuation decisions, third-party actions, and business judgments occurred between the alleged conduct and the alleged losses Flagstar now seeks to recover—involving IDC, Foster, Bloomberg, BlackRock, Bank of America Merrill Lynch, U.S. Bank, and Flagstar itself. Flagstar's motion largely ignores those intervening events and assumes that every dollar of alleged loss flowed directly from me. The record does not support that conclusion.

### A.  Proximate Cause Cannot Be Presumed.

A finding of liability does not automatically establish that every subsequent alleged loss was caused by me. See *Exxon Co. U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837-40 (1996). Where independent actors exercise their own judgment and make separate business decisions, causation becomes highly fact-specific and unsuitable for summary determination.

### B.  Flagstar's Decision to Liquidate the Securities Was Voluntary.

The securities at issue were government-guaranteed instruments. Flagstar has not established that liquidation was legally required, contractually mandated, or economically unavoidable. The alleged damages theory advanced by Flagstar assumes that liquidation proceeds automatically constitute recoverable loss—but a voluntary liquidation decision does not itself establish causation. Had Flagstar retained the securities, continued collecting cash flows, received future coupon payments, or held through changing market conditions, the economic outcome may have been materially different. The present record contains no analysis comparing liquidation proceeds to projected future cash flows, maturity values, or alternative disposition strategies. Without such evidence, the Court cannot determine whether the alleged losses resulted from the underlying conduct, from subsequent market developments, or from Flagstar's own decisions.

## C.  The BAML Auction Process Raises Additional Questions Concerning Fair Value.

Flagstar elected to utilize Bank of America Merrill Lynch in connection with liquidation of the securities. The present record does not establish:

- the complete marketing process used;
- the identity of all bidders;
- the methodology used to solicit bids;
- the assumptions provided to potential purchasers;
- the extent to which embattled Foster Bloomberg pricing influenced bids;
- the relationship between auction pricing and intrinsic or true value; or
- whether alternative disposition strategies were considered.

The failed auction result raises serious questions that warrant discovery. Based on my direct experience working on BAML's HECM Sales and Trading Desk and my familiarity with how Wall Street institutions operate in thinly traded specialty markets, the circumstances surrounding BAML's role—both running the sale process and reportedly becoming involved as purchaser—raise substantial questions about whether the auction reflected arm's-length fair value or whether distorted Bloomberg valuations created an opportunity for BAML to retain the bonds at the expense of Flagstar's alleged recovery. Where the valuation benchmarks informing that market are themselves disputed, the resulting sale price cannot be treated as conclusive proof of economic loss.

## D.  BlackRock's Role Remains Insufficiently Developed.

Flagstar relied, at least in part, upon valuation information from BlackRock—yet Robert Marsh acknowledged in deposition that he did not possess the BlackRock valuation report, did not know BlackRock's assumptions, and could not explain the methodology employed. The securities at issue were not ordinary liquid fixed-income instruments. They were highly specialized HECM interest-only securities whose values depended upon numerous assumptions including:

- monthly and annually adjusting floating interest rates;
- prepayment behavior and history;
- mortality trends;
- buyout activity;
- policy developments;
- origination dynamics and originator incentives;

- housing market conditions;
- discount margins;
- servicing performance;
- long-term projected cash flows; and
- relative value.

Without disclosure of BlackRock's methodology, neither I nor the Court can evaluate whether the resulting conclusions accurately reflected fair value. Flagstar seeks a judgment exceeding $16 million while relying upon valuation work from an entity that never participated in this specialized market and that has never been produced or tested in this litigation.

**E.  Flagstar Has Not Established That Liquidation Proceeds Equal Economic Loss.**

A distressed sale, forced sale, thin-market sale, or questionable valuation-driven sale may produce proceeds materially different from intrinsic value—particularly where securities are specialized, illiquid, and dependent upon long-term cash flows. The offering materials themselves recognized the possibility that active secondary markets might not develop for these securities. Flagstar has not established that the sale price reflected:

- projected future cash flows;
- accrued interest;
- future coupon income;
- expected buyouts;
- future market dynamics;
- alternative holding strategies or other securitized options; or
- long-term economic value.

Without such evidence, the Court cannot conclude that liquidation proceeds accurately measured loss.

**V.  FLAGSTAR HAS NOT ESTABLISHED REASONABLE MITIGATION OF DAMAGES**

Even if some alleged loss occurred, Flagstar bears a duty to mitigate. A plaintiff may not recover losses that could have been avoided through reasonable efforts. See Restatement (Second) of Contracts § 350; *Ford Motor Co. v. City of Woodhaven*, 475 F.3d 594, 605 (6th Cir. 2007).

Flagstar's motion contains no evidence concerning mitigation—it appears Flagstar assumed that forced liquidation was the appropriate response and that all resulting losses are recoverable. The record contains insufficient evidence to support that assumption. Flagstar has not demonstrated:

- why forced liquidation was necessary;
- whether continued ownership was feasible;
- whether alternative strategies were considered;
- whether projected future cash flows were analyzed;
- whether the securities were expected to be money-good over time;
- whether other market participants would have valued the securities differently; or
- whether liquidation maximized economic value.

These questions are particularly important because the securities were government-guaranteed instruments rather than speculative assets lacking underlying credit support or government insurance. The record permits a reasonable inference that Flagstar's alleged losses were substantially affected by Flagstar's own decisions concerning valuation, liquidation timing, disposition strategy, and a multitude of outside influences.

## A.  Material Factual Disputes Require Further Proceedings.

The record raises numerous unresolved factual questions, including:

- whether Bloomberg valuations accurately reflected fair value;
- whether IDC's cessation of pricing materially altered market perception;
- whether embattled Foster's pricing submissions influenced Bloomberg valuations;
- whether BlackRock's assumptions and directive to conduct a fire-sale were reliable;
- whether liquidation was necessary;
- whether liquidation maximized value;
- whether future cash flows were considered;
- whether alternative strategies existed;
- whether BAML's auction process reflected fair value; and
- whether Flagstar reasonably mitigated its losses.

These issues go directly to causation and damages. Because Flagstar's requested judgment depends upon resolution of these disputed questions, entry of judgment is inappropriate on the present record.

**VI.  UNRESOLVED OFFSETS, SETTLEMENT CREDITS, AND DOUBLE RECOVERY
ISSUES INDEPENDENTLY PRECLUDE ENTRY OF JUDGMENT**

Entry of judgment remains independently improper because Flagstar has failed to establish the
amount of any remaining unrecovered loss. If proven through litigation, a plaintiff is entitled to
be made whole—not to recover the same loss multiple times from multiple sources. The Court
itself recognized this during prior proceedings when it observed that Flagstar cannot recover
twice for the same alleged loss. Yet Flagstar's motion provides no complete accounting of
amounts already recovered.

**A.  The Rohr Settlement Remains Undisclosed.**

The record reflects that Rohr was dismissed from this litigation with prejudice, yet the amount
and terms of any settlement remain absent from the public record. Any payment received by
Flagstar in connection with the same alleged loss necessarily affects the amount of any
remaining recoverable damages—without disclosure of the settlement amount, the Court cannot
determine the extent to which Flagstar has already been compensated. Rohr's position included
assertions that Flagstar's alleged losses resulted from its own conduct and failure to mitigate, and
any settlement arising from the same alleged loss must be accounted for before entry of
judgment.

**B.  Flagstar Has Not Produced A Comprehensive Accounting Of Recoveries.**

Beyond the undisclosed Rohr settlement, Flagstar has provided no comprehensive accounting
identifying:

- settlement proceeds;
- restitution payments;
- liquidation proceeds;
- coupon payments;
- servicing income from the warehouse line;
- insurance recoveries;
- indemnification recoveries;
- tax benefits;
- accounting adjustments;
- write-downs;
- write-offs; or

- any other amounts reducing the alleged loss.

Without a complete accounting, the Court cannot determine what net alleged loss, if any, remains outstanding. Courts routinely require transparency concerning offsets and prior recoveries before entering substantial judgments—especially where multiple parties, multiple proceedings, and multiple sources of recovery are involved.

## C.  The Restitution Obligation Creates Additional Double-Recovery Concerns.

Flagstar seeks the same damages already incorporated into the restitution proceedings. A civil judgment for the identical alleged loss, layered on top of a federal restitution obligation, creates a serious risk of duplicative recovery. Any judgment entered must therefore expressly provide that:

- (1) Flagstar's total recovery is limited to its actual loss;
- (2) all restitution payments are credited against any civil judgment;
- (3) all settlement recoveries are credited against any civil judgment; and
- (4) Flagstar may not obtain recovery exceeding the amount of any proven loss.

Absent such protections, entry of judgment would create an unacceptable risk of overcompensation.

## VII.  DUE PROCESS REQUIRES DISCOVERY AND AN EVIDENTIARY HEARING BEFORE ENTRY OF A MULTI-MILLION DOLLAR JUDGMENT

Perhaps most importantly, I have never been afforded a meaningful opportunity to litigate alleged damages in this proceeding. The due process deprivations at issue here are twofold and independent. The first is that the restitution figure Flagstar relies upon was produced in *United States v. Hild* without my notice, participation, or authorized representation — a proceeding whose procedures, as set forth above, also failed to satisfy the MVRA's mandatory statutory requirements as applied to me. The second is that I have not been afforded any opportunity to contest alleged damages here, in this civil proceeding, before this Court. Both deprivations are distinct, both are independently sufficient to preclude entry of judgment, and the second is squarely before this Court to remedy. Due process requires notice and a meaningful opportunity to be heard before deprivation of property. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The judgment sought exceeds $16 million with interest accruing indefinitely. Yet I have never been permitted to conduct meaningful discovery concerning:

- the Marsh affidavits;
- Flagstar's internal loss calculations;
- BlackRock's valuation methodology;
- Bloomberg pricing inputs;
- IDC's cessation of pricing;
- Foster's pricing submissions;
- the BAML auction process;
- settlement credits;
- offset calculations; or
- the assumptions underlying the restitution calculations.

Nor have I been afforded the opportunity to:

- depose critical witnesses;
- retain valuation experts;
- challenge pricing methodologies;
- present competing valuation evidence; or
- cross-examine witnesses concerning damages.

These deprivations are not merely constitutional in nature. As set forth in Section I.F above, they independently violated the mandatory procedural requirements of the MVRA, 18 U.S.C. §§ 3663A and 3664, which required my participation in the restitution determination as a matter of statutory right. The confluence of constitutional and statutory deprivation reinforces that the restitution figure carries no evidentiary weight in this proceeding and that Flagstar must prove its damages independently.

## A. Discovery Is Particularly Important Given The Complexity Of The Securities.

These were highly specialized HECM interest-only instruments whose valuation depends upon numerous assumptions and variables including but not limited to:

- discount margins;
- investor and market participant activity;
- relative value;
- prepayment assumptions;
- monthly and annually adjusting interest rate expectations;
- mortality assumptions;

- line of credit draw assumptions;
- buyout activity;
- housing market conditions;
- seasonality;
- bond origination volume and supply;
- originator activity and incentives to refinance borrowers;
- regulatory developments; and
- projected future cash flows.

Determining alleged damages in connection with such instruments is not a ministerial exercise—it requires analysis, expert testimony, and examination of unique valuation assumptions and methodologies. Flagstar seeks to bypass those procedures by relying upon calculations developed elsewhere, in proceedings I was not a part of. The Court should decline that invitation.

**B.  The Present Record Demonstrates The Need For Further Proceedings.**

The Court is presently confronted with substantial and unresolved disputes concerning:
- valuation methodology;
- pricing inputs and assumptions;
- modeling integrity;
- causation;
- mitigation;
- offsets;
- settlement credits;
- market value;
- liquidation value; and
- actual economic loss.

These disputes are not peripheral—they are central to the alleged damages question. Fairness requires that I be permitted to develop a factual record concerning those issues before judgment is entered.

The restitution order does not establish civil damages against me. Flagstar has not carried its burden of proving alleged damages in this proceeding. Material factual disputes remain concerning the embattled Foster-Bloomberg pricing chain, IDC's cessation of pricing, valuation

methodology, BlackRock's assumptions, the BAML liquidation process, causation, mitigation, settlement credits, offsets, and the amount of any remaining loss. The present record demonstrates that damages remain genuinely disputed and judgment is not proper.

# ARGUMENT

## I. THE RESTITUTION ORDER CANNOT ESTABLISH DAMAGES AGAINST ME BECAUSE I HAD NO NOTICE, NO PARTICIPATION, AND NO REPRESENTATION ON THE LOSS AMOUNT IN THE PROCEEDING THAT PRODUCED IT.

Flagstar's damages case rests entirely on the restitution figure determined in *United States v. Hild*. The manner in which that figure was determined deprives it of any binding or evidentiary force against me by law.

### A. The loss amount was litigated in Hild's case, by Hild's counsel—not by or on behalf of me.

By Flagstar's own description, the restitution amount was the product of "several rounds of briefing, updated submissions from the Government and the involved parties, an evidentiary hearing lasting approximately four hours, supplementary filings and calculations, and revised billing records." ECF No. 167 at 3. That entire adversarial process unfolded in Hild's criminal case. Hild's counsel argued the numbers. I was not a party to that process.

### B. I received no notice and never authorized anyone to represent me in the restitution proceeding.

My counsel never informed me that a restitution process was underway. I never signed any waiver of my right to notice or to be heard on the loss amount, and I never authorized Hild's attorney—or any other attorney—to represent me or appear on my behalf in the *United States v. Hild* restitution litigation. No one with authority to act for me, and no one charged with protecting my distinct interests, participated in the proceedings that led to the figure Flagstar now seeks to impose on me.

### C. Due process forbids binding me to a determination I had no opportunity to contest.

It is a foundational principle of due process that one is not bound by a judgment in a proceeding in which one was neither a party nor adequately represented and had no opportunity to be heard. See *Hansberry v. Lee*, 311 U.S. 32, 40 (1940); *Taylor v. Sturgell*, 553 U.S. 880, 884, 892-95 (2008); *Richards v. Jefferson County*, 517 U.S. 793, 798-802 (1996). Hild's counsel did not represent my interests, was not an adequate representative of me, and never purported to act on my behalf. Whether or not the alleged loss amount was "actually litigated" in Hild's proceeding is beside the point as to me, because it was not litigated by me or by anyone authorized to protect my interest. The appearance of my name on the final order does not retroactively supply the notice, participation, and representation that due process requires. A figure I had no chance to contest cannot be treated as conclusive—or even as competent—evidence of my civil damages in this Court.

**D.  A criminal restitution figure is not, by itself, proof of civil damages.**

Even setting aside the participation and constitutional due process violation, criminal restitution and civil damages are governed by different standards. Restitution focuses on loss under the criminal sentencing framework; it does not require proof of the civil elements of reliance, causation, foreseeability, and mitigation as to a particular defendant. The restitution court itself described the number only as "a reasonable approximation of losses." ECF No. 167 at 4. A "reasonable approximation" reached under a criminal standard, in a proceeding I did not litigate, is not the proof of damages required to enter a final civil judgment against me.

**E.  Flagstar's own exhibits show the restitution figure was repeatedly revised, disputed, and methodology-dependent.**

Flagstar's own submissions defeat its premise that the loss figure is fixed and undisputed. By Flagstar's account, the restitution amount emerged only after multiple rounds and months of briefing, updated and revised submissions, a multi-hour evidentiary hearing, supplementary calculations, and revised records. A number that required that much contested—albeit lacking and insufficient—litigation to produce, and that shifted over the course of it, is not a fixed, mechanically transferable figure. Flagstar cannot selectively invoke the final restitution number while disregarding the lengthy, disputed valuation process that generated it. That process is itself evidence that valuation and causation were, and remain, genuinely disputed.

**F.  The Mandatory Victims Restitution Act Independently Required My Participation in the Restitution Determination — and That Participation Never Occurred.**

Beyond the constitutional due process principles established in *Hansberry v. Lee*, *Taylor v. Sturgell*, and *Mathews v. Eldridge*, the restitution process that produced the figure Flagstar now seeks to use against me was independently deficient under the express statutory procedural requirements of the Mandatory Victims Restitution Act, 18 U.S.C. §§ 3663A and 3664 (the "MVRA").

The MVRA has been continuously in force since its enactment in 1996 — well before my 2019 plea and through the present date. It applies mandatorily to offenses including securities fraud, wire fraud, and bank fraud, the precise offenses in my plea agreement. The MVRA does not merely authorize restitution. It establishes a mandatory procedural framework governing how restitution amounts must be determined, and that framework vests specific rights in the defendant whose conduct is at issue.

Under 18 U.S.C. § 3664, the statute required, at minimum, that I receive notice of: the offenses of which I was convicted; the amounts being submitted to the probation officer as subject to restitution; the opportunity to submit information concerning those amounts; and the scheduled date, time, and place of the hearing at which restitution would be determined. The statute further required that I prepare and file a financial affidavit, that the court review presentence materials and evidence from both parties, and that the court make independent factual findings regarding the extent of any victim's losses. The government bears the burden of establishing loss amounts by a preponderance of the evidence, and defendants are entitled to challenge both the methodology and the amount.

None of these statutory requirements were met as to me in connection with the restitution proceedings in *United States v. Hild*.

The restitution amount was determined entirely within Hild's case — litigated by Hild's counsel, on submissions by the government and Flagstar, in a proceeding to which I was not a party. I received no MVRA-required notice. I was not provided an opportunity to appear, to submit information, to file a financial affidavit, or to challenge the loss calculations. No probation officer in my own case solicited restitution information in connection with a determination as to me. My sentencing court in the Southern District of New York does not appear to have conducted the independent restitution hearing the MVRA contemplates for each defendant subject to its obligations. The resulting figure was applied to me jointly and severally through the Hild order, without any of the procedural protections the MVRA independently requires.

The prejudice resulting from these omissions is not abstract or speculative — it is specific and demonstrable. The entire Foster-Bloomberg pricing chain — the IDC cessation, Foster's government cooperation, the Bloomberg pricing submissions, Murphy McGonigle's directive, the BAML auction process, and BlackRock's unproduced valuation — constitutes evidence directly relevant to the accuracy of the loss calculation that underlies the restitution figure. That evidence was not available in the 2021 Hild restitution proceedings. It has surfaced only in 2025 filings on this Court's docket. I could not have challenged the loss methodology with evidence that did not yet exist in the record. The inability to present that evidence to any proceeding that has ever evaluated the loss amount is precisely the kind of actual, concrete prejudice that courts require.

The MVRA's procedural requirements reflect Congress's recognition that restitution amounts require adversarial testing — that loss calculations developed by governments and victims must be subjected to challenge before they may be imposed on a defendant. That adversarial testing never occurred as to me, in any proceeding, in any court.

Accordingly, the restitution figure Flagstar seeks to import into this civil proceeding is deficient not only under the constitutional due process principles described above, but independently under the mandatory statutory framework that governs how such figures must be produced. A number that was never subjected to the MVRA's required procedural protections as to me carries no evidentiary weight in a civil proceeding in which Flagstar bears the independent burden of proving its damages.

## II.  THE APRIL 27 ORDER DECIDED LIABILITY ONLY; FLAGSTAR HAS NOT PROVEN DAMAGES IN THIS PROCEEDING.

The Court's Order granted summary judgment "on liability only with respect to Flagstar's common-law conspiracy claim." ECF No. 159 at 1 (emphasis added). At the hearing, the Court was explicit: "I haven't yet seen evidence of the amount of damages here." Liability and damages are independent elements, and a finding of liability does not establish the amount owed. Flagstar, as the party seeking judgment, bears the burden of establishing alleged damages with competent evidence in this case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Flagstar's only alleged damages "proof" is the restitution order in *United States v. Hild* and the supporting Marsh affidavits—affidavits prepared for, and tested (if at all) only in the Hild proceeding, in which I had no participation and no representation.

### III. THE COURT MUST PREVENT DOUBLE RECOVERY AND CREDIT BOTH THE RESTITUTION OBLIGATION AND THE ROHR SETTLEMENT.

My primary position is that the restitution order has no binding or evidentiary effect against me. The Court must guard against duplicative recovery for a single alleged loss. The Court recognized at the April 27, 2026 hearing that Flagstar "can't collect from [Stumberger] twice." That principle must be written into any judgment with prejudice—not left to later collection disputes. The civil due process violation at issue in this proceeding is independent of any question about the criminal restitution order's validity: I have not been afforded a meaningful opportunity to contest damages here, before this Court, on Flagstar's civil claims. That deprivation alone requires that the motion be denied or deferred.

**A. Any civil judgment must credit the existing restitution obligation for the same loss.**

Flagstar seeks "the same amounts" already reflected in the restitution order for the same alleged loss. ECF No. 167 at 4. A civil judgment for an identical alleged loss, layered on top of a federal restitution obligation, creates a serious risk of double recovery. Any judgment entered must expressly provide that it is satisfied to the extent of any payments made toward the restitution obligation by any party held responsible for that loss, and that Flagstar's total recovery for this single alleged loss is capped at the specified loss amount.

**B. Flagstar has not provided a complete accounting of prior recoveries and offsets.**

Beyond the Rohr settlement (still held in secret and not made public on this docket), Flagstar cannot establish the actual remaining net loss attributable to me because it has provided no comprehensive accounting of what it has already recovered. The restitution materials themselves referenced ongoing reconciliation involving settlement credits, liquidation proceeds, accrued coupon payments, servicing advances, and other offsets that altered the claimed loss over time. Yet Flagstar's motion provides no ledger identifying:

- amounts recovered from co-defendants or third parties;
- insurance or indemnification recoveries;
- servicing or coupon income received after liquidation;
- tax benefits or accounting write-downs associated with the underlying assets; or
- the methodology used to allocate prior recoveries against the amount now sought from me.

Without those disclosures, the Court cannot determine whether the requested judgment seeks amounts already recovered elsewhere. Courts routinely require transparent offset calculations before entering civil judgments where overlapping recoveries may exist, particularly where portions of the obligation are joint and several. See *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1277-78 (11th Cir. 2008); *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 333 (1980). Flagstar has not produced bond-level liquidation statements, custodial reconciliations, servicing remittance reports, or internal accounting adjustments needed to verify its claimed balances. Those omissions alone preclude entry of final judgment.

## IV.  ENTRY OF A $16.8 MILLION JUDGMENT WITHOUT AN EVIDENTIARY HEARING AND WITHOUT DISCOVERY ON DAMAGES VIOLATES DUE PROCESS.

Due process requires notice and a meaningful opportunity to be heard before deprivation of property. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Where complex and disputed alleged damages are involved, courts routinely require evidentiary proceedings before entering substantial monetary judgments. See Fed. R. Civ. P. 55(b)(2); *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110-11 (6th Cir. 1995). I have never had that opportunity. I have received no discovery in this case, have never seen Flagstar's internal loss calculations or valuation records, have never been able to depose Robert Marsh, and have never been able to retain an expert or present evidence on causation or the loss fairly attributable to Flagstar's specific conduct. The Sixth Circuit has cautioned against dispositive rulings where a party lacks meaningful access to the discovery needed to challenge the opposing party's claims. See *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004); *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231-32 (6th Cir. 1994). Rule 56(d) and basic fairness counsel that where a party has been deprived of discovery essential to opposing a damages claim, the Court should defer or deny rather than enter judgment. I respectfully request an evidentiary hearing and full discovery—including but not limited to, Flagstar's internal loss calculations, the Marsh affidavits, the restitution-proceeding record from SDNY, and the Rohr settlement amount.

## V.  FLAGSTAR'S ALLEGED LOSSES DEPEND ON A DISPUTED AND CONTAMINATED PRICING CHAIN THAT HAS NEVER BEEN TESTED IN THIS CIVIL CASE OR ANY RELATED CASES.

Even setting aside the restitution order entirely, Flagstar's motion treats a liquidation price as if it conclusively establishes alleged damages. It does not. The alleged loss was dependent on a highly suspicious, orchestrated, and disputed valuation chain.

IDC, owned by International Exchange (NYSE: ICE)—which also owns the New York Stock Exchange—ceased pricing HECM-IO bonds during the exact same period (2017–2019) that Murphy McGonigle prohibited Live Well from properly adjusting its portfolio. Both forces essentially left the bond portfolio unattended for 24-plus consecutive months during the SEC investigation, normal and customary monthly bond-level valuation adjustments were explicitly forbidden, leaving the portfolio in a deteriorating state. Any market participant knows this is harmful to bond valuation. Simultaneously and unbeknownst to me, Foster—upon departing Live Well in 2017 and lobbying to become an SEC cooperator—initiated a formal partnership with Bloomberg to provide broker quotes on HECM bonds while working for Baird. Foster's ultimate HECM IO pricing submissions to Bloomberg (per the record) were wildly different from his prior submissions to IDC while at Live Well. While the Murphy McGonigle portfolio effect certainly contributed to this, it remains unknown what assumptions Foster used in modeling the portfolio for Bloomberg or how they differed from his Live Well methodology. This needs to be examined. Ultimately, Flagstar valued and liquidated its portfolio relying on embattled Foster's Bloomberg values while Foster was actively auditioning for—and ultimately obtaining—non-prosecution agreements from both the SEC and SDNY.

**A. The alleged Flagstar loss cannot be separated from the pricing mechanism that drove the market's perception of the bonds.**

Flagstar's own witness Robert Marsh testified that U.S. Bank would provide "valuations based on IDC" and that IDC was "the required path of valuation." Marsh Dep. at 29:4–11. Marsh acknowledged that Bloomberg was another valuation source but "I don't think they were reporting at that time." Marsh Dep. at 30:1–4. That changed only after IDC stopped pricing the HECM-IO bonds. Once IDC ceased publishing prices, Bloomberg prices substituted into the reporting ecosystem and became the visible reference point for lenders, custodians, buyers, and sellers. This transition is not a side issue—it is the mechanism through which the alleged losses were created. The alleged losses materialized only after Bloomberg's values replaced IDC's values as the operative benchmark, and the record now indicates that Bloomberg was not deriving those prices from a deep, independent, observable market—it was receiving pricing information from embattled Foster.

**B. The record indicates Foster proposed and supplied the Bloomberg pricing for the same bonds at issue, while cooperating with the government.**

Foster affirmatively proposed a pricing relationship with Bloomberg for HECM CMO/IO securities. In an email within Exhibit E to ECF No. 144, Foster wrote that "the evaluation range

is so wide for this particular product" and proposed that "Baird & Bloomberg team up," offering "an annual fee of 25k for 50 HECM CMO's priced weekly." Foster signed an SEC proffer agreement in November 2017, before the Bloomberg pricing relationship became operative, and by August 2019 the government had executed Foster's non-prosecution agreement. The pricing information utilized to generate alleged losses was thus not supplied by a neutral third party in an ordinary-course market—but by a former Live Well insider facing substantial federal prison time, cooperating with the government.

Bloomberg's Larry Mattera asked whether Bloomberg could use Foster's levels "in production now," confirming Bloomberg was "a bit starved for data in this sector"—an admission confirming the absence of a robust, observable market. Foster sent Bloomberg the first "BAIRD - HECM CMO - BV AL Price Export," noting Bloomberg had "turned [it] on to immediately go into production." Bloomberg later acknowledged receiving quotes from Foster and Olivier Dupiton; but subsequent Bloomberg discovery failed to produce meaningful pricing submissions from Dupiton, leaving a record dominated by Foster's submissions, exports, and communications. This raises substantial questions about whether Foster was in practice the dominant or potentially sole identified contributor for the securities at issue. The pricing levels Foster later supplied into the Bloomberg ecosystem were materially lower than those previously supplied through the IDC process while at Live Well. A contributor who dramatically lowered his own valuations after becoming a government cooperator presents an obvious factual issue regarding the reliability of the resulting benchmark.

**C. Bloomberg's own methodology and the government's notes confirm Foster's role was material.**

Bloomberg disclosed that its valuations of certain thinly traded fixed-income securities could be "largely driven" by a single input such as a broker quote. ECF No. 144, Ex. E, at PDF pp. 92–93. The government's March 18, 2021 Foster interview notes confirm that Foster was advising Bloomberg on HECM questions and that Bloomberg requested weekly quotes from him on HMBS, IOs, floaters, and inverse IOs. While those notes attempt to qualify that Foster's quotes were "not used directly," they still confirm that Foster was supplying weekly quotes. In a thin and illiquid market, contributor inputs can drive published prices—and if Bloomberg's published prices became the operative reference after IDC stopped pricing, Foster's role goes directly to Flagstar's alleged loss.

**D.  The IDC cessation is central, and the surrounding record raises further questions.**

Bloomberg became operative only after IDC stopped pricing. While Foster was still at Live Well, his "IDC HECM IO Marks" were forwarded to Christopher Krupa at IDC/Intercontinental Exchange—IDC was not an outsider but had received the Live Well/Foster marks that supplied the original pricing path. The critical break occurred when IDC told Live Well it would no longer post values because the securities "have not been updated for an extended period of time," and Krupa stated the SEC had contacted IDC with concerns. On February 7, 2019, the SEC conducted an extensive interview of Krupa concerning IDC's HECM-IO pricing methodology. The notes reflect that IDC was not independently evaluating HECM-IOs—Krupa stated HECM-IOs were "None evaluated" and distinguished a broker quote from IDC's own market-value opinion. Once IDC stopped pricing, Bloomberg's lower values became the forced substitute in U.S. Bank reporting and market usage. If those Bloomberg prices were materially influenced by Foster's post-Live Well submissions, Flagstar's claimed loss rests on a disputed pricing substitution—not an independent market event.

**E.  Because both buyer and seller looked to Bloomberg, the sale price does not independently prove fair value in BAML's auction.**

If both the buyer and Flagstar looked to Bloomberg prices as the reference point for a reasonable sale price, the transaction price does not independently validate Bloomberg's prices—it merely reflects both sides' reliance on the same benchmark. If the benchmark was distorted, shared reliance does not cure the distortion; it rigs it and magnifies it. In a thin, illiquid market, published marks become self-confirming: a participant treats the Bloomberg value as authoritative, bids accordingly, and the resulting trade is then offered as proof the mark was right. That reasoning is circular and cannot support entry of judgment. The full circumstances of BAML's role—including its participation both as auction manager and apparent purchaser—have never been examined and require discovery.

**F.  Flagstar has not proven that liquidation proceeds equaled economic loss, and the BlackRock valuation it relies on was never produced.**

Marsh confirmed the absence of reliable internal valuation proof. He testified that Flagstar relied on a BlackRock valuation, but that he never saw the report, never possessed it, did not know BlackRock's assumptions, and could not say whether BlackRock accounted for the illiquid nature of the securities. Marsh Dep. at 22:12–23; 84:1–19. That omission is fatal to a request for judgment. These were not ordinary fixed-rate bonds but HECM interest-only floating rate

securities with monthly and annual indexed floating interest rates, long-duration cash flows tied to reverse-mortgage performance, whose value turned on assumptions about prepayments, mortality, interest rates, buyouts, policy changes, loan-level characteristics, origination dynamics, regulatory changes, and discount margins. Offering materials warned these securities were illiquid and that no active secondary market might develop—precisely why forced-liquidation proceeds cannot be relied upon.

The available sale documentation raises the question whether the securities were valued using fixed-rate yield-to-maturity concepts even though the instruments were adjustable- or floating-rate, for which discount-margin or spread analysis differs materially. Flagstar has not shown that it evaluated projected future coupon payments, accrued interest, discount margins, prepayment assumptions, or long-term cash flows before liquidating, nor that it compared immediate liquidation against holding the securities and collecting future cash flows. The sale process itself remains unproven: Marsh could not adequately identify the bidders, the marketing process, the competing bids, why BAML was selected, or why BAML both ran the sale process and became involved as purchaser. An auction price is not automatically fair value.

### G. Material factual disputes preclude entry of judgment.

Flagstar's claimed damages depend on unresolved questions, including:

- why IDC stopped pricing the bonds;
- the role of Krupa and IDC in that cessation;
- how Bloomberg prices substituted into U.S. Bank reports and the market;
- the extent to which Foster supplied or influenced Bloomberg's HECM-IO prices;
- whether Bloomberg's prices reflected independent fair value or contributor-driven marks;
- whether Flagstar and the buyer both relied on Bloomberg prices in setting the sale price;
- what BlackRock actually valued, assumed, and concluded;
- whether the liquidation maximized value or merely crystallized an unexamined contrived price;
- whether the sale pricing used fixed-rate concepts inconsistent with adjustable-rate securities;
- whether discount-margin analysis was the appropriate framework;
- whether projected coupon payments and accrued interest would have reduced or eliminated the alleged loss; and
- whether the securities' illiquidity made forced-liquidation proceeds unreliable as a measure of fair value.

Flagstar's theory requires the Court to accept an unbroken chain of assumptions: that Bloomberg's prices were reliable; that contributor-driven pricing accurately reflected value; that the disappearance of IDC pricing was irrelevant; that Foster's post-cooperation pricing activity had no impact; that BlackRock's unpublished valuation was sound; and that a liquidation sale in a thin, illiquid market necessarily established economic loss. The record calls each link in that chain into question. Because the damages calculation depends on the chain as a whole, judgment cannot be entered as a matter of law. Under *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), these disputes preclude summary resolution of damages and require discovery and an evidentiary hearing. This is independently reinforced by co-defendant Rohr's on-record assertion that Flagstar caused its own losses and failed to mitigate. See Restatement (Second) of Contracts § 350; *Ford Motor Co. v. City of Woodhaven*, 475 F.3d 594, 605 (6th Cir. 2007).

Finally, my 2019 plea predated the surfacing of this pricing-chain evidence by years. Whatever was admitted then, based on information presented to me at that time, could not have accounted for later-disclosed facts about pricing arrangements I had no involvement with and the inputs to an estimated loss calculation not performed until the restitution proceeding in which i was not afforded an opportunity to participate in. Those prior admissions cannot fairly be treated as a concession to the specific damages figure Flagstar is now attempting to advance.

## CONCLUSION

For the foregoing reasons, I respectfully request that the Court DENY Plaintiff Flagstar Bank, FSB's Motion for Entry of Judgment in its entirety.

Flagstar seeks entry of a civil judgment exceeding $16 million based primarily upon a restitution calculation developed in a separate criminal proceeding in which I received no notice, had no opportunity to participate, was not represented, conducted no discovery, presented no evidence, and did not challenge the methodology used to determine the alleged loss. The Court itself has recognized that it has not yet seen evidence establishing the amount of damages in this action. Under these circumstances, entry of judgment would be premature and inconsistent with fundamental principles of due process.

In the alternative, should the Court determine that further proceedings are appropriate before ruling on Flagstar's motion, I respectfully request that the Court:

1. Decline to treat the restitution order entered in *United States v. Hild* as conclusive, binding, or sufficient proof of civil damages against me, where I was neither afforded the

constitutional protections required by due process nor the statutory rights mandated by the Mandatory Victims Restitution Act, 18 U.S.C. §§ 3663A and 3664;

2. Permit targeted discovery and conduct a full evidentiary hearing on damages, causation, valuation, mitigation, offsets, settlement credits, and the amount of any alleged remaining loss, including but not limited to:
   - the BlackRock valuation and underlying methodology;
   - IDC's cessation of pricing and the role of IDC and Christopher Krupa;
   - Bloomberg's pricing methodology, assumptions, and pricing inputs;
   - Dan Foster's role in supplying or influencing Bloomberg pricing for HECM-IO securities;
   - the Bank of America Merrill Lynch sale and auction process;
   - Flagstar's internal loss calculations, accounting records, valuation analyses, and Marsh affidavits;
   - the restitution record from the Southern District of New York; and
   - the amount and terms of any settlement, release, payment, or recovery involving Eric Rohr or any other source of compensation;

3. Require Flagstar to produce a complete accounting of all amounts recovered, received, credited, written off, offset, or otherwise applied against the alleged loss, including settlement proceeds, restitution payments, liquidation proceeds, servicing income, insurance recoveries, tax benefits, indemnification payments, and any other amounts that may reduce the damages sought in this action;

4. Provide that no judgment may permit Flagstar to recover more than its actual proven loss and that all restitution payments, settlement proceeds, and other recoveries shall be credited against any amount ultimately determined by the Court; and

5. Grant such other and further relief as the interests of justice require.

FLAGSTAR BEARS THE BURDEN OF PROVING ALLEGED DAMAGES IN THIS PROCEEDING.

Given the substantial factual disputes concerning the Foster-Bloomberg pricing chain, IDC's cessation of pricing, valuation methodology, causation, mitigation, offsets, settlement credits, and the amount of any remaining alleged loss, I respectfully submit that the present record cannot support entry of a damages judgment as a matter of law.

Respectfully submitted,

Darren Stumberger

Pro Se Defendant

118 Chestnut Street #407 Red Bank, NJ 07701

cdjs2013@gmail.com

Case 2:19-cv-11512-MFL-EAS ECF No. 168, PageID.6301 Filed 06/01/26 Page 33 of 164

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

-----------------------------------X

FLAGSTAR BANK, FSB, a Federally
Chartered Savings Bank,

    Plaintiff,

VS.                                    Case No:

LIVE WELL FINANCIAL, INC., a           2:19-cv-11512
Delaware corporation, MICHAEL C.
HILD, an individual, ERIC ROHR,
an individual, and CHARLES DARREN
STUMBERGER, an individual,

    Defendants.

-----------------------------------X

30(b)(6) and Individual Capacity

Remote Deposition of

ROBERT MARSH

Tuesday, March 26, 2024, 1:00 p.m. EST

BEFORE:

JoRita B. Meyer
Registered Professional Reporter
Registered Merit Reporter
Certified Realtime Reporter
Job. No. 27644

I N D E X

EXAMINATION:                                                    PAGE

WITNESS:  ROBERT MARSH

BY MR. BROWN.................................6

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

E X H I B I T S

PAGE

(None)

///

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

THE REMOTE 30(b)(6) and INDIVIDUAL CAPACITY

DEPOSITION OF

ROBERT MARSH


TAKEN PURSUANT TO NOTICE HERETOFORE FILED,

VIA ZOOM VIDEOCONFERENCE, ON TUESDAY, MARCH 26,

2024, AT APPROXIMATELY 1 P.M. EST, UPON ORAL

EXAMINATION, BEFORE JoRITA B. MEYER, REGISTERED

PROFESSIONAL REPORTER, REGISTERED MERIT REPORTER,

AND CERTIFIED REALTIME REPORTER, NOTARY PUBLIC,

AND TO BE USED IN ACCORDANCE WITH ALL APPLICABLE

RULES OF CIVIL PROCEDURE.

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

REMOTE APPEARANCES


     ON BEHALF OF THE PLAINTIFF:

     BODMAN PLC

     6TH FLOOR AT FORD FIELD

     1901 ST. ANTOINE STREET

     DETROIT, MI  48226

BY:  JOSEPH J. SHANNON, III, ESQUIRE

     jshannon@bodmanlaw.com




     ON BEHALF OF THE DEFENDANT HILD:

     GELLERT SCALI BUSENKELL & BROWN, LLC

     1201 N. ORANGE STREET

     3RD FLOOR

     WILMINGTON, DE  19801

BY:  CHARLES J. BROWN, III, ESQUIRE

     cbrown@gsbblaw.com


ALSO PRESENT:

     Michael C. Hild, Defendant

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

(Proceedings commenced, 1:02 p.m. EST)

ROBERT MARSH,

WAS SWORN AND TESTIFIED AS FOLLOWS:

EXAMINATION

BY MR. BROWN:

Q.   Okay.  Good afternoon, Mr. Marsh.  For the record, my name is Charlie Brown.  I represent Michael Hild in this matter.

So, Mr. Marsh, immediately prior to the record starting I had a conversation with your counsel, Mr. Shannon, and we discussed the fact that there were two notices of depositions that were served in this matter, one on you individually and one on Flagstar, where you were designated the Rule 30(b)(6) designee.  So we're going to go through the 30(b)(6) notice first, if you will.

Does that makes sense?

A.   Yes.

Q.   Okay.  All right.  What is your position with Flagstar?

A.   I'm currently a regional credit officer, with a senior vice president title.

Q.   Okay.  And have you taken your deposition before?

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

A.    Yes.

Q.    Okay.  Approximately how many times?

A.    Can you be more specific?  Pertaining to this case?  Overall?

Q.    Okay.  Let's start off with overall. How many times have you been deposed in your lifetime, round numbers?

A.    Five.

Q.    Okay.  Have you been deposed in this matter before?

A.    I don't believe so.  There were -- no.

Q.    Okay.  Have you had your deposition taken in any proceeding connected to Live Well Financial?

A.    No.

Q.    Okay.  And so you said that you had your deposition taken approximately five times before. Can you, to the best of your ability, explain the circumstances for those prior depositions?

A.    So one of my roles at the bank is as a workout officer, handling problem loans; so it would be along those lines.

Q.    Okay.  And would that be the sum total of your experience in being deposed, would be in your capacity as a workout officer for Flagstar?

A.   No, previously I was a workout officer at a prior bank as well.

Q.   Okay.  And then what bank was that?

A.   Citizens State Bank in Michigan.

Q.   Okay.  So is this a small Michigan bank?

A.   It was, yeah.

Q.   Okay.  So let's start with some basic background about yourself, if we could.

Did you graduate from college?

A.   Yes.

Q.   Okay.  When did you graduate from college, and from what university and what degrees did you get?

A.   Most recent was the master's of finance from Walsh College in 2003.

Q.   Okay.  What college --

THE REPORTER:  You froze, Mr. Brown.

MR. SHANNON:  Charles, you were frozen for a while.

MR. BROWN:  Okay.  Looked like Mr. Marsh was -- hold on.

MR. SHANNON:  I think he just answered that he graduated with a finance degree from Walsh.  And then you froze.

THE REPORTER:  That's what I got, yes.

MR. BROWN:  Okay.

MR. SHANNON:  And Rob was just sitting quietly.  He's not frozen.

MR. BROWN:  Understood.

BY MR. BROWN:

Q.   So where did you get your undergraduate degree from, and when?

A.   Also at Walsh College.  It was a bachelor's degree in finance.

Q.   Okay.

A.   It was in the late '90s.

Q.   Okay.  And when did you get your master's degree again?

A.   2003.

Q.   Okay.  Thank you.

What did you do to prepare for today's deposition?

A.   I reviewed prior -- prior information, prior filings; recalled, you know, the events from the last five years as it pertains to this loan. I had various notes.

Q.   Okay.  What prior filings did you review, in what proceedings?

A.   I recently testified in a case, a related case in New York, for damages for

Mr. Hild.

Q.    Okay.  Was there anything else you reviewed other than the pleadings in that proceeding?

A.    Like I said, I have various notes from -- it goes back to basically May of '19, when my involvement started.

Q.    May of 2019?

A.    Yes, sir.

Q.    Okay.  Did you review the notices of deposition that were served in this matter?

A.    I am looking at it right now, yes.

Q.    Okay.  So the 30(b)(6) deposition notice identified a number of topics that I requested the witness to be -- the Flagstar witness to be able to testify to, and I'm just going to go over them with you real quick.

Number one was:  Any income or coupon payments generated from the Live Well bonds.

Are you prepared to testify to that today?

A.    Yes.

Q.    Okay.  Any analysis of possible future income or coupon payments that would generate from the Live Well bonds.

Are you prepared to testify to that today?

A.   Yes.

Q.   Any analysis of the decision to sell the Live Well bonds as opposed to hold the bonds and collect the income and coupon payments that the bonds would generate.

Are you prepared to testify to that today?

A.   Yes.

Q.   Okay.  Any analysis of the functionality of the market for the Live Well bonds.

Are you prepared to testify to that today?

A.   Yes.

Q.   Okay.  The sale of the Live Well bonds by Flagstar, including any efforts to market the bonds, any efforts to ensure that the sale of the bonds would generate an appropriate price, the identity of the purchaser of the Live Well bonds.

Are you prepared to testify to that?

A.   Yes.

Q.   Okay.  And the basis for the involuntary bankruptcy of Live Well.

You're prepared to testify to that?

A.    Yes.

Q.    Okay.  The basis for the $25 million adjustment in Flagstar's financial statements in or about 2019 related to the fines that the United States had previously imposed upon Flagstar.

Are you prepared to testify to that?

A.    Yes.

Q.    Okay.  Communications with the United States Department of Justice or the Securities and Exchange Commission regarding the $25 million adjustment in Flagstar's financial statements in or about 2019.

Are you prepared to testify to that?

A.    Yes.

Q.    And then communications with the United States Department of Justice or the Securities and Exchange Commission regarding Live Well and/or Michael Hild.

Are you prepared to testify to that?

A.    Yes.

Q.    Okay.  And then communications with the Live Well Chapter 7 trustee or any of its professionals.

Are you prepared --

A.    Yes.

Q.    -- to testify to that today?

Okay.  Thank you.

MR. SHANNON:  So, Charles, just for the record, and you'll find this out when you testify, I'm not sure the reason for the inclusions of 7 and 8, but this witness will testify that they had nothing to do with Live Well and, therefore, the information that we give will be limited.  It's confidential.  But you can get into that when you get to that point.

MR. BROWN:  Okay.

MR. SHANNON:  I don't know why they were included at all, if somebody believed that the $25 million was somehow connected to Live Well, so...

MR. BROWN:  Yeah.  I said that was a potential concern, yes.

BY MR. BROWN:

Q.    Mr. Marsh, were you involved in the origination of the loans that Flagstar made to Live Well?

A.    No.

Q.    Okay.  But I think you already indicated that you were involved in the workout and

collection phase of the loans; is that correct?

A.    Yes.

Q.    Okay.  Who was involved in the origination of the Flagstar to Live Well loans?

A.    There were numerous people involved. There were -- it obviously started with a warehouse relationship, evolved into a commercial relationship.

So relationship managers, underwriters, committee approvals.  It would have been pretty standard practice for the bank.

Q.    Okay.  And who were those people?

A.    I believe Dalwyn Tolcek (phonetic) was the initial commercial loan officer.  There's a laundry list of names.

Q.    Can you name more than one?

A.    So we had Stephanie Lubin was the credit officer that approved it, up to her authority.

It's hard to say who exactly was in place at that time.  People move around.

Joe Redoutey was our chief credit officer at the time.  He still is at the bank.  I think those are -- Joe Lathrop may have been the warehouse group manager.

Q.    Okay.  Do you know what due diligence

was done at the time that Flagstar made either of the loans to Live Well?

A.    My knowledge is limited to our underwriting package, which I reviewed multiple times.

Q.    Okay.  And what did the underwriting package indicate as to the due diligence that Flagstar did prior to making those loans?

A.    It basically starts with an understanding of the business, the purpose of the loan, proceeds of the loan, reviewing CPA-prepared audited financial statements, background checks on the officers.

Q.    Okay.

A.    And --

Q.    So focusing on the -- say the bond facility, which I think you would -- would that be the commercial facility?

A.    Yes.

Q.    Okay.  So when I say bond facility or commercial facility interchangeably, you know what I'm talking about.

Do you know if there was any due diligence at the time the loan was made regarding the collateral that Flagstar was taking in

connection with that commercial loan facility?

A.    There was an assessment of -- a third-party assessment of value, yes.

Q.    Can you describe that in more detail?

MR. SHANNON:  Let me just say for the record, we said we were going to start a 30(b)(6), and these are not 30(b)(6) topics.

I don't want to interrupt your deposition today, but I'll just preserve the objection and I'll let you ask questions in any order you want.

THE WITNESS:  Yeah, I don't have the approval in front of me, so I don't exactly know what they reference.

BY MR. BROWN:

Q.    Okay.  So I understand that you were not involved in the origination of the commercial bond facility, but, to your knowledge, did anyone at Flagstar at the time of the origination read the prospectus that was issued in connection with the bonds that Flagstar was taking as collateral?

A.    I do not know.

Q.    Okay.  Sitting here today, are you aware that the prospectus that the government generated in connection with these bonds provided that there

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

was an effort to develop a secondary market for the bonds, but the bonds were currently illiquid, and that it was disclosed that there might not be any secondary market for the bonds?

A.    "May not be" and "not be" and "could be," you know, it's -- it's a fine line.  We knew it was thinly traded.

Q.    At the time that the loans were originated, you knew that they were thinly traded; is that correct?

A.    Yes.

Q.    Okay.  Have you personally read the prospectus that was issued in connection with the bonds?

A.    I believe each tranche had its own prospectus.  I briefly looked at them.

Q.    Okay.  So how much time would you say you spent looking at the -- combined, looking at the various prospectuses?

A.    I'd say no more than 30 minutes.

Q.    Do you have an understanding of what these bonds are and how they operate?

A.    Yes.

Q.    Okay.  And can you describe for me what your understanding is as to what they are and how

they operate?

A.    It was a pool of reverse mortgages securitized.  This was the interest only strip of that pool.

Q.    Okay.

A.    Commonly known as HECM, H-E-C-M.

Q.    Right.  And --

A.    So they were reverse mortgage loans.

Q.    Okay. And these particular bonds were interest only, correct?

A.    Yes.  It was the interest only strip of those bonds, yes.

Q.    Right.  Okay.  Do you know if the interest rates were fixed rate or variable rate?

A.    On what?  On the ultimate loans in the pool?

Q.    The bonds.  I'm sorry.  On the HECM IO, or HECM interest only bonds, do you have an understanding as to whether those underlying bonds were fixed rate or variable rate interest?

A.    I don't believe that's how, you know, it worked.  The interest was paid as loans left the pool.  So each mortgage had its own interest rate, but it did not pay interest until the loan left the pool, thus creating interest that could be

paid to the bondholder.  So it was a stream of interest only payments.

Q.   Right.  So I understand that that's what the coupon payments were.  But I'm going down, like, one level below that, or maybe several levels below that.

So the underlying mortgages that comprised the securitization, do you know if the underlying mortgages were fixed rate or variable rate?

A.   I don't recall.

Q.   Okay.  Do you have an understanding as to whether the coupon payments were guaranteed by the government?

A.   It's my understanding they were.

Q.   Okay.  So you would agree with me, then, that the risk of default on the bonds would essentially be zero with a government guarantee?

A.   No, I don't agree.

Q.   Okay.  Can you explain why you disagree with that?

And just to be clear, when I say risk of default, I'm not talking about the risk of Live Well defaulting, I'm talking about the risk of default as far as not receiving the coupon

payments.  But you said --

MR. SHANNON:  If he knows.  This is quite far afield from his notice or from his expertise, but he can answer to the extent he knows.

THE WITNESS:  I believe the principal of the loans was guaranteed by the government. I'm not certain that the interest was guaranteed by the government.

BY MR. BROWN:

Q.  Okay.  At some point Flagstar took possession of the Live Well loans, correct, or the Live Well bonds?

A.  Briefly, yes.

Q.  Okay.  And what did Flagstar do once it took possession of the bonds?

A.  We sent them through an auction process to be sold.

Q.  Okay.  Can you explain that in detail?

A.  We foreclosed in August of 2019.  The stay lifted.  Because of the bankruptcy, the stay was lifted; we foreclosed on our bonds.  We had Bank of America Merrill Lynch run a sale process, according to an Article 9 process.

THE REPORTER:  Can we go off the record

for just a second, please?

MR. BROWN:  Sure.

(Discussion off the record)

THE WITNESS:  We ran an Article 9 sale of assets.  So we held the bonds in our possession for approximately 30 days.

BY MR. BROWN:

Q.    Okay.  What was the decision-making process that went into deciding that the bonds should be sold as opposed to holding on to the bonds?

A.    The idea that these bonds pay interest sporadically -- monthly is when it gets paid.  How much it gets paid was variable.  Only when loans left the pool would we get paid interest.  So you couldn't say we're going to get X amount of dollars every month in perpetuity.

And so we did consult with BlackRock to do a valuation, so it's a net present value of future cash flow.  When that future cash flow isn't known, it can be estimated based on various things.

But the idea for the bank to want to hold something like this, it was against what we do.  We don't hold collateral to realize a

recovery.  We sell collateral to realize a recovery.

So the ultimate decision, I believe, was fairly quick.  Let's get a valuation; and what we can sell, we will sell.

Q.   Okay.  So BlackRock did a valuation of the bonds; that's correct?

A.   Yes.

Q.   And what did BlackRock value the bonds as?  What was that number?

A.   Roughly 30 million.

Q.   Do you still have the BlackRock report?

A.   I do not.  I was not part of that process in credit and in workout, so I never had possession of that report.

Q.   Okay.  So you never saw the BlackRock report that says they're worth approximately 30 million, correct?

A.   Correct.

Q.   Okay.  So how do you know that that's what the BlackRock report said?

A.   I trust the executives of my bank who did see that.

Q.   Is there a reason why you've never seen the BlackRock report?

MR. SHANNON:  If you know.

THE WITNESS:  Well, similar to meetings that the executives set up, I don't invite myself to meetings that I'm not invited to; so it was not put out as something that I should review and opine on.  And so chain of command says I don't get to see it.

BY MR. BROWN:

Q.   So is it fair to say that you were not involved in the decision-making to sell the bonds?

A.   It was ultimately not within my approval authority.

Q.   Were you involved in the decision-making process, though?

A.   As a standard workout remedy, sell the collateral; I would always push for that.

Q.   Okay.  But Flagstar is a big bank, right, relatively big bank?

A.   Okay.

Q.   It does own securities, right?

A.   This is not the same thing.  This is loan collateral.

Q.   Well, I understand that it came into the bank's position as being loan collateral, but Flagstar does, in fact, buy and hold securities,

does it not?

A.    That's outside of my purview.

Q.    You don't know whether Flagstar buys and holds securities; is that correct?

A.    Out of my purview.

Q.    Well, I'm just asking you whether you know whether that's something that Flagstar does.

A.    It -- I don't follow that.  I'm not aware of everything the bank does outside of credit.  I'm a credit and workout specialist.

Q.    Okay.  Who ultimately made the decision to run the Article 9 sale and to sell the Live Well bonds?

A.    It would have been the CEO, the CFO, the COO.  So Jim Ciroli was our CFO.  Alessandro DiNello, CEO.  Lee Smith, COO.

Q.    Okay.  And is it your understanding that those were the individuals that signed off and directed that to happen?

A.    Yes.

Q.    Okay.  Do you know who was involved in making any recommendations to them to sell the bonds?

A.    They are smart fellows.  They make decisions like that all the time, so they didn't

need a recommendation from anybody to decide to sell.

Q.    I understand that they don't need a recommendation, but my question is:  Do you know of any individuals that were involved in making a recommendation to them, or whether you know for a fact that they made the decision without recommendations from any ones that were below them?

A.    My presumption is everybody suggested, recommended to sell.

Q.    And can you explain that answer?  Why is that?

A.    As I said before, we are not in the business of holding collateral and, you know, generating revenue off of it in the hopes that we might recover losses.  We obviously try to get the best offer, the best value we can.

Q.    Do you know if there was any analysis done to determine whether there would be any benefits to holding onto the bonds as opposed to liquidating them immediately?

A.    So the way the valuation from BlackRock works, it is a net present value of future cash flows.

So if you assume these funds come in year one, these funds come in year two, et cetera, et cetera, and you discount them back to a net present value, you really don't gain anything by waiting to see if that's actually what you get. You have a net present value, future cash flows, and so that's the value you have to decide: Do you take the value that's today based on the analysis, or do you hope that the future values come in as they were estimated?

So the decision was net present value, that's what we should get.

Q. So is it your testimony that the only due diligence that Flagstar did in connection with its decision to buy or to sell the bonds was to engage BlackRock to value the bonds?

A. I'm not aware of all the analysis that went on above me. There could have been closed-door meetings. I'm sure there were, actually. I don't know what was said. But it would be standard, common practice to liquidate the collateral.

Again, net present value, future cash flows that are unknown, unpredictable, you know, we're not in that kind of an entrepreneurial

business.

Q.   Do you know why BlackRock was selected to value the bonds?

A.   I believe they're a reputable company that would engage in that kind of analysis.  And I'm not sure who all might have been looked at to decide.  I just know that was the ultimate company that did the valuation.  I was not part of that process.

Q.   Okay.  So how long have you been working at Flagstar?

A.   A little over 14 years.

Q.   Okay.  And during the 14-year period, how many times have you been involved in workouts where there's been an auction of securities?

A.   I can't think of another one other than this one.

Q.   Okay.  I'm going to shift gears back to the -- back to the origination phase.  And I know you were not involved in it, but I'm going to ask you what you know of that.

So it's my understanding that there was a third party that was to value the bonds; the name of that third party was IDC.

Is that consistent with your

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

understanding?

A.   I believe they were one source, yes.

Q.   What -- okay.  Was there another source?

A.   We had CPA-prepared audits that valued the collateral as well, valued their assets.

Q.   Okay.  So Flagstar was independently valuing the bonds itself, internally?

A.   I did not say that.

Q.   Okay.  Then help me out.  What was Flagstar doing to --

A.   I referenced two third parties.  There was IDC.

Q.   Okay.

A.   And then Keiter, their CPA, who prepares their audited financial -- who did prepare their audited financial statements.

Q.   Okay.  So Keiter was a CPA firm that was auditing Live Well's financial statements?

A.   Yes.

Q.   Okay.  And so Flagstar was relying on IDC and Keiter; is that correct?

A.   I believe so, yes.

Q.   Do you know why IDC was selected?

A.   I believe we were steered towards them by Live Well.

Q.    Why do you say that?

A.    Why do I say that?

Q.    Yes.

A.    There was an agreement with a third party.  So it was U.S. Bank would provide valuations, they would provide the financial -- the bank statements and the transactions and the valuations based on IDC.

So that was the agreement that Live Well brought to us, that that was the required path of valuation.

Q.    Okay.  I'm sorry.  I'm not -- I'm not following.

So what role did U.S. Bank have in this?

A.    U.S. Bank was an intermediary.  So when interest was paid, it went to U.S. Bank, and then into Flagstar.  They were also reporting as often as daily valuations, as reported by IDC, and monthly.

And that was the agreement that -- when we signed up, that was the agreement that was brought to us by Live Well, that that's the way it had to go.

Q.    Okay.  Do you know if there's any other valuation services other than IDC?

A.    Bloomberg.

Q.    Okay.

A.    I don't think they were reporting at that time.

Q.    At that time --

A.    Correct.

Q.    I'm just going to finish my question.

A.    Oh.

Q.    So at that time, you said you didn't think Bloomberg was reporting valuations.  To your knowledge, was -- well, strike that question.

So you referenced Bloomberg, which was not reporting valuations at that time.

Other than IDC and Bloomberg, are you aware of any third-party valuation services that could value the bonds?

A.    On a routine basis?

I guess if you could clarify the question.  I'm just not sure if you're talking on a daily basis, a valuation like BlackRock did.

Can you clarify your question, please?

Q.    Well, you had testified -- I believe you had testified that IDC was the valuation service that was selected because Live Well steered Flagstar to IDC and Live Well said that --

represented that that was the only way that it could take place.

A.   Regardless of other valuation sources, we -- the agreement was that we would rely on that valuation.  That was the agreement brought to us by Live Well.

Q.   Okay.  And that was not something that -- was that something that Flagstar looked into negotiating and considering, other third-party valuation services?

A.   I believe a document was negotiated somewhat.  I don't know if that was an item that was negotiated.  And that predates my involvement.

I just know there was certain language that we did remove, other banks did not; but it was the same basic agreement.

Q.   Okay.  And then do you know, generally, what language Flagstar removed that the other banks did not?

A.   In particular, we removed the requirement that would have prevented us from engaging in an involuntary bankruptcy.  As part of the request, we got it removed.

Q.   Okay.  So you've been involved somewhat in the criminal proceedings that have been taking

place in New York involving Mr. Hild, correct?

A.   Yes.

Q.   Okay.   And part of that relates to the fact that Live Well was providing valuations to IDC; is that correct?

A.   Yes.

Q.   Okay.   Do you think it was appropriate or inappropriate for Live Well to provide its own values to IDC?

MR. SHANNON:   Calls for a legal conclusion.

Answer to the extent you know.   And vague, appropriate or not appropriate.

THE WITNESS:   I'm sorry, Joseph, what?

MR. SHANNON:   I said and vague.   But you can answer to the best of your knowledge.   I was objecting for the record.

THE WITNESS:   Yeah, it wouldn't seem appropriate for a company to provide its own valuation to a company that turned around and represented it was its own valuation; yes, I find that pretty unusual.

BY MR. BROWN:

Q.   Okay.   Let me ask you this question hypothetically.

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

Do you think that it would have been appropriate for IDC to have considered Live Well's valuation of its bonds, as well as other factors, in arriving at IDC's valuation for the bonds?

MR. SHANNON:  If you know, have an understanding.

THE WITNESS:  Normally we always rely on third parties for evaluating our collateral.

BY MR. BROWN:

Q.  Okay.  Which I understand.  So you were relying on IDC to do the valuations step?

A.  Yes.

Q.  And so my question to you is a little more nuanced than that, and that is:

Do you think that, in relying on IDC to provide you values, it would have been appropriate for IDC to have considered how Live Well was valuing the collateral, as well as other factors?

A.  Are you asking me this in hindsight?

Q.  No, I'm asking you as a hypothetical.

Would it be objectionable for IDC to have used multiple inputs to arrive at its valuation, including input from Live Well, as opposed to exclusively from Live Well?

MR. SHANNON:  Objection.  This calls

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

for -- it's way past his expertise.

THE WITNESS:  Yeah, I think it's improper to do that.

BY MR. BROWN:

Q.   Okay.

A.   Yeah, and I won't even get into the entire, you know, lawsuit that's already included as to why it is, you know, inappropriate.

Q.   Well, can you explain why you think it would be inappropriate for IDC to consider input from Live Well as well as other sources?

A.   Live Well was a broker-dealer; and in valuing the CUSIPs that we had as collateral, I don't think they should have relied on them at all.  I think they should have provided their own valuation.

Q.   And how do you think that they should have arrived at that valuation?

A.   From independent sources that aren't steering toward a value.  That's the risk.

Q.   From independent sources such as other broker-dealers?

A.   I think it's inappropriate to have

relied on Live Well to value its own bonds, even if you are going to factor other things in, unless -- I don't know what it was.  I think it's inappropriate.  Knowing that was the exclusive provider of value, you know, kind of draws out the reason why.

Q.   Do you know what IDC disclosed to Flagstar and its subscribers as to its methodology for valuing collateral, including the Live Well bonds?

A.   Eventually we found out.

Q.   And what did they disclose?

A.   That they relied on Live Well every day, every time, for the value.  They were told that they were valuing it wrong, so Live Well sent a valuation on a daily basis to IDC, who then reported it as if it was their valuation.  This is all, you know, proven out over time.

Q.   Okay.  But my question is more towards the disclosures that IDC was making at the time that it was publishing the bond valuations.

My question to you is:  Do you know what disclosures that IDC was making at that time as to its methodology?

A.   I do not.

Q.   Do you know if anyone at Flagstar was reviewing that?

A.   I know we got up to a daily valuation through U.S. Bank.

Q.   Okay.

A.   Who I believe was relying on IDC for the valuation.  U.S. Bank relied on IDC, provided a value in the statements, in all the reporting.

Q.   Okay.  Do you know what kind of due diligence that Flagstar did with respect to IDC and the methods that it would use for valuing collateral?

A.   No.  The assumption is it's the New York Stock Exchange, or more likely the company that owns the New York Stock Exchange; a sophisticated company, independent, should have been reliable.

Q.   Okay.  Is it your testimony that your understanding is that because IDC was tied to the New York Stock Exchange, that there was no need to review any of the disclosures that IDC made with respect to the methodology that it used for valuing securities?

A.   I'm sorry.  Can you repeat that?

MR. BROWN:  Can you read the question back, please.

THE REPORTER:  Sure.  One moment, please.

(Record read as follows:

QUESTION:  "Okay.  Is it your testimony that your understanding is that because IDC was tied to the New York Stock Exchange, that there was no need to review any of the disclosures that IDC made with respect to the methodology that it used for valuing securities?"

MR. SHANNON:  I'll just note this is far afield from the topics.

Answer to the extent you know.

THE WITNESS:  I'm not sure.

BY MR. BROWN:

Q.    Okay.

A.    Yeah.

Q.    All right.  Did you review the loan documents between Flagstar and Live Well?

A.    Yes, the majority of them.

Q.    Okay.  Is there anything in the loan documents that precludes Live Well from providing any information to IDC regarding the value of the bonds?

A.    I couldn't answer that offhand.  I don't

recall.

Q.   Did you appear at the restitution proceeding in New York in January of this year?

A.   I did, yes.

Q.   Okay.  Were you present when other lenders testified at that restitution proceeding?

A.   We were not allowed to be in there.  We were in the jury room.  It was one lender at a time.

Q.   Okay.

A.   And when that lender was done, you left.

Q.   Okay.  Flagstar was one of the creditors that petitioned for the involuntary bankruptcy of Live Well, correct?

A.   Yes.

Q.   Okay.  And there were other lenders that joined in that petition, correct?

A.   Yes.

Q.   Was Flagstar communicating with the other lenders as to what the other lenders were doing with the bonds that the -- the Live Well bonds that they took possession of?

A.   I don't believe so.

Q.   Okay.  I'm going to shift back to the BlackRock report.

Was the BlackRock report of the bond valuations ever produced in the criminal proceeding, in the restitution portion of that?

A.   It was not produced in the restitution piece.  We did discuss it.  I don't know if it was -- how it was handled in the criminal proceeding.

Q.   Okay.  Do you know why it was not produced in the restitution proceeding?

A.   I believe it was requested during testimony.

Q.   Okay.  But it was not produced, correct?

A.   I was currently on the witness stand when it was asked.  I could not produce it.

Q.   Okay.  So you didn't have it at that time?  Is that the only reason why it was not produced?

MR. SHANNON:  The only reason he's aware of, in other words?

MR. BROWN:  Yeah.

THE WITNESS:  No other reason that I'm aware of.

BY MR. BROWN:

Q.   Okay.  To your knowledge, did Flagstar inform anyone from the government that BlackRock

had valued the bonds that Flagstar repossessed --
that Flagstar possessed from Live Well?

MR. SHANNON:  Objection.  Misstates the
witness's prior testimony.  I don't remember
that he testified that the BlackRock report
valued the bonds -- but I suppose you can ask
him -- because he says he hasn't seen it.

MR. BROWN:  Okay.  I'm going to rephrase
the question.

BY MR. BROWN:

Q.   To your knowledge, did Flagstar inform
anyone from the government that BlackRock had done
any report in connection with the bonds that
Flagstar repossessed from Live Well?

A.   It was -- the fee for the report was
part of our restitution request; so they were
aware of it, yes.

Q.   Do you know if there were any other
discussions between Flagstar and the government
regarding the BlackRock report other than the
expense reimbursement that you referenced?

A.   I'm not -- I don't know.

Q.   Okay.  To your knowledge, did Flagstar
inform the Live Well bankruptcy trustee, or any of
its agents, that BlackRock had generated a report

with respect to the bonds that Flagstar had repossessed?

A.   I had no direct discussions with them. Primarily through counsel.  So I'm not aware.

Q.   Okay.  So you're not aware of that information being disclosed to the trustee; is that correct?

A.   As I recall, no.

Q.   Okay.  Do you know the term "Scenario 14"?

A.   I've heard of it, yes.

Q.   Okay.  And what's your understanding of what Scenario 14 is?

A.   It's one scenario where when Live Well needed to increase the value of the bonds or the methodology they used to produce the higher value. So as bonds left the pool, the value would go up.

Again, basically, it's a net present value of future cash flow.  So it was a fabricated valuation by the company, as proven out.

Q.   So Scenario 14 was utilized by Live Well, correct?

A.   Yes.

Q.   Okay.  And is it your understanding that Scenario did -- Scenario 14 did that net present

value analysis that was used to value bonds, or is it -- do you think that Scenario 14 used any kind of net present value analysis to value the bonds?

MR. SHANNON:  Objection.  Calls for legal speculation.

Go ahead if you know.

THE WITNESS:  I don't know offhand.

BY MR. BROWN:

Q.  Okay.  I mean, is it your belief that Scenario 14 was a complete fabrication for valuing the bonds?

MR. SHANNON:  Objection.  Calls for speculation, and vague.

You can still answer, if you know, Rob.

THE WITNESS:  As they testified, that was the valuation methodology when they needed to increase the per CUSIP, you know, value.  So it may have had some kind of net present value.  I don't know exactly how it was concocted; but, you know, that's what they, you know, testified to.

BY MR. BROWN:

Q.  That's what who testified to?

A.  I believe the former employees of Live Well that were associated with Mr. Hild.

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

Q.   Well, it's my understanding that what they testified to was that it was a good faith, quote/unquote, intrinsic value that was not, however, consistent with market value.

So is it your understanding that these witnesses testified that it was a fabrication just to increase the value of the bonds?

MR. SHANNON:  You're asking this witness about somebody else's testimony, so you're, therefore, not asking about his personal knowledge.

MR. BROWN:  But he's already testified --

MR. SHANNON:  I mean, what transcript, what witness?  I mean, do you want him to review it?  I don't know that he's reviewed transcripts from the criminal trial.

MR. BROWN:  Well, I think he testified that what he knew of Scenario 14 was that it was a complete fabrication because that's what witnesses testified to.  So I'm just following up on statements that he's already made.

THE WITNESS:  It's my understanding --

MR. SHANNON:  Wait a minute.  Let me

finish.

When you asked him that, I objected that you were asking for speculation, and then he speculated. I don't know whether he's learned this from the newspaper or whether he learned it from counsel or --

MR. BROWN: Okay. Go ahead, Mr. Marsh. You were going to say something.

THE WITNESS: My understanding --

MR. SHANNON: Restate the question so I know what the question is, or have the court reporter read it back.

MR. BROWN: Can you read back the question, please?

THE REPORTER: One moment, please.

(Record read as follows:

QUESTION: "Well, it's my understanding that what they testified to was that it was a good faith, quote/unquote, intrinsic value that was not, however, consistent with market value.

"So is it your understanding that these witnesses testified that it was a fabrication just to increase the value of the bonds?")

Deposition of Robert Marsh
Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

MR. SHANNON:  Same objections.

If you know.

THE WITNESS:  My understanding, it was used solely as a scheme to increase the value when they needed it to go up.

BY MR. BROWN:

Q.  Okay.  And you base your understanding of that on what?

A.  You know, it's been five years, so I'm not sure if I heard that from testimony or where exactly I came across it.

Q.  Okay.  Do you know if BlackRock did any analysis of Scenario 14?

A.  I do not know.

Q.  Okay.  Did you review the documents that Flagstar produced in this case?

A.  Which documents?  All the documents?

Q.  Okay.  So what I will represent to you is Flagstar made one document production in this proceeding; that the document production included a two and a half page affidavit from you, and it included the loan agreements between Flagstar and Live Well.

A.  I'm sorry.  I got a call coming through. I missed half your question.

Q.   Oh, okay.  Let's -- okay.  I was asking you about the document production that Flagstar made in this proceeding.  Okay?

A.   Yes.

Q.   So on behalf of Mr. Hild, I requested that Flagstar produce documents.  Flagstar did produce some documents.  The document production from Flagstar starts with an affidavit from you.  It's approximately two and a half pages.  And it includes the loan agreements between Flagstar and Live Well.  Okay?

And my question to you is:  Were you involved in preparing the document production that was made to Mr. Hild by Flagstar in this proceeding?

A.   I assisted, yes.

Q.   Okay.  The document production that Flagstar made does not include the BlackRock report.

Do you know why that is?

A.   No.

Q.   Okay.  The document production does not include -- I think you testified that Bank of America was involved in auctioning off the bonds in an Article 9 sale; is that correct?

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

A.    Bank of America Merrill Lynch; so kind of a separate division, yes.

Q.    Okay.  Were there any documents between Bank of America Merrill Lynch and Flagstar regarding the auction of the bonds?

A.    I would have to assume so.  I was not part of the process.

Q.    Okay.  Do you know why none of those documents were produced in this proceeding?

A.    No.

Q.    Who ultimately purchased the Live Well bonds at that auction?

A.    I believe the ultimate bidder was Bank of America Merrill Lynch.

Q.    So Bank of America Merrill Lynch was both the auctioneer and the purchaser?

A.    I believe we took the highest and best offer, which would have been theirs.

Q.    Who else was involved in the auction?

A.    I'm sorry.  From whose perspective?

MR. SHANNON:  I didn't understand.  You said who else was involved?

MR. BROWN:  Yeah, I did say:  Who else was involved?

BY MR. BROWN:

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

Q.    So were there any other bidders for the Live Well bonds?

A.    I believe there was.  I was not party to that.  I don't know who.  I don't know who all was there, who bid, how much, et cetera.  Like I said, it's my understanding they were the highest and best offer.

Q.    Do you know what efforts were undertaken to market the sale of the securities, the Live Well bonds?

A.    I believe standard notice was provided that they were going to be auctioned.  I don't know anything beyond that.

Q.    Standard notices to Live Well that the bonds are going to be auctioned?

A.    To the world.

Q.    And Live Well was -- what would a standard notice be?

A.    I did not see it.  I can't say exactly what it was.

Q.    What would it typically be?

A.    Notice of the CUSIP that we owned that was going to auction.  Probably had an auction date, had a bid notice date.

You know, just the standard auction;

this is what's being sold, and we're looking for the highest bids.  That would be standard.

I don't have -- I don't recall seeing anything about the actual auction.

Q.    So you don't know if there was any effort made to contact any other potential bidders directly?  Yes or no.

A.    I don't know about that process, no.

Q.    You don't know?

A.    No.

Q.    Okay.  Do you know if Bank of America Merrill Lynch published the potential sale of the bonds in any publication?

A.    I don't know.

Q.    Okay.

A.    It was not part of my assignment.

Q.    Why did Flagstar select Bank of America Merrill Lynch to auction off the bonds?

A.    I -- again, I was not part of that process, so I would speculate that it was because they were -- that is what they do, one of the services they offer.

Q.    One of the services that they offer is to run Article 9 sales of securities?

A.    Again, I was not part of the decision.

Q.   You don't know?  Is it fair to say you don't know why Bank of America Merrill Lynch was selected to --

A.   Correct.

Q.   -- run the auction?  I'm sorry.  I over-spoke you.

A.   That's correct.  It was not part of what I do.

Q.   Okay.  And then you're not aware of the steps that Bank of America Merrill Lynch took to market the bonds as well, correct?

A.   That's correct.

Q.   The affidavit, your affidavit that was produced in this matter, in paragraph 8 of your affidavit you say:  During 2019, Flagstar sold the bonds but received only about half the represented value of the bonds.

Did you review any documents regarding that?

MR. SHANNON:  At the time of the affidavit, you mean?  Or do you mean today or before --

MR. BROWN:  Well, at any time.

BY MR. BROWN:

Q.   At the time of the affidavit or since,

did you review any of the sale documents that would substantiate that Flagstar sold the bonds but received only about half of the represented value of the bonds?

A.    Shortly after they announced they were closing business, it was because -- I don't know if it was because, but the valuation that we had been getting from IDC was immediately cut in half. Like overnight, the value went down.

That's about the value that we received for the bonds.  So when we say half, it's because the collateral value was cut in half, and that's approximately what we received from the sale.

Q.    Okay.  My question to you is:  What documents did you review to substantiate your assertion that Flagstar sold the bonds but only received about half of the represented value of the bonds?  Let me -- okay.  So I think what you testified to was what IDC had represented the value of the bonds to be, and that when IDC stopped, then there were other valuations that were lower than that.

My question to you is:  What documents did you review regarding the sales price of the bonds?

A.   I reviewed -- there were individual tickets for the amounts to be received, including interest, accrued interest, and principal.  So there were 13 individual CUSIPs.  There were 13 individual notices of how much was going to be paid.

Q.   Okay.  So you recall reviewing 13 notices regarding the 13 CUSIPs?

A.   Yes.

Q.   Do you know why the --

A.   They were summarized in a chart that was presented in New York in January.

Q.   Okay.  Do you know why those notices were not produced in this proceeding?

A.   No.

Q.   Okay.  Paragraph 9 of your affidavit says:  Thus, after application of the value of the sale of the bonds and the net realization after a settlement with a third party that provided valuation services of the bonds, the below summary reflects the damages that Flagstar sustained as a result of Mr. Hild's frauds.

So my question to you regards the net realization after a settlement with the third party that provided valuation services.

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

Was that IDC that there was a settlement with?

A.    Yes.

Q.    Okay.  Were there documents generated in connection with that settlement?

A.    I'm sure there were.

Q.    Did you review them?

A.    No.

Q.    You've never seen any of the documents related to the settlement?

A.    It was handled by our attorney.

Q.    Okay.  But you have not seen the documents; is that correct?

A.    Right.

Q.    Okay.  Do you know what the settlement was with the third party?

MR. SHANNON:  The amount of?  You said: Do you know what the settlement is?  You mean the amount of the settlement payment?

MR. BROWN:  Yeah, the terms of the settlement, which the amount would probably be the most significant term, yes.

THE WITNESS:  I think it was somewhere between 15 and 16 million.

BY MR. BROWN:

Q.   Is that the total amount that IDC paid?

A.   You know, I'm not certain of the exact amount, but I can assure you every penny we got was applied to the indebtedness, if that's what you're asking.

Q.   Well, that's really not what I'm asking.

Do you know if any third party -- well, first off, do you know why there were no documents produced in this proceeding regarding any settlement with IDC?

A.   No.

Q.   Okay.  Do you know if any -- other than IDC and Flagstar, do you know if there were any other parties to that settlement agreement?

A.   I don't believe so.

Q.   Okay.  Previously, when we were discussing third parties involved with valuation and we mentioned IDC, and you also mentioned Keiter, that was Live Well's auditor.

Do you recall that?

A.   Yes.

Q.   Okay.  Has Flagstar asserted any claims against Keiter?

A.   Yes.

Q.   Have those claims been resolved?

Deposition of Robert Marsh                          Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

A.    Yes.

Q.    Okay.  How were those claims resolved?

A.    We entered into a settlement with Keiter.

Q.    Okay.  A written settlement agreement?

A.    I believe it would have been.

Q.    Okay.  Do you know why there were no documents produced regarding the written settlement agreement with Keiter?

A.    No.

Q.    What were the terms of the settlement agreement with Keiter?

A.    Cash payment.

Q.    Of?

A.    I believe it was approximately a million five, a million six.

Q.    Is that settlement reflected in your affidavit that was produced in this case?

A.    Yes.

Q.    It was?

A.    A hundred percent of proceeds received in the settlements were allocated to the loan.

Q.    Okay.  And the reason why I asked is because, in paragraph 9, there's a reference to the net realization after a settlement with a

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

third party, singular, which I understood to be IDC.  And I -- it doesn't identify IDC by name.

But you're telling me that there were settlements with at least two parties, right, IDC and Keiter?

A.    That's right.

Q.    Are there claims asserted against any other party?

MR. SHANNON:  By Flagstar as opposed to the bankruptcy trustee?  Because there are, just to be clear, other claims asserted by the trustee.

BY MR. BROWN:

Q.    Has Flagstar asserted any claims against any party regarding this matter -- well, regarding the -- you know, the claims against Live Well and the Live Well loans other than IDC and Keiter?

A.    I believe we recently had a settlement -- entered into a settlement with Eric Rohr.

Q.    Okay.

A.    That would not be reflected in the settlement.  That was too recent.

Q.    Yeah, and then Mr. Rohr was a party to this proceeding as well.

Flagstar has also filed a proof of claim in the bankruptcy case, correct?

A.    Yes.

Q.    Were you involved in preparing that proof of claim?

A.    Yes.

Q.    Okay.  Do you have an understanding as to what expected distributions might be made out of the Live Well bankruptcy estate to creditors such as Flagstar?

A.    Are you asking total, or Flagstar's portion?

Q.    I'm asking if you've -- if you have an idea what you expect to -- what you expect Flagstar to get out of the bankruptcy case in connection with its proof of claim.

A.    I believe the current expectation is somewhere between 1 million and $2 million, but that's completely in the hands of the trustee, who could -- you know, they're not going to distribute until the very end.  We just don't know what's going to be collected and, you know, what's going to be left over after their expenses.  But we're estimating somewhere between 1 and 2 million.

Q.    Okay.  And that estimation, is that

based on communications with the trustee or his professionals, or is it based on Flagstar's monitoring of the bankruptcy docket; or both?

A. I believe it's based on a report that the trustee indicated how much cash they had.

Q. Okay. Your affidavit references an expense reimbursement for Recon Management Group?

A. Yes.

Q. Who is Recon Management Group?

A. A third-party vendor.

Q. That does what?

A. Asset searches.

Q. And do you know what they do in connection with an asset search?

A. They search public information to see how much assets a person or a company may have that's public; bank accounts, that kind of a thing.

Q. They charged $8,500?

A. Yes.

Q. So they're searching publicly available -- just getting stuff off the internet? Is it -- I mean, what do they do, if you can explain?

A. I don't have the backroom processes that

they use, but that was the fee they assessed.

Q.   Okay.  And this was to determine assets that the defendants in this proceeding held?

A.   Yes.

Q.   Okay.

A.   Like, we don't have a group dedicated to do this type of a process.  So, you know, that's what the third parties are for, third-party vendors.

Q.   Okay.  Was a third-party vendor attempting to see if there were any assets that Mr. Hild or any of the Live Well defendants hid?

MR. SHANNON:  Hid?

MR. BROWN:  Hid, H-I-D.

THE WITNESS:  If you're aware of things they hid, let me know.

BY MR. BROWN:

Q.   Well, I'm asking you if -- so were they -- was the third-party vendor attempting to see if Mr. Hild or any of the Live Well defendants had hidden assets?

A.   Yeah, people own assets in their name individually, they own assets under LLCs or other corporations.  There's ways to search public records to -- you know, quickly search public

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

records to see what assets he might have owned under entity names, et cetera.

Q.    Okay.  And then so there was a search that was done of Mr. Hild and other Live Well defendants, I assume, as well?

A.    Yes.

Q.    I mean, your affidavit specifically referenced Mr. Hild's obligations.

A.    As guarantor.

Q.    Right.  Okay.  Did Recon Management discover any unusual assets that were affiliated with Mr. Hild?

A.    I'm not sure what you mean by "unusual."

Q.    Well, let's -- did you review the Recon Management report?

A.    Yes.  It's several years ago.

Q.    Do you recall there being any kind of, like, red flags?  Anything of particular interest that jumped out at you after reviewing the Recon Management report?

A.    No.

MR. SHANNON:  Charles, we've been going an hour and 40 minutes.  Can we take a break when it's the right time for you?

MR. BROWN:  Yeah, is this a good time

for a break, Mr. Marsh?  I'm fine taking a break now.  We can take ten.

THE WITNESS:  Thank you.  Thanks.

(Recess, 2:46 p.m. to 2:53 p.m. EST)

BY MR. BROWN:

Q.   All right.  So, Mr. Marsh, have you been the primary point person from Flagstar in connection with the restitution proceeding in New York?

A.   I testified there.  I don't believe anyone else did, so I would say yes.

Q.   Well, okay.  I know you testified there in January.  I'm kind of -- I'm going to ask a question that goes back to the initial submission by the government in connection with restitution.

Do you know if you were involved with that initial submission?

A.   I -- do you have a date?

Q.   I don't have a date off the top of my head.  What I do know is that -- and this may refresh your recollection, or maybe not, but after there was the initial submission by the government for restitution, Mr. Hild's criminal defense counsel filed a motion for new trial based on newly discovered evidence, the newly discovered

evidence being the evidence that the lenders, various repo lenders, including Flagstar, disclosed regarding the coupon payments that they had received.

So I don't know if you've been following the criminal trial and you were aware that Mr. Hild had filed a motion for a new trial based on newly discovered evidence.

Were you aware of that?

A. Not directly. I've seen -- I've followed along from time to time and seen updates, a request for new trial based on all kinds of things.

Q. Okay. To your knowledge, was there any communication between anyone from the Department of Justice or the SEC and Flagstar, or any one of Flagstar's agents, regarding discovery in this matter?

MR. SHANNON: Are you speaking of discovery with respect to Mr. Hild's motion for a new trial?

MR. BROWN: No, no.

BY MR. BROWN:

Q. I'm asking about the discovery in this civil proceeding, if you're aware whether there's

been any communications between Flagstar, its representatives, and anyone from the Department of Justice or the SEC?

A.   So I'm not aware of anybody from the SEC.

I've talked on a couple of occasions with Scott Hartman from the DOJ.  But that was the suit in New York that I went to.

Q.   Okay.  So you spoke with Mr. Hartman about the --

A.   The restitution.

Q.   -- restitution proceeding in New York?

A.   (Nods head)

Q.   Did you have any discussions with him about this civil proceeding that's taking place in Michigan?

A.   No.

Q.   Okay.  I'm going to ask you a couple questions in connection with the -- your personal notice of deposition that was served in this matter.  And I'm just going to go over the actual notice itself.  You were requested to produce documents in connection with your notice of deposition, so I'm just going to go over that document request with you.  Okay?

The first document request was:  Any documents related to or referenced by Robert Marsh in the affidavit of Robert Marsh bearing Bates numbers FLG_0001 through FLG_00003.

Have you produced any documents today that relate to that affidavit?

A.   I -- I don't know.

Q.   Okay.

A.   I'm not sure what you're referring to, if you're referring to this case.

Q.   Well, did the affidavit -- number one, I mean, the first document request relates to the affidavit that you produced, and that was the two and a half page affidavit that I asked you some specific questions about.

A.   Okay.

Q.   And, to your knowledge, were there any documents produced that you referred to in your affidavit?

A.   You were just referring to some legal document.  You referred to a series of numbers. You know, you're reading -- you're reading from something that I don't have in front of me, so I'm not sure what you're referring to.

Q.   Okay.  What I read from was the

deposition notice, the deposition notice that instructed you to produce documents to me in advance of your deposition. And the first one relates to documents referenced or related to in the affidavit that was produced in this matter.

A. I'm not in possession of all documents that were requested. I believe we turned over, you know -- well, we turned over what we did. If there's a request, you know, for something additional that could be meaningful --

Q. What I will represent to you has been produced is an affidavit from you and loan documents, and nothing related to the damages claim other than your affidavit.

Okay. So that was the first document request.

The second one is: Any documents concerning any income or coupon payments generated from the Live Well bonds.

Is the --

A. I'm sorry. Was there a question?

Q. Okay. I think earlier you referenced that there were 13 notices that you received with respect to each individual CUSIP?

A. Yes.

Q.   Okay.

A.   For the sale, yes.

Q.   Okay.  For the sale.  Did they reference income or coupon payments as well?

A.   It was principal and interest being paid per CUSIP.

Q.   Okay.  And you haven't produced those documents?  You don't have them today?

MR. SHANNON:  Live Well did not receive coupon payments.  You said earlier that there was an allegation that some of the lenders were reviewing coupon payments, and you included Flagstar, but you didn't ask him if it did, in fact, include Flagstar.  It's my understanding it does not include Flagstar.

BY MR. BROWN:

Q.   Mr. Marsh, for the period of time that Flagstar was in possession of the bonds, up until the time that they were sold to Bank of America Merrill Lynch, did those bonds generate any interest or coupon payments to which Flagstar was entitled?

A.   Yes.

Q.   Are there documents related to that interest -- those interest or coupon payments that

Flagstar was entitled to?

A.   Yes.

Q.   Okay.  Do you know why those documents would not have been produced?

A.   There was one bank statement that we did not -- we could not locate, and because it was a period of one month, it was about $709,000 that we could not, you know, produce evidence of.  But it was that one payment, again, applied to the loan. They got full credit for the money that we received.

Q.   You're saying that there's one document related to the coupon payments, and Flagstar cannot locate that document?

A.   It's a -- yes, it's a bank statement from September of 2019.

It's our evidence, by the way, it goes into the bank account at U.S. Bank.  That's the notice we receive.

Q.   Okay.  And that document wasn't produced because you can't locate it?

A.   Correct.

Q.   Okay.  Number 3:  Any documents related to any analysis of possible future income or coupon payments that would be generated from the

Live Well bonds.

Are there any documents related to that?

A.    The only thing we had was the bond valuation done by BlackRock.  Everything else is speculative.  We would not know from month to month how much interest that would be expected.

Q.    Okay.  Do you know why the BlackRock report was not produced?

A.    No.

Q.    Okay.  The next document request is: Any documents related to any analysis of the decision to sell the Live Well bonds as opposed to hold the bonds and collect the income or coupon payments that the bonds would generate.

So I'm guessing the BlackRock report would be a responsive document to that request.

Is that correct?

A.    Regarding the decision to sell?

Q.    Yes.

A.    Yeah, I -- I don't know if there was anything in writing.  It could have been a discussion.  You know, again, it was a higher level than me.

Q.    Okay.  So you're saying that there may be documents, but you're just not aware of them?

A.    I would say that --

Q.    Okay.

A.    -- there may be, but I'm not aware of them.

Q.    Okay.  Number five is:  Any documents related to any analysis of the functionality of the market for the Live Well bonds.

Do you think that there's any responsive documents to that request?

A.    I don't know.  If there are any, I'm not aware of them.

Q.    Okay.  And then number 6 is:  Any documents related to the sale of the Live Well bonds by Flagstar, including any efforts to market the bonds, any efforts to ensure that the sale of the bonds would generate an appropriate price, the identity of the purchaser of the Live Well bonds.

A.    So I don't know what document would ensure us to receive, you know, an appropriate value or appropriate price.

MR. SHANNON:  Is the question again those documents?  You just went off of documents.  Was the question does he have them?

BY MR. BROWN:

Q. Yeah, so let me ask you this.

A. Yeah.

Q. I think you've already identified that there was some kind of ticket or notice with respect to each of the individual CUSIPs that were sold.

So I assume that you do have documents related to the sale of the Live Well bonds, correct?

A. I don't. There could be. I don't have them. I'm not aware of them if there is.

Q. But there were tickets, correct?

A. The tickets were more, this is how much you're going to get paid, as opposed to any kind of an agreement.

Q. Okay. But the tickets would be related to the sale of the bonds, right?

A. Yes.

Q. Okay. So are there any other documents -- and I think the answer to this is no, but any other documents that you're aware of related to the sale of the Live Well bonds, other than, presumably, the agreement with Bank of America Merrill Lynch to auction the bonds in the first instance?

A.   I'm not sure what is out there, whatever was out there, what's available.  I was not party to that process.

Q.   Okay.  To your knowledge, was there a decision by Flagstar not to produce documents in discovery in this matter because there was the pending criminal matter in New York?

A.   I -- I don't know.

Q.   Okay.  And I think you testified that there was approximately 700,000 that Flagstar received for the period that it was holding onto the bonds before they were sold?

A.   About 710,000.

Q.   Okay.  Did Flagstar receive any funds from the bankruptcy trustee in connection with the Live Well bonds that Flagstar had a security interest in?

A.   I don't believe the trustees made any distributions, or anything.

Q.   Yeah, this would not be, you know, a distribution out of the estate.  It might have been more in the nature of income that the bonds or coupon payments that the bonds may have generated while they were in the possession of the trustee.  But there might have been a view that it

was -- because it was Flagstar's collateral, that Flagstar would be entitled to those coupon payments.

Does that make sense to you?

A. I think I understand what you're saying. And so, the money would always come to Flagstar from U.S. Bank. So when -- when they filed for bankruptcy -- so June of '19 -- U.S. Bank did not transmit those funds, did not make them available.

July 2019, they did not make them available.

August '19, they did not make them available, until the stay was lifted, at which point there was approximately $2 million that was turned over to Flagstar, all of which was applied to accrued interest and principal. 100 percent of that applied to indebtedness.

Q. Okay.

A. Then the September payment. Then they were sold.

Q. Okay. So at the time that the bonds were sold, would it be fair to say that Flagstar was aware of the coupon payments it had accumulated from the date of the Live Well bankruptcy up until the time that Flagstar took

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

possession of the bonds?

A.   Yes, we were aware of the amount.

Q.   Okay.  And, I mean, this may have been at a higher level than yours, but did that factor -- knowing the amount of money that the bonds had generated during that short period of time, did that in any way factor into a, you know, decision to do an analysis as to whether the bonds should be held onto as opposed to being liquidated?

A.   So you have to understand what these bonds are, how they get paid.  So we knew every time interest was paid, that meant collateral was leaving the pool.  You cannot make the linear jump to say, this is 700,000 this month, it's going to be 700,000 next month, and 700,000 every month in perpetuity.  That amount will eventually go to zero.

Q.   Right, it will fluctuate and so --

THE REPORTER:  I'm sorry.  Say your question again.  You were talking at the same time.

MR. BROWN:  I'm sorry.

BY MR. BROWN:

Q.   Just go ahead and finish your thoughts

there.

A.    Yeah, just to finish my thought, we knew that what we got this month did not mean that's what you would get next month.  It was not a -- you know, you don't say it's $700,000 a month out to 20 years, net present value.  You have to assume you're reducing your collateral, because you're ultimately going to get less and less and less over time.

Q.    Okay.

A.    You're going to trend to zero.

Q.    So --

MR. SHANNON:  We can't hear you, Charles.

MR. BROWN:  I'm sorry.

BY MR. BROWN:

Q.    Okay.  So it's my understanding, Mr. Marsh -- and you can correct me if I'm wrong.  Maybe we're both wrong.  It's my understanding that initially these bonds were what's called negatively amortized.  So, you know, initially the -- kind of the interest that the bonds are going to pay out are -- they're increasing because no one is leaving the pool.  And then when people start leaving, you reach a level where the amount

that's leaving is -- exceeds the accrued interest that is -- that the mortgages are generating.

Does that make sense to you?

A.   I think I see what you're saying.  It's a reverse mortgage, so they're based on the assumption at a certain age -- somebody will only live so long, and when they pass, that's when the mortgage would leave the pool.  And if somebody would, quote/unquote, outlive that assumption, that there would be more.  But if somebody was to pass ahead of time, you know, that's the trigger.

There really is -- the only way you can look at it is trends on prior similar type of securities.

And over time, we added, or they added, more collateral, more CUSIPs.  So it's not like you can look at the historical interest being paid and say that's a continuation.  You know, it was 13 at the time that it -- you know, that everything stopped, when the default occurred.

Q.   It was 13, meaning that there were 13 CUSIPs?

A.   CUSIPs, correct.  You really couldn't look historically and say, hey, this is an amount that's going to be paid.  As the collateral value

went down, new bonds were added to the portfolio to maintain the value, you know, to support the loan.

Q.   Okay.   Do you know who ICBC is?

A.   Yes.

Q.   Okay.  Are you aware that ICBC did hold on to the Live Well bonds?

A.   It was Moray and ICBC, you know, I think they chose to hold them and then sell, I think.

Q.   Okay.  So you're aware that both ICBC and Moray did hold on to the bonds?

A.   For various periods, yes.

Q.   Okay.  And are you familiar with Customers Bank and Live Well?

A.   Yes.

Q.   Okay.  Are you aware that Customers Bank held an auction where Customers Bank outbid the other bidders by one penny for each of the bonds, so Customers Bank held on to the bonds?

A.   Their decision.  I wasn't aware what's what happened, but it's -- it's -- okay.  I'm not sure of the relevance.

Q.   Okay.  Early on I talked about the $100 million fine that had been imposed on Flagstar and that there was a $25 million adjustment reflected

on Flagstar's financial statements in 2019 regarding that liability.

Are you aware that there was that $25 million adjustment on Flagstar's financial statements in 2019?

A.    Yes.

Q.    Okay.  And was that because Flagstar's liability to the government was reduced by 25 million at that time?

A.    I'm sorry.  Is there a relevance to this case?

MR. SHANNON:  Yeah, he already said this was not relevant to Live Well.

But to the extent you understand that question, go ahead and give basic information.

I assume, Charles, all you want to do is ensure it didn't have anything to do with Live Well, right?

THE WITNESS:  If that's what you're asking, it has nothing to do with Live Well.

BY MR. BROWN:

Q.    Okay.  What was it related to?

Well, first off, so the financial statements indicated that there's -- I mean, I'll

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

use my term -- a $25 million credit to Flagstar as a result of -- in connection with that fine.

So would it be fair to say that in the first quarter of 2019, Flagstar recognized a $25 million benefit in connection with, you know, that outstanding fine?

A.   Again, I'm not sure I understand the relevance to this case.  It has nothing to do with Live Well.

Q.   Okay.  Well, what did it have to do with?

A.   Again, it's not Live Well, so it's not relevant to this case.

We've got all kinds of disclosures.  It's a public company.  Feel free to review the, you know, documents.  I'm not trying to be combative.  I'm just saying --

Q.   No, no, no.  That's fine.  And I'm --

A.   It has nothing --

THE REPORTER:  Gentlemen, gentlemen, I can't do it.  One at the time, please.

THE WITNESS:  My point is he's asking questions about things that have nothing to do with Live Well or this case or Michael Hild or Rob Marsh and my testimony.

BY MR. BROWN:

Q.   Okay.  And I'm not going to try and be argumentative with you, Mr. Marsh, when I'm going to suggest the possible relevance to this, in my opinion.

Okay?

A.   Okay.

Q.   Okay.  So what -- from my perspective, what I see is that Live Well got its hands on -- repossessed collateral from -- or Flagstar repossessed collateral from Live Well.  The government is prosecuting a fraud claim against Mr. Hild and other Live Well defendants in connection with these very exotic securities that are difficult to value, and they are also difficult to sell because there's an illiquid market, and none of the other Live Well vendors sold in -- sold the bonds in 2019.  Flagstar did.

Flagstar -- and I was not present at Mr. Hild's criminal trial, but it's my understanding that the government's case against Mr. Hild for fraud and, you know, its theory against, you know, the other, you know, codefendants who pled guilty was that the bonds were -- the bonds were overvalued.  But the

government never produced any evidence as to what the value of the bonds were.

And Mr. Hild in his criminal proceeding, the defense he raised was that the bonds had an intrinsic value and that Live Well reported to IDC this intrinsic value of the bonds.  And the government's position was that what should have been produced was a -- what should have been disclosed to IDC was a -- it's one of two things.  Either they should have disclosed a market value as opposed to an intrinsic value, or maybe what should have been disclosed was that it should have been disclosed that Live Well was providing valuations to IDC.  Maybe that's what the government thinks should have been disclosed and what was fraudulent.

But there was an illiquid market for these very exotic financial instruments, and it would help the government's case for there to be a market figure for the bonds.  Okay?

And really no one else other than Flagstar sold the bonds in 2019, and Flagstar gets a benefit of $25 million from the federal government in 2019 at around the same time that Flagstar's booking an approximately $30 million

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

loss in connection with the sale of the bonds.

That's a very long-winded analysis.  I get that.  But there is a correlation between the -- I mean, the 25 and 30 million.  They're pretty close in terms of, you know, the financial impact to Live Well.  The timing of the sale seems to coincide with the timing of the benefit that the -- that Flagstar got from the government.

So that was why there's an inquiry into it.

MR. SHANNON:  So, Charles, can I -- I think I understood what you said.  Just to be clear, this is a subject matter that was included in the 30(b)(6) notice, and I asked Rob to look into it because it was included in the 30(b)(6) notice.  And the benefit that you're referring to is a reduction in the amount that Flagstar was obligated to pay under a 2012 settlement agreement with the Department of Justice related to TARP funds.  And as a result of a -- of the bank meeting certain obligations that were imposed upon it in that settlement, its potential liability was reduced, allowing it to recognize -- having satisfied those obligations in 2019,

it allowed it to recognize the reduction in its liability.

MR. BROWN: Okay. So then stated somewhat differently, my understanding would be that the settlement agreement that was reached in 2012 had certain contingencies or benchmarks that Flagstar would have had to have met in order to reduce the fine, and it met those contingencies, and that was recognized in 2019. Is that --

MR. SHANNON: I think we were -- we met the obligations of the settlement agreement. It hit our books in 2019, you know. So I don't know -- I don't know -- to tie those two things, I'm not able to tie those two things, so I'm --

MR. BROWN: So, Joe, I think what you're saying is that the -- the 25 million reduction in the fine was part of the 2012 settlement agreement?

MR. SHANNON: Yes.

MR. BROWN: Okay.

MR. SHANNON: Yes, it included obligations with respect to all sorts of regulatory obligations that we needed to meet

over a period of time.

MR. BROWN:  Okay.

MR. SHANNON:  I thought you were suggesting that Flagstar was induced to testify against Hild by a favor from DOJ.  I wasn't sure if that's what you meant.

MR. BROWN:  Well --

MR. SHANNON:  But, anyway, it relates to a 2012 settlement agreement.

MR. BROWN:  Okay.  Yeah, that's fine. Yeah, that's fine.  We'll just leave it at that.

BY MR. BROWN:

Q.  So, Mr. Marsh, to your knowledge, did Flagstar have any communications with the SEC related to Live Well?

A.  I'm not aware of any.

Q.  In your affidavit, there's an expense reimbursement for 143,000 and change, and it relates to an SEC subpoena, a legal hold document preservation.

Do you know --

A.  I -- yeah, I don't know what that is. I -- I don't know.  Like, I didn't -- I relied on other people for this number.

Q.    Okay.  And you've never seen the BlackRock report, right?

A.    Correct.

Q.    Do you have any knowledge of what assumptions BlackRock -- well, what assumptions BlackRock made in connection with its valuation of the Live Well bonds?

A.    No.

Q.    Do you know if Flagstar currently holds any government guaranteed mortgage-backed securities in its investment portfolio?

A.    I do not.

Q.    You don't know?

A.    Correct.

Q.    Okay.  Thanks.

Do you know if the BlackRock report referenced the illiquid nature of the Live Well bonds?

A.    I do not.

Q.    To your knowledge, has Flagstar had any communications with Bloomberg about the Live Well bonds or pricing for bonds?

A.    I don't know if there's been communication.  I know at one time we reviewed, you know, online Bloomberg to see what the values

were, and they were similar to the BlackRock valuation. But that's not, you know, talking to anybody saying: What do you think? It's pulling up their service and looking it up.

Q. Do you know who at Flagstar reviewed the proposed trade tickets when the bonds were sold?

A. It would be Toby Thomas.

Q. And what's their title?

A. Chief investment officer.

Q. And you don't know whether the underlying mortgages were fixed rate or adjustable rate?

A. Not offhand, no.

Q. Do you have an understanding of bond yield?

A. Yes.

Q. Can you explain to me what your understanding of bond yield is?

A. Bond yield is how much interest would be paid on a bond, and then you would get interest, and then you get your principal back when you sell.

Q. Okay. Do you have an understanding of the term "discount margin"?

A. Not exactly, but I think the premise is

that there's something less than par, par being a hundred percent of an amount.

MR. BROWN:  Okay.  Okay.  We can take another ten-minute break.  I think we can probably wrap up pretty quickly.  So if we can be back at, let's say, 3:50?

MR. SHANNON:  Okay.

THE WITNESS:  Okay.

(Recess, 3:38 p.m. to 3:50 p.m. EST)

BY MR. BROWN:

Q.  I don't think I have that much more, but I do have a few more questions for you. Hopefully, we can get through this pretty quickly.

Okay.  So do you know, Mr. Marsh, whether BlackRock eventually ended up with the bonds that were liquidated, or do you know if they stayed in the hands of Bank of America Merrill Lynch?

A.  I'm not certain what BAML, B-A-M-L, did after they bought them.

Q.  Okay.  Do you know if Flagstar asked the bankruptcy trustee if it had to liquidate the bonds in order to file a proof of claim?

A.  I don't know if that was asked or not.

Q.  Okay.  Did the decision to liquidate the

bonds have anything to do with what was going on in the bankruptcy case?

A.   No.   As I indicated, it's -- we're not entrepreneurs with our loan collateral.   Other banks may choose to do something different.

Q.   Okay.   Do you know why Flagstar would liquidate the bonds if there was little to no market for them at the time of the sale of the bonds?

A.   Again, you would be calling for speculation that at some point it might get better.   Again, the decision was made we're not going to take that chance.   We have a valuation. Let's sell.   Let's try to get the value.

And clearly the motive was to collect as much as we could, not have a higher deficiency.

Q.   Okay.   Are you aware that Flagstar admitted in its interrogatories that there was little to no market for the Live Well bonds?

A.   Thinly traded, I knew that.   We talked about that earlier.

Q.   Okay.   If there's no market for the bonds, in your opinion, is it smart that Flagstar dumped the securities into a non-existent market rather than holding them and collecting the

monthly coupon payments?

MR. SHANNON:  Objection.  Nobody testified there was no market.

MR. BROWN:  Okay.  I'll rephrase it.

BY MR. BROWN:

Q.    If there was an illiquid market, was it smart, in your opinion, that Flagstar dumped the securities into an illiquid market rather than holding them and collecting the monthly coupon payments?

MR. SHANNON:  I object to the word "dumped."

Go ahead and answer.

THE WITNESS:  So are you saying we -- our decision was collect 30 million versus 700,000 a month and maybe save that much over time?  I mean, if you really think about what you're asking me, it's the net present value and the speculation that that value will continue for a period of time that will exceed 30 million today.

BY MR. BROWN:

Q.    Okay.  How long did Live Well have a relationship with Flagstar in connection with the bonds?

A.    It was only two years, I think, maybe.

Q.    Okay.

A.    Two to three before it ended, when they abruptly shut down, yeah.

Q.    Okay.  And U.S. Bank produced a report showing what the monthly coupon payments were in connection with the individual bonds, correct?

A.    Yeah, bank statements.  Yes.

Q.    Okay.  And Flagstar had access to those U.S. Bank statements over the entire length of the loan, correct?

A.    Yes.  As did Live Well, I believe.

Q.    I think you're correct on that.

So understanding that coupon payments can fluctuate over time, Flagstar had -- you would agree with me that Flagstar had at its disposal a two-plus year track record of the coupon payments that were generated, correct?

A.    Again, over time, more CUSIPs were added.  So as new ones were starting, old ones were paying down.

So, again, I'm not going to presuppose that it's going to be a linear payout.  You just can't say that.

Q.    Right.  But you would agree with me that

Flagstar had a two-year track record to look at as to the payments that were being -- that had generated -- the coupon payments that had been generated over that time period, right?

A. Yes.

Q. Okay. Did you look at that track record?

A. Yes, we have it. I have it. I don't have loan interest, which might not be -- it's not the same as the payout on the bonds. But, anyway, you asked that question, so...

Q. Okay. During that two-year time period -- I understand that it's not going to be linear for an indefinite period of time and that there can be fluctuations, but during that two-year time period, were the coupon payments pretty consistent?

A. Again, you're comparing apples to oranges, because there were more added over time, as other ones were paying down. You really just can't make a broad statement that it was flat and it was going to remain flat.

Q. Well, I'm not making a statement that it was flat. I mean, in fact, it's my understanding that there was some fluctuation, but I didn't

think that it was a dramatic fluctuation from month to month, and that there was a track record that Flagstar could have looked at.

A.   Yeah, again, interest is only paid when collateral leaves the pool.  It's a melting ice cube, as they say.  Eventually it gets to zero. How fast it gets to zero, does it all get paid, there was no guarantee we would get a combined 30 million over time, let alone 30 million net present value.

Q.   Do you know if Bank of New York Mellon had any involvement with the Live Well bonds?

A.   You know, I -- I don't.  I don't recall. With our bonds?

Q.   With your bonds, or do you -- yeah, with your bonds.

A.   Yeah, I don't recall with our bonds.

Q.   Okay.  Do you know if they had -- NY Mellon had anything -- any involvement with any of the Live Well bonds?

A.   I think that's where the money came from when we sold them.  I think that's why I recognize the name.  So on those one-page notices, I believe the money came from NY Mellon.

Q.   Okay.  But it's your understanding that

Bank of America Merrill Lynch was the purchaser?

A.   So your -- it's a different division than Bank of America.  So I don't know that they would use necessarily Bank of America.

Banks do that from time to time. They'll write checks, you know, from another bank.

Q.   Yeah.

A.   You think it's their check, but it's not; it's really drawn off of another bank.

Q.   Okay.  Okay.  That's fine.

We talked a little bit about the prospectus that the government or Ginnie Mae issued with respect to the bonds.

Do you know when you first looked at that prospectus?

A.   It would have been -- May of '19 was my initial involvement.  It would have been within 30 days of that.

Q.   Okay.  And do you know if anyone looked at that prospectus before your involvement?

A.   I believe so.

Q.   What's your basis for that?

A.   The fact that Stephanie Lubin, who was the credit officer, that she had them.

Q.   Did you have any discussions with her

about the disclosures in the prospectus?

A.   I don't recall.  She retired a few years ago, a couple years ago, so she was still here when everything blew up, but she's been retired, I guess, two or three years now.

Q.   Okay.  And so you read the prospectus. I think you said you first looked at it in 2019?

A.   Yes.

Q.   Okay.  Do you know if that was before or after Flagstar sold the Live Well bonds?

A.   It would have been before.

Q.   Okay.

A.   Again, my involvement started in May of '19.  We sold the bonds in September of '19.  So I would have looked at that May or early June of '19.

Q.   Okay.

A.   It's pretty heavy reading.  I don't know if you've looked at it.

Q.   Oh, it's my -- well, I think every prospectus is pretty heavy reading, yeah. Actually, my brother, I think, was involved in -- well, you know, my brother, the more successful one, made me the trustee of his trust, and I was getting a bunch of prospectuses, and he actually

got involved in working on them, and I said, I'm getting these notices and stuff.  I said, I'm not reading them, I don't know -- and he was like, yeah.  So at one point, I'm sure I worked on them and, you know, made a lot of money generating a prospectus that no one ever reads that stuff.

All right.  If there were communications between the SEC and DOJ with Flagstar, if they occurred prior to your involvement in 2019, would you be aware of them?

A.    Not necessarily.

Q.    Okay.  I think you previously testified that there was no interest rate associated with the -- these HECM bonds?

A.    Again, that could have been in error, but I'm sure they have an interest rate that they pay.  I'm just not aware of what it was. Variable, fixed, I don't know what it was.

Q.    Okay.  You previously testified that it was your understanding that Flagstar was steered to IDC, and I just want to, you know, revisit that topic.

Can you tell me, what is your basis for believing that Flagstar was steered to IDC?

A.    There's a bank account control agreement

that basically lays out how it will work; that U.S. Bank is going to be the intermediary and they're going to rely on IDC for valuation.  And it was -- basically, it was from -- the version we got was from a prior lender that had just been paid off, I believe, and so it was blacked out, the name of that other bank.  But, otherwise, it was, like, here's that agreement, here's what you have to agree to.  And I think each bank had that.

And in that document is where it said that we would not be party to an involuntary bankruptcy.  We caught that, removed it. Customers Bank did not.  So that's why they could not be part of the bankruptcy involuntary process.

But that bank account control agreement, if you don't have it, I'm sure we can get it.

Q.   Okay.  So just so I understand, Flagstar was coming in and it was stepping into the shoes of another lender, and Flagstar received basically the forms that the other lender had been using with the name blacked out, and then it was -- okay, that was the template that was used to --

A.   Yes.

Q.   Okay.  Okay.

A.   I want to say it was Xenith Bank,

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

something with an X.  You know, based on the UCC search, they were -- they terminated their UCC days before we actually recorded ours.

Q.   Okay.  So let me ask you this question, then:  So, then, other than the fact that the -- you know, the template referenced IDC, do you have any other basis for saying that Flagstar was steered to IDC?

A.   I lost you.  Can anybody hear?

Q.   I can hear.

A.   I lost your entire question.  Looks like mine might have been unstable here.  Sorry.  If you can repeat it.

Q.   Okay.  So my question was:  Other than the fact that there was a -- you know, a template form that was presented to Flagstar, is there any other, you know, basis for you to say that Flagstar -- or for you to believe that Flagstar was steered to IDC?

A.   In hindsight, for sure.  It was part of a fraud.

Q.   Okay.  I'm -- I don't -- I'm not following your -- your response there.

A.   The fraud that's been proven, everybody has admitted to it.  I say everybody loosely.

They were providing a value to IDC who was turning around and providing it as if it was its own independent value.  We had to go through them because they were part of the fraud.  They were producing the value that Live Well provided to them.  It's already been proven.

So I can go on, but I don't know that I need to.

Q.   Okay.  Are you aware that the SEC fined IDC for -- I think levied an $8 million fine on IDC for relying on single-broker quotes for its valuation services?

A.   No, doesn't sound familiar.

Q.   Okay.  If I were to represent to you that the SEC identified approximately 46,000 separate instances where IDC relied on single-broker quotes for its valuation, would that surprise you?

A.   Obviously it's a big number.  So it's not a number I would have put on it.  But, you know, there's also the relevance of, you know, is it the single broker being the one that's providing it for themselves?  Right.  I don't have that context.  You know, if Live Well was providing the value on their own bond versus a

broker not related to, you know, a security.

Q.   Okay.  You said you were not aware of IDC getting fined for relying on single-broker quotes.  Are you aware that Bloomberg was fined $5 million for providing values that relied on single-broker quotes?

A.   No.  Again, I don't have any context of: Is it the broker providing a value on their own security?  And so it's a -- I don't want to paint it with a broad brush to say what we have in this case is related at all to anything else you're talking about.

MR. SHANNON:  The question was were you aware of that.  And the answer was no?

THE WITNESS:  That's right.

BY MR. BROWN:

Q.   Okay.  Just one second here.

Going back to the U.S. Bank statements, Mr. Marsh, did you have access to -- were you able to look at the coupon payments that were received over the two-year period at the CUSIP level on the U.S. Bank statements?

MR. SHANNON:  You mean per CUSIP?

MR. BROWN:  Yeah.

THE WITNESS:  Yes.

BY MR. BROWN:

Q.    Okay.  So you would be able to see for each individual CUSIP what the track record of those was, at least for the period of time that Flagstar was financing them on behalf of Live Well, right?

A.    Yes.

MR. BROWN:  Okay.  All right.  Thank you.  That's all the questions that I have for you.

MR. SHANNON:  Thank you.  I have no questions for him.

THE REPORTER:  Mr. Brown, just regular delivery on the transcript?

MR. BROWN:  Yes, that would be fine. Thank you.

MR. SHANNON:  Yeah, that's good.  Send me a copy.

Time noted:  4:14 p.m. EST

Deposition of Robert Marsh                                      Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

CHANGES AND SIGNATURE

PAGE/LINE                          CHANGE                              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

I, ROBERT MARSH, have read the foregoing deposition and herby affix my signature that same is true and correct, except as noted above.

_____
ROBERT MARSH

THE STATE OF_____)

COUNTY OF_____)

    BEFORE ME,_____, on this day personally appeared ROBERT MARSH, known to me (or proved to me under oath of _____ or through _____ (description of identify card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

    Given under my hand and seal of office this ____ day of _____, 2024.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF_____
MY COMMISSION EXPIRES:

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

REPORTER'S CERTIFICATION
REMOTE DEPOSITION OF
ROBERT MARSH
MARCH 26, 2024

I, JoRita B. Meyer, Registered Professional Reporter, Registered Merit Reporter, and Certified Realtime Reporter, Notary Public, hereby certify to the following:

That the witness, ROBERT MARSH, was duly sworn and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

_____ was requested by the deponent or a party before the completion of the deposition and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor.

XXXX was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Certified on April 4, 2024

/s/ JoRita B. Meyer

_____

JoRITA B. MEYER, RPR, RMR, CRR

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

## WORD INDEX

**< $ >**
**$100**  76:*23*
**$2**  57:*18*  72:*14*
**$25**  12:*2, 10*  13:*15*
76:*25*  77:*3*  78:*1, 4*
80:*23*
**$30**  80:*25*
**$5**  98:*4*
**$700,000**  74:*5*
**$709,000**  67:*7*
**$8**  97:*10*
**$8,500**  58:*19*

**< 1 >**
**1**  4:*12*  57:*18, 24*
**1:00**  1:*17*
**1:02**  6:*1*
**100**  72:*16*
**1201**  5:*14*
**13**  52:*4, 7, 8*  65:*23*
75:*19, 21*
**14**  27:*12*  41:*10, 13,*
*21, 25*  42:*2, 10*  43:*19*
45:*13*
**143,000**  83:*19*
**14-year**  27:*13*
**15**  53:*24*
**16**  53:*24*
**19**  10:*6*  72:*8, 12*
92:*16*  93:*14, 16*
**1901**  5:*6*
**19801**  5:*16*

**< 2 >**
**2**  57:*24*
**2:19-cv-11512**  1:*8*
**2:46**  61:*4*
**2:53**  61:*4*
**20**  74:*6*
**2003**  8:*15*  9:*14*
**2012**  81:*19*  82:*6, 19*
83:*9*
**2019**  10:*8*  12:*4, 12*
20:*20*  50:*15*  67:*16*
72:*10*  77:*1, 5*  78:*4*
79:*18*  80:*22, 24*
81:*25*  82:*10, 13*  93:*7*
94:*9*

**2024**  1:*17*  4:*12*
101:*19*  102:*2, 20*
**25**  77:*8*  81:*4*  82:*18*
**26**  1:*17*  4:*11*  102:*2*
**27644**  1:*25*

**< 3 >**
**3**  67:*23*
**3:38**  86:*9*
**3:50**  86:*6, 9*
**30**  17:*20*  21:*6*  22:*11,*
*17*  81:*4*  88:*15, 21*
91:*8, 9*  92:*17*  102:*11*
**30(b)(6**  1:*14*  4:*6*
6:*15, 16*  10:*13*  16:*7*
81:*14, 16*
**30(f)(1**  102:*9*
**3RD**  5:*15*

**< 4 >**
**4**  102:*20*
**4:14**  99:*19*
**40**  60:*23*
**46,000**  97:*15*
**48226**  5:*7*

**< 6 >**
**6**  69:*12*
**6TH**  5:*5*

**< 7 >**
**7**  12:*22*  13:*6*
**700,000**  71:*10*  73:*15,*
*16*  88:*16*
**710,000**  71:*13*

**< 8 >**
**8**  13:*6*  50:*14*

**< 9 >**
**9**  20:*24*  21:*4*  24:*12*
46:*25*  49:*24*  52:*16*
55:*24*
**90s**  9:*11*

**< A >**
**ability**  7:*18*
**able**  10:*15*  82:*15*
98:*19*  99:*2*

**abruptly**  89:*4*
**access**  89:*9*  98:*19*
**account**  67:*18*  94:*25*
95:*15*
**accounts**  58:*17*
**accrued**  52:*3*  72:*16*
75:*1*
**accumulated**  72:*24*
**acknowledged**  101:*15*
**action**  102:*16, 19*
**actual**  49:*4*  63:*21*
**added**  75:*15*  76:*1*
89:*20*  90:*19*
**additional**  65:*10*
**adjustable**  85:*11*
**adjustment**  12:*3, 11*
76:*25*  77:*4*
**admitted**  87:*18*  96:*25*
**advance**  65:*3*
**affidavit**  45:*21*  46:*8*
50:*13, 15, 21, 25*
52:*16*  55:*18*  58:*6*
60:*7*  64:*3, 6, 11, 13,*
*14, 19*  65:*5, 12, 14*
83:*18*
**affiliated**  60:*11*
**affix**  101:*2*
**afield**  20:*3*  37:*12*
**afternoon**  6:*6*
**age**  75:*6*
**agents**  40:*25*  62:*17*
**ago**  60:*16*  93:*3*
**agree**  19:*16, 19*
89:*16, 25*  95:*9*
**agreement**  29:*4, 9, 20,*
*21*  31:*4, 5, 16*  54:*14*
55:*5, 9, 12*  70:*15, 23*
81:*19*  82:*5, 12, 20*
83:*9*  94:*25*  95:*8, 15*
**agreements**  45:*22*
46:*10*
**ahead**  42:*6*  44:*7*
73:*25*  75:*11*  77:*15*
88:*13*
**Alessandro**  24:*15*
**allegation**  66:*11*
**allocated**  55:*22*
**allowed**  38:*7*  82:*1*
**allowing**  81:*24*

**America**  20:*23*
46:*24*  47:*1, 4, 14, 15*
49:*11, 17*  50:*2, 10*
66:*19*  70:*24*  86:*17*
92:*1, 3, 4*
**amortized**  74:*21*
**amount**  21:*16*  53:*17,*
*19, 21*  54:*1, 3*  73:*2, 5,*
*17*  74:*25*  75:*24*
81:*18*  86:*2*
**amounts**  52:*2*
**analysis**  10:*23*  11:*4,*
*11*  25:*19*  26:*9, 17*
27:*5*  42:*1, 3*  45:*13*
67:*24*  68:*11*  69:*6*
73:*8*  81:*2*
**and/or**  12:*17*
**announced**  51:*5*
**answer**  20:*4*  25:*12*
32:*12, 16*  34:*2*  37:*13,*
*25*  42:*14*  70:*20*
88:*13*  98:*14*
**answered**  8:*22*
**ANTOINE**  5:*6*
**anybody**  25:*1*  63:*4*
85:*3*  96:*9*
**anyway**  83:*8*  90:*10*
**appear**  38:*2*
**APPEARANCES**  5:*1*
**appeared**  101:*10*
**apples**  90:*18*
**APPLICABLE**  4:*16*
**application**  52:*17*
**applied**  54:*4*  67:*9*
72:*15, 17*
**appropriate**  11:*19*
32:*7, 13, 19*  33:*2, 16*
69:*16, 19, 20*
**approval**  16:*13*  23:*11*
**approvals**  14:*10*
**approved**  14:*18*
**APPROXIMATELY**
4:*12*  7:*2, 17*  21:*6*
22:*17*  46:*9*  51:*13*
55:*15*  71:*10*  72:*14*
80:*25*  97:*15*
**April**  102:*20*
**argumentative**  79:*3*
**arrive**  33:*22*

**arrived** 34:*20*
**arriving** 33:*4*
**Article** 20:*24* 21:*4* *24:12* 46:*25* 49:*24*
**asked** 39:*14* 44:*2* *55:23* 64:*14* 81:*14* 86:*21, 24* 90:*11*
**asking** 24:*6* 33:*19, 20* 43:*8, 10* 44:*3* *46:1* 54:*5, 6* 57:*11, 13* 59:*18* 62:*24* *77:21* 78:*22* 88:*18*
**asserted** 54:*22* 56:*7, 11, 14*
**assertion** 51:*16*
**assessed** 59:*1*
**assessment** 16:*2, 3*
**Asset** 58:*12, 14*
**assets** 21:*5* 28:*5* *58:16* 59:*2, 11, 21, 22, 23* 60:*1, 11*
**assignment** 49:*16*
**assisted** 46:*16*
**associated** 42:*25* *94:13*
**assume** 26:*1* 47:*6* *60:5* 70:*7* 74:*7* *77:17*
**assumption** 36:*13* *75:6, 9*
**assumptions** 84:*5*
**assure** 54:*3*
**attached** 102:*12*
**attempting** 59:*11, 19*
**attorney** 53:*11* *102:14, 18*
**auction** 20:*17* 27:*15* *47:5, 12, 19* 48:*23, 25* *49:4, 18* 50:*5* 70:*24* *76:17*
**auctioned** 48:*12, 15*
**auctioneer** 47:*16*
**auctioning** 46:*24*
**audited** 15:*12* 28:*15, 16*
**auditing** 28:*18*
**auditor** 54:*19*
**audits** 28:*4*
**August** 20:*20* 72:*12*

**authority** 14:*18* *23:12*
**available** 58:*22* 71:*2* *72:9, 11, 13*
**aware** 16:*23* 24:*9* *26:17* 30:*15* 39:*18, 22* 40:*17* 41:*4, 5* *50:9* 59:*15* 62:*6, 9, 25* 63:*4* 68:*25* 69:*3, 11* 70:*11, 21* 72:*23* *73:2* 76:*6, 10, 16, 20* *77:3* 83:*17* 87:*17* *94:10, 17* 97:*9* 98:*2, 4, 14*

**< B >**
**bachelor's** 9:*9*
**back** 10:*6* 26:*3* *27:18, 19* 36:*25* *38:24* 44:*12, 13* *61:14* 85:*21* 86:*6* *98:18*
**background** 8:*8* *15:12*
**backroom** 58:*25*
**BAML** 86:*19*
**B-A-M-L** 86:*19*
**BANK** 1:*4* 7:*20* 8:*2, 3, 4, 5* 14:*11, 22* *20:23* 21:*23* 22:*22* *23:17, 18* 24:*9* 29:*5, 7, 14, 15, 16* 36:*4, 7* *46:23* 47:*1, 4, 13, 15* *49:11, 17* 50:*2, 10* *58:17* 66:*19* 67:*5, 15, 18* 70:*23* 72:*7, 8* *76:14, 16, 17, 19* *81:21* 86:*17* 89:*5, 8, 10* 91:*11* 92:*1, 3, 4, 6, 9* 94:*25* 95:*2, 7, 9, 13, 15, 25* 98:*18, 22*
**bankruptcy** 11:*24* *20:21* 31:*22* 38:*13* *40:24* 56:*10* 57:*2, 9, 15* 58:*3* 71:*15* 72:*8, 25* 86:*22* 87:*2* 95:*12, 14*
**banks** 31:*15, 19* 87:*5* *92:5*

**bank's** 23:*24*
**base** 45:*7*
**based** 21:*21* 26:*8* *29:8* 58:*1, 2, 4* 61:*24* *62:7, 12* 75:*5* 96:*1*
**basic** 8:*7* 31:*16* *77:15*
**basically** 10:*6* 15:*9* *41:18* 95:*1, 4, 19*
**basis** 11:*23* 12:*2* *30:17, 20* 35:*16* *92:22* 94:*23* 96:*7, 17*
**Bates** 64:*3*
**bearing** 64:*3*
**BEHALF** 5:*3, 12* *46:5* 99:*5*
**belief** 42:*9*
**believe** 7:*11* 14:*13* *17:15* 18:*21* 20:*6* *22:3* 27:*4* 28:*2, 22, 24* 30:*22* 31:*11* 36:*6* *38:23* 39:*10* 42:*24* *47:13, 17* 48:*3, 11* *54:15* 55:*6, 15* 56:*18* *57:17* 58:*4* 61:*10* *65:7* 71:*18* 89:*12* *91:23* 92:*21* 95:*6* *96:18*
**believed** 13:*14*
**believing** 94:*24*
**benchmarks** 82:*7*
**benefit** 78:*5* 80:*23* *81:7, 16*
**benefits** 25:*21*
**best** 7:*18* 25:*18* *32:16* 47:*17* 48:*7*
**better** 87:*12*
**beyond** 48:*13*
**bid** 48:*5, 24*
**bidder** 47:*13*
**bidders** 48:*1* 49:*6* *76:18*
**bids** 49:*2*
**big** 23:*17, 18* 97:*19*
**bit** 92:*11*
**blacked** 95:*6, 21*
**BlackRock** 21:*18* *22:6, 9, 12, 16, 21, 25* *25:23* 26:*16* 27:*2* *30:20* 38:*25* 39:*1, 25*

**40:5, *12, 20, 25* 45:*12* *46:18* 68:*4, 7, 15* *84:2, 5, 6, 16* 85:*1* *86:15*
**blew** 93:*4*
**Bloomberg** 30:*1, 10, 12, 14* 84:*21, 25* 98:*4*
**BODMAN** 5:*4*
**bond** 15:*16, 20* *16:17* 35:*21* 39:*1* *68:3* 85:*14, 18, 19, 20* *97:25*
**bondholder** 19:*1*
**bonds** 10:*19, 25* 11:*5, 7, 12, 16, 18, 19, 20* *16:21, 25* 17:*2, 4, 14, 22* 18:*9, 12, 17, 18, 19* *19:17* 20:*13, 16, 22* *21:5, 9, 11, 12* 22:*7, 9* *23:10* 24:*13, 23* *25:21* 26:*15, 16* 27:*3, 23* 28:*7* 30:*16* 33:*3, 4* 35:*1, 10* 37:*24* *38:21, 22* 40:*1, 6, 13* *41:1, 15, 17* 42:*1, 3, 11* 43:*7* 44:*25* 46:*24* *47:5, 12* 48:*2, 10, 15* *49:13, 18* 50:*11, 16, 17* 51:*2, 4, 11, 16, 18, 20, 25* 52:*18, 20* *65:19* 66:*18, 20* 68:*1, 12, 13, 14* 69:*7, 14, 15, 16, 17* 70:*8, 17, 22, 24* *71:12, 16, 22, 23* *72:21* 73:*1, 6, 8, 12* *74:20, 22* 76:*1, 7, 11, 18, 19* 79:*18, 24, 25* *80:2, 4, 6, 20, 22* 81:*1* *84:7, 18, 22* 85:*6* *86:16, 23* 87:*1, 7, 9, 19, 23* 88:*25* 89:*7* *90:10* 91:*12, 14, 15, 16, 17, 20* 92:*13* *93:10, 14* 94:*14*
**booking** 80:*25*
**books** 82:*13*
**bought** 86:*20*
**break** 60:*23* 61:*1, 2* *86:4*

**briefly** 17:*16* 20:*14*
**broad** 90:*21* 98:*10*
**broker** 97:*22* 98:*1*, *8*
**broker-dealer** 34:*14*
**broker-dealers** 34:*24*
**brother** 93:*22*, *23*
**brought** 29:*10*, *22*
31:*5*
**BROWN** 5:*13*, *17*
6:*5*, *7* 8:*17*, *20* 9:*1*, *4*,
*5* 13:*12*, *17*, *19* 16:*15*
20:*10* 21:*2*, *7* 23:*8*
32:*23* 33:*9* 34:*6*
36:*24* 37:*15* 39:*20*,
*23* 40:*8*, *10* 42:*8*, *22*
43:*12*, *18* 44:*7*, *13*
45:*6* 47:*23*, *25* 50:*23*,
*24* 53:*20*, *25* 56:*13*
59:*14*, *17* 60:*25* 61:*5*
62:*22*, *23* 66:*16*
69:*25* 73:*23*, *24*
74:*15*, *16* 77:*22* 79:*1*
82:*3*, *17*, *22* 83:*2*, *7*,
*10*, *13* 86:*3*, *10* 88:*4*,
*5*, *22* 98:*16*, *24* 99:*1*,
*8*, *13*, *15*
**BROWN**........................
.........6 2:*4*
**brush** 98:*10*
**bunch** 93:*25*
**BUSENKELL** 5:*13*
**business** 15:*10* 25:*15*
27:*1* 51:*6*
**buy** 23:*25* 26:*15*
**buys** 24:*3*

**< C >**
**call** 45:*24*
**called** 74:*20*
**calling** 87:*10*
**Calls** 32:*10* 33:*25*
42:*4*, *12*
**Capacity** 1:*14* 4:*6*
7:*25*
**card** 101:*13*
**Case** 1:*7* 7:*4* 9:*24*,
*25* 45:*16* 55:*18* 57:*2*,
*15* 64:*10* 77:*11* 78:*8*,
*13*, *24* 79:*21* 80:*19*
87:*2* 98:*11*

**cash** 21:*20* 25:*24*
26:*6*, *23* 41:*19* 55:*13*
58:*5*
**caught** 95:*12*
**cause** 102:*18*

**cbrown@gsbblaw.com**
5:*18*
**CEO** 24:*14*, *16*
**certain** 20:*8* 31:*14*
54:*2* 75:*6* 81:*22*
82:*6* 86:*19*
**CERTIFICATION**
102:*1*
**Certified** 1:*24* 4:*15*
102:*4*, *20*
**certify** 102:*5*, *9*, *14*
**cetera** 26:*2*, *3* 48:*5*
60:*2*
**CFO** 24:*14*, *15*
**chain** 23:*6*
**chance** 87:*13*
**change** 83:*19* 100:*2*
**CHANGES** 100:*1*
102:*12*
**Chapter** 12:*22*
**charged** 58:*19*
**CHARLES** 1:*9* 5:*17*
8:*18* 13:*3* 60:*22*
74:*14* 77:*17* 81:*11*
**Charlie** 6:*7*
**chart** 52:*11*
**Chartered** 1:*4*
**check** 92:*8*
**checks** 15:*12* 92:*6*
**chief** 14:*21* 85:*9*
**choose** 87:*5*
**chose** 76:*9*
**circumstances** 7:*19*
**Ciroli** 24:*15*
**Citizens** 8:*4*
**CIVIL** 4:*17* 62:*25*
63:*15*
**claim** 57:*1*, *5*, *16*
65:*14* 79:*12* 86:*23*
**claims** 54:*22*, *25*
55:*2* 56:*7*, *11*, *14*, *16*
**clarify** 30:*18*, *21*
**clear** 19:*22* 56:*11*

81:*13*
**clearly** 87:*15*
**close** 81:*5*
**closed-door** 26:*19*
**closing** 51:*6*
**codefendants** 79:*24*
**coincide** 81:*7*
**collateral** 15:*25*
16:*21* 21:*25* 22:*1*
23:*16*, *22*, *24* 25:*15*
26:*22* 28:*5* 33:*8*, *18*
34:*15* 35:*9* 36:*12*
51:*12* 72:*1* 73:*13*
74:*7* 75:*16*, *25* 79:*10*,
*11* 87:*4* 91:*5*
**collect** 11:*6* 68:*13*
87:*15* 88:*15*
**collected** 57:*22*
**collecting** 87:*25* 88:*9*
**collection** 14:*1*
**college** 8:*9*, *12*, *15*, *16*
9:*8*
**combative** 78:*17*
**combined** 17:*18* 91:*8*
**come** 26:*1*, *2*, *10* 72:*6*
**coming** 45:*24* 95:*18*
**command** 23:*7*
**commenced** 6:*1*
**commercial** 14:*7*, *14*
15:*18*, *21* 16:*1*, *17*
**Commission** 12:*10*,
*17* 101:*22*
**committee** 14:*10*
**common** 26:*21*
**Commonly** 18:*6*
**communicating** 38:*19*
**communication** 62:*15*
84:*24*
**Communications**
12:*8*, *15*, *21* 58:*1*
63:*1* 83:*15* 84:*21*
94:*7*
**company** 27:*4*, *7*
32:*19*, *20* 36:*14*, *16*
41:*20* 58:*16* 78:*15*
**comparing** 90:*18*
**complete** 42:*10* 43:*20*
**completely** 57:*19*
**completion** 102:*11*, *14*

**comprised** 19:*8*
**concern** 13:*18*
**concerning** 65:*18*
**conclusion** 32:*11*
**concocted** 42:*20*
**confidential** 13:*10*
**connected** 7:*13* 13:*15*
**connection** 16:*1*, *20*,
*25* 17:*13* 26:*14*
40:*13* 53:*5* 57:*16*
58:*14* 61:*8*, *15* 63:*19*,
*23* 71:*15* 78:*2*, *5*
79:*14* 81:*1* 84:*6*
88:*24* 89:*7*
**consider** 34:*12*
**consideration** 101:*17*
**considered** 33:*2*, *17*
**considering** 31:*9*
**consistent** 27:*25*
43:*4* 44:*21* 90:*17*
**consult** 21:*18*
**contact** 49:*6*
**contains** 102:*12*
**context** 97:*24* 98:*7*
**contingencies** 82:*6*, *9*
**continuation** 75:*18*
**continue** 88:*20*
**control** 94:*25* 95:*15*
**conversation** 6:*10*
**COO** 24:*15*, *16*
**copy** 99:*18*
**corporation** 1:*8*
**corporations** 59:*24*
**correct** 14:*1* 17:*10*
18:*10* 20:*12* 22:*7*, *18*,
*19* 24:*4* 28:*21* 30:*6*
32:*1*, *5* 38:*14*, *17*
39:*12* 41:*7*, *22* 46:*25*
50:*4*, *7*, *11*, *12* 53:*13*
57:*2* 67:*22* 68:*17*
70:*9*, *12* 74:*18* 75:*23*
84:*3*, *14* 89:*7*, *11*, *13*,
*18* 101:*3*
**correlation** 81:*3*
**counsel** 6:*11* 41:*4*
44:*6* 61:*24* 102:*16*
**COUNTY** 101:*8*
**couple** 63:*6*, *18* 93:*3*
**coupon** 10:*18*, *24*
11:*6* 19:*4*, *13*, *25*

Deposition of Robert Marsh

Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

62:3 65:18 66:4, 10, 12, 21, 25 67:13, 25 68:13 71:23 72:2, 23 88:1, 9 89:6, 14, 17 90:3, 16 98:20
**COURT** 1:1 44:11
**CPA** 28:14, 17
**CPA-prepared** 15:11 28:4
**creating** 18:25
**credit** 6:22 14:17, 21 22:14 24:10 67:10 78:1 92:24
**creditors** 38:12 57:9
**criminal** 31:25 39:2, 6 43:17 61:23 62:6 71:7 79:20 80:3
**CRR** 102:23
**cube** 91:6
**current** 57:17
**currently** 6:22 17:2 39:13 84:9
**CUSIP** 42:17 48:22 65:24 66:6 98:21, 23 99:3
**CUSIPs** 34:15 52:4, 8 70:5 75:16, 22, 23 89:19
**Customers** 76:14, 16, 17, 19 95:13
**cut** 51:8, 12

**< D >**
**daily** 29:18 30:20 35:16 36:3
**Dalwyn** 14:13
**damages** 9:25 52:21 65:13
**DARREN** 1:9
**date** 48:24 61:18, 19 72:24 102:11
**day** 35:13 101:9, 19
**days** 21:6 92:18 96:3 102:11
**DE** 5:16
**decide** 25:1 26:7 27:7
**deciding** 21:9
**decision** 11:4 22:3 24:11 25:7 26:11, 15

49:25 68:12, 18 71:5 73:8 76:20 86:25 87:12 88:15
**decision-making** 21:8 23:10, 13
**decisions** 24:25
**dedicated** 59:6
**default** 19:17, 23, 25 75:20
**defaulting** 19:24
**DEFENDANT** 5:12, 21
**Defendants** 1:11 59:3, 12, 20 60:5 79:13
**defense** 61:23 80:4
**deficiency** 87:16
**degree** 8:23 9:7, 9, 13
**degrees** 8:12
**Delaware** 1:8
**delivery** 99:14
**Department** 12:9, 16 62:15 63:2 81:20
**deponent** 102:9, 14
**deposed** 7:6, 9, 24
**Deposition** 1:15 4:7 6:25 7:12, 17 9:17 10:11, 13 16:9 63:20, 24 65:1, 3 101:2 102:1, 7, 11, 14
**depositions** 6:12 7:19
**describe** 16:4 17:24
**description** 101:12
**designated** 6:15
**designee** 6:15
**detail** 16:4 20:19
**determine** 25:20 59:2
**DETROIT** 5:7
**develop** 17:1
**different** 87:5 92:2
**differently** 82:4
**difficult** 79:15, 16
**diligence** 14:25 15:7, 24 26:14 36:10
**DiNello** 24:16
**direct** 41:3
**directed** 24:19
**directly** 49:7 62:10
**disagree** 19:20
**disclose** 35:12

**disclosed** 17:3 35:7 41:6 62:3 80:9, 10, 12, 13, 15
**disclosures** 35:20, 23 36:20 37:8 78:14 93:1
**discount** 26:3 85:24
**discover** 60:11
**discovered** 61:25 62:8
**discovery** 62:17, 20, 24 71:6
**discuss** 39:5
**discussed** 6:11
**discussing** 54:17
**Discussion** 21:3 68:22
**discussions** 40:19 41:3 63:14 92:25
**disposal** 89:16
**distribute** 57:20
**distribution** 71:21
**distributions** 57:8 71:19
**DISTRICT** 1:1, 2
**division** 47:2 92:2
**docket** 58:3
**document** 31:11 45:19, 20 46:2, 7, 13, 17, 22 63:25 64:1, 12, 21 65:15 67:12, 14, 20 68:10, 16 69:18 83:20 95:10 101:13
**documents** 37:19, 22 45:15, 17 46:6, 7 47:3, 9 50:18 51:1, 15, 23 53:4, 9, 13 54:8 55:8 63:23 64:2, 5, 18 65:2, 4, 6, 13, 17 66:8, 24 67:3, 23 68:2, 11, 25 69:5, 9, 13, 22, 23 70:7, 20, 21 71:5 78:16
**doing** 28:10 38:21
**DOJ** 63:7 83:5 94:8
**dollars** 21:17
**dramatic** 91:1
**drawn** 92:9
**draws** 35:5

**due** 14:25 15:7, 23 26:14 36:9
**duly** 102:5
**dumped** 87:24 88:7, 12

**< E >**
**earlier** 65:22 66:10 87:21
**Early** 76:23 93:15
**EASTERN** 1:2
**effort** 17:1 49:6
**efforts** 11:17, 18 48:8 69:14, 15
**either** 15:1 80:10
**else's** 43:9
**employed** 102:16
**employee** 102:18
**employees** 42:24
**ended** 86:15 89:3
**engage** 26:16 27:5
**engaging** 31:22
**ensure** 11:18 69:15, 19 77:18
**entered** 55:3 56:19
**entire** 34:9 89:10 96:11
**entitled** 66:22 67:1 72:2
**entity** 60:2
**entrepreneurial** 26:25
**entrepreneurs** 87:4
**ERIC** 1:9 56:19
**error** 94:15
**ESQUIRE** 5:8, 17
**essentially** 19:18
**EST** 1:17 4:12 6:1 61:4 86:9 99:19
**estate** 57:9 71:21
**estimated** 21:21 26:10
**estimating** 57:24
**estimation** 57:25
**et** 26:2, 3 48:5 60:2
**evaluating** 33:8
**events** 9:19
**Eventually** 35:11 73:17 86:15 91:6
**everybody** 25:10 96:24, 25

**evidence** 61:25 62:1, 8 67:8, 17 80:1
**evolved** 14:7
**exact** 54:2
**exactly** 14:19 16:13 42:19 45:11 48:19 85:25
**EXAMINATION** 2:2 4:13 6:4
**exceed** 88:21
**exceeds** 75:1
**Exchange** 12:10, 17 36:14, 15, 19 37:7
**exclusive** 35:4
**exclusively** 33:24
**executed** 101:16
**executives** 22:22 23:3
**exotic** 79:14 80:18
**expect** 57:14
**expectation** 57:17
**expected** 57:8 68:6
**expense** 40:21 58:7 83:18
**expenses** 57:23
**experience** 7:24
**expertise** 20:4 34:1
**EXPIRES** 101:22
**explain** 7:18 19:20 20:19 25:12 34:11 58:24 85:17
**expressed** 101:17
**extent** 20:4 32:12 34:2 37:13 77:14

**< F >**
**fabricated** 41:19
**fabrication** 42:10 43:6, 20 44:24
**facility** 15:17, 18, 20, 21 16:1, 18
**fact** 6:11 23:25 25:7 32:4 66:14 90:24 92:23 96:5, 15
**factor** 35:2 73:5, 7
**factors** 33:3, 18
**fair** 23:9 50:1 72:22 78:3
**fairly** 22:4
**faith** 43:2 44:19

**familiar** 76:13 97:13
**far** 19:25 20:3 37:11
**fast** 91:7
**favor** 83:5
**federal** 80:23
**Federally** 1:4
**fee** 40:15 59:1
**Feel** 78:15
**fellows** 24:24
**FIELD** 5:5
**figure** 80:20
**file** 86:23
**FILED** 4:10 57:1 61:24 62:7 72:7
**filings** 9:19, 22
**finance** 8:14, 23 9:9
**FINANCIAL** 1:8 7:14 12:3, 11 15:12 28:15, 16, 18 29:6 77:1, 4, 24 80:18 81:5 102:19
**financing** 99:5
**find** 13:4 32:22
**fine** 17:6 61:1 76:24 78:2, 6, 18 82:8, 19 83:10, 11 92:10 97:10 99:15
**fined** 97:9 98:3, 4
**fines** 12:4
**finish** 30:7 44:1 73:25 74:2
**firm** 28:17
**first** 6:16 54:8 64:1, 12 65:3, 15 70:25 77:24 78:4 92:14 93:7
**Five** 7:8, 17 9:20 45:9 55:16 69:5
**fixed** 18:14, 20 19:9 85:11 94:18
**flags** 60:18
**FLAGSTAR** 1:4 6:14, 21 7:25 10:15 11:17 12:5 13:21 14:4 15:1, 8, 25 16:19, 21 20:11, 15 23:17, 25 24:3, 7 26:14 27:11 28:6, 10, 20 29:17 30:25 31:8, 18 35:8 36:1, 10

37:19 38:12, 19 39:24 40:1, 2, 11, 14, 19, 23 41:1 45:16, 19, 22 46:2, 6, 8, 10, 14, 18 47:4 49:17 50:15 51:2, 16 52:21 54:13, 22 56:9, 14 57:1, 10, 15 61:7 62:2, 16 63:1 66:13, 14, 15, 18, 21 67:1, 13 69:14 71:5, 10, 14, 16 72:2, 6, 15, 22, 25 76:24 78:1, 4 79:10, 18, 19 80:22 81:8, 18 82:7 83:4, 15 84:9, 20 85:5 86:21 87:6, 17, 23 88:7, 24 89:9, 15, 16 90:1 91:3 93:10 94:8, 20, 24 95:17, 19 96:7, 16, 18 99:5
**Flagstar's** 12:3, 11 57:11 58:2 62:17 72:1 77:1, 4, 7 80:25
**flat** 90:21, 22, 24
**FLG_00003** 64:4
**FLG_0001** 64:4
**FLOOR** 5:5, 15
**flow** 21:20 41:19
**flows** 25:25 26:6, 24
**fluctuate** 73:19 89:15
**fluctuation** 90:25 91:1
**fluctuations** 90:15
**focusing** 15:16
**follow** 24:8
**followed** 62:11
**following** 29:13 43:22 62:5 96:23 102:5
**FOLLOWS** 6:3 37:3 44:16
**FORD** 5:5
**foreclosed** 20:20, 22
**foregoing** 101:1, 14
**form** 96:16
**former** 42:24
**forms** 95:20
**found** 35:11
**fraud** 79:12, 22

96:21, 24 97:4
**frauds** 52:22
**fraudulent** 80:16
**FRCP** 102:9
**free** 78:15
**front** 16:13 64:23
**froze** 8:17, 24
**frozen** 8:18 9:3
**FSB** 1:4
**full** 67:10
**functionality** 11:11 69:6
**funds** 26:1, 2 71:14 72:9 81:20
**further** 102:9, 14, 18
**future** 10:23 21:20 25:24 26:6, 9, 23 41:19 67:24

**< G >**
**gain** 26:4
**gears** 27:18
**GELLERT** 5:13
**generally** 31:17
**generate** 10:24 11:7, 19 66:20 68:14 69:16
**generated** 10:19 16:24 40:25 53:4 65:18 67:25 71:24 73:6 89:18 90:3, 4
**generating** 25:16 75:2 94:5
**Gentlemen** 78:20
**getting** 51:8 58:22 93:25 94:2 98:3
**Ginnie** 92:12
**give** 13:9 77:15
**Given** 101:18 102:7
**go** 6:16 10:16 20:25 29:23 41:17 42:6 44:7 45:5 63:21, 24 73:17, 25 77:15 88:13 97:3, 7
**goes** 10:6 61:14 67:17
**going** 6:16 10:16 16:6 19:4 21:16 27:18, 20 30:7 35:2 38:24 40:8 44:8

Case 2:19-cv-11512-MFL-EAS ECF No. 168, PageID.6408 Filed 06/01/26 Page 140 of 164
Deposition of Robert Marsh
Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

48:*12, 15, 23* 52:*5*
57:*20, 22* 60:*22*
61:*13* 63:*18, 21, 24*
70:*14* 73:*15* 74:*8, 11,*
*23* 75:*25* 79:*2, 3*
87:*1, 13* 89:*22, 23*
90:*13, 22* 95:*2, 3*
98:*18*
**Good** 6:*6* 43:*2*
44:*19* 60:*25* 99:*17*
**government** 16:*24*
19:*14, 18* 20:*7, 9*
39:*25* 40:*12, 19*
61:*15, 22* 77:*8* 79:*12*
80:*1, 15, 24* 81:*8*
84:*10* 92:*12*
**government's** 79:*21*
80:*7, 19*
**graduate** 8:*9, 11*
**graduated** 8:*23*
**group** 14:*24* 58:*7, 9*
59:*6*
**guarantee** 19:*18* 91:*8*
**guaranteed** 19:*13*
20:*7, 9* 84:*10*
**guarantor** 60:*9*
**guess** 30:*18* 93:*5*
**guessing** 68:*15*
**guilty** 79:*24*

**< H >**
**half** 45:*21, 25* 46:*9*
50:*16* 51:*3, 8, 11, 12,*
*17* 64:*14*
**hand** 101:*18*
**handled** 39:*6* 53:*11*
**handling** 7:*21*
**hands** 57:*19* 79:*9*
86:*17*
**happen** 24:*19*
**happened** 76:*21*
**hard** 14:*19*
**Hartman** 63:*7, 9*
**head** 61:*20* 63:*13*
**hear** 74:*13* 96:*9, 10*
**heard** 41:*11* 45:*10*
**heavy** 93:*18, 21*
**HECM** 18:*6, 17, 18*
94:*14*
**H-E-C-M** 18:*6*

**held** 21:*5* 59:*3* 73:*9*
76:*17, 19*
**help** 28:*9* 80:*19*
**herby** 101:*2*
**HERETOFORE** 4:*10*
**hey** 75:*24*
**hid** 59:*12, 13, 14, 16*
**H-I-D** 59:*14*
**hidden** 59:*21*
**higher** 41:*16* 68:*22*
73:*4* 87:*16*
**highest** 47:*17* 48:*6*
49:*2*
**HILD** 1:*9* 5:*12, 21*
6:*8* 10:*1* 12:*18* 32:*1*
42:*25* 46:*5, 14* 59:*12,*
*20* 60:*4, 12* 62:*7*
78:*25* 79:*13, 22* 80:*3*
83:*5*
**Hild's** 52:*22* 60:*8*
61:*23* 62:*20* 79:*20*
**hindsight** 33:*19*
96:*20*
**historical** 75:*17*
**historically** 75:*24*
**hit** 82:*13*
**hold** 8:*21* 11:*5*
21:*24, 25* 23:*25*
68:*13* 76:*6, 9, 11*
83:*20*
**holding** 21:*10* 25:*15,*
*21* 71:*11* 87:*25* 88:*9*
**holds** 24:*4* 84:*9*
**hope** 26:*9*
**Hopefully** 86:*13*
**hopes** 25:*16*
**hour** 60:*23*
**hundred** 55:*21* 86:*2*
**hypothetical** 33:*20*
**hypothetically** 32:*25*

**< I >**
**ICBC** 76:*4, 6, 8, 10*
**ice** 91:*5*
**IDC** 27:*24* 28:*12, 21,*
*23* 29:*8, 18, 25* 30:*14,*
*23, 25* 32:*5, 9* 33:*2,*
*11, 15, 17, 21* 34:*12*
*35:7, 16, 20, 23* 36:*6,*
*7, 10, 18, 20* 37:*6, 8,*

*23* 51:*8, 19, 20* 53:*1*
54:*1, 10, 13, 18* 56:*2,*
*4, 17* 80:*5, 9, 14*
94:*21, 24* 95:*3* 96:*6,*
*8, 19* 97:*1, 10, 11, 16*
98:*3*
**IDC's** 33:*4*
**idea** 21:*12, 23* 57:*14*
**identified** 10:*14* 70:*3*
97:*15*
**identify** 56:*2* 101:*13*
**identity** 11:*20* 69:*17*
**III** 5:*8, 17*
**illiquid** 17:*2* 79:*16*
80:*17* 84:*17* 88:*6, 8*
**immediately** 6:*9*
25:*22* 51:*8*
**impact** 81:*6*
**imposed** 12:*5* 76:*24*
81:*22*
**improper** 34:*5*
**inappropriate** 32:*8*
34:*10, 12, 25* 35:*4*
**include** 46:*18, 23*
66:*14, 15*
**included** 13:*14* 34:*9*
45:*20, 22* 66:*13*
81:*14, 15* 82:*23*
**includes** 46:*10*
**including** 11:*17*
33:*23* 35:*9* 52:*2*
62:*2* 69:*14*
**inclusions** 13:*6*
**income** 10:*18, 24*
11:*6* 65:*18* 66:*4*
67:*24* 68:*13* 71:*22*
**increase** 41:*15* 42:*17*
43:*7* 44:*24* 45:*4*
**increasing** 74:*23*
**indebtedness** 54:*4*
72:*17*
**indefinite** 90:*14*
**independent** 34:*21,*
*23* 36:*16* 97:*3*
**independently** 28:*6*
**indicate** 15:*7*
**indicated** 13:*24* 58:*5*
77:*25* 87:*3*

**individual** 1:*9, 10, 14*
4:*6* 52:*1, 4, 5* 65:*24*
70:*5* 89:*7* 99:*3*
**individually** 6:*14*
59:*23*
**individuals** 24:*18*
25:*5*
**induced** 83:*4*
**inform** 39:*25* 40:*11,*
*24*
**information** 9:*18*
13:*8* 37:*23* 41:*6*
58:*15* 77:*16*
**initial** 14:*14* 61:*14,*
*17, 22* 92:*17*
**initially** 74:*20, 21*
**input** 33:*23* 34:*12*
**inputs** 33:*22*
**inquiry** 81:*9*
**instance** 70:*25*
**instances** 97:*16*
**instructed** 65:*2*
**instrument** 101:*15*
**instruments** 80:*18*
**interchangeably**
15:*21*
**interest** 18:*3, 10, 11,*
*14, 18, 20, 22, 23, 24,*
*25* 19:*2* 20:*8* 21:*12,*
*15* 29:*16* 52:*3* 60:*18*
66:*5, 21, 25* 68:*6*
71:*17* 72:*16* 73:*13*
74:*22* 75:*1, 17* 85:*19,*
*20* 90:*9* 91:*4* 94:*13,*
*16* 102:*19*
**intermediary** 29:*15*
95:*2*
**internally** 28:*7*
**internet** 58:*22*
**interrogatories** 87:*18*
**interrupt** 16:*8*
**intrinsic** 43:*3* 44:*20*
80:*5, 6, 11*
**investment** 84:*11*
85:*9*
**invite** 23:*3*
**invited** 23:*4*
**involuntary** 11:*23*
31:*22* 38:*13* 95:*11,*
*14*

Deposition of Robert Marsh                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

**involved**  13:*20, 25*
  14:*3, 5*  16:*17*  23:*10,*
  *13*  24:*21*  25:*5*  27:*14,*
  *20*  31:*24*  46:*13, 24*
  47:*19, 22, 24*  54:*17*
  57:*4*  61:*16*  93:*22*
  94:*1*
**involvement**  10:*7*
  31:*13*  91:*12, 19*
  92:*17, 20*  93:*13*  94:*9*
**involving**  32:*1*
**IO**  18:*17*
**issued**  16:*20*  17:*13*
  92:*13*
**item**  31:*12*
**its**  12:*22*  17:*15*
  18:*23*  26:*15*  32:*8, 19,*
  *21*  33:*3, 22*  35:*1, 8,*
  *24*  40:*25*  57:*16*  63:*1*
  79:*9, 22*  81:*23*  82:*2*
  84:*6, 11*  87:*18*  89:*16*
  97:*2, 11, 17*

**< J >**
**January**  38:*3*  52:*12*
  61:*13*
**Jim**  24:*15*
**Job**  1:*25*
**Joe**  14:*21, 23*  82:*17*
**joined**  38:*17*
**JoRita**  1:*23*  4:*13*
  102:*4, 21, 23*
**JOSEPH**  5:*8*  32:*14*
**jshannon@bodmanlaw**
**.com**  5:*9*
**July**  72:*10*
**jump**  73:*14*
**jumped**  60:*19*
**June**  72:*8*  93:*15*
**jury**  38:*8*
**Justice**  12:*9, 16*
  62:*16*  63:*3*  81:*20*

**< K >**
**Keiter**  28:*14, 17, 21*
  54:*19, 23*  55:*4, 9, 12*
  56:*5, 17*
**kind**  26:*25*  27:*5*
  35:*5*  36:*9*  42:*2, 18*

  47:*1*  58:*17*  60:*17*
  61:*13*  70:*4, 14*  74:*22*
**kinds**  62:*12*  78:*14*
**knew**  17:*6, 9*  43:*19*
  73:*12*  74:*2*  87:*20*
**know**  9:*19*  13:*13*
  14:*25*  15:*21, 23*
  16:*14, 22*  17:*6*  18:*13,*
  *21*  19:*8*  22:*20*  23:*1*
  24:*3, 7, 21*  25:*4, 6, 15,*
  *19*  26:*20, 24*  27:*2, 7,*
  *19, 21*  28:*23*  29:*24*
  31:*12, 14, 17*  32:*12*
  33:*5*  34:*3, 9, 10*  35:*3,*
  *5, 7, 18, 22*  36:*1, 3, 9*
  37:*13*  39:*5, 8*  40:*18,*
  *22*  41:*9*  42:*6, 7, 14,*
  *17, 19, 20, 21*  43:*16*
  44:*4, 11*  45:*2, 9, 12,*
  *14*  46:*20*  47:*8*  48:*4,*
  *8, 13, 25*  49:*5, 8, 9, 11,*
  *14*  50:*1, 2*  51:*6*
  52:*10, 13*  53:*15, 18*
  54:*2, 7, 8, 12, 13*  55:*7*
  56:*16*  57:*20, 21, 22*
  58:*13*  59:*7, 16, 25*
  61:*12, 16, 20*  62:*5*
  64:*7, 22*  65:*8, 9*  67:*3,*
  *8*  68:*5, 7, 20, 22*
  69:*10, 18, 19*  71:*8, 20*
  73:*7*  74:*5, 21*  75:*11,*
  *18, 19*  76:*2, 4, 8*  78:*5,*
  *16*  79:*22, 23*  81:*5*
  82:*13, 14*  83:*22, 23,*
  *24*  84:*9, 13, 16, 23, 24,*
  *25*  85:*2, 5, 10*  86:*14,*
  *16, 21, 24*  87:*6*  91:*11,*
  *13, 18*  92:*3, 6, 14, 19*
  93:*9, 18, 23*  94:*3, 5,*
  *18, 21*  96:*1, 6, 15, 17*
  97:*7, 21, 24*  98:*1*
**Knowing**  35:*4*  73:*5*
**knowledge**  15:*3*
  16:*18*  30:*11*  32:*16*
  39:*24*  40:*11, 23*
  43:*11*  62:*14*  64:*17*
  71:*4*  83:*14*  84:*4, 20*
**known**  18:*6*  21:*21*
  101:*10*

**knows**  20:*2, 5*

**< L >**
**language**  31:*14, 18*
**late**  9:*11*
**Lathrop**  14:*23*
**laundry**  14:*15*
**lawsuit**  34:*9*
**lays**  95:*1*
**learned**  44:*5, 6*
**leave**  75:*8*  83:*11*
**leaves**  91:*5*
**leaving**  73:*14*  74:*24,*
  *25*  75:*1*
**Lee**  24:*16*
**left**  18:*22, 24*  21:*15*
  38:*11*  41:*17*  57:*23*
**legal**  32:*10*  42:*5*
  64:*20*  83:*20*
**lender**  38:*8, 11*  95:*5,*
  *19, 20*
**lenders**  38:*6, 16, 20*
  62:*1, 2*  66:*11*
**length**  89:*10*
**level**  19:*5*  68:*23*
  73:*4*  74:*25*  98:*21*
**levels**  19:*6*
**levied**  97:*10*
**liability**  77:*2, 8*
  81:*23*  82:*2*
**lifetime**  7:*7*
**lifted**  20:*21, 22*  72:*13*
**limited**  13:*9*  15:*3*
**line**  17:*6*
**linear**  73:*14*  89:*23*
  90:*14*
**lines**  7:*22*
**liquidate**  26:*21*
  86:*22, 25*  87:*7*
**liquidated**  73:*10*
  86:*16*
**liquidating**  25:*22*
**list**  14:*15*
**little**  27:*12*  33:*13*
  87:*7, 19*  92:*11*
**LIVE**  1:*8*  7:*13*
  10:*19, 25*  11:*5, 12, 16,*
  *20, 24*  12:*17, 22*  13:*8,*
  *16, 22*  14:*4*  15:*2*
  19:*24*  20:*12, 13*

  24:*13*  28:*18, 25*  29:*9,*
  *22*  30:*24, 25*  31:*6*
  32:*4, 8*  33:*2, 17, 23,*
  *24*  34:*13, 14*  35:*1, 9,*
  *13, 15*  37:*19, 22*
  38:*14, 21*  40:*2, 14, 24*
  41:*14, 22*  42:*25*
  45:*23*  46:*11*  47:*11*
  48:*2, 10, 14, 17*  54:*19*
  56:*16, 17*  57:*9*  59:*12,*
  *20*  60:*4*  65:*19*  66:*9*
  68:*1, 12*  69:*7, 13, 17*
  70:*8, 22*  71:*16*  72:*24*
  75:*7*  76:*7, 14*  77:*13,*
  *19, 21*  78:*9, 12, 24*
  79:*9, 11, 13, 17*  80:*5,*
  *13*  81:*6*  83:*16*  84:*7,*
  *17, 21*  87:*19*  88:*23*
  89:*12*  91:*12, 20*
  93:*10*  97:*5, 24*  99:*6*
**LLC**  5:*13*
**LLCs**  59:*23*
**loan**  9:*20*  14:*14*
  15:*11, 24*  16:*1*  18:*24*
  23:*22, 24*  37:*18, 21*
  45:*22*  46:*10*  55:*22*
  65:*12*  67:*9*  76:*3*
  87:*4*  89:*11*  90:*9*
**loans**  7:*21*  13:*21*
  14:*1, 4*  15:*2, 8*  17:*8*
  18:*8, 15, 22*  20:*7, 12*
  21:*14*  56:*17*
**locate**  67:*6, 14, 21*
**long**  27:*10*  75:*7*
  88:*23*
**long-winded**  81:*2*
**look**  75:*13, 17, 24*
  81:*15*  90:*1, 6*  98:*20*
**Looked**  8:*20*  17:*16*
  27:*6*  31:*8*  91:*3*
  92:*14, 19*  93:*7, 15, 19*
**looking**  10:*12*  17:*18*
  49:*1*  85:*4*
**Looks**  96:*11*
**loosely**  96:*25*
**loss**  81:*1*
**losses**  25:*17*
**lost**  96:*9, 11*
**lot**  94:*5*

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

**lower**  51:*22*
**Lubin**  14:*17*  92:*23*
**Lynch**  20:*23*  47:*1*, *4*, *14*, *15*  49:*12*, *18*  50:*2*, *10*  66:*20*  70:*24*  86:*18*  92:*1*

**< M >**
**Mae**  92:*12*
**maintain**  76:*2*
**majority**  37:*20*
**making**  15:*8*  24:*22*  25:*5*  35:*20*, *23*  90:*23*
**Management**  58:*7*, *9*  60:*10*, *15*, *20*
**manager**  14:*24*
**managers**  14:*9*
**March**  1:*17*  4:*11*  102:*2*
**margin**  85:*24*
**market**  11:*12*, *17*  17:*1*, *4*  43:*4*  44:*21*  48:*9*  50:*11*  69:*7*, *14*  79:*17*  80:*10*, *17*, *20*  87:*8*, *19*, *22*, *24*  88:*3*, *6*, *8*
**MARSH**  1:*16*  2:*3*  4:*8*  6:*2*, *6*, *9*  8:*21*  13:*20*  44:*7*  61:*1*, *6*  64:*2*, *3*  66:*17*  74:*18*  78:*25*  79:*3*  83:*14*  86:*14*  98:*19*  101:*1*, *5*, *10*  102:*2*, *5*
**master's**  8:*14*  9:*13*
**matter**  6:*8*, *13*  7:*10*  10:*11*  50:*14*  56:*15*  62:*18*  63:*21*  65:*5*  71:*6*, *7*  81:*13*
**mean**  42:*9*  43:*14*, *15*  50:*21*  53:*18*  58:*23*  60:*7*, *13*  64:*12*  73:*3*  74:*3*  77:*25*  81:*4*  88:*17*  90:*24*  98:*23*
**meaning**  75:*21*
**meaningful**  65:*10*
**meant**  73:*13*  83:*6*
**meet**  82:*25*
**meeting**  81:*21*
**meetings**  23:*2*, *4*

26:*19*
**Mellon**  91:*11*, *19*, *24*
**melting**  91:*5*
**mentioned**  54:*18*
**Merit**  1:*24*  4:*14*  102:*4*
**Merrill**  20:*23*  47:*1*, *4*, *14*, *15*  49:*12*, *18*  50:*2*, *10*  66:*20*  70:*24*  86:*17*  92:*1*
**met**  82:*8*, *9*, *11*
**methodology**  35:*8*, *24*  36:*21*  37:*9*  41:*16*  42:*16*
**methods**  36:*11*
**Meyer**  1:*23*  4:*13*  102:*4*, *21*, *23*
**MI**  5:*7*
**MICHAEL**  1:*8*  5:*21*  6:*8*  12:*18*  78:*24*
**MICHIGAN**  1:*2*  8:*4*, *5*  63:*16*
**million**  12:*2*, *10*  13:*15*  22:*11*, *18*  53:*24*  55:*15*, *16*  57:*18*, *24*  72:*14*  76:*24*, *25*  77:*4*, *9*  78:*1*, *5*  80:*23*, *25*  81:*4*  82:*18*  88:*15*, *21*  91:*9*  97:*10*  98:*5*
**mine**  96:*12*
**minute**  43:*25*
**minutes**  17:*20*  60:*23*
**missed**  45:*25*
**Misstates**  40:*3*
**moment**  37:*1*  44:*15*
**money**  67:*10*  72:*6*  73:*5*  91:*21*, *24*  94:*5*
**monitoring**  58:*3*
**month**  21:*17*  67:*7*  68:*5*, *6*  73:*15*, *16*  74:*3*, *4*, *5*  88:*16*  91:*2*
**monthly**  21:*13*  29:*19*  88:*1*, *9*  89:*6*
**Moray**  76:*8*, *11*
**mortgage**  18:*8*, *23*  75:*5*, *8*
**mortgage-backed**  84:*10*

**mortgages**  18:*2*  19:*7*, *9*  75:*2*  85:*11*
**motion**  61:*24*  62:*7*, *20*
**motive**  87:*15*
**move**  14:*20*
**multiple**  15:*4*  33:*22*

**< N >**
**name**  6:*7*  14:*16*  27:*24*  56:*2*  59:*22*  91:*23*  95:*7*, *21*  101:*14*
**names**  14:*15*  60:*2*
**nature**  71:*22*  84:*17*
**necessarily**  92:*4*  94:*11*
**need**  25:*1*, *3*  36:*19*  37:*7*  97:*8*
**needed**  41:*15*  42:*17*  45:*5*  82:*25*
**negatively**  74:*21*
**negotiated**  31:*11*, *13*
**negotiating**  31:*9*
**neither**  102:*14*
**net**  21:*19*  25:*24*  26:*3*, *6*, *11*, *23*  41:*18*, *25*  42:*3*, *18*  52:*18*, *23*  55:*25*  74:*6*  88:*18*  91:*9*
**never**  22:*14*, *16*, *24*  53:*9*  80:*1*  84:*1*
**New**  9:*25*  32:*1*  36:*13*, *15*, *19*  37:*6*  38:*3*  52:*12*  61:*9*, *24*  62:*7*, *12*, *21*  63:*8*, *12*  71:*7*  76:*1*  89:*20*  91:*11*
**newly**  61:*25*  62:*8*
**newspaper**  44:*5*
**Nods**  63:*13*
**non-existent**  87:*24*
**Normally**  33:*7*
**NOTARY**  4:*15*  101:*21*  102:*5*
**note**  37:*11*
**noted**  99:*19*  101:*3*
**notes**  9:*21*  10:*5*
**NOTICE**  4:*10*  6:*16*  10:*13*  20:*3*  48:*11*, *18*,

22, 24  63:*20*, *22*, *23*  65:*1*  67:*19*  70:*4*  81:*14*, *16*
**notices**  6:*12*  10:*10*  48:*14*  52:*5*, *8*, *13*  65:*23*  91:*23*  94:*2*
**nuanced**  33:*14*
**number**  10:*14*, *18*  22:*10*  64:*11*  67:*23*  69:*5*, *12*  83:*25*  97:*19*, *20*
**numbers**  7:*7*  64:*4*, *21*
**numerous**  14:*5*
**NY**  91:*18*, *24*

**< O >**
**oath**  101:*11*
**object**  88:*11*
**objected**  44:*2*
**objecting**  32:*17*
**objection**  16:*10*  33:*25*  40:*3*  42:*4*, *12*  88:*2*
**objectionable**  33:*21*
**objections**  45:*1*
**obligated**  81:*18*
**obligations**  60:*8*  81:*22*, *25*  82:*12*, *24*, *25*
**obviously**  14:*6*  25:*17*  97:*19*
**occasions**  63:*6*
**occurred**  75:*20*  94:*9*
**offer**  25:*18*  47:*18*  48:*7*  49:*22*, *23*
**offhand**  37:*25*  42:*7*  85:*13*
**office**  101:*18*
**officer**  6:*22*  7:*21*, *25*  8:*1*  14:*14*, *18*, *22*  85:*9*  92:*24*
**officers**  15:*13*
**Oh**  30:*8*  46:*1*  93:*20*
**Okay**  6:*6*, *20*, *24*  7:*2*, *5*, *9*, *12*, *16*, *23*  8:*3*, *5*, *7*, *11*, *16*, *20*  9:*1*, *10*, *12*, *15*, *22*  10:*2*, *10*, *13*, *23*  11:*11*, *16*, *23*  12:*2*, *8*, *21*  13:*2*, *12*, *24*  14:*3*, *12*, *25*  15:*6*, *14*,

Case 2:19-cv-11512-MFL-EAS ECF No. 168, PageID.6411 Filed 06/01/26 Page 143 of 164
Deposition of Robert Marsh
Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

**20** 16:*16, 23* 17:*12, 17, 24* 18:*5, 9, 13* 19:*12, 16, 20* 20:*11, 15, 19* 21:*8* 22:*6, 16, 20* 23:*17, 19* 24:*11, 17, 21* 27:*10, 13, 18* 28:*3, 6, 9, 13, 17, 20* 29:*12, 24* 30:*2* 31:*7, 17, 24* 32:*3, 7, 24* 33:*10* 34:*7* 35:*19* 36:*5, 9, 17* 37:*4, 16, 21* 38:*5, 10, 12, 16, 24* 39:*8, 12, 15, 24* 40:*8, 23* 41:*5, 9, 12, 24* 42:*9* 44:*7* 45:*7, 12, 15, 18* 46:*1, 3, 11, 17, 22* 47:*3, 8* 49:*11, 15* 50:*9* 51:*14, 18* 52:*7, 13, 16* 53:*4, 12, 15* 54:*12, 16, 22* 55:*2, 5, 7, 23* 56:*21* 57:*7, 25* 58:*6* 59:*2, 5, 10* 60:*3, 10* 61:*12* 62:*14* 63:*9, 18, 25* 64:*8, 16, 25* 65:*15, 22* 66:*1, 3, 7* 67:*3, 20, 23* 68:*7, 10, 24* 69:*2, 5, 12* 70:*16, 19* 71:*4, 9, 14* 72:*18, 21* 73:*3* 74:*10, 17* 76:*4, 6, 10, 13, 16, 21, 23* 77:*7, 23* 78:*10* 79:*2, 6, 7, 8* 80:*20* 82:*3, 22* 83:*2, 10* 84:*1, 15* 85:*23* 86:*3, 7, 8, 14, 21, 25* 87:*6, 17, 22* 88:*4, 23* 89:*2, 5, 9* 90:*6, 12* 91:*18, 25* 92:*10, 19* 93:*6, 9, 12, 17* 94:*12, 19* 95:*17, 22, 24* 96:*4, 14, 22* 97:*9, 14* 98:*2, 17* 99:*2, 8*
**old** 89:*20*
**once** 20:*15*
**one-page** 91:*23*
**ones** 25:*8* 89:*20* 90:*20*
**online** 84:*25*
**operate** 17:*22* 18:*1*
**opine** 23:*6*

**opinion** 79:*5* 87:*23* 88:*7*
**opposed** 11:*5* 21:*10* 25:*21* 33:*24* 56:*9* 68:*12* 70:*14* 73:*9* 80:*11*
**ORAL** 4:*12* 102:*7*
**ORANGE** 5:*14*
**oranges** 90:*19*
**order** 16:*11* 82:*8* 86:*23*
**originated** 17:*9*
**origination** 13:*21* 14:*4* 16:*17, 19* 27:*19*
**outbid** 76:*17*
**outlive** 75:*9*
**outside** 24:*2, 9*
**outstanding** 78:*6*
**Overall** 7:*4, 5*
**overnight** 51:*9*
**over-spoke** 50:*6*
**overvalued** 79:*25*
**owned** 48:*22* 60:*1*
**owns** 36:*15*

**< P >**
**p.m** 1:*17* 4:*12* 6:*1* 61:*4* 86:*9* 99:*19*
**package** 15:*4, 7*
**PAGE** 2:*2* 3:*2* 45:*21* 64:*14* 102:*12*
**PAGE/LINE** 100:*2*
**pages** 46:*9*
**paid** 18:*22* 19:*1* 21:*13, 14, 15* 29:*16* 52:*6* 54:*1* 66:*5* 70:*14* 73:*12, 13* 75:*17, 25* 85:*20* 91:*4, 7* 95:*6*
**paint** 98:*9*
**par** 86:*1*
**paragraph** 50:*14* 52:*16* 55:*24*
**part** 22:*13* 27:*8* 31:*22* 32:*3* 40:*16* 47:*7* 49:*16, 19, 25* 50:*7* 82:*19* 95:*14* 96:*20* 97:*4*
**particular** 18:*9* 31:*20* 60:*18*

**parties** 28:*11* 33:*8* 54:*14, 17* 56:*4* 59:*8* 102:*16*
**party** 27:*23, 24* 29:*5* 48:*3* 52:*19, 25* 53:*16* 54:*7* 56:*1, 8, 15, 24* 71:*2* 95:*11* 102:*9, 14*
**pass** 75:*7, 11*
**path** 29:*10*
**pay** 18:*24* 21:*12* 74:*23* 81:*18* 94:*17*
**paying** 89:*21* 90:*20*
**payment** 53:*19* 55:*13* 67:*9* 72:*19*
**payments** 10:*19, 24* 11:*6* 19:*2, 4, 13* 20:*1* 62:*3* 65:*18* 66:*4, 10, 12, 21, 25* 67:*13, 25* 68:*14* 71:*23* 72:*3, 23* 88:*1, 10* 89:*6, 14, 17* 90:*2, 3, 16* 98:*20*
**payout** 89:*23* 90:*10*
**pending** 71:*7*
**penny** 54:*3* 76:*18*
**people** 14:*5, 12, 20* 59:*22* 74:*24* 83:*25*
**percent** 55:*21* 72:*16* 86:*2*
**period** 27:*13* 66:*17* 67:*7* 71:*11* 73:*6* 83:*1* 88:*20* 90:*4, 13, 14, 16* 98:*21* 99:*4*
**periods** 76:*12*
**perpetuity** 21:*17* 73:*17*
**person** 58:*16* 61:*7* 101:*13*
**personal** 43:*10* 63:*19*
**personally** 17:*12* 101:*10*
**perspective** 47:*20* 79:*8*
**Pertaining** 7:*3*
**pertains** 9:*20*
**petition** 38:*17*
**petitioned** 38:*13*
**phase** 14:*1* 27:*19*
**phonetic** 14:*13*
**piece** 39:*5*

**place** 14:*20* 31:*2* 32:*1* 63:*15*
**Plaintiff** 1:*4* 5:*3*
**PLC** 5:*4*
**pleadings** 10:*3*
**please** 21:*1* 30:*21* 36:*25* 37:*2* 44:*14, 15* 78:*21*
**pled** 79:*24*
**point** 13:*11* 20:*11* 61:*7* 72:*14* 78:*22* 87:*11* 94:*4*
**pool** 18:*2, 4, 16, 23, 25* 21:*15* 41:*17* 73:*14* 74:*24* 75:*8* 91:*5*
**portfolio** 76:*1* 84:*11*
**portion** 39:*3* 57:*12*
**position** 6:*20* 23:*24* 80:*7*
**possessed** 40:*2*
**possession** 20:*12, 16* 21:*6* 22:*15* 38:*22* 65:*6* 66:*18* 71:*24* 73:*1*
**possible** 10:*23* 67:*24* 79:*4*
**potential** 13:*18* 49:*6, 12* 81:*23*
**practice** 14:*11* 26:*21*
**precludes** 37:*22*
**predates** 31:*13*
**premise** 85:*25*
**prepare** 9:*16* 28:*15*
**prepared** 10:*20* 11:*1, 8, 13, 21, 25* 12:*6, 13, 19, 24*
**prepares** 28:*14*
**preparing** 46:*13* 57:*4*
**PRESENT** 5:*20* 21:*19* 25:*24* 26:*4, 6, 11, 23* 38:*5* 41:*18, 25* 42:*3, 19* 74:*6* 79:*19* 88:*18* 91:*10*
**presented** 52:*12* 96:*16*
**preservation** 83:*21*
**preserve** 16:*9*
**president** 6:*23*

Case 2:19-cv-11512-MFL-EAS  ECF No. 168, PageID.6412  Filed 06/01/26  Page 144 of 164
Deposition of Robert Marsh
Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

**presumably** 70:*23*
**presumption** 25:*10*
**presuppose** 89:*22*
**pretty** 14:*10* 32:*22*
81:*5* 86:*5, 13* 90:*17*
93:*18, 21*
**prevented** 31:*21*
**previously** 8:*1* 12:*5*
54:*16* 94:*12, 19*
**price** 11:*19* 51:*24*
69:*16, 20*
**pricing** 84:*22*
**Primarily** 41:*4*
**primary** 61:*7*
**principal** 20:*6* 52:*3*
66:*5* 72:*16* 85:*21*
**prior** 6:*9* 7:*19* 8:*2*
9:*18, 19, 22* 15:*8*
40:*4* 75:*13* 94:*9*
95:*5*
**Probably** 48:*23*
53:*21* 86:*5*
**problem** 7:*21*
**PROCEDURE** 4:*17*
**proceeding** 7:*13*
10:*4* 38:*3, 6* 39:*3, 7,*
*9* 45:*20* 46:*3, 15*
47:*9* 52:*14* 54:*9*
56:*25* 59:*3* 61:*8*
62:*25* 63:*12, 15* 80:*3*
**Proceedings** 6:*1*
9:*23* 31:*25*
**proceeds** 15:*11* 55:*21*
**process** 20:*17, 23, 24*
21:*9* 22:*14* 23:*14*
27:*9* 47:*7* 49:*8, 20*
59:*7* 71:*3* 95:*14*
**processes** 58:*25*
**produce** 39:*14* 41:*16*
46:*6, 7* 63:*22* 65:*2*
67:*8* 71:*5*
**produced** 39:*2, 4, 9,*
*12, 17* 45:*16* 47:*9*
50:*14* 52:*14* 54:*9*
55:*8, 18* 64:*5, 13, 18*
65:*5, 12* 66:*7* 67:*4,*
*20* 68:*8* 80:*1, 8* 89:*5*
**producing** 97:*5*
**production** 45:*19, 20*
46:*2, 7, 13, 17, 22*

**Professional** 1:*23*
4:*14* 102:*4*
**professionals** 12:*23*
58:*2*
**proof** 57:*1, 5, 16*
86:*23*
**proposed** 85:*6*
**prosecuting** 79:*12*
**prospectus** 16:*20, 24*
17:*13, 16* 92:*12, 15,*
*20* 93:*1, 6, 21* 94:*6*
**prospectuses** 17:*19*
93:*25*
**proved** 101:*11*
**proven** 35:*18* 41:*20*
96:*24* 97:*6*
**provide** 29:*5, 6* 32:*8,*
*19* 33:*16*
**provided** 16:*25*
34:*17* 36:*7* 48:*11*
52:*19, 25* 97:*5*
**provider** 35:*5*
**providing** 32:*4*
37:*22* 80:*13* 97:*1, 2,*
*23, 25* 98:*5, 8*
**PUBLIC** 4:*15* 58:*15,*
*17* 59:*24, 25* 78:*15*
101:*21* 102:*5*
**publication** 49:*13*
**publicly** 58:*21*
**published** 49:*12*
**publishing** 35:*21*
**pulling** 85:*3*
**purchased** 47:*11*
**purchaser** 11:*20*
47:*16* 69:*17* 92:*1*
**purpose** 15:*10*
**purposes** 101:*16*
**PURSUANT** 4:*10*
102:*9*
**purview** 24:*2, 5*
**push** 23:*16*
**put** 23:*5* 97:*20*

**< Q >**
**quarter** 78:*4*
**question** 25:*4* 30:*7,*
*11, 19, 21* 32:*24*
33:*13* 35:*19, 22*
36:*24* 37:*4* 40:*9*

44:*10, 11, 14, 17*
45:*25* 46:*12* 51:*14,*
*23* 52:*23* 61:*14*
65:*21* 69:*21, 23*
73:*21* 77:*15* 90:*11*
96:*4, 11, 14* 98:*13*
**questions** 16:*10*
63:*19* 64:*15* 78:*23*
86:*12* 99:*9, 12*
**quick** 10:*17* 22:*4*
**quickly** 59:*25* 86:*5,*
*13*
**quietly** 9:*3*
**quite** 20:*3*
**quote/unquote** 43:*3*
44:*19* 75:*9*
**quotes** 97:*11, 17*
98:*4, 6*

**< R >**
**raised** 80:*4*
**ran** 21:*4*
**rate** 18:*14, 20, 23*
19:*9, 10* 85:*11, 12*
94:*13, 16*
**rates** 18:*14*
**reach** 74:*25*
**reached** 82:*6*
**read** 16:*19* 17:*12*
36:*24* 37:*3* 44:*12, 13,*
*16* 64:*25* 93:*6* 101:*1*
**reading** 64:*22* 93:*18,*
*21* 94:*3*
**reads** 94:*6*
**real** 10:*17*
**realization** 52:*18, 24*
55:*25*
**realize** 21:*25* 22:*1*
**really** 26:*4* 54:*6*
75:*12, 23* 80:*21*
88:*17* 90:*20* 92:*9*
**Realtime** 1:*24* 4:*15*
102:*5*
**reason** 13:*5* 22:*24*
35:*6* 39:*16, 18, 21*
55:*23* 100:*2*
**reasons** 102:*13*
**recall** 19:*11* 38:*1*
41:*8* 49:*3* 52:*7*

54:*20* 60:*17* 91:*13,*
*17* 93:*2*
**recalled** 9:*19*
**receipt** 102:*11*
**receive** 66:*9* 67:*19*
69:*19* 71:*14*
**received** 50:*16* 51:*3,*
*10, 13, 17* 52:*2* 55:*21*
62:*4* 65:*23* 67:*11*
71:*11* 95:*19* 98:*20*
**receiving** 19:*25*
**Recess** 61:*4* 86:*9*
**recognize** 81:*24* 82:*1*
91:*22*
**recognized** 78:*4*
82:*10*
**recollection** 61:*21*
**recommendation**
25:*1, 4, 6*
**recommendations**
24:*22* 25:*8*
**recommended** 25:*11*
**Recon** 58:*7, 9* 60:*10,*
*14, 19*
**record** 6:*7, 10* 13:*4*
16:*6* 20:*25* 21:*3*
32:*17* 37:*3* 44:*16*
89:*17* 90:*1, 7* 91:*2*
99:*3* 102:*7, 18*
**recorded** 96:*3*
**records** 59:*25* 60:*1*
**recover** 25:*17*
**recovery** 22:*1, 2*
**red** 60:*18*
**Redoutey** 14:*21*
**reduce** 82:*8*
**reduced** 77:*8* 81:*24*
**reducing** 74:*7*
**reduction** 81:*17*
82:*1, 19*
**reference** 16:*14*
55:*24* 66:*3*
**referenced** 28:*11*
30:*12* 40:*21* 60:*8*
64:*2* 65:*4, 22* 84:*17*
96:*6*
**references** 58:*6*
**referred** 64:*18, 21*
**referring** 64:*9, 10, 20,*
*24* 81:*17*

**reflected** 55:*17* 56:*22* 76:*25*
**reflects** 52:*21*
**refresh** 61:*21*
**regarding** 12:*10*, *17* 15:*24* 37:*23* 40:*20* 47:*5* 50:*18* 51:*24* 52:*8* 54:*9* 55:*8* 56:*15* 62:*3*, *17* 68:*18* 77:*2*
**Regardless** 31:*3*
**regards** 52:*23*
**regional** 6:*22*
**Registered** 1:*23*, *24* 4:*13*, *14* 102:*4*
**regular** 99:*13*
**regulatory** 82:*25*
**reimbursement** 40:*21* 58:*7* 83:*19*
**relate** 64:*6*
**related** 9:*25* 12:*4* 53:*10* 64:*2* 65:*4*, *13* 66:*24* 67:*13*, *23* 68:*2*, *11* 69:*6*, *13* 70:*8*, *16*, *22* 77:*23* 81:*20* 83:*16* 98:*1*, *11* 102:*16*
**relates** 32:*3* 64:*12* 65:*4* 83:*8*, *20*
**relationship** 14:*7*, *8*, *9* 88:*24*
**relative** 102:*18*
**relatively** 23:*18*
**relevance** 76:*22* 77:*10* 78:*8* 79:*4* 97:*21*
**relevant** 77:*13* 78:*13*
**reliable** 36:*16*
**relied** 34:*16* 35:*1*, *13* 36:*7* 83:*24* 97:*16* 98:*5*
**rely** 31:*4* 33:*7* 95:*3*
**relying** 28:*20* 33:*11*, *15* 36:*6* 97:*11* 98:*3*
**remain** 90:*22*
**remedy** 23:*15*
**remember** 40:*4*
**Remote** 1:*15* 4:*6* 5:*1* 102:*1*
**remove** 31:*15*

**removed** 31:*18*, *20*, *23* 95:*12*
**repeat** 36:*23* 96:*13*
**rephrase** 40:*8* 88:*4*
**repo** 62:*2*
**report** 22:*12*, *15*, *17*, *21*, *25* 38:*25* 39:*1* 40:*5*, *13*, *15*, *20*, *25* 46:*19* 58:*4* 60:*15*, *20* 68:*8*, *15* 84:*2*, *16* 89:*5*
**reported** 29:*18* 35:*17* 80:*5*
**Reporter** 1:*23*, *24* 4:*14*, *15* 8:*17*, *25* 20:*25* 37:*1* 44:*12*, *15* 73:*20* 78:*20* 99:*13* 102:*4*, *5*
**REPORTER'S** 102:*1*
**reporting** 29:*17* 30:*3*, *10*, *13* 36:*8*
**repossessed** 40:*1*, *14* 41:*2* 79:*10*, *11*
**represent** 6:*7* 45:*18* 65:*11* 97:*14*
**representatives** 63:*2*
**represented** 31:*1* 32:*21* 50:*16* 51:*3*, *17*, *19*
**reputable** 27:*4*
**request** 31:*23* 40:*16* 62:*12* 63:*25* 64:*1*, *12* 65:*9*, *16* 68:*10*, *16* 69:*9*
**requested** 10:*14* 39:*10* 46:*5* 63:*22* 65:*7* 102:*9*, *14*
**required** 29:*10*
**requirement** 31:*21*
**resolved** 54:*25* 55:*2*
**respect** 36:*10*, *21* 37:*9* 41:*1* 62:*20* 65:*24* 70:*5* 82:*24* 92:*13*
**response** 96:*23*
**responsive** 68:*16* 69:*8*
**Restate** 44:*10*

**restitution** 38:*2*, *6* 39:*3*, *4*, *9* 40:*16* 61:*8*, *15*, *23* 63:*11*, *12*
**result** 52:*22* 78:*2* 81:*21*
**retired** 93:*2*, *4*
**returned** 102:*11*, *12*
**revenue** 25:*16*
**reverse** 18:*2*, *8* 75:*5*
**review** 9:*23* 10:*10* 23:*6* 36:*20* 37:*8*, *18* 43:*16* 45:*15* 50:*18* 51:*1*, *15*, *24* 53:*7* 60:*14* 78:*15*
**reviewed** 9:*18* 10:*3* 15:*4* 43:*16* 52:*1* 84:*24* 85:*5*
**reviewing** 15:*11* 36:*2* 52:*7* 60:*19* 66:*12*
**revisit** 94:*21*
**right** 6:*20* 10:*12* 18:*7*, *13* 19:*3* 23:*18*, *20* 37:*18* 53:*14* 56:*4*, *6* 60:*10*, *24* 61:*6* 70:*17* 73:*19* 77:*19* 84:*2* 89:*25* 90:*4* 94:*7* 97:*23* 98:*15* 99:*6*, *8*
**risk** 19:*17*, *22*, *23*, *24* 34:*22*
**RMR** 102:*23*
**Rob** 9:*2* 42:*14* 78:*25* 81:*15*
**ROBERT** 1:*16* 2:*3* 4:*8* 6:*2* 64:*2*, *3* 101:*1*, *5*, *10* 102:*2*, *5*
**ROHR** 1:*9* 56:*20*, *24*
**role** 29:*14*
**roles** 7:*20*
**room** 38:*8*
**Roughly** 22:*11*
**round** 7:*7*
**routine** 30:*17*
**RPR** 102:*23*
**Rule** 6:*15* 102:*9*
**RULES** 4:*17*
**run** 20:*23* 24:*12* 49:*24* 50:*5*

**< S >**
**sale** 11:*16*, *18* 20:*23* 21:*4* 24:*12* 46:*25* 48:*9* 49:*12* 51:*1*, *13* 52:*18* 66:*2*, *3* 69:*13*, *15* 70:*8*, *17*, *22* 81:*1*, *6* 87:*8*
**sales** 49:*24* 51:*24*
**satisfied** 81:*25*
**save** 88:*16*
**Savings** 1:*4*
**saw** 22:*16*
**saying** 67:*12* 68:*24* 72:*5* 75:*4* 78:*17* 82:*18* 85:*3* 88:*14* 96:*7*
**says** 22:*17* 23:*7* 40:*7* 52:*17*
**SCALI** 5:*13*
**Scenario** 41:*9*, *13*, *14*, *21*, *25* 42:*2*, *10* 43:*19* 45:*13*
**scheme** 45:*4*
**Scott** 63:*7*
**seal** 101:*18*
**search** 58:*14*, *15* 59:*24*, *25* 60:*3* 96:*2*
**searches** 58:*12*
**searching** 58:*21*
**SEC** 62:*16* 63:*3*, *5* 83:*15*, *20* 94:*8* 97:*9*, *15*
**second** 21:*1* 65:*17* 98:*17*
**secondary** 17:*1*, *4*
**Securities** 12:*9*, *16* 23:*20*, *25* 24:*4* 27:*15* 36:*22* 37:*10* 48:*9* 49:*24* 75:*14* 79:*14* 84:*11* 87:*24* 88:*8*
**securitization** 19:*8*
**securitized** 18:*3*
**security** 71:*16* 98:*1*, *9*
**see** 22:*23* 23:*7* 26:*5* 48:*19* 58:*15* 59:*11*, *20* 60:*1* 75:*4* 79:*9* 84:*25* 99:*2*
**seeing** 49:*3*

Deposition of Robert Marsh

Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

seen 22:*24* 40:*7* 53:*9, 12* 62:*10, 11* 84:*1*

select 49:*17*

selected 27:*2* 28:*23* 30:*24* 50:*3*

sell 11:*4* 22:*1, 5* 23:*10, 15* 24:*12, 22* 25:*2, 11* 26:*15* 68:*12, 18* 76:*9* 79:*16* 85:*22* 87:*14*

Send 99:*17*

senior 6:*23*

sense 6:*18* 72:*4* 75:*3*

sent 20:*17* 35:*15*

separate 47:*2* 97:*16*

September 67:*16* 72:*19* 93:*14*

series 64:*21*

served 6:*13* 10:*11* 63:*20*

service 30:*23* 85:*4*

services 29:*25* 30:*15* 31:*10* 49:*22, 23* 52:*20, 25* 97:*12*

set 23:*3*

settlement 52:*19, 24* 53:*1, 5, 10, 15, 18, 19, 21* 54:*10, 14* 55:*3, 5, 9, 11, 17, 25* 56:*19, 23* 81:*19, 23* 82:*5, 12, 20* 83:*9*

settlements 55:*22* 56:*4*

SHANNON 5:*8* 6:*11* 8:*18, 22* 9:*2* 13:*3, 13* 16:*5* 20:*2* 23:*1* 32:*10, 15* 33:*5, 25* 37:*11* 39:*18* 40:*3* 42:*4, 12* 43:*8, 14, 25* 44:*10* 45:*1* 47:*21* 50:*20* 53:*17* 56:*9* 59:*13* 60:*22* 62:*19* 66:*9* 69:*21* 74:*13* 77:*12* 81:*11* 82:*11, 21, 23* 83:*3, 8* 86:*7* 88:*2, 11* 98:*13, 23* 99:*11, 17*

shift 27:*18* 38:*24*

shoes 95:*18*

short 73:*6*

Shortly 51:*5*

showing 89:*6*

shut 89:*4*

SIGNATURE 100:*1* 101:*2* 102:*9, 12*

signed 24:*18* 29:*21*

significant 53:*22*

similar 23:*2* 75:*13* 85:*1*

single 97:*22*

single-broker 97:*11, 17* 98:*3, 6*

singular 56:*1*

sir 10:*9*

sitting 9:*2* 16:*23*

six 55:*16*

small 8:*5*

smart 24:*24* 87:*23* 88:*7*

Smith 24:*16*

sold 20:*18* 21:*10* 49:*1* 50:*15* 51:*2, 16* 66:*19* 70:*6* 71:*12* 72:*20, 22* 79:*18* 80:*22* 85:*6* 91:*22* 93:*10, 14*

solely 45:*4*

somebody 13:*14* 43:*9* 75:*6, 8, 10*

somewhat 31:*12, 24* 82:*4*

sophisticated 36:*15*

sorry 18:*17* 29:*12* 32:*14* 36:*23* 45:*24* 47:*20* 50:*5* 65:*21* 73:*20, 23* 74:*15* 77:*10* 96:*12*

sorts 82:*24*

sound 97:*13*

source 28:*2, 3*

sources 31:*3* 34:*13, 21, 23*

speaking 62:*19*

specialist 24:*10*

specific 7:*3* 64:*15*

specifically 60:*7*

speculate 49:*20*

speculated 44:*4*

speculation 42:*5, 13* 44:*3* 87:*11* 88:*19*

speculative 68:*5*

spent 17:*18*

spoke 63:*9*

sporadically 21:*13*

ST 5:*6*

stand 39:*13*

standard 14:*11* 23:*15* 26:*21* 48:*11, 14, 18, 25* 49:*2*

start 7:*5* 8:*7* 16:*6* 74:*25*

started 10:*7* 14:*6* 93:*13*

starting 6:*10* 89:*20*

starts 15:*9* 46:*8*

State 8:*4* 101:*7, 21*

stated 82:*3*

statement 67:*5, 15* 90:*21, 23*

statements 12:*3, 11* 15:*12* 28:*16, 18* 29:*7* 36:*8* 43:*22* 77:*1, 5, 25* 89:*8, 10* 98:*18, 22*

STATES 1:*1* 12:*5, 9, 16*

stay 20:*21* 72:*13*

stayed 86:*17*

steered 28:*24* 30:*24* 94:*20, 24* 96:*8, 19*

steering 34:*22*

step 33:*11*

Stephanie 14:*17* 92:*23*

stepping 95:*18*

steps 50:*10*

Stock 36:*14, 15, 19* 37:*6*

stopped 51:*21* 75:*20*

stream 19:*1*

STREET 5:*6, 14*

strike 30:*11*

strip 18:*3, 11*

stuff 58:*22* 94:*2, 6*

STUMBERGER 1:*10*

subject 81:*13*

submission 61:*14, 17, 22*

subpoena 83:*20*

subscribed 101:*14*

subscribers 35:*8*

substantiate 51:*2, 15*

successful 93:*23*

suggest 79:*4*

suggested 25:*10*

suggesting 83:*4*

suit 63:*8*

sum 7:*23*

summarized 52:*11*

summary 52:*20*

support 76:*2*

suppose 40:*6*

sure 13:*5* 21:*2* 26:*19* 27:*6* 30:*19* 37:*1, 14* 45:*10* 53:*6* 60:*13* 64:*9, 24* 71:*1* 76:*22* 78:*7* 83:*6* 94:*4, 16* 95:*16* 96:*20*

surprise 97:*18*

sustained 52:*21*

SWORN 6:*3* 102:*7*

< T >

take 26:*8* 31:*2* 60:*23* 61:*2* 86:*3* 87:*13*

TAKEN 4:*10* 6:*24* 7:*13, 17* 102:*17*

talked 63:*6* 76:*23* 87:*20* 92:*11*

talking 15:*22* 19:*23, 24* 30:*19* 73:*21* 85:*2* 98:*12*

TARP 81:*20*

tell 94:*23*

telling 56:*3*

template 95:*22* 96:*6, 15*

ten 61:*2*

ten-minute 86:*4*

term 41:*9* 53:*22* 78:*1* 85:*24*

terminated 96:*2*

terms 53:*20* 55:*11* 81:*5*

TESTIFIED 6:*3* 9:*24* 30:*22, 23* 38:*6* 40:*5* 42:*15, 21, 23*

43:*2, 6, 13, 18, 21*
44:*18, 23* 46:*23*
51:*19* 61:*10, 12* 71:*9*
88:*3* 94:*12, 19*
**testify** 10:*16, 20* 11:*1,
8, 13, 21, 25* 12:*6, 13,
19* 13:*1, 5, 7* 83:*5*
**testimony** 26:*13*
36:*17* 37:*4* 39:*11*
40:*4* 43:*9* 45:*10*
78:*25* 102:*7, 17*
**Thank** 9:*15* 13:*2*
61:*3* 99:*8, 11, 16*
**Thanks** 61:*3* 84:*15*
**theirs** 47:*18*
**theory** 79:*22*
**therefor** 102:*13*
**thing** 23:*21* 58:*18*
68:*3*
**things** 21:*22* 35:*2*
59:*15* 62:*13* 78:*23*
80:*9* 82:*15, 16*
**think** 8:*22* 13:*24*
14:*23* 15:*17* 27:*16*
30:*3, 10* 32:*7* 33:*1,
15* 34:*4, 11, 16, 17, 19,
25* 35:*3* 42:*2* 43:*18*
46:*23* 51:*18* 53:*23*
65:*22* 69:*8* 70:*3, 20*
71:*9* 72:*5* 75:*4* 76:*8,
9* 81:*12* 82:*11, 17*
85:*3, 25* 86:*4, 11*
88:*17* 89:*1, 13* 91:*1,
21, 22* 92:*8* 93:*7, 20,
22* 94:*12* 95:*9* 97:*10*
**thinks** 80:*15*
**thinly** 17:*7, 9* 87:*20*
**third** 27:*23, 24*
28:*11* 29:*4* 33:*8*
52:*19, 24* 53:*16* 54:*7,
17* 56:*1* 59:*8*
**third-party** 16:*3*
30:*15* 31:*10* 58:*10*
59:*8, 10, 19*
**Thomas** 85:*7*
**thought** 74:*2* 83:*3*
**thoughts** 73:*25*
**three** 89:*3* 93:*5*
**ticket** 70:*4*

**tickets** 52:*2* 70:*12,
13, 16* 85:*6*
**tie** 82:*14, 15*
**tied** 36:*18* 37:*6*
**time** 14:*20, 22* 15:*1,
24* 16:*19* 17:*8, 17*
24:*25* 30:*4, 5, 9, 13*
35:*14, 18, 20, 23* 38:*9*
39:*16* 50:*20, 23, 25*
60:*24, 25* 62:*11*
66:*17, 19* 72:*21, 25*
73:*7, 13, 22* 74:*9*
75:*11, 15, 19* 77:*9*
78:*21* 80:*24* 83:*1*
84:*24* 87:*8* 88:*17, 20*
89:*15, 19* 90:*4, 12, 14,
16, 19* 91:*9* 92:*5*
99:*4, 19*
**times** 7:*2, 6, 17* 15:*5*
27:*14*
**timing** 81:*6, 7*
**title** 6:*23* 85:*8*
**Toby** 85:*7*
**today** 10:*21* 11:*2, 9,
14* 13:*1* 16:*9, 23*
26:*8* 50:*21* 64:*5*
66:*8* 88:*21*
**today's** 9:*16*
**Tolcek** 14:*13*
**told** 35:*14*
**top** 61:*19*
**topic** 94:*22*
**topics** 10:*14* 16:*7*
37:*12*
**total** 7:*23* 54:*1*
57:*11*
**track** 89:*17* 90:*1, 6*
91:*2* 99:*3*
**trade** 85:*6*
**traded** 17:*7, 9* 87:*20*
**tranche** 17:*15*
**transactions** 29:*7*
**transcript** 43:*14*
99:*14* 102:*7, 12*
**transcripts** 43:*17*
**transmit** 72:*9*
**trend** 74:*11*
**trends** 75:*13*
**trial** 43:*17* 61:*24*

62:*6, 7, 12, 21* 79:*20*
**trigger** 75:*11*
**true** 101:*3* 102:*7*
**trust** 22:*22* 93:*24*
**trustee** 12:*22* 40:*24*
41:*6* 56:*10, 12* 57:*19*
58:*1, 5* 71:*15, 25*
86:*22* 93:*24*
**trustees** 71:*18*
**try** 25:*17* 79:*2* 87:*14*
**trying** 78:*16*
**Tuesday** 1:*17* 4:*11*
**turned** 32:*20* 65:*7, 8*
72:*15*
**turning** 97:*1*
**two** 6:*12* 26:*2* 28:*11*
45:*21* 46:*9* 56:*4*
64:*13* 80:*9* 82:*15*
89:*1, 3* 93:*5*
**two-plus** 89:*17*
**two-year** 90:*1, 12, 16*
98:*21*
**type** 59:*7* 75:*13*
**typically** 48:*21*

**< U >**
**U.S** 29:*5, 14, 15, 16*
36:*4, 7* 67:*18* 72:*7, 8*
89:*5, 10* 95:*2* 98:*18,
22*
**UCC** 96:*1, 2*
**ultimate** 18:*15* 22:*3*
27:*7* 47:*13*
**ultimately** 23:*11*
24:*11* 47:*11* 74:*8*
**undergraduate** 9:*6*
**underlying** 18:*19*
19:*7, 9* 85:*11*
**understand** 16:*16*
19:*3* 23:*23* 25:*3*
33:*10* 47:*21* 72:*5*
73:*11* 77:*14* 78:*7*
90:*13* 95:*17*
**understanding** 15:*10*
17:*21, 25* 18:*19*
19:*12, 15* 24:*17*
27:*22* 28:*1* 33:*6*
36:*18* 37:*5* 41:*12, 24*
43:*1, 5, 24* 44:*9, 17,
22* 45:*3, 7* 48:*6* 57:*7*

66:*15* 74:*17, 19*
79:*21* 82:*4* 85:*14, 18,
23* 89:*14* 90:*24*
91:*25* 94:*20*
**Understood** 9:*4* 56:*1*
81:*12*
**undertaken** 48:*8*
**underwriters** 14:*9*
**underwriting** 15:*4, 6*
**UNITED** 1:*1* 12:*4, 8,
15*
**university** 8:*12*
**unknown** 26:*24*
**unpredictable** 26:*24*
**unstable** 96:*12*
**unusual** 32:*22* 60:*11,
13*
**updates** 62:*11*
**use** 36:*11* 59:*1* 78:*1*
92:*4*
**utilized** 41:*21*

**< V >**
**vague** 32:*13, 15*
42:*13*
**valuation** 21:*19* 22:*4,
6* 25:*23* 27:*8* 29:*11,
25* 30:*15, 20, 23* 31:*3,
5, 10* 32:*20, 21* 33:*3,
4, 23* 34:*18, 20* 35:*16,
17* 36:*3, 7* 41:*20*
42:*16* 51:*7* 52:*20, 25*
54:*17* 68:*4* 84:*6*
85:*2* 87:*13* 95:*3*
97:*12, 17*
**valuations** 29:*6, 8, 18*
30:*10, 13* 32:*4* 33:*11*
35:*21* 39:*2* 51:*21*
80:*14*
**value** 16:*3* 21:*19*
22:*9* 25:*18, 24* 26:*4,
6, 7, 8, 11, 16, 23* 27:*3,
23* 30:*16* 34:*22* 35:*1,
5, 14* 36:*8* 37:*23*
41:*15, 16, 17, 19* 42:*1,
3, 18, 19* 43:*3, 4, 7*
44:*20, 21, 24* 45:*4*
50:*17* 51:*4, 9, 10, 12,
17, 20* 52:*17* 69:*20*
74:*6* 75:*25* 76:*2*

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

79:*15*  80:*2, 5, 6, 10, 11*  87:*14*  88:*18, 19*  91:*10*  97:*1, 3, 5, 25*  98:*8*
**valued**  28:*4, 5*  40:*1, 6*
**values**  26:*9*  32:*9*  33:*16*  84:*25*  98:*5*
**valuing**  28:*7*  33:*18*  34:*15*  35:*9, 15*  36:*11, 22*  37:*10*  42:*10*
**variable**  18:*14, 20*  19:*9*  21:*14*  94:*18*
**various**  9:*21*  10:*5*  17:*19*  21:*21*  62:*2*  76:*12*
**vendor**  58:*10*  59:*10, 19*
**vendors**  59:*9*  79:*17*
**version**  95:*4*
**versus**  88:*15*  97:*25*
**vice**  6:*23*
**VIDEOCONFERENC E**  4:*11*
**view**  71:*25*
**VS**  1:*7*

**< W >**
**Wait**  43:*25*
**waiting**  26:*5*
**Walsh**  8:*15, 24*  9:*8*
**want**  16:*8, 11*  21:*23*  43:*15*  77:*17*  94:*21*  95:*25*  98:*9*
**warehouse**  14:*7, 24*
**way**  25:*23*  29:*22*  31:*1*  34:*1*  67:*17*  73:*7*  75:*12*
**ways**  59:*24*
**WELL**  1:*8*  7:*13*  8:*2*  10:*19, 25*  11:*5, 12, 16, 20, 24*  12:*17, 22*  13:*8, 16, 22*  14:*4*  15:*2*  19:*24*  20:*12, 13*  23:*2, 23*  24:*6, 13*  28:*5, 25*  29:*9, 22*  30:*11, 22, 24, 25*  31:*6*  32:*4, 8*  33:*3, 17, 18, 23, 24*  34:*11, 13, 14*  35:*1, 9, 13, 15*  37:*19, 22*  38:*14, 21*  40:*2, 14, 24*  41:*14, 22*

42:*25*  43:*1, 18*  44:*17*  45:*23*  46:*11*  47:*11*  48:*2, 10, 14, 17*  50:*11, 23*  54:*6, 7*  56:*15, 16, 17, 25*  57:*9*  59:*12, 18, 20*  60:*4, 5, 14*  61:*12*  64:*11*  65:*8, 19*  66:*4, 9*  68:*1, 12*  69:*7, 13, 17*  70:*8, 22*  71:*16*  72:*24*  76:*7, 14*  77:*13, 19, 21, 24*  78:*9, 10, 12, 24*  79:*9, 11, 13, 17*  80:*5, 13*  81:*6*  83:*7, 16*  84:*5, 7, 17, 21*  87:*19*  88:*23*  89:*12*  90:*23*  91:*12, 20*  93:*10, 20, 23*  97:*5, 24*  99:*6*
**Well's**  28:*18*  33:*2*  54:*19*
**went**  21:*9*  26:*18*  29:*16*  51:*9*  63:*8*  69:*22*  76:*1*
**we're**  6:*15*  21:*16*  26:*25*  49:*1*  57:*23*  74:*19*  87:*3, 12*
**we've**  60:*22*  78:*14*
**WILMINGTON**  5:*16*
**WITNESS**  2:*3*  10:*15*  13:*6*  16:*12*  20:*6*  21:*4*  23:*2*  32:*14, 18*  33:*7*  34:*4*  37:*14*  39:*13, 21*  42:*7, 15*  43:*8, 15, 24*  44:*9*  45:*3*  53:*23*  59:*15*  61:*3*  77:*20*  78:*22*  86:*8*  88:*14*  98:*15, 25*  102:*5, 8*
**witnesses**  43:*6, 21*  44:*23*
**witness's**  40:*4*
**word**  88:*11*
**words**  39:*19*
**work**  95:*1*
**worked**  18:*22*  94:*4*
**working**  27:*10*  94:*1*
**workout**  7:*21, 25*  8:*1*  13:*25*  22:*14*  23:*15*  24:*10*

**workouts**  27:*14*
**works**  25:*24*
**world**  48:*16*
**worth**  22:*17*
**wrap**  86:*5*
**write**  92:*6*
**writing**  68:*21*
**written**  55:*5, 8*
**wrong**  35:*15*  74:*18, 19*

**< X >**
**Xenith**  95:*25*
**XXXX**  102:*14*

**< Y >**
**yeah**  8:*6*  13:*17*  16:*12*  32:*18*  34:*4, 8*  37:*17*  39:*20*  47:*23*  53:*20*  56:*24*  59:*22*  60:*25*  68:*20*  70:*1, 2*  71:*20*  74:*2*  77:*12*  83:*10, 11, 23*  89:*4, 8*  91:*4, 15, 17*  92:*7*  93:*21*  94:*4*  98:*24*  99:*17*
**year**  26:*2*  38:*3*  89:*17*
**years**  9:*20*  27:*12*  45:*9*  60:*16*  74:*6*  89:*1*  93:*2, 3, 5*
**yield**  85:*15, 18, 19*
**York**  9:*25*  32:*1*  36:*13, 15, 19*  37:*6*  38:*3*  52:*12*  61:*9*  63:*8, 12*  71:*7*  91:*11*

**< Z >**
**zero**  19:*18*  73:*18*  74:*11*  91:*6, 7*
**ZOOM**  4:*11*

Deposition of Robert Marsh

Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

## WORD LIST

**< $ >**
$100  *(1)*
$2  *(2)*
$25  *(8)*
$30  *(1)*
$5  *(1)*
$700,000  *(1)*
$709,000  *(1)*
$8  *(1)*
$8,500  *(1)*

**< 1 >**
1  *(3)*
1:00  *(1)*
1:02  *(1)*
100  *(1)*
1201  *(1)*
13  *(8)*
14  *(9)*
143,000  *(1)*
14-year  *(1)*
15  *(1)*
16  *(1)*
19  *(7)*
1901  *(1)*
19801  *(1)*

**< 2 >**
2  *(1)*
2:19-cv-11512  *(1)*
2:46  *(1)*
2:53  *(1)*
20  *(1)*
2003  *(2)*
2012  *(4)*
2019  *(18)*
2024  *(5)*
25  *(3)*
26  *(3)*
27644  *(1)*

**< 3 >**
3  *(1)*
3:38  *(1)*
3:50  *(2)*
30  *(11)*
30(b)(6  *(9)*

30(f)(1  *(1)*
3RD  *(1)*

**< 4 >**
4  *(1)*
4:14  *(1)*
40  *(1)*
46,000  *(1)*
48226  *(1)*

**< 6 >**
6  *(1)*
6TH  *(1)*

**< 7 >**
7  *(2)*
700,000  *(5)*
710,000  *(1)*

**< 8 >**
8  *(2)*

**< 9 >**
9  *(7)*
90s  *(1)*

**< A >**
ability  *(1)*
able  *(4)*
abruptly  *(1)*
access  *(2)*
account  *(3)*
accounts  *(1)*
accrued  *(3)*
accumulated  *(1)*
acknowledged  *(1)*
action  *(2)*
actual  *(2)*
added  *(5)*
additional  *(1)*
adjustable  *(1)*
adjustment  *(4)*
admitted  *(2)*
advance  *(1)*
affidavit  *(21)*
affiliated  *(1)*
affix  *(1)*
afield  *(2)*
afternoon  *(1)*

age  *(1)*
agents  *(2)*
ago  *(3)*
agree  *(5)*
agreement  *(21)*
agreements  *(2)*
ahead  *(6)*
Alessandro  *(1)*
allegation  *(1)*
allocated  *(1)*
allowed  *(2)*
allowing  *(1)*
America  *(16)*
amortized  *(1)*
amount  *(13)*
amounts  *(1)*
analysis  *(15)*
and/or  *(1)*
announced  *(1)*
answer  *(11)*
answered  *(1)*
ANTOINE  *(1)*
anybody  *(4)*
anyway  *(2)*
appear  *(1)*
APPEARANCES  *(1)*
appeared  *(1)*
apples  *(1)*
APPLICABLE  *(1)*
application  *(1)*
applied  *(4)*
appropriate  *(10)*
approval  *(2)*
approvals  *(1)*
approved  *(1)*
APPROXIMATELY
 *(12)*
April  *(1)*
argumentative  *(1)*
arrive  *(1)*
arrived  *(1)*
arriving  *(1)*
Article  *(5)*
asked  *(8)*
asking  *(16)*
asserted  *(4)*
assertion  *(1)*
assessed  *(1)*
assessment  *(2)*

Asset  *(2)*
assets  *(10)*
assignment  *(1)*
assisted  *(1)*
associated  *(2)*
assume  *(6)*
assumption  *(3)*
assumptions  *(2)*
assure  *(1)*
attached  *(1)*
attempting  *(2)*
attorney  *(3)*
auction  *(13)*
auctioned  *(2)*
auctioneer  *(1)*
auctioning  *(1)*
audited  *(3)*
auditing  *(1)*
auditor  *(1)*
audits  *(1)*
August  *(2)*
authority  *(2)*
available  *(5)*
aware  *(35)*

**< B >**
bachelor's  *(1)*
back  *(12)*
background  *(2)*
backroom  *(1)*
BAML  *(1)*
B-A-M-L  *(1)*
BANK  *(64)*
bankruptcy  *(17)*
banks  *(4)*
bank's  *(1)*
base  *(1)*
based  *(11)*
basic  *(3)*
basically  *(6)*
basis  *(9)*
Bates  *(1)*
bearing  *(1)*
BEHALF  *(4)*
belief  *(1)*
believe  *(34)*
believed  *(1)*
believing  *(1)*
benchmarks  *(1)*

Deposition of Robert Marsh

Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

benefit  *(4)*
benefits  *(1)*
best  *(6)*
better  *(1)*
beyond  *(1)*
bid  *(2)*
bidder  *(1)*
bidders  *(3)*
bids  *(1)*
big  *(3)*
bit  *(1)*
blacked  *(2)*
BlackRock  *(29)*
blew  *(1)*
Bloomberg  *(7)*
BODMAN  *(1)*
bond  *(11)*
bondholder  *(1)*
bonds  *(146)*
booking  *(1)*
books  *(1)*
bought  *(1)*
break  *(4)*
briefly  *(2)*
broad  *(2)*
broker  *(3)*
broker-dealer  *(1)*
broker-dealers  *(1)*
brother  *(2)*
brought  *(3)*
BROWN  *(72)*
BROWN.......................
.........6  *(1)*
brush  *(1)*
bunch  *(1)*
BUSENKELL  *(1)*
business  *(4)*
buy  *(2)*
buys  *(1)*

< C >
call  *(1)*
called  *(1)*
calling  *(1)*
Calls  *(4)*
Capacity  *(3)*
card  *(1)*
Case  *(17)*
cash  *(8)*

caught  *(1)*
cause  *(1)*

cbrown@gsbblaw.com
 *(1)*
CEO  *(2)*
certain  *(7)*
CERTIFICATION
 *(1)*
Certified  *(4)*
certify  *(3)*
cetera  *(4)*
CFO  *(2)*
chain  *(1)*
chance  *(1)*
change  *(2)*
CHANGES  *(3)*
Chapter  *(1)*
charged  *(1)*
CHARLES  *(8)*
Charlie  *(1)*
chart  *(1)*
Chartered  *(1)*
check  *(1)*
checks  *(2)*
chief  *(2)*
choose  *(1)*
chose  *(1)*
circumstances  *(1)*
Ciroli  *(1)*
Citizens  *(1)*
CIVIL  *(3)*
claim  *(6)*
claims  *(7)*
clarify  *(2)*
clear  *(3)*
clearly  *(1)*
close  *(1)*
closed-door  *(1)*
closing  *(1)*
codefendants  *(1)*
coincide  *(1)*
collateral  *(25)*
collect  *(4)*
collected  *(1)*
collecting  *(2)*
collection  *(1)*
college  *(5)*
combative  *(1)*

combined  *(2)*
come  *(4)*
coming  *(2)*
command  *(1)*
commenced  *(1)*
commercial  *(6)*
Commission  *(3)*
committee  *(1)*
common  *(1)*
Commonly  *(1)*
communicating  *(1)*
communication  *(2)*
Communications  *(8)*
company  *(9)*
comparing  *(1)*
complete  *(2)*
completely  *(1)*
completion  *(2)*
comprised  *(1)*
concern  *(1)*
concerning  *(1)*
conclusion  *(1)*
concocted  *(1)*
confidential  *(1)*
connected  *(2)*
connection  *(21)*
consider  *(1)*
consideration  *(1)*
considered  *(2)*
considering  *(1)*
consistent  *(4)*
consult  *(1)*
contact  *(1)*
contains  *(1)*
context  *(2)*
contingencies  *(2)*
continuation  *(1)*
continue  *(1)*
control  *(2)*
conversation  *(1)*
COO  *(2)*
copy  *(1)*
corporation  *(1)*
corporations  *(1)*
correct  *(37)*
correlation  *(1)*
counsel  *(5)*
COUNTY  *(1)*
couple  *(3)*

coupon  *(27)*
COURT  *(2)*
CPA  *(2)*
CPA-prepared  *(2)*
creating  *(1)*
credit  *(9)*
creditors  *(2)*
criminal  *(9)*
CRR  *(1)*
cube  *(1)*
current  *(1)*
currently  *(4)*
CUSIP  *(7)*
CUSIPs  *(8)*
Customers  *(5)*
cut  *(2)*

< D >
daily  *(4)*
Dalwyn  *(1)*
damages  *(3)*
DARREN  *(1)*
date  *(6)*
day  *(3)*
days  *(4)*
DE  *(1)*
decide  *(3)*
deciding  *(1)*
decision  *(15)*
decision-making  *(3)*
decisions  *(1)*
dedicated  *(1)*
default  *(4)*
defaulting  *(1)*
DEFENDANT  *(2)*
Defendants  *(6)*
defense  *(2)*
deficiency  *(1)*
degree  *(4)*
degrees  *(1)*
Delaware  *(1)*
delivery  *(1)*
Department  *(5)*
deponent  *(3)*
deposed  *(3)*
Deposition  *(19)*
depositions  *(2)*
describe  *(2)*
description  *(1)*

| | | | |
|---|---|---|---|
| designated *(1)* | EASTERN *(1)* | expenses *(1)* | FLG_0001 *(1)* |
| designee *(1)* | effort *(2)* | experience *(1)* | FLOOR *(2)* |
| detail *(2)* | efforts *(5)* | expertise *(2)* | flow *(3)* |
| determine *(2)* | either *(2)* | EXPIRES *(1)* | flows *(3)* |
| DETROIT *(1)* | else's *(1)* | explain *(7)* | fluctuate *(2)* |
| develop *(1)* | employed *(1)* | expressed *(1)* | fluctuation *(2)* |
| different *(2)* | employee *(1)* | extent *(5)* | fluctuations *(1)* |
| differently *(1)* | employees *(1)* | | focusing *(1)* |
| difficult *(2)* | ended *(2)* | **< F >** | follow *(1)* |
| diligence *(5)* | engage *(2)* | fabricated *(1)* | followed *(1)* |
| DiNello *(1)* | engaging *(1)* | fabrication *(4)* | following *(5)* |
| direct *(1)* | ensure *(4)* | facility *(6)* | FOLLOWS *(3)* |
| directed *(1)* | entered *(2)* | fact *(9)* | FORD *(1)* |
| directly *(2)* | entire *(3)* | factor *(3)* | foreclosed *(2)* |
| disagree *(1)* | entitled *(3)* | factors *(2)* | foregoing *(2)* |
| disclose *(1)* | entity *(1)* | fair *(4)* | form *(1)* |
| disclosed *(9)* | entrepreneurial *(1)* | fairly *(1)* | former *(1)* |
| disclosures *(6)* | entrepreneurs *(1)* | faith *(2)* | forms *(1)* |
| discount *(2)* | ERIC *(2)* | familiar *(2)* | found *(1)* |
| discover *(1)* | error *(1)* | far *(3)* | fraud *(5)* |
| discovered *(3)* | ESQUIRE *(2)* | fast *(1)* | frauds *(1)* |
| discovery *(4)* | essentially *(1)* | favor *(1)* | fraudulent *(1)* |
| discuss *(1)* | EST *(6)* | federal *(1)* | FRCP *(1)* |
| discussed *(1)* | estate *(2)* | Federally *(1)* | free *(1)* |
| discussing *(1)* | estimated *(2)* | fee *(2)* | front *(2)* |
| Discussion *(2)* | estimating *(1)* | Feel *(1)* | froze *(2)* |
| discussions *(4)* | estimation *(1)* | fellows *(1)* | frozen *(2)* |
| disposal *(1)* | et *(4)* | FIELD *(1)* | FSB *(1)* |
| distribute *(1)* | evaluating *(1)* | figure *(1)* | full *(1)* |
| distribution *(1)* | events *(1)* | file *(1)* | functionality *(2)* |
| distributions *(2)* | Eventually *(4)* | FILED *(5)* | funds *(5)* |
| DISTRICT *(2)* | everybody *(3)* | filings *(2)* | further *(3)* |
| division *(2)* | evidence *(7)* | finance *(3)* | future *(9)* |
| docket *(1)* | evolved *(1)* | FINANCIAL *(15)* | |
| document *(22)* | exact *(1)* | financing *(1)* | **< G >** |
| documents *(44)* | exactly *(6)* | find *(2)* | gain *(1)* |
| doing *(2)* | EXAMINATION *(3)* | fine *(13)* | gears *(1)* |
| DOJ *(3)* | exceed *(1)* | fined *(3)* | GELLERT *(1)* |
| dollars *(1)* | exceeds *(1)* | fines *(1)* | generally *(1)* |
| dramatic *(1)* | Exchange *(6)* | finish *(4)* | generate *(6)* |
| drawn *(1)* | exclusive *(1)* | firm *(1)* | generated *(11)* |
| draws *(1)* | exclusively *(1)* | first *(11)* | generating *(3)* |
| due *(5)* | executed *(1)* | Five *(6)* | Gentlemen *(2)* |
| duly *(1)* | executives *(2)* | fixed *(5)* | getting *(5)* |
| dumped *(3)* | exotic *(2)* | flags *(1)* | Ginnie *(1)* |
| | expect *(2)* | FLAGSTAR *(125)* | give *(2)* |
| **< E >** | expectation *(1)* | Flagstar's *(10)* | Given *(2)* |
| earlier *(3)* | expected *(2)* | flat *(3)* | go *(16)* |
| Early *(2)* | expense *(3)* | FLG_00003 *(1)* | goes *(3)* |

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

**going** *(41)*
**Good** *(5)*
**government** *(18)*
**government's** *(3)*
**graduate** *(2)*
**graduated** *(1)*
**group** *(4)*
**guarantee** *(2)*
**guaranteed** *(4)*
**guarantor** *(1)*
**guess** *(2)*
**guessing** *(1)*
**guilty** *(1)*

**< H >**
**half** *(10)*
**hand** *(1)*
**handled** *(2)*
**handling** *(1)*
**hands** *(3)*
**happen** *(1)*
**happened** *(1)*
**hard** *(1)*
**Hartman** *(2)*
**head** *(2)*
**hear** *(3)*
**heard** *(2)*
**heavy** *(2)*
**HECM** *(4)*
**H-E-C-M** *(1)*
**held** *(5)*
**help** *(2)*
**herby** *(1)*
**HERETOFORE** *(1)*
**hey** *(1)*
**hid** *(4)*
**H-I-D** *(1)*
**hidden** *(1)*
**higher** *(4)*
**highest** *(3)*
**HILD** *(20)*
**Hild's** *(5)*
**hindsight** *(2)*
**historical** *(1)*
**historically** *(1)*
**hit** *(1)*
**hold** *(10)*
**holding** *(6)*
**holds** *(2)*

**hope** *(1)*
**Hopefully** *(1)*
**hopes** *(1)*
**hour** *(1)*
**hundred** *(2)*
**hypothetical** *(1)*
**hypothetically** *(1)*

**< I >**
**ICBC** *(4)*
**ice** *(1)*
**IDC** *(56)*
**IDC's** *(1)*
**idea** *(3)*
**identified** *(3)*
**identify** *(2)*
**identity** *(2)*
**III** *(2)*
**illiquid** *(6)*
**immediately** *(3)*
**impact** *(1)*
**imposed** *(3)*
**improper** *(1)*
**inappropriate** *(5)*
**include** *(4)*
**included** *(8)*
**includes** *(1)*
**including** *(6)*
**inclusions** *(1)*
**income** *(8)*
**increase** *(5)*
**increasing** *(1)*
**indebtedness** *(2)*
**indefinite** *(1)*
**independent** *(4)*
**independently** *(1)*
**indicate** *(1)*
**indicated** *(4)*
**individual** *(12)*
**individually** *(2)*
**individuals** *(2)*
**induced** *(1)*
**inform** *(3)*
**information** *(6)*
**initial** *(5)*
**initially** *(2)*
**input** *(2)*
**inputs** *(1)*
**inquiry** *(1)*

**instance** *(1)*
**instances** *(1)*
**instructed** *(1)*
**instrument** *(1)*
**instruments** *(1)*
**interchangeably** *(1)*
**interest** *(36)*
**intermediary** *(2)*
**internally** *(1)*
**internet** *(1)*
**interrogatories** *(1)*
**interrupt** *(1)*
**intrinsic** *(5)*
**investment** *(2)*
**invite** *(1)*
**invited** *(1)*
**involuntary** *(5)*
**involved** *(22)*
**involvement** *(8)*
**involving** *(1)*
**IO** *(1)*
**issued** *(3)*
**item** *(1)*
**its** *(27)*

**< J >**
**January** *(3)*
**Jim** *(1)*
**Job** *(1)*
**Joe** *(3)*
**joined** *(1)*
**JoRita** *(5)*
**JOSEPH** *(2)*
**jshannon@bodmanlaw**
**.com** *(1)*
**July** *(1)*
**jump** *(1)*
**jumped** *(1)*
**June** *(2)*
**jury** *(1)*
**Justice** *(5)*

**< K >**
**Keiter** *(10)*
**kind** *(13)*
**kinds** *(2)*
**knew** *(6)*
**know** *(174)*
**Knowing** *(2)*

**knowledge** *(14)*
**known** *(3)*
**knows** *(2)*

**< L >**
**language** *(2)*
**late** *(1)*
**Lathrop** *(1)*
**laundry** *(1)*
**lawsuit** *(1)*
**lays** *(1)*
**learned** *(2)*
**leave** *(2)*
**leaves** *(1)*
**leaving** *(4)*
**Lee** *(1)*
**left** *(6)*
**legal** *(4)*
**lender** *(5)*
**lenders** *(7)*
**length** *(1)*
**level** *(5)*
**levels** *(1)*
**levied** *(1)*
**liability** *(4)*
**lifetime** *(1)*
**lifted** *(3)*
**limited** *(2)*
**line** *(1)*
**linear** *(3)*
**lines** *(1)*
**liquidate** *(4)*
**liquidated** *(2)*
**liquidating** *(1)*
**list** *(1)*
**little** *(5)*
**LIVE** *(103)*
**LLC** *(1)*
**LLCs** *(1)*
**loan** *(20)*
**loans** *(14)*
**locate** *(3)*
**long** *(3)*
**long-winded** *(1)*
**look** *(7)*
**Looked** *(10)*
**looking** *(5)*
**Looks** *(1)*
**loosely** *(1)*

loss  (*1*)
losses  (*1*)
lost  (*2*)
lot  (*1*)
lower  (*1*)
Lubin  (*2*)
Lynch  (*13*)

**< M >**
Mae  (*1*)
maintain  (*1*)
majority  (*1*)
making  (*6*)
Management  (*5*)
manager  (*1*)
managers  (*1*)
March  (*3*)
margin  (*1*)
market  (*21*)
MARSH  (*25*)
master's  (*2*)
matter  (*12*)
mean  (*17*)
meaning  (*1*)
meaningful  (*1*)
meant  (*2*)
meet  (*1*)
meeting  (*1*)
meetings  (*3*)
Mellon  (*3*)
melting  (*1*)
mentioned  (*2*)
Merit  (*3*)
Merrill  (*13*)
met  (*3*)
methodology  (*6*)
methods  (*1*)
Meyer  (*5*)
MI  (*1*)
MICHAEL  (*5*)
MICHIGAN  (*4*)
million  (*28*)
mine  (*1*)
minute  (*1*)
minutes  (*2*)
missed  (*1*)
Misstates  (*1*)
moment  (*2*)
money  (*6*)

monitoring  (*1*)
month  (*13*)
monthly  (*5*)
Moray  (*2*)
mortgage  (*4*)
mortgage-backed  (*1*)
mortgages  (*5*)
motion  (*3*)
motive  (*1*)
move  (*1*)
multiple  (*2*)

**< N >**
name  (*9*)
names  (*2*)
nature  (*2*)
necessarily  (*2*)
need  (*5*)
needed  (*4*)
negatively  (*1*)
negotiated  (*2*)
negotiating  (*1*)
neither  (*1*)
net  (*16*)
never  (*6*)
New  (*19*)
newly  (*3*)
newspaper  (*1*)
Nods  (*1*)
non-existent  (*1*)
Normally  (*1*)
NOTARY  (*3*)
note  (*1*)
noted  (*2*)
notes  (*2*)
NOTICE  (*17*)
notices  (*9*)
nuanced  (*1*)
number  (*10*)
numbers  (*3*)
numerous  (*1*)
NY  (*2*)

**< O >**
oath  (*1*)
object  (*1*)
objected  (*1*)
objecting  (*1*)
objection  (*6*)

objectionable  (*1*)
objections  (*1*)
obligated  (*1*)
obligations  (*6*)
obviously  (*3*)
occasions  (*1*)
occurred  (*2*)
offer  (*5*)
offhand  (*3*)
office  (*1*)
officer  (*9*)
officers  (*1*)
Oh  (*3*)
Okay  (*240*)
old  (*1*)
once  (*1*)
one-page  (*1*)
ones  (*4*)
online  (*1*)
operate  (*2*)
opine  (*1*)
opinion  (*3*)
opposed  (*9*)
ORAL  (*2*)
ORANGE  (*1*)
oranges  (*1*)
order  (*3*)
originated  (*1*)
origination  (*5*)
outbid  (*1*)
outlive  (*1*)
outside  (*2*)
outstanding  (*1*)
Overall  (*2*)
overnight  (*1*)
over-spoke  (*1*)
overvalued  (*1*)
owned  (*2*)
owns  (*1*)

**< P >**
p.m  (*8*)
package  (*2*)
PAGE  (*5*)
PAGE/LINE  (*1*)
pages  (*1*)
paid  (*18*)
paint  (*1*)
par  (*2*)

paragraph  (*3*)
part  (*14*)
particular  (*3*)
parties  (*7*)
party  (*16*)
pass  (*2*)
path  (*1*)
pay  (*5*)
paying  (*2*)
payment  (*4*)
payments  (*29*)
payout  (*2*)
pending  (*1*)
penny  (*2*)
people  (*6*)
percent  (*3*)
period  (*13*)
periods  (*1*)
perpetuity  (*2*)
person  (*3*)
personal  (*2*)
personally  (*2*)
perspective  (*2*)
Pertaining  (*1*)
pertains  (*1*)
petition  (*1*)
petitioned  (*1*)
phase  (*2*)
phonetic  (*1*)
piece  (*1*)
place  (*4*)
Plaintiff  (*2*)
PLC  (*1*)
pleadings  (*1*)
please  (*7*)
pled  (*1*)
point  (*7*)
pool  (*11*)
portfolio  (*2*)
portion  (*2*)
position  (*3*)
possessed  (*1*)
possession  (*9*)
possible  (*3*)
potential  (*4*)
practice  (*2*)
precludes  (*1*)
predates  (*1*)
premise  (*1*)

Deposition of Robert Marsh                                    Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

**prepare**  (*2*)
**prepared**  (*10*)
**prepares**  (*1*)
**preparing**  (*2*)
**PRESENT**  (*16*)
**presented**  (*2*)
**preservation**  (*1*)
**preserve**  (*1*)
**president**  (*1*)
**presumably**  (*1*)
**presumption**  (*1*)
**presuppose**  (*1*)
**pretty**  (*8*)
**prevented**  (*1*)
**previously**  (*5*)
**price**  (*4*)
**pricing**  (*1*)
**Primarily**  (*1*)
**primary**  (*1*)
**principal**  (*5*)
**prior**  (*12*)
**Probably**  (*3*)
**problem**  (*1*)
**PROCEDURE**  (*1*)
**proceeding**  (*20*)
**Proceedings**  (*3*)
**proceeds**  (*2*)
**process**  (*13*)
**processes**  (*1*)
**produce**  (*8*)
**produced**  (*24*)
**producing**  (*1*)
**production**  (*7*)
**Professional**  (*3*)
**professionals**  (*2*)
**proof**  (*4*)
**proposed**  (*1*)
**prosecuting**  (*1*)
**prospectus**  (*11*)
**prospectuses**  (*2*)
**proved**  (*1*)
**proven**  (*4*)
**provide**  (*5*)
**provided**  (*7*)
**provider**  (*1*)
**providing**  (*9*)
**PUBLIC**  (*8*)
**publication**  (*1*)
**publicly**  (*1*)

**published**  (*1*)
**publishing**  (*1*)
**pulling**  (*1*)
**purchased**  (*1*)
**purchaser**  (*4*)
**purpose**  (*1*)
**purposes**  (*1*)
**PURSUANT**  (*2*)
**purview**  (*2*)
**push**  (*1*)
**put**  (*2*)

**< Q >**
**quarter**  (*1*)
**question**  (*32*)
**questions**  (*7*)
**quick**  (*2*)
**quickly**  (*3*)
**quietly**  (*1*)
**quite**  (*1*)
**quote/unquote**  (*3*)
**quotes**  (*4*)

**< R >**
**raised**  (*1*)
**ran**  (*1*)
**rate**  (*11*)
**rates**  (*1*)
**reach**  (*1*)
**reached**  (*1*)
**read**  (*10*)
**reading**  (*5*)
**reads**  (*1*)
**real**  (*1*)
**realization**  (*3*)
**realize**  (*2*)
**really**  (*8*)
**Realtime**  (*3*)
**reason**  (*8*)
**reasons**  (*1*)
**recall**  (*10*)
**recalled**  (*1*)
**receipt**  (*1*)
**receive**  (*4*)
**received**  (*13*)
**receiving**  (*1*)
**Recess**  (*2*)
**recognize**  (*3*)
**recognized**  (*2*)

**recollection**  (*1*)
**recommendation**  (*3*)
**recommendations**  (*2*)
**recommended**  (*1*)
**Recon**  (*5*)
**record**  (*16*)
**recorded**  (*1*)
**records**  (*2*)
**recover**  (*1*)
**recovery**  (*2*)
**red**  (*1*)
**Redoutey**  (*1*)
**reduce**  (*1*)
**reduced**  (*2*)
**reducing**  (*1*)
**reduction**  (*3*)
**reference**  (*3*)
**referenced**  (*9*)
**references**  (*1*)
**referred**  (*2*)
**referring**  (*5*)
**reflected**  (*3*)
**reflects**  (*1*)
**refresh**  (*1*)
**regarding**  (*17*)
**Regardless**  (*1*)
**regards**  (*1*)
**regional**  (*1*)
**Registered**  (*6*)
**regular**  (*1*)
**regulatory**  (*1*)
**reimbursement**  (*3*)
**relate**  (*1*)
**related**  (*22*)
**relates**  (*5*)
**relationship**  (*4*)
**relative**  (*1*)
**relatively**  (*1*)
**relevance**  (*5*)
**relevant**  (*2*)
**reliable**  (*1*)
**relied**  (*7*)
**rely**  (*3*)
**relying**  (*6*)
**remain**  (*1*)
**remedy**  (*1*)
**remember**  (*1*)
**Remote**  (*4*)
**remove**  (*1*)

**removed**  (*4*)
**repeat**  (*2*)
**rephrase**  (*2*)
**repo**  (*1*)
**report**  (*21*)
**reported**  (*3*)
**Reporter**  (*18*)
**REPORTER'S**  (*1*)
**reporting**  (*5*)
**repossessed**  (*5*)
**represent**  (*4*)
**representatives**  (*1*)
**represented**  (*6*)
**reputable**  (*1*)
**request**  (*11*)
**requested**  (*7*)
**required**  (*1*)
**requirement**  (*1*)
**resolved**  (*2*)
**respect**  (*9*)
**response**  (*1*)
**responsive**  (*2*)
**Restate**  (*1*)
**restitution**  (*11*)
**result**  (*3*)
**retired**  (*2*)
**returned**  (*2*)
**revenue**  (*1*)
**reverse**  (*3*)
**review**  (*15*)
**reviewed**  (*7*)
**reviewing**  (*5*)
**revisit**  (*1*)
**right**  (*25*)
**risk**  (*5*)
**RMR**  (*1*)
**Rob**  (*4*)
**ROBERT**  (*11*)
**ROHR**  (*3*)
**role**  (*1*)
**roles**  (*1*)
**room**  (*1*)
**Roughly**  (*1*)
**round**  (*1*)
**routine**  (*1*)
**RPR**  (*1*)
**Rule**  (*2*)
**RULES**  (*1*)
**run**  (*4*)

Deposition of Robert Marsh                                          Flagstar Bank, FSB v. Live Well Financial, Inc., et al.

**< S >**
sale  *(21)*
sales  *(2)*
satisfied  *(1)*
save  *(1)*
Savings  *(1)*
saw  *(1)*
saying  *(9)*
says  *(4)*
SCALI  *(1)*
Scenario  *(10)*
scheme  *(1)*
Scott  *(1)*
seal  *(1)*
search  *(6)*
searches  *(1)*
searching  *(1)*
SEC  *(8)*
second  *(3)*
secondary  *(2)*
Securities  *(15)*
securitization  *(1)*
securitized  *(1)*
security  *(3)*
see  *(12)*
seeing  *(1)*
seen  *(7)*
select  *(1)*
selected  *(4)*
sell  *(17)*
Send  *(1)*
senior  *(1)*
sense  *(3)*
sent  *(2)*
separate  *(2)*
September  *(3)*
series  *(1)*
served  *(3)*
service  *(2)*
services  *(8)*
set  *(1)*
settlement  *(26)*
settlements  *(2)*
SHANNON  *(48)*
shift  *(2)*
shoes  *(1)*
short  *(1)*
Shortly  *(1)*

showing  *(1)*
shut  *(1)*
SIGNATURE  *(4)*
signed  *(2)*
significant  *(1)*
similar  *(3)*
single  *(1)*
single-broker  *(4)*
singular  *(1)*
sir  *(1)*
sitting  *(2)*
six  *(1)*
small  *(1)*
smart  *(3)*
Smith  *(1)*
sold  *(18)*
solely  *(1)*
somebody  *(5)*
somewhat  *(3)*
sophisticated  *(1)*
sorry  *(13)*
sorts  *(1)*
sound  *(1)*
source  *(2)*
sources  *(4)*
speaking  *(1)*
specialist  *(1)*
specific  *(2)*
specifically  *(1)*
speculate  *(1)*
speculated  *(1)*
speculation  *(5)*
speculative  *(1)*
spent  *(1)*
spoke  *(1)*
sporadically  *(1)*
ST  *(1)*
stand  *(1)*
standard  *(8)*
start  *(4)*
started  *(3)*
starting  *(2)*
starts  *(2)*
State  *(3)*
stated  *(1)*
statement  *(4)*
statements  *(15)*
STATES  *(4)*
stay  *(3)*

stayed  *(1)*
steered  *(6)*
steering  *(1)*
step  *(1)*
Stephanie  *(2)*
stepping  *(1)*
steps  *(1)*
Stock  *(4)*
stopped  *(2)*
stream  *(1)*
STREET  *(2)*
strike  *(1)*
strip  *(2)*
stuff  *(3)*
STUMBERGER  *(1)*
subject  *(1)*
submission  *(3)*
subpoena  *(1)*
subscribed  *(1)*
subscribers  *(1)*
substantiate  *(2)*
successful  *(1)*
suggest  *(1)*
suggested  *(1)*
suggesting  *(1)*
suit  *(1)*
sum  *(1)*
summarized  *(1)*
summary  *(1)*
support  *(1)*
suppose  *(1)*
sure  *(20)*
surprise  *(1)*
sustained  *(1)*
SWORN  *(2)*

**< T >**
take  *(6)*
TAKEN  *(5)*
talked  *(4)*
talking  *(7)*
TARP  *(1)*
tell  *(1)*
telling  *(1)*
template  *(3)*
ten  *(1)*
ten-minute  *(1)*
term  *(4)*
terminated  *(1)*

terms  *(3)*
TESTIFIED  *(24)*
testify  *(14)*
testimony  *(10)*
Thank  *(6)*
Thanks  *(2)*
theirs  *(1)*
theory  *(1)*
therefor  *(1)*
thing  *(3)*
things  *(8)*
think  *(51)*
thinks  *(1)*
thinly  *(3)*
third  *(12)*
third-party  *(7)*
Thomas  *(1)*
thought  *(2)*
thoughts  *(1)*
three  *(2)*
ticket  *(1)*
tickets  *(5)*
tie  *(2)*
tied  *(2)*
time  *(56)*
times  *(5)*
timing  *(2)*
title  *(2)*
Toby  *(1)*
today  *(12)*
today's  *(1)*
Tolcek  *(1)*
told  *(1)*
top  *(1)*
topic  *(1)*
topics  *(3)*
total  *(3)*
track  *(5)*
trade  *(1)*
traded  *(3)*
tranche  *(1)*
transactions  *(1)*
transcript  *(4)*
transcripts  *(1)*
transmit  *(1)*
trend  *(1)*
trends  *(1)*
trial  *(7)*
trigger  *(1)*

| | | |
|---|---|---|
| **true**  (*2*) | **vendors**  (*2*) | **years**  (*9*) |
| **trust**  (*2*) | **version**  (*1*) | **yield**  (*3*) |
| **trustee**  (*12*) | **versus**  (*2*) | **York**  (*13*) |
| **trustees**  (*1*) | **vice**  (*1*) | |
| **try**  (*3*) | **VIDEOCONFERENC** | **< Z >** |
| **trying**  (*1*) | **E**  (*1*) | **zero**  (*5*) |
| **Tuesday**  (*2*) | **view**  (*1*) | **ZOOM**  (*1*) |
| **turned**  (*4*) | **VS**  (*1*) | |
| **turning**  (*1*) | | |
| **two**  (*13*) | **< W >** | |
| **two-plus**  (*1*) | **Wait**  (*1*) | |
| **two-year**  (*4*) | **waiting**  (*1*) | |
| **type**  (*2*) | **Walsh**  (*3*) | |
| **typically**  (*1*) | **want**  (*8*) | |
| | **warehouse**  (*2*) | |
| **< U >** | **way**  (*7*) | |
| **U.S**  (*14*) | **ways**  (*1*) | |
| **UCC**  (*2*) | **WELL**  (*133*) | |
| **ultimate**  (*4*) | **Well's**  (*3*) | |
| **ultimately**  (*4*) | **went**  (*7*) | |
| **undergraduate**  (*1*) | **we're**  (*8*) | |
| **underlying**  (*4*) | **we've**  (*2*) | |
| **understand**  (*12*) | **WILMINGTON**  (*1*) | |
| **understanding**  (*36*) | **WITNESS**  (*33*) | |
| **Understood**  (*3*) | **witnesses**  (*3*) | |
| **undertaken**  (*1*) | **witness's**  (*1*) | |
| **underwriters**  (*1*) | **word**  (*1*) | |
| **underwriting**  (*2*) | **words**  (*1*) | |
| **UNITED**  (*4*) | **work**  (*1*) | |
| **university**  (*1*) | **worked**  (*2*) | |
| **unknown**  (*1*) | **working**  (*2*) | |
| **unpredictable**  (*1*) | **workout**  (*7*) | |
| **unstable**  (*1*) | **workouts**  (*1*) | |
| **unusual**  (*3*) | **works**  (*1*) | |
| **updates**  (*1*) | **world**  (*1*) | |
| **use**  (*4*) | **worth**  (*1*) | |
| **utilized**  (*1*) | **wrap**  (*1*) | |
| | **write**  (*1*) | |
| **< V >** | **writing**  (*1*) | |
| **vague**  (*3*) | **written**  (*2*) | |
| **valuation**  (*37*) | **wrong**  (*3*) | |
| **valuations**  (*11*) | | |
| **value**  (*65*) | **< X >** | |
| **valued**  (*4*) | **Xenith**  (*1*) | |
| **values**  (*5*) | **XXXX**  (*1*) | |
| **valuing**  (*9*) | | |
| **variable**  (*5*) | **< Y >** | |
| **various**  (*6*) | **yeah**  (*32*) | |
| **vendor**  (*3*) | **year**  (*4*) | |

**Interview of Chris Krupa (via conference call) 2/7/2019**

SEC: Gregg, Rob Gordon (ARO trial counsel), Craig, Michelle
IDC/ICE: Amelia, Vinny, and Chris Krupa (witness)
Interview lasted from 3-5 pm ET

Gregg sent Form 1662 before call, explained this is voluntary, witness needs to answer truthfully. Witness confirmed receipt and review of Form 1662. No questions from witness or counsel.

### Krupa's professional background

Head of Ice's Global fixed income evaluations team since 2016
- Evaluators and broker quote analysts report to Krupa

2010-2016: US structured finance team
Previous to 2010: Business Development within Interactive Data working on fixed income evaluations

No experience as a trader.

### IDC Pricing Protocol

- Familiar with HECM IOs and IDC's evaluation/pricing of them.
  - Currently: IDC uses broker-quote, passes through quotes provided by market participants and pass them through to clients. None evaluated.
    - Does ICE provide evaluated pricing for any HECM IO bonds as of today? No.
    - Since Mar. 2015 has IDC provided evaluated pricing for any HECM IO bonds? Not that he's aware of.
  - Previously: these prices were evaluated.
- Evaluation process for HECM IOs:
  - 3 pieces of information: IDC collected reference data, set up security, used 3rd party cash-flow provider called InTech to use cash-flow info to price. Use market color to look at value of securities. Market color means looking at trade prices, like trade tickets.

- Familiar with market-linked notes and IDCs evaluation/pricing of them.
  - Currently: IDC uses broker-quote, passes through quotes from underwriters. Not sure if some are evaluated.
  - Who would know whether some are evaluated? Not sure.

### IDC Broker-Quote Process

- IDC's evaluation is meant to represent market value? Yes. Is market value a good faith opinion of what holder would receive under current market conditions? Yes.
- Is a broker-quote also meant to represent a market value? Krupa: No. Meant to represent what the value is of the market participant who provided the quote.
  - What's the basis for this? Several internal IDC docs say when market conditions don't allow evaluation, then IDC will pass along broker-quote.
- Is broker-quote meant to reflect the price at which a broker will transact? Or an actionable quote? Krupa: Not aware of this.

- Each day the evaluators produce prices and decide whether to use a particular quote or not. Not sure what percentage are rejected.

1

- ○ Hypo: If participant bought at $10 and submitted quote at $50, then the value will be $50? Krupa: This would be at the discretion of the evaluation team to make a decision on whether to use a quote or not.
  - ○ Process followed to review moves over certain tolerances. If price moves day-over-day over a certain amount, evaluator will look to validate whether move was intended. Daily check to make sure no fat finger. Tolerance set within pricing program that will spit out outliers and analysts will review those.
  - ○ Not sure what tolerance levels are. IDC could provide that. It varies day by day.
  - ○ Tolerance breaks used to trigger review of broker-quote by evaluator. Who designs the different tolerances? The analysts set the tolerances in each group. Any process for supervisors to review tolerances that are set? Managers work alongside evaluators and are aware of how systems are set. Protocols to set consistency to calibrate tolerances among various asset classes? Tolerances are done at asset class level based on experience of evaluators.
  - ○ Tolerances are documented somewhere? Applications have what the tolerance levels are. Historically can these be identified? Not sure.
  - ○ Tolerances - set by asset class. In different asset classes, might be some granularity. He's not sure.

- Any intermittent review of whether to continue providing broker-quotes for a specific product (like HECM Ios) or should go back to being evaluated? The evaluation analysts review this and make judgements. No internal policy on this.
  - ○ Since switching to broker quote, IDC still believes HECM Ios as an asset class don't have enough input reference data for valuation.
  - ○ How was this decided? Evaluation teams who cover that asset class and make that judgment on whether they have enough input reference data. These teams would then alert someone that there is enough reference data to return to evaluating them.
  - ○ Matt Murphy responsible for agency CMO evaluation team (HECM Ios). Market linked notes would be Natalie Kitchen (investment grade corporate).
- How is a new broker quote set up for a new product? A market participant quote would be necessary.
  - ○ When a new quote is received, analysts look at experience with quote provider, that provider's participation in market, frequency of quote that will be provided, and other factors. Analysts have discretion.
  - ○ If multiple quotes provided from different participants, analysts have discretion to pick from among them and have one source only.
  - ○ Any document re controls over how quote providers should be deriving the quote.
  - ○ For HECM Ios, this would be Lydian Nudel.

- How do you know providers are giving a reasonable quote? Krupa: I can't speak to that.

- Any insight into recipients of IDC broker-quotes? Depends on what part of IDC you're talking about. In general, evaluation team/analysts don't see who is holding or taking prices on specific securities. Sales and Product Delivery teams at IDC, they would know who is receiving the prices. Any check on whether quote provider is also receiving pricing from IDC on sales side? Not that he's aware of.

- SEC understands quotes are copy/pasted. Additionally, now we understand there are reviews for tolerance breaks. Anything else done by IDC to validate quotes provided by broker? No.

2

- How does a user of IDC know if something is broker-quoted or evaluated? There's numerous places where it indicates that security falls in broker-quote methodology. On 360View web-based product. Another web-based product is called Vantage. When clients set up pricing products, they select whether they want to receive securities that are priced on that methodology.
  - Vinny: Production has some examples of this.
- Ways for IDC clients to get prices: 360View, Vantage. IDC also gives pricing feeds to clients (client submits portfolio of securities, and IDC will provide pricing in various available formats depending on client needs). Not sure if the pricing fees indicate whether a product is broker-quoted or evaluated.
- How do clients use IDC pricing? For all different purposes, so hard to speak broadly how they use pricing. IDC is agnostic to that.

- When a quote provider is both offering a quote and also receiving that broker-quote from IDC, does that cause you any concerns? From process perspective, any holder of a security can take that IDC price. So IDC doesn't focus on that in the process.
- Any controls/procedures to check for instances in which broker-quote is being published by IDC and is also being delivered to the provider of that quote? Not aware of any.
- If broker submits quote that is arbitrary, too high/too low on purpose, would this concern IDC? Can't speak to that. From a process, IDC consumes the quotes and pass them through. Controls are to send pricing to all holders of that security. IDC also uses info from challenge process to validate.
- Any understanding that submitters of quotes are not supposed to arbitrarily make up numbers when submitting pricing to IDC? No formal policies that are set up to identify that. If an evaluator believes a quote is not reasonable, they will discontinue it or not add that security. If a security traded at $10, but then quote comes in at $50, that would be unreasonable.  Evaluator will use discretion.
- If an analyst sees a broker-quote at $15, they would pass it through and provide it as the quoted level from the market participant. Tolerance limits will be triggered too. No due diligence to see if there is a TRACE trade or a bloomberg price valuation? Usually this analysis can't be done, there aren't other reference points to produce a valuation.
- Have they ever not used quotes from a provider before? Yes. When? United Capital Markets, IDC deemed their quotes as not consistent with market info. Krupa doesn't have much knowledge of that. Not sure that UCM was broker-quoted.
  - Sources not deemed to be usable. No policies/procedures on how to decide whether to stop accepting quotes from a particular source.

Is there a policy procedure to determine is a source [like UCM] is not usable? No, it up to the evaluator. They don't document – they just wouldn't use the data point in their process.

- Understand that pricing can be derived from Evaluation, issuer or broker quote… is that correct?
  - Yes, either underwriter or secondary market participants;
  - From issuer too? Yes, underwriter or issuer (He considers them synonymous)

- What is criteria for choosing between the three?
  - The evaluator would have discretion; default is to use underwriter and evaluator would make a decision if other sources were available (who provider wsa, history with provider, frequency of quotes coming in, factors such as that)

- Ever aware of situation where underwriter defers to secondary?
  - That does occur.  Less common – majority of time it is underwriter/issuer quotes that are provided.
  - Frequency of underwriter providing quotes varies by source.

3

- ○ As a process, we look to maintain w/in 30 days to receive a quote, so quotes can come in anytime between daily and monthly.

- For a product that would have prints on trace, is that something that an evaluator would consider in deciding to pass through a quote?
  - ○ They would pass through the quote that was received if there was one from the underwriter, they wouldn't consider a price on trace.
- When tolerance thresholds are set, would a price in trace get inputed to help set thresholds?
  - ○ No, thresholds would be set by analyst who maintained sector and price would change when new price received and threshold would compare last price to new quote.

- Any periodic review of pricing to confirm that CUSIPs with similar characteristics have similar price movements (e.g, moving same direction, similar size of price changes)?
  - ○ No, in these securities because we don't have information to evaluate them we don't analyze comparability we simply pass through the quote
- Any higher scrutiny given to broker-quoted prices received on last day of month?
  - ○ No, same process each day; no difference based on days of the week or month

- Does IDC ever do anything protect itself against the risk that a provider of a broker quote might have an interest in the published valuation coming out on the high end or the low end?
  - ○ No, not that I'm aware of.
- Is this a risk that IDC is aware of and protects against?
  - ○ I can't speak to that.

**IDC Challenge Process (for both broker-quote and evaluations)**

- Familiar with it. Process not different, generally, for different products. No difference if valuation is broker-quoted price versus evaluated price.
  - ○ When did IDC start accepting challenges for broker-quote pricing? Not sure, think it was more than 5 years ago
- Currently: if client has different opinion of what price should be from IDC, they can send in an email to client service team for them to log in challenge, or client has direct access to a portal to upload challenge themselves. Once in system, routed to appropriate analyst/evaluator to review challenge.  Who determines the person to review the challenge? It goes to a web-based application and analysts/evaluators are assigned from there.
  - ○ For HECM IOs, who reviews challenges? Lydian Nudel. Has been in this role since before 2014.
  - ○ For market-linked notes, who reviews challenges? Brian Yuan.
- When did access to portal start?
  - ○ Originally technology allowed to submit manual challenges through email process; over past few years added portal to add efficiency to challenge process
  - ○ Prior to portal, an email would be sent to client service team; client service team reports to a particular operations team that handles client queries
  - ○ Currently, can't challenge by calling but many years back could
- Who has the authority to approve a price change?
  - ○ Evaluators themselves
- Aware of anyone raising a challenge by calling evaluator directly?
  - ○ Not aware of it; challenge procedures are set to document and set up challenge in portal if any query rec'd by phone; if it comes in , it should be logged in portal

- How often does a challenge result in a price change?

4

- o Not sure, depends on asset class and time frame. IDC tracks this. SEC: we may want this info.
- How frequently are challenges submitted to IDC? If daily, approx. how many per day?
  - o Ad hoc, depends on asset class and day
  - o For ML-notes, can't speak to specifics on that
- Any specific type of product most frequently challenged?
  - o Varies depending on broad market
  - o Does ICE track that? We periodically review (challenge volume) w/in evaluations team; look at it with directors across asset classes to look at whats going on with challenges as a whole; in general, we track to look at staffing, being able to support queries coming in on a timely basis and track general market moving
  - o Not used to evaluate whether doing a good job in valuing (not a performance metric)
- What type of clients typically submit challenges – large institution or smaller funds?
  - o Broad; any client with contract to receive ICE service has ability to challenge

- ICE-IDC-SEC-4660 Spreadsheet
  - o Row 4: Column t - quote provider. Column L - IDC price. Column J - client comment re "we observe alternative levels around 10.31." column o "Responder Response": How does this get communicated to client? This is a system-generated response. If client uses portal, the client will download these responses and will see a similar view to this spreadsheet.
  - o Did someone review this challenge? No. This was system generated, didn't go to a human being.
  - o What's the point of being able to challenge then? IDC is alerting the client of the methodology for providing price for this product. If the client message doesn't have/provide enough information, then system will send automated response.
  - o What info will not get an automated response? Row 3 is an example of a non-automated response.
  - o What info is in Row 3 is additional? In "market data type" column, there is add'l data. There was a quote provided. This was new information that supported the challenge so that triggered an analyst to review the challenge, rather than just an automated response.

## LiveWell Financial

- Familiar with them in context of trying to evaluate HECM Ios. LiveWell was a provider of quotes within this area. POC at LiveWell: Don't remember many, but Dan Foster was one. Never met in person or had any phone calls, just emails.
- From Dec 2015 - Feb 2016, HECM IOs priced based on ICE evaluation models, after Feb 2016, priced based on broker-quote.
  - o When they were evaluated, was value of bond being pegged to current market value? Yes, what buyer would pay in a sale or what security would trade at in current sale.
  - o When switch made to publish broker-quotes from LiveWell, was there expectation that LiveWell quotes would be where security could trade in current market? IDC doesn't make that designation for broker quoted securities.
- Why take broker quotes from LiveWell? When not enough info to provide evaluation, IDC offers service of passing through broker-quote to clients.
- What changed in Feb 2016 to trigger change to broker-quote? From end of 2014 to early 2015, there was less market information, so deemed security as no longer eligible to be evaluated so they became eligible to be broker-quoted.
- Who involved in this decision? Doesn't recall all the people. He was involved in discussions on that. Matt Murphy involved too. Who had ultimate authority on making this decision? (didn't answer this)

5

- Are you aware of whether LiveWell is also a client of IDC (meaning, uses IDC pricing service on sales side)? He was not aware until last year sometime when LiveWell subpoena received by IDC.

- Who else provided HECM quotes other than LiveWell? There are others, but he's not sure of the names. Amelia: Will be produced tomorrow.

equal to the weighted average coupon rate of the related HECM MBS. In the event that LIBOR for the HECMs related to the participations underlying the group 4 and 5 trust assets is higher than LIBOR for the related securities, interest accruing on the related floating rate class will not be affected but interest accruals with respect to the related notional class will be increased.

***Adjustable rate HECMs are subject to certain caps, or maximum interest rates, which may limit the amount of interest payable in respect of the related HECM MBS and may limit the WACR on the related HECM MBS and the interest rates on the group 4 and 5 securities.*** If LIBOR increases to a sufficiently high level, the interest rates on the adjustable rate HECMs related to the participations under-

vailing interest rates may result in an unexpected return of principal. In that interest rate climate, higher yielding reinvestment opportunities may be limited. Conversely, higher prevailing interest rates may result in slower returns of principal and you may not be able to take advantage of higher yielding investment opportunities. The final payment on your security may occur much earlier than the final distribution date.

***The securities may not be a suitable investment for you.*** The securities in particular, the interest only and residual classes, are not suitable investments for all investors.

In addition, although the sponsor intends to make a market for the purchase and sale of the securities after their initial issuance, it has no

obligation to do so. There is no assurance that a secondary market will develop, that any secondary market will continue, or that the price at which you can sell an investment in any class will enable you to realize a desired yield on that investment.

You will bear the market risk of your investment. The market values of the classes are likely to fluctuate. These fluctuations may be significant and could result in significant losses to you.

The secondary markets for mortgage-related securities have experienced periods of illiquidity and can be expected to do so in the future. Illiquidity can have a severely adverse effect on the prices of classes that are especially sensitive to prepayment or interest rate risk or that have been structured to meet the investment requirements of limited categories of investors.

The residual securities may experience significant adverse tax timing consequences. Accordingly, you are urged to consult tax advisors and to consider the after-tax effect of ownership of a residual security and the suitability of the residual securities to your investment objectives. See "Certain United States Federal Income Tax Consequences" in this supplement and in the base offering circular.

You are encouraged to consult advisors regarding the financial, legal, tax and other aspects of an investment in the securities. You should not purchase the securities of any class unless you understand and are able to bear the prepay-

ment, yield, liquidity and market risks associated with that class.

***The actual characteristics of the HECMs and the participations underlying the trust assets affect the weighted average lives and yields of your securities.*** The yield and decrement tables in this supplement are based on assumed characteristics which are likely to be different from the actual characteristics. Furthermore, certain of the assumed characteristics identified in Exhibit A to this supplement, such as maximum claim amount and HECM MBS principal balance, are calculated on an aggregate basis which may cause results to differ, perhaps significantly, from those calculated using the actual characteristics of the trust assets on a HECM or participation level basis. As a result, the yields on your securities could be lower than you expected, even if the HECMs prepay at the constant prepayment rates set forth in the applicable table.

It is highly unlikely that the HECMs will prepay at any of the prepayment rates assumed or draw at any of the draw rates assumed, if any, in this supplement, or at any constant rate.

***Lack of publicly available information on the HECMs and the related participations underlying the trust assets may adversely affect the liquidity of your securities.*** Limited information will be made publicly available regarding the performance of the HECMs and the related participations underlying the trust assets after the closing date. The absence of publicly available information may affect your ability to sell your securities to prospective investors.

### THE TRUST ASSETS

#### General

The Sponsor intends to acquire the Trust Assets in privately negotiated transactions prior to the Closing Date and to sell them to the Trust according to the terms of a Trust Agreement between the Sponsor and the Trustee. The Sponsor will make certain representations and warranties with respect to the Trust Assets. All Trust Assets will evidence, directly or indirectly, Ginnie Mae Certificates.

#### The Trust MBS

The Trust Assets are HECM MBS guaranteed by Ginnie Mae, and are based on or backed by Participations in advances made to borrowers and related amounts in respect of HECMs. Each such

Regular and MX Securities will qualify as "guaranteed governmental mortgage pool certificates" within the meaning of a Department of Labor regulation, the effect of which is to provide that mortgage loans and participations therein underlying a "guaranteed governmental mortgage pool certificate" will not be considered assets of an employee benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or subject to section 4975 of the Code (each, a "Plan"), solely by reason of the Plan's purchase and holding of that certificate.

Governmental plans and certain church plans, while not subject to the fiduciary responsibility provisions of ERISA or the prohibited transaction provisions of ERISA and the Code, may nevertheless be subject to local, state or other federal laws that are substantially similar to the foregoing provisions of ERISA and the Code. Fiduciaries of any such plans should consult with their counsel before purchasing any of the Securities.

**Prospective Plan Investors should consult with their advisors, however, to determine whether the purchase, holding or resale of a Security could give rise to a transaction that is prohibited or is not otherwise permissible under either ERISA or the Code.**

See "ERISA Considerations" in the Base Offering Circular.

The Residual Securities are not offered to, and may not be transferred to, a Plan Investor.

## LEGAL INVESTMENT CONSIDERATIONS

Institutions whose investment activities are subject to legal investment laws and regulations or to review by certain regulatory authorities may be subject to restrictions on investment in the Securities. **No representation is made about the proper characterization of any Class for legal investment or other purposes, or about the permissibility of the purchase by particular investors of any Class under applicable legal investment restrictions.**

**Investors should consult their own legal advisors regarding applicable investment restrictions and the effect of any restrictions on the liquidity of the Securities prior to investing in the Securities.**

See "Legal Investment Considerations" in the Base Offering Circular.

## PLAN OF DISTRIBUTION

Subject to the terms and conditions of the Sponsor Agreement, the Sponsor has agreed to purchase all of the Securities if any are sold and purchased. The Sponsor proposes to offer the Regular and MX Classes to the public from time to time for sale in negotiated transactions at varying prices to be determined at the time of sale, plus accrued interest from (1) September 1, 2013 on the Fixed Rate and Delay Classes and (2) September 20, 2013 on the Floating Rate Classes. The Sponsor may effect these transactions by sales to or through certain securities dealers. These dealers may receive compensation in the form of discounts, concessions or commissions from the Sponsor and/or commissions from any purchasers for which they act as agents. Some of the Securities may be sold through dealers in relatively small sales. In the usual case, the commission charged on a relatively small sale of securities will be a higher percentage of the sales price than that charged on a large sale of securities.