# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

FLAGSTAR BANK, FSB, a Federally Chartered Savings Bank,

Plaintiff,

v.

LIVE WELL FINANCIAL, INC., a Delaware corporation,

MICHAEL C. HILD, an individual, ERIC ROHR, an individual,

and DARREN STUMBERGER, an individual,.

Case No. 2:19-cv-11512

Hon. Matthew F. Leitman

## SUR-REPLY IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT

---

## PRELIMINARY STATEMENT

Flagstar's Reply substitutes confident rhetoric for competent proof. It repeats conclusions without producing evidence, dismisses documented factual questions as speculation, and asks this Court to enter a $16 million judgment on the strength of a proceeding Flagstar's own brief admits it did not litigate. This filing responds on different terms entirely — grounded in indisputable law and binding precedent, in Flagstar's own written concessions, and in a factual and market-based record that has never been subjected to adversarial testing in any forum. Beyond the procedural arguments, this filing demonstrates and explains the root causation issues beneath Flagstar's alleged losses — showing that the magnitude of those alleged losses was not determined by the alleged underlying conduct alone, but by a simultaneous and deleteriously orchestrated chain of events involving the government's own investigation, a cooperating witness's pricing submissions, a two-year valuation freeze imposed by outside counsel Murphy McGonigle, and a liquidation process in a market those events had rendered non-functional.

I submit this sur-reply to address Flagstar's Reply Brief (ECF No. 170) and to supplement the record on the issues raised in my Response (ECF No. 168). The starting point is Flagstar's own Exhibit A.

Sheet 5 of the Judgment entered in my criminal case — United States v. Stumberger, No. 19-CR-608 (S.D.N.Y.) — checks the box stating: 'The determination of restitution is deferred until [January 4, 2024]. An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination.' That is Flagstar's own exhibit. It is the Judgment Flagstar attached to its Motion. It says, on its face, that a restitution determination was deferred in my case, pending a future proceeding and a future amended judgment.

The public docket of my case confirms this — see docket No. 19-CR-608. No Amended Judgment was ever entered. No restitution hearing was ever noticed. No government submission proposing a loss amount as to me was ever filed on that docket. No order determining my restitution obligation appears anywhere in the record of my own case. The docket remained active for other matters during and after the January 4, 2024 control date. The restitution matter is the one thing that never appears.

Flagstar is therefore asking this Court to enter a $16 million civil judgment — one that grows indefinitely with accruing interest — based on a number that was never legally determined as to me, in any court, before any judge, at any time. That is the central fact of this motion, and no argument about joint and several liability, a plea allocution, or the thoroughness of proceedings in United States v. Hild changes it. Any restitution proceedings Flagstar refers to occurred within Hild's case in which I was not a co-defendant.

Flagstar's Reply confirms the problem more than it resolves it. First, Flagstar now concedes it does not argue preclusion, despite previously and repeatedly presenting issue preclusion to this Court as their primary argument. Not only does Flagstar's sudden shift undermine the credibility of its position, it abandons the only theory under which the restitution figure could have had binding legal effect as to me. Second — and more significantly — Flagstar admits in its own words that it 'did not directly litigate its damages' in the restitution proceeding it asks this Court to rely upon. Reply at 3. Flagstar is admitting it submitted a claim to the government without representation by counsel at the restitution hearing. The court reduced the amount Flagstar sought, evidencing that factual disputes were present and were attempted to be resolved by non-experts conducting the restitution determination. These two admissions, standing together, are fatal to Flagstar's motion. Flagstar did not litigate its alleged damages and cannot satisfy its burden of proving them by pointing to a proceeding that it did not litigate, in a case that was not my own, and for which I received no notice of participation.

Beyond these structural problems, several additional points require direct emphasis before turning to the argument.

The government's own prosecutor told the sentencing court, on the record at my sentencing, that meeting with me was 'very helpful . . . in terms of thinking about how to present the case to the jury and making sure that we ourselves understood the mechanics of the bonds.' Sentencing Tr. at 7:21-8:1, United States v. Stumberger, No. 19 Cr. 608 (RA) (S.D.N.Y. Oct. 6, 2023), ECF No. 42. The government prosecution team's own understanding of how these instruments worked came substantially from me. I was then excluded from every proceeding in which the alleged loss attributable to those same instruments was calculated. To my knowledge, no independent expert of these unique instruments filled that gap at any stage of any proceeding. This Court is now being asked to enter a $16 million judgment built on that foundation.

The constitutional and statutory deprivations that have prevented me from independently verifying Flagstar's alleged loss calculations do not relieve Flagstar of its burden to prove them. The burden never shifts.

This sur-reply is organized as follows. Section I addresses Flagstar's shift from preclusion to 'evidence' and why that shift sharpens rather than resolves the defects identified in my Response. Section II addresses the MVRA procedural requirements and corrects Flagstar's mischaracterization of my Response in footnote 7, incorporating what the docket of my own criminal case now confirms. Section III addresses the affirmative causation argument: a simultaneous and deleteriously orchestrated chain of events — through Foster, Bloomberg, IDC, and Murphy McGonigle — manufactured the conditions under which the alleged losses were realized at the magnitude Flagstar claims, and Flagstar has therefore not established proximate causation as to the amount even if liability is ultimately established. Section IV addresses the absence of any independent bond valuation expert and why the government's own sentencing statements underscore why that gap matters. Section V notes the arguments Flagstar's Reply did not address. Section VI sets out the relief I request.

For the record, and as has been documented on multiple occasions on this Court's docket, I remain without access to the core documents from my own proceedings in the Southern District of New York. Despite repeated requests directed to my former counsel, Orrick Herrington and Sutcliffe LLP, and to subsequent CJA-appointed counsel, I have not received a copy of my plea agreement or my cooperation agreement from my SDNY proceedings. I raise this not to seek relief from this Court regarding those requests, but because it is directly relevant to the posture of this motion: Flagstar is a sophisticated institution represented by retained counsel with full access to the SDNY record, while I remain unable to obtain even my own plea agreement from my own former counsel despite years of documented requests. That asymmetry is material to how this Court should evaluate Flagstar's request to resolve a $16 million alleged damages question without discovery, without an evidentiary hearing, and without affording me the opportunity to review the very documents that form the foundation of its claim.

The contrast with identically situated co-defendant Eric Rohr, former Chief Financial Officer of Live Well Financial, is also instructive and belongs on this record. Not only did Rohr decline to

admit Flagstar's allegations, he affirmatively declared, on the record in this proceeding, that Flagstar caused its own alleged losses in whole or in part. He was represented by counsel throughout. He had the resources to contest this litigation. And yet Rohr was quietly dismissed from this case with prejudice by this same Court — without public disclosure of the terms — while I, a pro se defendant without access to my own criminal case documents, face a $16 million judgment motion without discovery, without a hearing, and without knowing what Flagstar recovered from the co-defendant who said Flagstar caused its own losses. This Court cannot determine whether Flagstar is seeking to recover losses it has already recovered, at least in part, from Rohr — because no one besides Flagstar and Rohr knows what really happened, and Flagstar has still disclosed nothing. That silence is not a neutral fact. It is an evidentiary gap that Flagstar bears the burden of filling before this Court enters any judgment against me.

## THE BURDEN OF PROOF

Before turning to the legal argument, the Court should have a clear picture of what Flagstar has and has not produced in support of a motion seeking a $16 million judgment. Flagstar bears the burden of proving alleged damages in this civil proceeding. On the present record, Flagstar has not produced the BlackRock valuation report its own witness relied upon and could not explain. It has not produced Dan Foster's Bloomberg pricing submissions or the assumptions underlying them. It has not produced the underlying alleged loss calculations, supporting workpapers, or any semblance of complete documentation required. It has not disclosed offsets or recoveries of any kind. It has not disclosed the amount or terms of the Rohr settlement. It has not identified or presented a single independent bond valuation expert at any stage of any proceeding involving these highly specialized and illiquid instruments. And — as Flagstar's own brief concedes — it did not directly litigate its alleged damages in the restitution proceeding it asks this Court to treat as sufficient proof of damages. That is the evidentiary foundation on which a $16 million judgment is being requested. It is not enough. The burden never shifts to the defendant to disprove an alleged damages figure that the plaintiff has not competently proven.

## ARGUMENT

### I. FLAGSTAR'S SHIFT FROM PRECLUSION TO 'EVIDENCE' DOES NOT CURE THE DEFECTS IDENTIFIED IN MY RESPONSE — IT CONFIRMS THEM.

**A. Flagstar's abandonment of preclusion means the restitution order must be evaluated purely as evidence, and evidence must be reliable and tested.**

My Response argued that the SDNY restitution order cannot bind me because I was neither a party to, nor adequately represented in, the proceeding that produced it. See Hansberry v. Lee,

311 U.S. 32, 40 (1940); Taylor v. Sturgell, 553 U.S. 880, 892-95 (2008); Richards v. Jefferson Cty., 517 U.S. 793, 798-802 (1996). Flagstar's Reply now states that it 'does not argue that the restitution order binds me through res judicata or claim preclusion.' Reply at 6. That is a significant concession. It means the only question remaining is the one my Response also raised in the alternative: what evidentiary weight, if any, a restitution order entered in a proceeding in which I was not a party can carry as proof of alleged damages against me in this civil case.

Flagstar's answer is that the order is simply 'evidence,' and Flagstar cites Al-Adily v. Garland, 63 F.4th 1065, 1069 (6th Cir. 2023), and Pilla v. Holder, 458 F. App'x 518, 521 (6th Cir. 2012), for the proposition that restitution orders 'can be sufficient evidence of loss.' Reply at 4. Both cases are distinguishable in a way that matters here. Both are immigration cases in which the restitution order was entered against the same person it was later used against, in the same criminal proceeding in which that person was sentenced, after that person had notice and an opportunity to contest the figure. Neither case involved a person who was a stranger to the restitution proceeding being told, in a separate civil action, that a restitution order entered in a proceeding in which he was not a party is evidence against him.

That distinction is the entire point of my Response's Due Process argument. The reason a restitution order can carry evidentiary weight as to the defendant in that case is that the defendant had the opportunity — through counsel, through the presentence process, through the restitution hearing itself — to contest the number before it became part of the judgment against him. I had no such opportunity. Flagstar's own description of the restitution proceedings in United States v. Hild confirms this: Flagstar describes 'several rounds of briefing, updated submissions from the Government and the involved parties, an evidentiary hearing lasting approximately four hours, supplementary filings and calculations, and revised billing records.' Reply at 2 (quoting ECF No. 167 at 3). I was not a participant in any round of that briefing, that hearing, or those calculations. Al-Adily and Pilla do not stand for the proposition that a number produced through that process in a proceeding in which I was not a party becomes admissible, reliable evidence of my civil liability simply because my name appears in the resulting order.

Flagstar's citation to United States v. Bogart, 576 F.3d 565, 575-76 (6th Cir. 2009), does not change this analysis. Bogart addresses a sentencing court's authority under 18 U.S.C. § 3664(h) to impose joint and several restitution among co-defendants sentenced together — and it should be noted that I was not a co-defendant in the Hild trial — each of whom had the opportunity to be heard at his own sentencing. Bogart does not address, and provides no basis for, the proposition that a civil plaintiff may treat a restitution figure from one defendant's case as sufficient evidence of alleged damages against a different defendant who was sentenced in a different proceeding, and who never had the opportunity Bogart assumes.

For these reasons, Flagstar's shift from 'preclusion' to 'evidence' does not resolve the issue raised in my Response — it sharpens it. The question before this Court is the reliability and weight of a

number that has never been tested as to me, in any forum, at any time. That question requires discovery and an evidentiary hearing, as my Response requested.

**B. Flagstar's own concession that it did not litigate alleged damages in the restitution proceeding is fatal to its motion.**

Flagstar's Reply contains an admission that deserves to stand alone: 'Flagstar did not directly litigate its damages' in the restitution proceeding. Reply at 3. Flagstar submitted its alleged claim to the government. It was not represented by counsel at the hearing. The court reduced the amount it sought — clearly signaling that genuine factual disputes were present and were attempted to be resolved by non-expert subject matter litigants.

This means the figure Flagstar is asking this Court to adopt was not litigated by Flagstar. It was not litigated by me. It was litigated — to the extent it was litigated at all — to my knowledge by Hild's counsel and the government, in a proceeding to which I was not a party, in which there were no subject matter experts, and at which Flagstar was not a represented advocate for its own alleged damages claim.

Flagstar cannot simultaneously argue that a proceeding it did not litigate establishes alleged damages it bears the burden of proving in this Court. The burden of proof on alleged damages belongs to the plaintiff in a civil action. Carey v. Piphus, 435 U.S. 247, 254-55 (1978); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63 (1931). Flagstar has not met that burden. The restitution order is not a substitute for meeting it, particularly given Flagstar's own concession that it was not a party litigating that figure.

**C. Section 3664(h) and joint and several liability address the SDNY court's authority over the restitution order; they do not address the notice and opportunity to be heard that I was due before that order was entered.**

Flagstar's Reply devotes substantial attention to establishing that the SDNY restitution order names me as jointly and severally liable, and that 18 U.S.C. § 3664(h) permits a sentencing court to impose joint and several liability without requiring identical participation by each co-defendant. Flagstar conveniently ignores the fact that I was not a co-defendant in United States v. Hild. Reply at 2-3.

My Response's argument was not about the SDNY court's authority to enter the order it entered. It was about the process due to me before that order was entered. Section 3664(d) and (e) of the MVRA, and the Due Process Clause independently, require notice to a defendant of the restitution amounts being considered and an opportunity to be heard before those amounts are fixed. My Response laid out in detail the specific MVRA notice provisions that were never satisfied as to me. Flagstar's Reply does not engage with any of this. It does not identify any notice sent to me. It does not identify any notice sent to my counsel of record, Xavier R. Donaldson. Flagstar's Reply simply repeats that the SDNY court had the power to enter a joint

and several order — which was never in dispute — without addressing whether that power was exercised consistent with the notice and hearing requirements that apply to me individually.

## II. THE DOCKET OF MY OWN CASE CONFIRMS THAT NO MVRA-COMPLIANT RESTITUTION PROCEEDING EVER OCCURRED AS TO ME — AND CORRECTS A MISCHARACTERIZATION IN FLAGSTAR'S REPLY.

### A. What Flagstar's own Exhibit A establishes.

The starting point is the document Flagstar itself submitted. The Judgment entered in United States v. Stumberger, No. 19-CR-608 (S.D.N.Y.) on October 10, 2023 — Flagstar's Exhibit A — contains Sheet 5, the Criminal Monetary Penalties page. That page checks the box stating: 'The determination of restitution is deferred until [January 4, 2024]. An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination.' The page also reflects no restitution amount — zero dollars are entered in the restitution field.

Flagstar submitted this document as support for its Motion. It is therefore established on the face of Flagstar's own submission that, as of October 2023, no restitution had been determined as to me, and a future proceeding was contemplated to make that determination. The question is what happened next.

### B. The docket of my own case shows that the contemplated restitution proceeding never occurred.

Since filing my Response, I have again reviewed the publicly available docket of United States v. Stumberger, No. 19-CR-608 (S.D.N.Y.). That review confirms the following:

- No Amended Judgment (AO 245C) has ever been entered in 19-CR-608.

- No restitution hearing was ever noticed on that docket.

- No government submission proposing a loss amount as to me was ever filed on that docket.

- No probation officer submission concerning restitution appears on that docket.

- No order determining my restitution obligation appears on that docket at all.

This is not because the case went inactive. Docket No. 19-CR-608 remained open and the Court and Probation Office continued to act on matters in my case well after the January 4, 2024 control date — including reassigning my supervision among probation officers and granting my request to relocate my district of residence so that I could live near my children. The docket was capable of receiving filings and orders during this period and did receive them. Any restitution proceeding that my own Judgment said would occur is the one thing that never appears.

The only place restitution has ever been addressed in connection with my case is in the docket of a different case — United States v. Hild, No. 19-CR-602 (S.D.N.Y.) — in which I was not a defendant. The sole connection between that case's restitution proceedings and me is a single sentence in the resulting order stating that restitution is joint and several as to, 'United States v. Eric Rohr, No. 19-CR-595' 'United States v. Darren Stumberger, No. 19-CR-608.' Ex. A to Flagstar's Motion at 26.

My Response argued that I was deprived of the notice and participation the MVRA requires. The docket of my own case now confirms that argument with specificity: not only did I not receive notice, but no MVRA process — notice, hearing, submission, or order — occurred on the docket of my own criminal case at all, even though that same docket was active and being used for other purposes during the relevant period. If Flagstar contends that some other process, not reflected on the docket of my own case, satisfied the MVRA's requirements as to me, that is Flagstar's burden to establish. On the present record, the only proceeding that ever fixed a restitution figure as to me is one to which I was not a party, of which I have no evidence I received notice, and which does not appear anywhere in the public record of my own case.

**C. The MVRA independently required my participation in the restitution determination — and that participation never occurred.**

Beyond the constitutional due process principles established in Hansberry v. Lee, Taylor v. Sturgell, and Mathews v. Eldridge, the restitution process that produced the figure Flagstar now seeks to use against me was independently deficient under the express statutory procedural requirements of the Mandatory Victims Restitution Act, 18 U.S.C. §§ 3663A and 3664 (the 'MVRA').

The MVRA has been continuously in force since its enactment in 1996 — well before my 2019 plea and through the present date. It applies mandatorily to offenses including securities fraud, wire fraud, and bank fraud, the precise offenses alleged. The MVRA does not merely authorize restitution. It establishes a mandatory procedural framework governing how restitution amounts must be determined, and that framework vests specific rights in the defendant whose alleged conduct is at issue — including defendants who have entered plea agreements.

Under 18 U.S.C. § 3664, the statute required, at minimum, that I receive notice of: the offenses for which restitution was being sought; the amounts being submitted to the probation officer; the opportunity to submit information concerning those amounts; and the scheduled date, time, and place of the hearing at which restitution would be determined. The statute further required that I prepare and file a financial affidavit, that the court review presentence materials and evidence from both parties, and that the court make independent factual findings regarding the extent of any victim's alleged losses. The government bears the burden of establishing alleged loss amounts by a preponderance of the evidence, and I am entitled to challenge both the methodology and the amount.

None of these statutory requirements were met as to me in connection with the restitution proceedings in United States v. Hild. The restitution amount was determined entirely within Hild's case — litigated by Hild's counsel, on submissions by the government and Flagstar, in a proceeding to which I was not a party. I received no MVRA-required notice. I was not provided an opportunity to appear, to submit information, to file a financial affidavit, or to challenge the alleged loss calculations. No probation officer in my own case solicited restitution information in connection with a determination as to me. My sentencing court in the Southern District of New York does not appear to have conducted the independent restitution hearing the MVRA contemplates for each individual defendant subject to its obligations. The resulting figure was applied to me jointly and severally through the Hild order, without any of the procedural protections the MVRA independently requires.

Flagstar's Reply dismisses the MVRA argument by stating that the MVRA 'governs the relationship between a defendant and the government in a criminal case' and 'does not control admissibility or proof of damages in this civil action.' Reply at 8. That response misses the point. My MVRA argument is not that the MVRA controls admissibility in this Court as a matter of evidentiary law. My argument is that the figure Flagstar offers as evidence was produced without the adversarial testing that the MVRA mandates for me — and therefore lacks the indicia of reliability that would justify this Court's reliance on it. A number that was never subjected to the MVRA's required procedural protections as to me carries no meaningful evidentiary weight in a civil proceeding in which Flagstar bears the independent burden of proving its alleged damages.

The prejudice from these omissions is specific and demonstrable. The entire Foster-Bloomberg pricing chain — the IDC cessation, Foster's government cooperation, the Bloomberg pricing submissions, Murphy McGonigle's valuation directive, the BAML auction process, and BlackRock's unproduced valuation — constitutes evidence directly relevant to the accuracy of the alleged loss calculation that underlies the restitution figure. That evidence surfaced only in 2025 filings on this Court's docket. Had I actually been noticed and participated in the Hild restitution proceedings, I could have only partially challenged the alleged loss methodology without this highly relevant evidence that did not yet exist in the record. The inability to present that evidence to any proceeding that has ever evaluated the alleged loss amount is precisely the kind of concrete, demonstrable prejudice that courts must weigh and cannot permit.

### D. Flagstar's footnote 7 mischaracterizes my Response and converts a gap in the record into an inference that favors Flagstar.

My Response stated that my own counsel did not inform me of the restitution proceedings. Flagstar's footnote 7 treats this as an admission that notice of the restitution proceedings was sent to, and received by, my then-counsel, Mr. Donaldson, who simply did not pass it along — and on that basis argues that my 'lack of notice' is 'attributable to [my] own representation, not a defect in the process.' Reply at 8 n.7.

That is not what my Response suggests, and the record does not support it. I do not know, and have no way of knowing, whether Mr. Donaldson ever received notice of the restitution proceedings in United States v. Hild and failed to relay it to me, or whether no notice was ever sent to Mr. Donaldson — or to anyone else acting on my behalf — in the first place. My statement was narrower: regardless of what process was supposed to occur, I personally received no notice of any restitution proceeding, no opportunity to submit a financial affidavit, no opportunity to challenge the alleged loss methodology, and no opportunity to be heard. Flagstar — as the party with the burden of proof and with full access to the SDNY record — needs to establish what notice, if any, was given and to whom. It has not done so. In the absence of any evidence that proper MVRA notice was given to me or to counsel authorized to act on my behalf, the inference runs against Flagstar, not in its favor.

### III. A SIMULTANEOUS AND DELETERIOUSLY ORCHESTRATED CHAIN OF EVENTS MANUFACTURED THE CONDITIONS UNDER WHICH FLAGSTAR'S ALLEGED LOSSES WERE REALIZED AT THE MAGNITUDE CLAIMED — AND FLAGSTAR HAS THEREFORE NOT ESTABLISHED PROXIMATE CAUSATION AS TO THE AMOUNT.

This section presents an affirmative causation argument that is distinct from and independent of the procedural arguments in Sections I and II. Flagstar has not established that the specific dollar amount of alleged loss it claims was proximately caused by the alleged conduct underlying the alleged conspiracy. The present record demonstrates that the magnitude of the alleged loss was substantially shaped by a simultaneous and deleteriously orchestrated chain of events that intervened between the alleged underlying conduct and the alleged realized loss — events that functioned, in combination, to manufacture the conditions under which Flagstar's alleged losses were crystallized at the level they were crystallized.

The Court has preliminarily resolved liability and I have preserved that ruling for the appeal for which I have already filed a notice of intent with this Court. This is currently an argument about the dollar amount of alleged damages. The law states a defendant may be liable for the alleged underlying conduct and still establish, as a matter of proximate causation, that the specific magnitude of the alleged claims was determined not by that alleged conduct alone but by subsequent independent events. See Exxon Co. U.S.A. v. Sofec, Inc., 517 U.S. 830, 837-40 (1996); Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-65 (1946). That is the argument I make here, and the present record supports it.

**A. The government investigation dismantled the independent pricing mechanism that the entire repo lending structure depended upon — and the structure was then replaced with valuation pricing supplied by the government's cooperating witness.**

The HECM interest-only bond market that existed during the period at issue was not a deep, transparent market with multiple independent pricing sources. It was a thin, specialized market in which Interactive Data Corporation ('IDC') served as the primary pricing source for repo lending valuations. Flagstar's own witness, Robert Marsh, confirmed that IDC was the 'required path of valuation' within the applicable reporting structure, and that U.S. Bank relied on IDC values as the operative pricing benchmark. Marsh Dep. at 29:4-11.

That pricing structure did not collapse because the market determined the bonds were worth less. It collapsed because the SEC investigated IDC's pricing methodology and IDC, in response to SEC concerns, ceased accepting and publishing prices for these securities. The SEC's own enforcement action and cease-and-desist order against ICE Data Pricing and Reference Data LLC arose from the same practices. IDC's cessation was a direct consequence of the government's investigation. It removed the one pricing benchmark that the entire lending and collateral structure depended upon, not because independent market participants had reached a different view of value, but because the government's investigation had made IDC unwilling to continue publishing prices.

Into that vacuum stepped Bloomberg — and into Bloomberg's data collection for these securities stepped Dan Foster. Foster was a former Live Well Vice President who had departed Live Well in 2017, entered into a proffer agreement with the SEC in November 2017, and was actively cooperating with federal investigators while simultaneously developing a formal pricing relationship with Bloomberg for HECM collateralized mortgage obligations and interest-only securities. Bloomberg's own representatives acknowledged they were 'starved for data' in the HECM sector — confirming the absence of a deep, independently observable market that could validate any contributor's submissions. ECF No. 144, Ex. E.

The investigation that led to IDC's cessation was the same investigation through which Foster was simultaneously managed as a cooperating witness. The replacement pricing that entered the market through Bloomberg after IDC ceased was supplied, at least in material part, by that same cooperating witness. Whatever the intent of any individual decision, the practical effect of these concurrent developments was that the independent pricing benchmark the repo lending structure had depended upon was removed, and the pricing that replaced it came from a source whose independence and reliability have never been independently examined. These concurrent developments form a critical part of the simultaneous and deleteriously orchestrated chain of events that contributed to the magnitude of the alleged losses — and they have never been subjected to adversarial scrutiny in any proceeding to which I was a party.

**B. Foster's pricing submissions to Bloomberg occurred under conditions that make their independence and reliability impossible to assess without discovery — yet those submissions drove the benchmark against which Flagstar valued and liquidated its portfolio.**

The pricing levels Foster supplied to Bloomberg after departing Live Well differed materially from the valuations he had supplied to IDC while at Live Well. The record does not establish why those differences existed, what discounted HECM cash flow modeling assumptions or DCF model Foster used in modeling the securities for Bloomberg, or how his methodology compared to what he had previously employed at Live Well. There has never been testing as to the accuracy or integrity of the model Foster used. To my knowledge, those questions have never been examined in any proceeding — not in the Hild trial, not in the Hild restitution proceedings, and not in this civil action. All that is known is that Foster was a government cooperator with the SEC and then the SDNY, and he supplied valuations to Bloomberg upon which Flagstar relied.

What the record does establish is the context in which Foster supplied those prices. He had signed a proffer agreement with the SEC in November 2017. He was cooperating with federal investigators throughout the period in which he was supplying Bloomberg with pricing inputs. He ultimately received a non-prosecution agreement from both the SEC and the SDNY — an agreement executed by August 2019, the same period in which Flagstar was evaluating and ultimately liquidating its portfolio. A pricing contributor who supplied valuations to Bloomberg while simultaneously cooperating with federal investigators and securing a non-prosecution agreement presents an obvious conflict and unresolved questions about the independence and reliability of those valuations. Whether Foster's cooperation status influenced his pricing assumptions, his modeling methodology, or the resulting Bloomberg benchmark values are factual questions that have never been subjected to discovery in this case or in any related proceeding.

The restitution proceedings that produced the alleged loss figure Flagstar relies upon involved, as a central witness, the same cooperating witness whose pricing submissions to Bloomberg informed what that alleged loss would be. The government relied on Dan Foster's cooperation and expertise to understand and present its case involving these bonds, while Foster simultaneously supplied pricing valuations to Bloomberg — valuations that became the operative benchmark against which Flagstar valued and liquidated its portfolio. Whatever the intent of any individual participant in that process, the practical result is an alleged loss figure that traces, at every critical stage, to a single source whose independence has never been independently verified and whose methodology has never been subjected to adversarial scrutiny in any proceeding to which I was a party. That is not an independent market determination of alleged loss. It is a figure whose reliability depends entirely on the reliability of a contaminated pricing chain that remains unexamined.

**C. Murphy McGonigle's directive froze the portfolio's valuation adjustments for over two years during a period of significant, documented, multi-variable market change — and the compounded effect of that freeze on the magnitude of the alleged claims has never been quantified, examined, or separated from the alleged loss attributable to the alleged underlying conduct.**

The alleged losses Flagstar experienced were absolutely not simply the product of the original valuations. They were compounded by a second, entirely independent factor that has received insufficient attention in this litigation: the explicit directive issued by Murphy McGonigle to the employees of Live Well Financial — Live Well's outside counsel during the SEC investigation — prohibiting Live Well and IDC from making valuation adjustments to the bond portfolio for the entire period from approximately July 2017 through August 2019.

Any active participant in a HECM IO bond portfolio makes routine, normal, and customary adjustments to individual bond valuations on a monthly basis to isolate the 'seasoning' element of the bonds. As bonds mature, valuations should be adjusted monthly. These are not discretionary adjustments made to increase or decrease values — it is standard bond maintenance. They are the ordinary mechanics of maintaining an accurate picture of what a bond portfolio is worth independent of broader market conditions. Market-condition-related changes are reflected separately through adjustments for changes in interest rates, prepayment experience, mortality experience, line of credit draw activity, buyout dynamics, policy developments, yield, discount margin and spread, and a range of other factors that affect the value of floating-rate, long-duration instruments over time.

Murphy McGonigle's directive prevented all of those adjustments — both the seasoning element and the market-condition-related elements — from occurring for more than twenty-four consecutive months. The absence of seasoning adjustments is highly material to valuations by itself. What makes this situation particularly significant — and what has been entirely absent from every proceeding in this matter — is that the freeze did not occur during a period of market stability. It occurred, as any reasonable financial markets or HECM market participant knows, during a period of substantial, documented, multi-variable market change across every major driver of HECM IO bond value, forming a critical element of the simultaneous and deleteriously orchestrated chain of events that produced the alleged losses at the magnitude claimed. The following changes occurred and compounded during the July 2017 through August 2019 freeze period and were entirely excluded from the portfolio's carried valuations — this list is not exhaustive:

- **Interest Rates and Yield Movements:** The freeze period encompassed significant Federal Reserve policy action, including multiple rate increases through 2018 followed by a pivot toward rate cuts in 2019. HECM IO bonds are floating-rate instruments indexed to LIBOR and CMT rates whose coupon income — and therefore present value — changes directly with rate movements. A properly maintained portfolio would have reflected each of these rate changes through monthly valuation adjustments. The frozen portfolio did not. The net effect of two years of substantial rate volatility on the value of these instruments was never captured and has never been analyzed.

- **Credit Spreads and Discount Margins:** HECM IO securities are priced to a spread over benchmark rates, not to a fixed yield-to-maturity. Discount margins in this sector are sensitive to changes in liquidity, market technicals, and investor appetite. The 2017-2019 period saw meaningful changes in credit spreads across fixed-income markets, including periods of both spread widening and tightening that would directly affect the discount margin at which a properly valued HECM IO portfolio would be marked. None of those spread movements were captured in the frozen positions. The relationship between the frozen carried values and any measure of fair market value during this period is therefore unknown without independent analysis.

- **Prepayment History and Forward Prepayment Assumptions:** Prepayment speeds for HECM IO collateral were actively evolving during this period. Actual prepayment experience accumulates monthly, and each month's experience updates the forward prepayment assumptions that drive the present value of IO strip cash flows. Twenty-four months of actual prepayment experience — which either confirmed or contradicted the assumptions embedded in the original valuations — was never incorporated into the portfolio's carried values. Forward prepayment curves changed materially during this period in response to changes in FHA policy, originator churning and refinance activity, interest rates, and market conditions. None of those changes were reflected in the frozen positions.

- **Line of Credit Draw History and Projected Draws:** HECM reverse mortgages frequently include line of credit features that allow borrowers to draw additional principal over time. Draw activity directly affects the outstanding balance of underlying loans and therefore affects the cash flows available to support the IO strip. During the freeze period, line of credit draw activity continued to accumulate across the portfolio's underlying collateral, changing the collateral composition and affecting prepayment timing, buyout triggers, and cash flow projections. A properly maintained monthly adjustment process would have captured this activity. The frozen portfolio ignored twenty-four months of accumulated draw experience and its effect on forward cash flow projections entirely.

- **Mortality and Morbidity Trends:** HECM loan terminations are driven in significant part by borrower mortality. Changes in mortality and morbidity trends for the reverse mortgage borrower population affect the expected duration of HECM loans and therefore the expected life of IO strip cash flows. During the freeze period, mortality experience within the existing HECM borrower population was actively accumulating. Actual terminations either confirmed or contradicted the mortality assumptions embedded in the original valuations. The portfolio's assumed remaining cash flow life was therefore increasingly disconnected from the actual remaining life of the underlying collateral, and the magnitude of that disconnection grew with each passing month of the freeze.

- **FHA Policy, Regulatory, and Product Changes:** The 2017-2019 period was one of significant FHA policy activity directly affecting the HECM program. In October 2017,

FHA implemented the most substantial changes to HECM principal limit factors and insurance premium structures in years — changes that materially affected origination economics, collateral composition, and the expected cash flows of existing HECM IO positions. These policy changes altered the incentive structures for servicers, originators, and borrowers in ways that directly affected prepayment speeds, buyout activity, and the future supply of HECM IO collateral. A properly maintained valuation process would have incorporated the effects of these regulatory changes into monthly adjustments. The frozen portfolio did not. The effect of these policy changes on the value of existing positions was simply never captured.

• **Origination Dynamics, Supply, and Market Technicals:** HECM IO bond valuation is sensitive to the supply and demand technicals of the secondary market. The October 2017 FHA changes reduced HECM loan origination volumes significantly, affecting the supply of new IO securities entering the market and changing the relative scarcity value of existing positions. Both supply and demand conditions in the HECM IO secondary market changed materially during the freeze period. A properly maintained portfolio would have reflected these shifts in the discount margin and relative value assumptions applied to each position. The frozen portfolio did not. The relationship between the frozen carried values and the market technicals that would have been reflected under normal monthly adjustment practice grew more disconnected with each passing month.

• **Buyout Activity and Servicer Economics:** FHA guidelines create economic incentives for servicers to buy out HECM loans that have reached certain balance thresholds relative to property values. Buyout activity accelerated during the freeze period as the existing HECM loan pool aged and more loans crossed buyout thresholds. Buyouts terminate the IO strip on the affected loans and therefore directly affect the remaining cash flow life of the IO securities. A properly maintained valuation process would have updated buyout assumptions based on actual monthly buyout experience. The frozen portfolio did not. Twenty-four months of actual buyout experience — which materially affects the projected duration and present value of IO cash flows — was excluded from the portfolio's valuations entirely.

The compounded effect of excluding all of the above market changes from the portfolio's valuations for twenty-four consecutive months is not a technical footnote to the alleged damages question. It is a fundamental distortion of the relationship between the portfolio's carried values and any measure of what these securities were actually worth at the time of liquidation. When the portfolio was ultimately valued and liquidated, the gap between the frozen carried values and the realized prices reflected not only whatever existed in the original valuations but also the accumulated disconnection produced by twenty-four months of ignored, documented, multi-variable market change across every major driver of HECM IO bond value — all forming

part of the simultaneous and deleteriously orchestrated chain of events that produced the alleged losses at the magnitude Flagstar now claims.

No analysis has been performed — in any proceeding, by any party, at any stage — to separate these two components of the alleged loss. The alleged loss figure Flagstar asks this Court to adopt does not distinguish between the portion of the alleged loss attributable to the original valuations and the portion attributable to the compounded effect of the Murphy McGonigle freeze during this period of significant market change. Those are separable questions. An independent HECM bond valuation expert with access to the portfolio's position-level data could reconstruct what the portfolio valuations would have been under a properly maintained monthly adjustment process and isolate that component from the component attributable to the alleged underlying conduct. That analysis has never been performed. Until it is, the alleged loss figure Flagstar relies upon necessarily includes alleged losses caused by Murphy McGonigle's legal directive — alleged losses that are not attributable to the alleged conduct underlying the conspiracy claim and that Flagstar has made no attempt to identify, quantify, or exclude from its alleged claims.

Flagstar's alleged damages theory asks this Court to accept the full gap between the frozen carried values and the liquidation proceeds as the measure of alleged loss caused by the conspiracy. That theory is not supported by the present record. What the record shows is that the portfolio was frozen for two years during a period of material market change, then valued and liquidated in a distorted pricing environment created by the simultaneous and deleteriously orchestrated chain of events described throughout this section. Flagstar has not established — and cannot establish without the analysis described above — that the specific dollar amount it claims flows from the alleged underlying conduct rather than from these independent, compounding, and entirely unexamined intervening causes.

### D. The BAML liquidation occurred in a market that the simultaneous and deleteriously orchestrated chain of events had rendered non-functional as an independent price-discovery mechanism.

Flagstar ultimately liquidated its portfolio through an auction process conducted by Bank of America Merrill Lynch. The prices obtained in that auction are the foundation of Flagstar's alleged claims. But those prices were not determined in a functioning, independent market. They were determined in a market that had been structurally altered by the simultaneous and deleteriously orchestrated chain of events described above: the SEC investigation commenced; IDC ceased pricing the securities; Bloomberg became the operative reference source; Bloomberg's prices for these securities were driven, at least in material part, by Foster's submissions made during his active cooperation with federal investigators; and the normal monthly valuation adjustments that would have gradually reduced any gap between carried values and current values had been frozen for two years by Murphy McGonigle's directive.

When both buyer and seller in a thin, illiquid market look to the same questionable Bloomberg benchmark as the reference point for a reasonable transaction price, the resulting sale price does not independently validate the benchmark. It reflects shared reliance on it. If the benchmark was distorted — whether by Foster's cooperation-era pricing assumptions, by the two-year valuation freeze, or by both — shared reliance does not cure the distortion. It confirms and magnifies it. The auction price becomes self-confirming: participants treat the Bloomberg value as authoritative, bid accordingly, and the resulting trade is then offered as proof the mark was right. That is circular reasoning, and it cannot support entry of a $16 million judgment.

The circumstances of the BAML auction raise an additional independent concern. Based on my direct experience working on BAML's HECM Sales and Trading Desk, I am familiar with how Wall Street institutions operate in thinly traded specialty markets. The record indicates that BAML both managed the auction process and became involved as a purchaser of the securities being auctioned. An institution that has access to all bidder information by virtue of managing the auction, and that simultaneously participates as a bidder, occupies a structurally advantaged position. In a market where the dominant pricing benchmark was itself disputed and potentially distorted, that structural advantage creates obvious questions about whether the auction reflected arm's-length fair value or whether BAML identified an opportunity created by the distorted benchmark and exploited it. Those questions have never been examined in any proceeding and require discovery.

**E. The alleged losses Flagstar claims were not an inevitable consequence of the alleged underlying conduct — they were the product of a simultaneous and deleteriously orchestrated chain of events that crystallized the alleged loss at the magnitude claimed.**

The theory Flagstar presents to this Court is that the alleged losses it experienced flowed naturally and directly from the original bond valuations — that once the bonds were liquidated in the fire-sale to BAML, the alleged losses were determined. That theory is not supported by the record. What the record actually shows is that the alleged losses were crystallized through a simultaneous and deleteriously orchestrated chain of events that converged to produce the alleged damages at the level Flagstar now claims:

- The SEC investigated and pressured IDC to stop pricing the bonds, removing the independent pricing benchmark the repo lending structure depended upon.

- The government managed Foster's cooperation while Foster simultaneously supplied replacement pricing to Bloomberg at materially lower levels than he had previously supplied to IDC.

- Murphy McGonigle's directive froze the portfolio's valuation adjustments for twenty-four consecutive months during a period of significant multi-variable market change, compounding the apparent gap between carried values and current values.

- Flagstar valued and liquidated its portfolio relying on Bloomberg prices that were, by Bloomberg's own admission, driven by a thin contributor base in a sector where Bloomberg was starved for data.

- The BAML auction occurred in that distorted market environment, with BAML occupying a dual role as auction manager and purchaser — and despite this conflict, Flagstar made a business decision to permit it and accept the resultant loss.

Each of these events was independent of and subsequent to the alleged underlying conduct. Each contributed to the magnitude of the alleged loss that was ultimately realized. None of them has been examined in any adversarial proceeding to which I was a party. And the alleged loss figure Flagstar asks this Court to adopt makes no attempt to separate the alleged loss attributable to the alleged underlying conduct from the alleged loss attributable to this simultaneous and deleteriously orchestrated chain of events.

Flagstar's Response argues that this Court's liability ruling resolved causation. Reply at 5. That is not what the April 27, 2026 Order says. It resolved liability on the conspiracy claim. It expressly stated that the Court had not yet seen evidence of the amount of alleged damages. Causation as to liability and causation as to the specific dollar magnitude of alleged loss are separable inquiries. The Court has answered the first. It has not answered the second. And on the present record, Flagstar has not met its burden of proving that the specific dollar amount it claims flows proximately from the alleged underlying conduct rather than from the simultaneous and deleteriously orchestrated chain of events described above.

**F. Flagstar's characterization of the Foster-Bloomberg evidence as speculation is incorrect — it is a documentary record that has never been subjected to adversarial testing.**

Flagstar's Reply characterizes the Foster-Bloomberg evidence as speculation. Reply at 5. That characterization is not accurate. The evidence consists of emails between Foster and Bloomberg, SEC interview notes, Bloomberg's own internal communications acknowledging its data limitations in the HECM sector, and documents reflecting the timing of Foster's proffer and non-prosecution agreements — all already in the record at ECF No. 144, Ex. E. This is not speculation. It is a documentary record that raises specific, concrete, answerable questions about the reliability of the pricing mechanism that drove Flagstar's alleged losses.

What has not yet occurred is discovery into those questions. Flagstar is correct that I have not produced a competing alleged damages figure. I cannot produce a competing alleged damages figure without the BlackRock report, without the BAML auction records, without Foster's Bloomberg submission data, without the opportunity to investigate the Murphy McGonigle directive and its full effect on portfolio valuations during the freeze period, and without the opportunity to retain a qualified HECM bond valuation expert to analyze all of the above. Flagstar's observation that I have offered no competing calculation is not a point in its favor — it is a description of precisely what targeted discovery would produce. The absence of a competing

number at this stage reflects the absence of discovery, not the absence of a legitimate challenge to Flagstar's alleged number.

**G. Defendant had no role in, contact with, or knowledge of Flagstar's day-to-day lending relationship — the individuals who managed that relationship have either been dismissed or were never named.**

A further fact bearing directly on causation and proportionality belongs on this record. I was not an officer of Live Well Financial. I held no unilateral trading authority, no management authority over the company's lending relationships, and no decision-making role with respect to the repo facilities and warehouse lines at issue in this case. I was never consulted in connection with any margin call Flagstar made or threatened. I was not a party to any contract negotiation with Flagstar. I was not copied on, consulted about, or present for any communications between Live Well and Flagstar in connection with the lending arrangements at issue. To my knowledge, I have never had a discussion of any kind, in any form, with anyone at Flagstar Bank.

The individuals who maintained daily and customary contact with Flagstar throughout the relevant period were Ernie Calabrese and Eric Rohr. It was Calabrese and Rohr who managed the lending relationship, responded to margin calls, participated in contract negotiations, and served as Live Well's operational point of contact with Flagstar on a day-to-day basis. Rohr is the co-defendant who affirmatively declared on the record in this proceeding that Flagstar caused its own alleged losses in whole or in part — and who was then quietly dismissed from this case with prejudice under undisclosed terms. Calabrese, to my knowledge, was never named as a defendant in this action at all.

Flagstar is therefore seeking a $16 million judgment against the one individual connected to this matter who had no direct contact with Flagstar, no role in managing the lending relationship, no involvement in margin call responses, and no participation in contract negotiations — while the individuals who actually managed that relationship have either been dismissed under undisclosed terms or were never sued. That disparity is not peripheral to the causation question. It goes directly to whether the specific alleged loss Flagstar claims was proximately caused by my alleged conduct or by decisions made and relationships managed by others who are no longer in this case. Flagstar has never addressed this disparity, and it cannot be resolved without the discovery and evidentiary hearing this sur-reply requests.

**IV. NO INDEPENDENT BOND VALUATION EXPERT HAS TESTIFIED AT ANY STAGE OF ANY PROCEEDING — INCLUDING THE RESTITUTION PROCEEDING FLAGSTAR NOW OFFERS AS EVIDENCE — AND THE GOVERNMENT'S OWN STATEMENTS AT MY SENTENCING CONFIRM WHY THAT GAP IS NOT HARMLESS.**

The causation problems identified in Section III are compounded by a fundamental evidentiary gap that runs through every proceeding in this matter: no independent expert has testified at any stage about how these HECM interest-only securities should be valued, what they were actually worth, or how the alleged loss figure now before this Court was derived.

Flagstar's own witness, Robert Marsh, testified that he did not possess the BlackRock valuation report, did not know BlackRock's assumptions, and could not explain the methodology employed. Marsh Dep. at 22:12-23; 84:1-19. Flagstar's Reply does not produce the BlackRock report, does not identify any other valuation expert, and does not explain the gap. These securities were not ordinary fixed-rate instruments. They were HECM interest-only floating-rate securities whose value depended on assumptions about prepayments, mortality, interest rates, buyouts, discount margins, regulatory changes, and long-term projected cash flows. The offering materials warned that no active secondary market might develop. Determining their value is not a ministerial exercise.

The government's own prosecutor acknowledged this directly. AUSA Scott Hartman told the sentencing court that meeting with me was 'very helpful . . . in terms of thinking about how to present the case to the jury and making sure that we ourselves understood the mechanics of the bonds.' Sentencing Tr. at 7:21-8:1, United States v. Stumberger, No. 19 Cr. 608 (RA) (S.D.N.Y. Oct. 6, 2023), ECF No. 42. The government needed my expertise to understand the very instruments whose alleged value is now in dispute. I was then excluded from every proceeding in which the alleged loss attributable to those instruments was calculated. No independent expert has ever filled that gap.

Flagstar's 'evidence, not preclusion' position asks this Court to treat the SDNY restitution figure as reliable proof of alleged loss for instruments that required 'several rounds of briefing' and 'supplementary filings and calculations' to arrive at — yet no party to that process has identified a qualified valuation expert who testified, was deposed, or submitted an expert report. The suggested extensiveness of the Hild proceedings is not a substitute for independent expert analysis. It is simply a record of how hard the parties argued over a methodology that has never been independently validated and that the prosecution itself told the Court it needed me to help explain.

Before a $16 million judgment is entered on that basis, the methodology must be independently tested. That requires production of the BlackRock report, discovery into the Foster-Bloomberg pricing chain and the Murphy McGonigle directive, and the opportunity to retain a qualified HECM bond valuation expert to assess whether the liquidation proceeds Flagstar obtained reflect the actual economic alleged loss caused by the alleged underlying conduct or the compounded effects of the simultaneous and deleteriously orchestrated chain of events described in Section III above.

**V. THE REMAINING ARGUMENTS IN MY RESPONSE — CAUSATION, MITIGATION, OFFSETS, AND THE UNDISCLOSED ROHR SETTLEMENT — ARE NOT ADDRESSED IN FLAGSTAR'S REPLY AND REMAIN BEFORE THIS COURT.**

Flagstar's Reply does not meaningfully address several arguments from my Response. I note them here so the record is clear that they remain live.

**A. Causation and the BAML auction process.**

My Response argued that Flagstar has not established that the liquidation proceeds it relies upon reflect fair market value, and that Flagstar's decision to liquidate through Bank of America Merrill Lynch — an institution that served as both the manager of the auction and a bidder for the securities — has never been examined. Resp. §§ IV-V. Flagstar's Reply does not address the BAML auction, does not address the question of whether BAML's dual role affected the auction result, and does not address the broader causation question of whether the liquidation price reflects the alleged loss caused by the alleged conspiracy rather than the alleged loss caused by the simultaneous and deleteriously orchestrated chain of subsequent events described in Section III above.

In a market where both buyer and seller look to the same Bloomberg benchmark as the reference point, the transaction price does not independently validate the benchmark. If the benchmark was distorted, shared reliance does not cure the distortion. The full circumstances of the BAML auction — the marketing process, the identity of all bidders, the assumptions provided to potential purchasers, and any communications regarding BAML's own participation as a purchaser — have never been examined in discovery and require examination before any judgment is entered.

**B. Mitigation.**

Flagstar has not demonstrated that it had a legal obligation to liquidate these government-guaranteed securities, that liquidation was contractually required, or that continued ownership was not a viable and less costly alternative. The securities were government-insured instruments rather than speculative assets lacking underlying credit support. Had Flagstar retained the securities, the economic outcome might have been materially different — through continued coupon income, resecuritization of future buyouts, or changed market conditions. Further, a CMO resecuritization of the interest-only cashflows represented an alternative that was never examined.

Flagstar's motion contains no evidence concerning mitigation. It presents no analysis comparing the liquidation proceeds to projected future cash flows, maturity values, or alternative disposition strategies. A plaintiff seeking alleged damages bears the duty to mitigate. See Restatement (Second) of Contracts § 350; Ford Motor Co. v. City of Woodhaven, 475 F.3d 594, 605 (6th Cir. 2007). Flagstar has not met that burden on the present record.

**C. Double recovery and the undisclosed Rohr settlement.**

The record reflects that co-defendant Eric Rohr was dismissed from this civil litigation with prejudice under settlement terms that remain entirely absent from the public record. This Court recognized at the April 27, 2026 hearing that Flagstar cannot recover twice for the same alleged loss. Any payment received by Flagstar in connection with Rohr's dismissal necessarily affects the amount of any remaining recoverable alleged damages. Without disclosure of the settlement amount and terms, this Court cannot determine the extent to which Flagstar has already been compensated for the alleged loss it now seeks to collect from me.

Rohr's position, on the record before his dismissal from this case, included assertions that Flagstar's alleged losses resulted from its own alleged conduct and failure to mitigate — assertions that are directly consistent with the causation arguments set out in Section III above. The fact that Flagstar proceeded to settle with Rohr under undisclosed terms, after Rohr argued that Flagstar caused its own alleged losses, raises questions about what Flagstar represented in connection with that settlement. Those questions cannot be answered without disclosure. Moreover, any civil judgment entered must be expressly offset against any restitution payments Flagstar has received or will receive from any source — including under the Hild restitution order — to prevent Flagstar from collecting the same alleged loss twice through parallel civil and criminal recovery channels.

**D. Comprehensive offset accounting.**

Beyond the Rohr settlement, Flagstar has provided no comprehensive accounting identifying amounts recovered through any of the following: settlement proceeds from any source; restitution payments already received; liquidation proceeds on a bond-by-bond basis; coupon payments received after the warehouse line relationship ended; servicing income; insurance recoveries; indemnification recoveries; tax benefits or accounting write-downs; or any other amounts that reduce the net alleged loss remaining.

Courts routinely require transparency concerning offsets and prior recoveries before entering substantial civil judgments, particularly where multiple parties, multiple proceedings, and multiple potential sources of recovery are involved. See BUC Int'l Corp. v. Int'l Yacht Council Ltd., 517 F.3d 1271, 1277-78 (11th Cir. 2008); Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 333 (1980). Flagstar has not produced bond-level liquidation statements, custodial reconciliations, servicing remittance reports, or internal accounting adjustments needed to verify its alleged claimed balances. Those omissions independently preclude entry of final judgment.

Any judgment entered in this case must expressly provide that: (1) Flagstar's total recovery is limited to its actual proven alleged loss; (2) all restitution payments made by any co-defendant are credited against the civil judgment; (3) all settlement recoveries are credited against the civil judgment; and (4) Flagstar may not obtain recovery exceeding the amount of actual proven, uncompensated alleged loss.

## VI. THE RELIEF I AM REQUESTING IS LIMITED TO THE PROCESS DUE BEFORE A JUDGMENT OF THIS SIZE IS ENTERED.

This case has been pending since 2019. I entered my plea in August 2019. The restitution determination contemplated by my own Judgment, with a control date of January 4, 2024, is now more than two years overdue and, as set forth above, was never conducted as to me. The documentary evidence concerning Foster, Bloomberg, IDC, Murphy McGonigle, and the BAML auction did not surface on this Court's docket until 2025 — years after my plea and after the window in which I could have raised it in my own criminal proceeding. I have not caused the delay in resolving this case, and the relief I request is intended to bring this case to a fair resolution on the merits.

Specifically, I respectfully request that this Court:

1.   Decline to treat the SDNY restitution order in United States v. Hild as sufficient evidence of alleged damages against me, for the reasons set forth in Sections I and II above and in my Response — and in particular because the restitution determination deferred in Flagstar's own Exhibit A never occurred on the docket of my own criminal case as the law requires;

2.   Order Flagstar to produce the documents underlying the alleged loss figure it asks this Court to adopt, including: Flagstar's internal alleged loss calculations and supporting workpapers; the Marsh affidavits together with all exhibits and source data; the BlackRock valuation report and its underlying assumptions and methodology; the Bloomberg pricing data and contributor submissions including precise methodology and assumptions from Dan Foster; the Murphy McGonigle directive and all related communications concerning the suspension of valuation adjustments; the complete records of the BAML auction process including participants, bids received, assumptions provided to bidders, and any communications regarding BAML's own participation as a purchaser; and the amount and terms of any settlement, release, or payment involving Eric Rohr or any other source that has reduced the alleged loss;

3.   Permit limited, targeted discovery on valuation methodology, the IDC-to-Bloomberg pricing transition, the Murphy McGonigle valuation freeze, Foster's Bloomberg submissions and their effect on the pricing benchmark, causation, mitigation, and offsets, including the deposition of Robert Marsh on the documents and methodology he was previously unable to explain;

4.   Permit me the opportunity to retain and present a qualified HECM bond valuation expert with respect to these securities, given that no such expert has appeared at any stage of any proceeding to date; and

5.   Set an evidentiary hearing on alleged damages, causation, mitigation, and offsets before any judgment is entered against me.


# CONCLUSION

Flagstar's Reply confirms more than it refutes. It confirms that Flagstar no longer treats the restitution order as binding on me. It confirms — in Flagstar's own words — that Flagstar did not directly litigate the alleged damages figure it asks this Court to adopt. And it leaves entirely unaddressed the documentary record now establishing that the restitution determination contemplated by Flagstar's own Exhibit A never occurred on the docket of my own criminal case.

The burden of proof in this case belongs to Flagstar. Flagstar has not produced the BlackRock report. It has not disclosed the Rohr settlement. It has not accounted for offsets and recoveries. It has not presented an independent bond valuation expert. And it has not addressed the affirmative causation argument set out in Section III: that the magnitude of its alleged claims was substantially shaped by a simultaneous and deleteriously orchestrated chain of events — the SEC-compelled IDC cessation, Foster's cooperation-era Bloomberg submissions, Murphy McGonigle's twenty-four month valuation freeze during a period of significant documented market change, and Flagstar's business decision to pursue the fire-sale liquidation via the BAML auction in a market those events had rendered non-functional — that intervened between the alleged underlying conduct and the realized alleged loss and that have never been subjected to adversarial scrutiny in any proceeding to which I was a party.

The government investigation that produced the alleged loss figure Flagstar relies upon involved, as a central witness, the same cooperating witness whose pricing submissions to Bloomberg informed what that alleged loss would be. The government needed Dan Foster to understand these bonds. It managed his cooperation. His post-cooperation Bloomberg pricing fed the benchmark against which Flagstar's portfolio was valued and liquidated. None of that process has ever been independently examined, nor was it evidence available to me until another party presented it before this Court in 2025. Before this Court enters a $16 million judgment built on it, the process must be tested.

For the reasons set forth in my Response and in this sur-reply, I respectfully request that this Court deny Flagstar's Motion for Entry of Judgment, or in the alternative grant the specific relief described in Section VI above before any judgment is entered.


In support of this sur-reply, I am submitting the accompanying Declaration of Charles Darren Stumberger and the docket sheet for United States v. Stumberger, No. 19-CR-608 (S.D.N.Y.), attached to it as Exhibit 1.

Respectfully submitted,

Darren Stumberger

Pro Se Defendant

118 Chestnut Street #407

Red Bank, NJ 07701

cdjs2013@gmail.com