UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FLAGSTAR BANK, FSB,
Plaintiff,

v.                                                    Case No. 19-cv-11512

MICHAEL C. HILD, et al.,                              Hon. Matthew F. Leitman
Defendants.

---

**DEFENDANT MICHAEL C. HILD'S RESPONSE TO PLAINTIFF FLAGSTAR BANK'S NOTICE OF SUPPLEMENTAL AUTHORITY**

---

Defendant Michael C. Hild respectfully submits this response for the limited purpose of providing procedural context omitted from Plaintiff Flagstar Bank's Notice of Supplemental Authority.

**I. The Eastern District of Virginia Dismissal Was Jurisdictional Only and Did Not Reach the Merits**

Flagstar advises this Court that the United States District Court for the Eastern District of Virginia dismissed Defendant Hild's civil claims against Flagstar and other defendants. Standing alone, that statement leaves the misleading impression that the federal court rejected Defendant Hild's claims on their merits. It did not.

The Eastern District of Virginia dismissed the action **without prejudice** after concluding that subject matter jurisdiction under 28 U.S.C. § 1332 had not been established. Having determined that jurisdiction was lacking, the court expressly declined to reach the merits of Defendant Hild's Virginia-law claims, and Flagstar's Rule 12(b)(6) motion was denied as moot. Accordingly, the

1

dismissal was not an adjudication on the merits and carries no preclusive effect as to Defendant Hild's claims against Flagstar.

The dismissal rested upon federal diversity jurisdiction issues unrelated to the merits of Defendant Hild's claims.

First, the district court concluded that Defendant Glen Haddock remained domiciled in Virginia for diversity purposes. Defendant Hild had presented evidence that Mr. Haddock had physically resided in North Carolina for years and was successfully served at his North Carolina residence. The district court nevertheless concluded that Mr. Haddock remained a Virginia citizen based upon its finding concerning his stated intent to return to Virginia at some future point.

Second, with respect to Bloomberg L.P., the district court concluded that Defendant Hild had not affirmatively established the citizenship of every partner comprising Bloomberg's limited partnership. Bloomberg, however, did not identify any Virginia partner or otherwise contend that any partner was a citizen of Virginia. Instead, the action was dismissed because Defendant Hild had not carried the burden of establishing complete diversity to the court's satisfaction before jurisdictional discovery occurred.

Rather than seek reconsideration or appellate review of those jurisdictional rulings, Defendant Hild elected to proceed in the forum made available by the dismissal and promptly refiled his Virginia-law claims in the Circuit Court for the City of Richmond, Virginia. A true and correct copy of that Complaint is attached as **Exhibit A**. Those claims therefore remain pending in another court and have never been adjudicated on their merits.

Accordingly, the Eastern District of Virginia dismissal should not be construed as reflecting any

2

judicial determination concerning the merits of Defendant Hild's claims against Flagstar.

**II. Flagstar's Notice Omits Material Portions of the Record Concerning Charles Darren Stumberger**

Flagstar's Notice presents an incomplete account of the record concerning Charles Darren Stumberger by quoting isolated excerpts while omitting other statements and filings addressing the same subject matter.

Earlier in these proceedings, Mr. Stumberger submitted a written communication to this Court's chambers in which he described his plea transcript as being "among the most corrupt elements of the entire case." That communication was later submitted as an exhibit in Defendant Hild's post-conviction proceedings in the Southern District of New York.

Mr. Stumberger also made additional statements before this Court and submitted later filings addressing the Foster/Bloomberg evidence and his contention that the factual narrative concerning Live Well Financial differed materially from that presented during the criminal proceedings.

Defendant Hild does not ask this Court to resolve the significance or credibility of Mr. Stumberger's statements in connection with this filing. Defendant submits only that Flagstar's Notice presents selected excerpts from a broader record concerning the same subject matter.

**CONCLUSION**

Defendant respectfully submits this Response solely to ensure that the Court has an accurate understanding of the procedural posture of the Virginia litigation and the record concerning Mr.

Stumberger. The Eastern District of Virginia did not adjudicate the merits of Defendant Hild's claims against Flagstar, and those claims are now pending in the Circuit Court for the City of Richmond, Virginia. Likewise, the record concerning Mr. Stumberger is broader than the isolated excerpts presented in Plaintiff's Notice.

DATED: July 8, 2026

Respectfully submitted,

Michael C. Hild, pro se
2302 E. Marshall Street
Richmond, VA 23223
michaelchristopherhild@gmail.com
804.306.4314

4

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2026, a true copy of the foregoing was served via email to Mr.

Joseph Shannon and Mr. Darren Stumberger and via the Court's pro se upload system.


Michael C. Hild

Pro Se Defendant

2302 E Marshall Street

Richmond, VA 23223

804.306.4314

**IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND, VIRGINIA**

**MICHAEL C. HILD,**

Plaintiff,

v.                                   Case No. _____

DAN FOSTER;

GLEN HADDOCK;

LAWRENCE "LARRY" MATTERA, JR.;

CHRISTOPHER KRUPA;

BLOOMBERG L.P.;

ICE DATA PRICING & REFERENCE DATA LLC

(f/k/a Interactive Data Pricing and Reference Data LLC;

converted from Interactive Data Pricing and Reference Data, Inc.);

INTERCONTINENTAL EXCHANGE, INC.;

INDUSTRIAL AND COMMERCIAL BANK OF CHINA FINANCIAL SERVICES LLC;

MIRAE ASSET SECURITIES (USA) INC.;

FLAGSTAR BANK, FSB;

CUSTOMERS BANK; and

DOES 1-50,

Defendants.



RECEIVED AND FILED
CIRCUIT COURT
JUL - 8 2026
EDWARD F. JEWETT, CLERK
BY_____ D.C.

COPY

**JURY TRIAL DEMANDED**

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

**(Virginia Business Conspiracy - Va. Code §§ 18.2-499, 18.2-500; Common-Law Civil
Conspiracy; Tortious Interference; Aiding and Abetting / Concert of Action)**

## I. INTRODUCTION

1. This action arises from a coordinated course of conduct that replaced the contractually designated IDC pricing path for Live Well Financial, Inc.'s HECM interest-only bond portfolio with Bloomberg pricing influenced by former Live Well insider Dan Foster, and then used that substituted pricing to trigger margin calls, defaults, cross-defaults, liquidation activity, bankruptcy, personal-guaranty exposure, destruction of Plaintiff Michael C. Hild's trade and profession, and continuing enforcement harms.

1

## IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND, VIRGINIA

**MICHAEL C. HILD,**

Plaintiff,

v.                                                    Case No. _____

DAN FOSTER;

GLEN HADDOCK;

LAWRENCE "LARRY" MATTERA, JR.;

CHRISTOPHER KRUPA;

BLOOMBERG L.P.;

ICE DATA PRICING & REFERENCE DATA LLC

(f/k/a Interactive Data Pricing and Reference Data LLC;

converted from Interactive Data Pricing and Reference Data, Inc.);

INTERCONTINENTAL EXCHANGE, INC.;

INDUSTRIAL AND COMMERCIAL BANK OF CHINA FINANCIAL SERVICES LLC;

MIRAE ASSET SECURITIES (USA) INC.;

FLAGSTAR BANK, FSB;

CUSTOMERS BANK; and

DOES 1-50,

Defendants.

**JURY TRIAL DEMANDED**

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

**(Virginia Business Conspiracy - Va. Code §§ 18.2-499, 18.2-500; Common-Law Civil Conspiracy; Tortious Interference; Aiding and Abetting / Concert of Action)**

## I. INTRODUCTION

1.  This action arises from a coordinated course of conduct that replaced the contractually designated IDC pricing path for Live Well Financial, Inc.'s HECM interest-only bond portfolio with Bloomberg pricing influenced by former Live Well insider Dan Foster, and then used that substituted pricing to trigger margin calls, defaults, cross-defaults, liquidation activity, bankruptcy, personal-guaranty exposure, destruction of Plaintiff Michael C. Hild's trade and profession, and continuing enforcement harms.

1

2. Plaintiff does not assert any cause of action belonging to Live Well Financial, Inc. ("Live Well"), its bankruptcy estate, or the Chapter 7 Trustee. Plaintiff seeks recovery solely in his individual capacity for direct personal injuries unique to Plaintiff and not for injuries suffered by Live Well itself, including loss of contractual guarantee-fee income, personal guaranty exposure, restitution-related enforcement harm, reputational and professional destruction, loss of future earning capacity, and loss of Plaintiff's personal contractual and economic interests.

3. The mechanism was not an ordinary market event. IDC was the designated pricing source. After SEC pressure and communications with IDC/ICE personnel, IDC stopped accepting and publishing Live Well values for the relevant securities. Bloomberg pricing then became the operative substitute through U.S. Bank reporting and market usage, despite Bloomberg not being the contractual pricing source.

4. Bloomberg's pricing was materially influenced by contributor inputs supplied by Dan Foster, a former Live Well Vice President who had left Live Well, entered into a proffer agreement with the SEC, later obtained a non-prosecution agreement from the United States Attorney's Office for the Southern District of New York, and supplied pricing or market information to Bloomberg during the relevant period.

5. Defendant Lawrence "Larry" Mattera, Jr. was not a passive bystander. Mattera participated in Bloomberg's effort to obtain and operationalize Foster's HECM pricing inputs. Bloomberg personnel acknowledged that Bloomberg was "starved for data" in the HECM sector, asked whether Bloomberg could use Foster's levels "in production now," and then turned Foster's submitted Baird/HECM pricing export into production.

2

6.  Defendants then used, relied upon, adopted, benefited from, or failed to correct the substituted pricing chain to cause and exploit Live Well's collapse, with direct and foreseeable injury to Plaintiff personally.

## II. PARTIES

7.  Plaintiff Michael C. Hild is a resident and citizen of the Commonwealth of Virginia. At all relevant times, Plaintiff resided in Richmond, Virginia, operated his business and professional affairs from Virginia, and suffered direct personal injury in Virginia.

8.  Defendant Dan Foster is a natural person. Foster formerly served as a Vice President of Live Well and participated in the valuation and pricing of the HECM interest-only securities at issue. After leaving Live Well, Foster supplied or influenced Bloomberg pricing for the same general class of securities, including while cooperating with federal authorities and seeking favorable treatment.

9.  Defendant Glen Haddock is a natural person. Haddock served as Live Well's Chief Financial Officer and was responsible for, or directly involved in, the pricing, reporting, financial-statement, lender-communication, and IDC-related events alleged below. Haddock's conduct occurred in Virginia and caused direct injury to Plaintiff in Virginia.

10.  Defendant Lawrence "Larry" Mattera, Jr. is a natural person. Mattera acted for Bloomberg in connection with HECM pricing, communicated about Foster's pricing levels and Bloomberg's need for data, and participated in the operational use of Foster-related pricing within Bloomberg's pricing products.

11.  Defendant Christopher Krupa is a natural person. Krupa was affiliated with IDC/ICE, served in a senior role involving fixed-income evaluations, communicated with Live Well personnel,

3

including Haddock, concerning IDC's HECM IO pricing, and participated in or had knowledge of IDC's cessation of pricing for the securities at issue.

12.  Defendant Bloomberg L.P. publishes and disseminates financial data, analytics, and pricing information to institutional market participants, including pricing information for HECM pools, HECM CMOs, and HECM interest-only securities. Bloomberg purposefully directed its pricing products and conduct into Virginia and knew those products would be used in Virginia-related valuation, margining, default, liquidation, and enforcement decisions.

13.  Defendant ICE Data Pricing & Reference Data LLC, formerly known as Interactive Data Pricing and Reference Data LLC and converted from Interactive Data Pricing and Reference Data, Inc. ("ICE Data" or "IDC"), provided pricing data and related valuation information for mortgage-related bonds, including HECM interest-only bonds, and served as the contractually designated pricing source under relevant repo, lending, custodial, and reporting processes.

14.  Defendant Intercontinental Exchange, Inc. ("ICE") is the corporate parent and enterprise owner of the ICE Data Services business within which IDC operated. ICE owned, controlled, marketed, benefited from, and had the ability to supervise or correct the pricing services and conduct at issue.

15.  Defendant Industrial and Commercial Bank of China Financial Services LLC ("ICBCFS") is a U.S.-based broker-dealer and market participant whose conduct was purposefully directed at Virginia and caused direct injury to Plaintiff in Virginia.

16.  Defendant Mirae Asset Securities (USA) Inc. is a U.S.-based broker-dealer and market participant whose conduct was purposefully directed at Virginia and caused direct injury to Plaintiff in Virginia.

4

17. Defendant Flagstar Bank, FSB is a federally chartered savings bank whose conduct was purposefully directed at Virginia and caused direct injury to Plaintiff in Virginia.

18. Defendant Customers Bank is a Pennsylvania-chartered bank whose conduct was purposefully directed at Virginia and caused direct injury to Plaintiff in Virginia.

19. Defendants Does 1-50 are persons or entities whose identities are presently unknown and who participated in, facilitated, concealed, benefited from, or aided the conduct alleged herein.

## III. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction because the Circuit Court for the City of Richmond is a court of general jurisdiction and this action asserts Virginia common-law and statutory claims, including claims under Virginia Code §§ 18.2-499 and 18.2-500.

21. This Court has personal jurisdiction over Defendants because Defendants transacted business in Virginia, contracted with or dealt with a Virginia-based business and Virginia resident, purposefully directed conduct into Virginia, committed tortious acts in Virginia or outside Virginia causing injury in Virginia, and/or joined a conspiracy intentionally directed at Virginia and a Virginia resident.

22. Venue is proper in the Circuit Court for the City of Richmond because Plaintiff resides in Richmond, substantial events occurred in Richmond, Live Well was headquartered and operated from Virginia, Plaintiff's personal guarantee-fee income and professional interests were centered in Virginia, and Defendants' conduct caused direct injury to Plaintiff in Richmond.

23. Defendants' out-of-state residence or incorporation does not defeat this Court's authority. The conduct alleged herein was directed toward Virginia, caused injury in Virginia, and involved a Virginia-based company, Virginia-based executive, Virginia-based financial reporting and business operations, and personal economic interests held by a Virginia resident.

5

**IV. PRIOR FEDERAL ACTION, DISMISSAL WITHOUT PREJUDICE, AND TOLLING**

24.   On or about December 23, 2025, Plaintiff timely commenced an action in the United States District Court for the Eastern District of Virginia, Richmond Division, captioned *Hild v. Foster, et al.*, Civil Action No. 3:25-cv-01050-DJN.

25.   The Federal Action arose from the same nucleus of operative facts alleged herein, including IDC's cessation of pricing, Bloomberg's operational substitution, Foster-influenced Bloomberg pricing, lender reliance, default and cross-default activity, liquidation activity, bankruptcy consequences, personal-guaranty exposure, and direct personal injury to Plaintiff.

26.   On February 2, 2026, Plaintiff filed a First Amended Complaint in the Federal Action asserting Virginia statutory and common-law claims based on the same transaction, occurrence, conduct, and injuries alleged herein.

27.   Defendants appeared and filed motions to dismiss. The parties actively litigated the Federal Action for approximately six months.

28.   On June 24, 2026, the United States District Court dismissed the Federal Action without prejudice for lack of federal subject-matter jurisdiction. The dismissal was jurisdictional only and did not adjudicate the merits of Plaintiff's Virginia statutory or common-law claims.

29.   The Federal Action was timely filed. Because it was dismissed without determining the merits, the time during which the Federal Action was pending is not computed as part of the applicable limitations period under Virginia Code § 8.01-229(E)(1), and this action has been filed within the remaining limitations period.

30.   Plaintiff files this action promptly after the jurisdictional dismissal. This action is timely under Virginia Code § 8.01-229(E)(1), delayed-discovery principles, fraudulent-concealment

6

principles, continuing-conduct principles, and the continuing nature of Defendants' conduct and injury.

31. Plaintiff did not personally receive the Foster Notes or other Foster/Bloomberg notes or disclosures before or during his criminal trial in 2021. Plaintiff's then-criminal counsel, Benjamin Dusing, received materials reflecting Foster's Bloomberg-related pricing role during that period, but Dusing did not provide those materials to Plaintiff, did not explain their significance to Plaintiff, and did not develop or investigate the Foster/Bloomberg issue on Plaintiff's behalf.

## V. PLAINTIFF'S PERSONAL GUARANTEES AND INDEPENDENT ECONOMIC INTERESTS

32. Over a period exceeding fifteen years, Plaintiff personally guaranteed key credit facilities of Live Well, including the Flagstar warehouse line and the Customers Bank credit facility, as well as other material obligations.

33. Certain facilities, including the Mirae repo agreement and the ICBC repo agreement, were not directly guaranteed by Plaintiff. The Flagstar commercial bond facility was extended pursuant to separate credit documentation that did not include an express personal guarantee by Plaintiff; however, Flagstar has asserted, and Plaintiff disputes, that a prior guarantee executed in connection with an earlier warehouse line agreement extended to later-created obligations, including the bond facility.

34. All material credit facilities were subject to cross-default provisions. A default declared under one facility foreseeably triggered defaults under other facilities, thereby exposing Plaintiff to personal liability under facilities he had guaranteed and terminating the personal guarantee-fee income that Live Well paid Plaintiff for assuming those risks.

7

35.  In connection with his personal guarantees, Plaintiff entered into a written Personal Guaranty Fee and Indemnity Agreement with Live Well. The agreement was prepared by outside counsel and accompanied by detailed schedules identifying Plaintiff's numerous personal guaranties covering substantial credit facilities over many years. The agreement provided compensation to Plaintiff specifically in consideration for assuming personal liability on corporate indebtedness and separately provided indemnification for that personal risk. Those contractual rights were separate and distinct from Plaintiff's salary, equity ownership, dividends, or other compensation, constituted a substantial portion of Plaintiff's livelihood and trade or profession, and belonged solely to Plaintiff rather than to Live Well or its bankruptcy estate.

36.  The Lender Defendants knew, or reasonably should have known, of Plaintiff's personal guaranties, guarantee-fee arrangements, and resulting personal exposure. Plaintiff routinely furnished personal financial statements, guaranty documentation, audited financial statements, and related credit materials to lenders in connection with the guaranteed facilities. The existence of Plaintiff's personal guaranty obligations and related contractual compensation was therefore known or reasonably foreseeable to Defendants participating in those lending relationships.

37.  Defendants knew or reasonably should have known that inducing defaults, cross-defaults, bankruptcy, liquidation, and enforcement proceedings would directly injure Plaintiff personally by terminating his guarantee-fee income, impairing his professional standing, exposing him to personal enforcement, and destroying his ability to work in financial services.

## VI. THE SPECIALIZED HECM IO MARKET AND THE CONTRACTUAL IDC PRICING PATH

38.  The securities at issue were specialized HECM interest-only and related reverse-mortgage securities. They were thinly traded, complex, long-duration instruments whose values depended

8

on assumptions concerning interest rates, prepayments, mortality, borrower behavior, buyouts, FHA and Ginnie Mae policy, origination dynamics, discount margins, and projected future cash flows.

39.  The offering materials and market record disclosed that an active secondary market might not exist or might not develop for these securities. Defendants knew or should have known that in such a thin market, published pricing benchmarks could become self-confirming and materially influence perceived market value, margining, default decisions, and liquidation proceeds.

40.  The governing repo and lending agreements designated IDC as the operative pricing source for the securities. U.S. Bank served as securities custodian and reporting intermediary and reported valuations based on the contractual pricing path.

41.  While IDC continued to provide prices, lenders and counterparties relied on IDC values for valuation, margining, default, and enforcement decisions. Bloomberg prices, even if existing in the background, were not the operative contractual source and were not the basis for ordinary margining or enforcement under the governing repo and lending agreements.

42.  Flagstar representative Robert Marsh later testified that U.S. Bank reported valuations based upon IDC pricing during the relevant period and acknowledged that the governing lender agreement identified IDC as the required pricing source. Marsh's testimony confirms that IDC—not Bloomberg—was the contractually designated valuation mechanism before IDC ceased providing prices.

43.  Because the market was thin and specialized, any disruption of the IDC pricing path and substitution of a different pricing source could materially affect lender behavior, market perception, reported collateral values, default determinations, and liquidation outcomes.

9

**VII. IDC, ICE, KRUPA, AND THE CESSATION OF PRICING**

44.  IDC historically provided the pricing values used in U.S. Bank reporting for Live Well's HECM IO bonds and related securities.

45.  At relevant times, IDC/ICE personnel, including Defendant Krupa, were aware that HECM IO pricing involved broker quotes, issuer or market-participant information, limited market observations, and judgment by evaluators.

46.  In a February 7, 2019 SEC interview, Krupa stated that IDC was not then providing evaluated pricing for HECM IO bonds and that HECM IO prices were handled through broker-quote or pass-through processes. Krupa distinguished evaluated prices, which are meant to represent market value, from broker quotes, which reflect the value of the market participant providing the quote.

47.  Krupa further acknowledged that when market conditions did not allow evaluation, IDC would pass along broker quotes; that analysts had discretion; that IDC generally did not independently validate quotes against TRACE trades or Bloomberg valuations where no other reference points existed; and that IDC was not aware of controls to determine whether a quote provider was also receiving the same broker-quote pricing from IDC.

48.  The SEC's inquiry into IDC/ICE pricing practices focused on the same type of practices and securities at issue here. IDC and ICE were therefore aware that their pricing decisions would have consequences for Live Well, its lenders, and Plaintiff.

49.  Through communications with Live Well personnel, including Haddock, Krupa communicated that IDC would no longer accept or post updated values for the securities because they had not been updated for an extended period and because the SEC had expressed concerns.

10

50. IDC's cessation of pricing did not occur in isolation. It occurred after SEC scrutiny, after IDC/ICE communications with Live Well personnel, and in circumstances where IDC and ICE knew or should have known that cessation would force market participants and custodian reports to look elsewhere for values.

51. IDC and ICE knew or should have known that cessation of IDC pricing would leave the market without the contractually designated benchmark, trigger operational substitution through U.S. Bank reporting, expose Live Well to immediate margin pressure, and create the conditions for defaults and cross-defaults.

## VIII. FOSTER, BLOOMBERG, MATTERA, AND THE BAIRD PRICING RELATIONSHIP

52. Defendant Foster formerly worked at Live Well and participated in valuing the same categories of HECM IO and related securities at issue in this case.

53. After leaving Live Well, Foster associated with Robert W. Baird & Co. ("Baird") and developed a pricing relationship with Bloomberg concerning HECM pools, HECM CMOs, HECM IOs, floaters, inverse IOs, and related reverse-mortgage securities.

54. Bloomberg and Baird entered into a data-acquisition arrangement under which Baird provided Bloomberg data and information for use in Bloomberg's pricing products. The amended schedule identified HECM pools and related pricing information and identified Foster among key personnel involved in creating or generating the information.

55. Bloomberg's own pricing methodology for reverse-mortgage pools and CMOs used contributor data and market observations as inputs, and Bloomberg's valuation process for thinly traded fixed-income securities could be materially affected by a single broker quote or contributor input.

11

56. Foster signed a proffer agreement with the SEC in November 2017. By August 2019, Foster had obtained a non-prosecution agreement from the United States Attorney's Office for the Southern District of New York concerning Live Well-related conduct. During the relevant period, Foster supplied or influenced Bloomberg pricing while cooperating with federal authorities or seeking favorable treatment.

57. The Government's March 18, 2021 interview notes of Foster reflect that Foster was advising Bloomberg regarding HECM questions and that Bloomberg requested weekly quotes from him concerning HMBS, HECM IOs, floaters, and inverse IOs. Although the same notes contain a statement that Foster's quotes were "not used directly," the notes simultaneously document Bloomberg's ongoing solicitation of Foster's weekly pricing information for precisely the securities at issue, creating a factual inconsistency that cannot be resolved on the pleadings and that supports a reasonable inference that Foster's submissions materially influenced Bloomberg's pricing process.

58. Foster affirmatively proposed a pricing relationship between Baird and Bloomberg for HECM CMO/IO securities, stating that the evaluation range was wide for the product and proposing that Baird and Bloomberg "team up" for weekly pricing of HECM CMOs.

59. Defendant Mattera participated in Bloomberg's communications concerning Foster's pricing levels. Mattera asked whether Bloomberg could use Foster's levels "in production now" and acknowledged that Bloomberg was "a bit starved for data" in the sector.

60. Mattera's statements were material because they show Bloomberg's knowledge that the HECM market lacked a robust, observable, independent pricing base; that Bloomberg needed contributor data to produce pricing; and that Foster's submissions were being considered for production use.

12

61.  Foster then sent Bloomberg the first "BAIRD - HECM CMO - BVAL Price Export" and indicated that Bloomberg had turned the submission on to go immediately into production.

62.  Bloomberg later acknowledged receiving quotes from Foster and Olivier Dupiton. However, subsequent Bloomberg discovery failed to produce meaningful pricing submissions from Dupiton, leaving a production record dominated by Foster's submissions, pricing exports, and related communications. On information and belief, Foster was the dominant contributor reflected in the materials produced to date and a materially significant source of pricing inputs used by Bloomberg for the HECM-related securities at issue during the relevant period.

63.  The pricing levels Foster supplied into the Bloomberg ecosystem were materially lower than pricing levels associated with the prior IDC/Live Well process. A contributor who materially lowered valuations after becoming a government cooperator created an obvious issue concerning independence, reliability, motive, and causation.

64.  Bloomberg, Mattera, and Foster knew or should have known that Bloomberg prices would be sold, licensed, disseminated, and relied upon by sophisticated financial institutions for valuation, margining, default, liquidation, and enforcement purposes.

65.  Bloomberg and Mattera also knew or should have known that in a thin and illiquid market, publication of Bloomberg prices materially lower than IDC values would not merely report market reality; it would help create the market perception and enforcement consequences that followed.

## IX. OPERATIONAL SUBSTITUTION THROUGH U.S. BANK REPORTING

66.  After IDC ceased providing prices and posted null or no values, valuation of the securities continued for margining, default, and enforcement purposes.

13

67. The governing repo and lending agreements did not designate Bloomberg as the successor, backup, or replacement pricing source in the event IDC stopped publishing prices.

68. Nevertheless, after IDC ceased pricing, U.S. Bank's reporting system operationally defaulted to Bloomberg pricing when IDC values became unavailable.

69. As a result, Bloomberg pricing that had previously existed in the background became visible, operative, and actionable in U.S. Bank reports and market usage.

70. The substitution was not merely clerical. It transformed Bloomberg contributor-driven pricing into the operative valuation benchmark for lenders and counterparties, even though Bloomberg had not been designated as the contractual pricing source and even though Bloomberg's HECM pricing was dependent upon a thin contributor base that included Foster.

71. Haddock knew that IDC's cessation of pricing would cause Bloomberg prices to appear in U.S. Bank reports and would result in immediate valuation write-downs, margin failures, covenant breaches, and collapse.

72. Krupa and IDC/ICE knew or should have known that cessation of IDC prices would force operational substitution or reliance on other pricing sources, including Bloomberg.

73. Bloomberg, Mattera, and Foster knew or should have known that Bloomberg prices, once published, could become the operative reference point for market participants, custodians, and lenders if IDC pricing disappeared.

74. The Lender Defendants knew or should have known that Bloomberg was not the contractual pricing source and that a forced substitution from IDC to Bloomberg materially changed the valuation regime under which they declared defaults and pursued enforcement.

14

## X. WHY THE SUBSTITUTED PRICING AND LENDER RELIANCE WERE IMPROPER

75. Defendants are expected to contend that the Lender Defendants merely exercised contractual rights after receiving lower collateral values. That characterization omits the central misconduct alleged here.

76. The wrongful conduct was not the abstract existence of contractual remedies. The wrongful conduct was the coordinated or mutually reinforcing use of a non-designated, contributor-driven, Foster-influenced Bloomberg pricing path to replace the contractual IDC pricing path and then using that substitution to manufacture, accelerate, justify, or magnify default, liquidation, bankruptcy, restitution, and enforcement consequences.

77. The governing repo and lender agreements depended on IDC. Bloomberg was not the contractual pricing source. Once IDC ceased pricing, Defendants did not obtain a neutral, agreed, contractually authorized replacement methodology. Instead, Bloomberg pricing became operationally substituted through U.S. Bank reporting and market usage.

78. Bloomberg's substituted pricing was materially tainted because it depended in whole or in material part on a thin contributor base that included Dan Foster, a former Live Well insider who was cooperating with government authorities and had an obvious motive to support a pricing narrative adverse to Plaintiff.

79. Defendants cannot justify their conduct merely by invoking contractual default provisions. Those provisions presupposed use of the contractually designated IDC pricing mechanism or another contractually authorized valuation methodology, not an operationally substituted Bloomberg pricing path materially influenced by contributor submissions from Foster after IDC

15

ceased providing the designated pricing. Plaintiff challenges the manipulation and exploitation of the valuation mechanism itself, not the existence of contractual remedies in the abstract.

80. Mattera and Bloomberg knew Bloomberg was "starved for data" in the HECM sector and nevertheless operationalized Foster's submitted pricing levels into Bloomberg's production process.

81. IDC, ICE, and Krupa knew or should have known that cessation of IDC pricing would foreseeably cause substituted pricing sources to become operative in custodian reports and lender decisions.

82. Haddock knew or should have known that IDC cessation would cause Bloomberg values to appear in U.S. Bank reports, trigger write-downs, and precipitate lender action.

83. The Lender Defendants knew or should have known that reliance on substituted Bloomberg pricing materially changed the valuation regime, created default and liquidation consequences not arising from the designated IDC pricing path, and directly exposed Plaintiff to personal guaranty, guarantee-fee, reputational, professional, and enforcement injuries.

84. Defendants' conduct was improper because it used pricing opacity, contributor conflicts, non-designated valuation paths, undisclosed substitution mechanics, coordinated enforcement pressure, and liquidation activity in a thin market to shift losses and impose direct personal injury on Plaintiff.

85. This was not ordinary contract enforcement. It was the exploitation of a disrupted pricing mechanism and substituted valuation path to create, accelerate, or magnify defaults and enforcement outcomes.

## XI. LENDER RELIANCE, COORDINATED ENFORCEMENT, AND DEFAULT CASCADE

86.  Following IDC's cessation, the Lender Defendants relied upon Bloomberg pricing, whether through U.S. Bank reports, direct Bloomberg access, or a combination of both, as operative pricing data for valuation, margining, default, and enforcement decisions.

87.  The Lender Defendants' reliance was immediate and uniform, notwithstanding that Bloomberg had not been designated as the pricing source in the governing repo and lender agreements.

88.  The Lender Defendants issued margin calls, declared defaults, accelerated obligations, triggered cross-defaults, participated in or supported involuntary bankruptcy proceedings, and pursued enforcement measures based on the substituted pricing path.

89.  The Lender Defendants knew or should have known that use of substituted Bloomberg pricing would directly injure Plaintiff personally by terminating his guarantee-fee income, exposing him to personal guaranty liability, causing personal asset seizures and enforcement activity, destroying his professional reputation, and contributing to restitution-related loss calculations.

90.  The Lender Defendants also knew or should have known that a liquidation sale in a thin, illiquid market using the same Bloomberg benchmark would not independently prove fair market value. If both buyer and seller relied on the same questioned Bloomberg marks, the resulting transaction price would merely reflect shared reliance on the same benchmark.

91.  Flagstar, in particular, liquidated securities through a Bank of America Merrill Lynch auction process. Marsh later testified that Flagstar consulted BlackRock regarding a valuation

17

but that he never saw or possessed the BlackRock report, did not know its assumptions, and could not explain the methodology.

92.  Marsh further testified that Bank of America Merrill Lynch ran the Article 9 sale process and, on information and belief, was also the ultimate purchaser or highest bidder. The circumstances of an auction manager also becoming purchaser in a thin and specialized market require discovery and support Plaintiff's allegations that liquidation proceeds cannot be treated as an independent measure of true economic loss.

93.  Flagstar failed to produce or disclose key materials necessary to validate its claimed losses, including BlackRock valuation materials, BAML auction materials, bidder information, marketing materials, underlying sale documentation, settlement offsets, and analyses of future cash flows or alternative holding strategies.

94.  The Lender Defendants benefited from the collapse by shifting losses, obtaining enforcement leverage, asserting recoveries, pursuing restitution or civil judgments, avoiding market risk, and attributing their own liquidation decisions and pricing reliance to Plaintiff.

## XII. HADDOCK'S KNOWLEDGE AND CONDUCT

95. Defendant Haddock was responsible for, or directly involved in, supplying Live Well's pricing inputs to IDC and managing the internal financial reporting consequences of IDC's pricing role.

96.  Haddock possessed detailed knowledge of how IDC pricing functioned contractually and operationally. He knew that IDC was the required pricing path and that U.S. Bank reports depended upon IDC values while IDC continued pricing.

97.  Haddock knew that if IDC ceased pricing, Bloomberg values would appear in U.S. Bank reports, materially reducing reported values and triggering lender concerns.

18

98. Through communications with Krupa, Haddock had advance notice that IDC would cease pricing the securities.

99. Immediately before the known cessation event, Haddock refused to sign Live Well's financial statements, conduct inconsistent with ordinary practice and reflective of contemporaneous knowledge of the impending collapse.

100. Haddock prepared, oversaw, or directed the preparation of monthly pricing spreadsheets used to supply bond valuations to IDC. In sworn testimony, Haddock acknowledged learning that the bond marks had not changed and that the spreadsheet transmitted to IDC appeared to be re-dated and sent month after month.

101. Haddock further acknowledged that the marks reflected on that spreadsheet remained static across multiple reporting periods.

102. On information and belief, Haddock created, controlled, or directed the monthly pricing spreadsheet process and caused static marks to be submitted to IDC for multiple months before IDC's cessation.

103. After IDC ceased pricing, Haddock relied upon Bloomberg pricing reflected in U.S. Bank reports to write down Live Well's HECM bond portfolio by approximately fifty percent. Haddock knew or reasonably should have known that those Bloomberg values reflected a fundamental change in valuation methodology rather than ordinary market movement and that the resulting write-down would immediately precipitate margin failures, covenant breaches, lender enforcement actions, and cascading defaults.

104. Haddock's conduct was not merely internal corporate conduct. It directly injured Plaintiff personally because Haddock knew Plaintiff was the founder, owner, guarantor, guarantee-fee recipient, and professional target of the foreseeable default cascade.

19

105.  Haddock's conduct also supplied a Virginia anchor for the conspiracy. He acted from within Live Well's Virginia-centered operations and coordinated with or responded to out-of-state actors whose conduct was directed into Virginia.

### XIII. STUMBERGER'S SUBSEQUENT ADOPTION OF THE CAUSATION CHAIN

106.  Darren Stumberger was a former Live Well executive, a central government cooperating witness in United States v. Hild, and a defendant in related Flagstar civil litigation.

107.  Plaintiff does not plead Stumberger's subsequent filings as the source of the underlying facts. The underlying facts concerning IDC, Bloomberg, Foster, Mattera, Krupa, U.S. Bank, and lender reliance were developed through Plaintiff's own federal filings, discovery efforts, criminal-case materials, bankruptcy filings, and related civil litigation.

108.  Stumberger's significance is that, after reviewing or using those materials in related litigation, he adopted and repackaged the same causal chain and represented in federal court that the Foster/Bloomberg evidence, IDC cessation, valuation methodology, BAML auction, BlackRock valuation issues, and lender reliance materially affected causation, valuation, damages, and the reliability of the loss narrative.

109.  In his Flagstar opposition, Stumberger stated that the Foster/Bloomberg pricing chain, IDC's cessation of pricing, Foster's government cooperation, Bloomberg pricing submissions, the subsequent valuation freeze, the Bank of America Merrill Lynch auction process, and BlackRock's unproduced valuation were directly relevant to the accuracy of the loss calculation used against Plaintiff and others.

110.  In his sur-reply, Stumberger further argued that the magnitude of the alleged losses was shaped by a simultaneous and deleterious chain of events involving the government investigation, IDC's cessation of pricing, Foster's Bloomberg submissions, a two-year valuation

20

freeze, and liquidation in a market rendered non-functional as an independent price-discovery mechanism.

111.  Stumberger's subsequent statements are relevant because the government and courts previously treated him as a key witness concerning the mechanics of the bonds. His later adoption of the IDC/Bloomberg/Foster causation chain materially undercuts Defendants' expected contention that Plaintiff's allegations are speculative or implausible.

112.  Stumberger's subsequent statements also matter because he represented that, had he known or understood the Foster/Bloomberg evidence earlier, his testimony and understanding of the events would have been different. This confirms the centrality of the pricing substitution chain to the criminal, civil, restitution, and enforcement narratives that continue to injure Plaintiff.

113. Plaintiff pleads these facts to show plausibility, corroboration, continuing injury, and the significance of the pricing chain, not to ask this Court to adjudicate the validity of any criminal conviction or plea.

## XIV. DISCOVERY, CONCEALMENT, AND CONTINUING CONDUCT

114.  Plaintiff knew in 2019 that IDC had ceased publishing prices for the securities, that Krupa had stated SEC concerns were involved, and that Bloomberg prices would appear in U.S. Bank reports once IDC values became unavailable.

115. Plaintiff did not know in 2019 or before his criminal trial in 2021 that Foster, a former Live Well insider and government cooperator, had established a pricing relationship with Bloomberg and had supplied HECM-related pricing information to Bloomberg before IDC ceased publishing prices.

116.  Before Plaintiff's criminal trial in 2021, Plaintiff's then-criminal counsel, Benjamin Dusing, received the Foster Notes and related materials reflecting Foster's Bloomberg-related

21

pricing role. Dusing did not provide those materials to Plaintiff, did not explain their significance, and did not investigate or develop the Foster/Bloomberg issue on Plaintiff's behalf.

117. Plaintiff therefore did not personally possess the Foster Notes or related Foster/Bloomberg materials before or during his criminal trial in 2021 and did not understand that the Bloomberg prices appearing in U.S. Bank reports after IDC ceased publishing prices were materially influenced by Foster.

118. The Foster Notes and related materials available to counsel, had they been reasonably investigated, would have led to the discovery of the full scope of Foster's relationship with Bloomberg, including Foster's proposal to "team up" with Bloomberg, the Mattera communications reflecting that Bloomberg was "starved for data" in the HECM sector, the extent to which Bloomberg operationalized Foster's pricing within its production system, the significance of those facts in light of IDC's cessation of pricing, and the resulting causal chain connecting Foster-influenced Bloomberg pricing to the subsequent margin calls, defaults, liquidations, lender reliance, and damages alleged herein.

119.  Plaintiff also did not know until later that SEC-related materials indicated a materially different chronology concerning SEC communications with IDC/ICE and Krupa than Plaintiff had previously been led to believe.

120.  Plaintiff obtained additional pieces of the pricing-substitution evidence only later through post-trial proceedings, bankruptcy court litigation, restitution proceedings, subpoena practice, limited third-party productions, civil discovery, third-party filings, and related litigation. Plaintiff also pursued FOIA requests to the SEC, but those FOIA efforts did not result in meaningful production; instead, the SEC delayed, represented that it was processing the requests, and ultimately refused to produce responsive materials.

22

121. Defendants, government agencies, and third parties delayed, withheld, disputed, redacted, failed to produce, or obscured material information concerning Bloomberg contributor submissions, Foster's Bloomberg role, IDC/ICE communications, U.S. Bank reporting mechanics, lender reliance, and liquidation methodology.

122. Plaintiff exercised diligence by pursuing criminal filings, bankruptcy court litigation, FOIA requests, subpoenas, motions to compel, civil discovery, third-party productions, and related litigation to uncover the facts alleged herein.

## XV. DAMAGES AND CONTINUING INJURY

123. As a direct and proximate result of Defendants' conduct, Plaintiff suffered compensatory damages exceeding $900,000,000, subject to proof at trial, including destruction of contractual guarantee-fee income, personal guaranty exposure, personal enforcement actions, professional exclusion, loss of future earning capacity, reputational destruction, loss of banking access, loss of personal contractual and economic interests, and continuing restitution-related enforcement harm.

124. Defendants' conduct terminated Plaintiff's guarantee-fee income and destroyed the economic value of his personal guarantee-fee agreements.

125. Defendants' conduct triggered or contributed to enforcement of personal guarantees and related personal liability exposure.

126. Defendants' conduct destroyed Plaintiff's controlling ownership interest and personal economic interests associated with Live Well and its anticipated growth trajectory, to the extent those injuries are direct and personal to Plaintiff and not derivative claims belonging to Live Well or its bankruptcy estate.

23

127. Defendants' conduct contributed to restitution obligations and enforcement premised on loss calculations derived from the same distorted pricing and liquidation chain.

128. Plaintiff's assets and financial resources were frozen, seized, impaired, or rendered inaccessible.

129. Plaintiff suffered severe reputational and professional harm, including permanent exclusion from financial services, inability to obtain ordinary banking access, loss of employment opportunities, and public stigma.

130. Defendants' conduct and its effects continue into the present. Restitution enforcement, civil enforcement, reputational harm, banking exclusion, loss of professional capacity, and loss of economic opportunity remain continuing injuries.

131. Under Virginia Code § 18.2-500, Plaintiff is entitled to treble damages, reasonable attorneys' fees where recoverable, costs, interest, and all other relief authorized by law.

## XVI. CAUSES OF ACTION

### COUNT I - VIRGINIA BUSINESS CONSPIRACY
### (Va. Code §§ 18.2-499 and 18.2-500)

132. Plaintiff realleges and incorporates by reference paragraphs 1 through 131 as though fully set forth herein.

133. Defendants combined, associated, agreed, acted in concert, or pursued a common plan to willfully and maliciously injure Plaintiff in his reputation, trade, business, and profession.

134. The combination included, without limitation, the coordinated or mutually reinforcing cessation of IDC pricing, operational substitution of Bloomberg pricing, use of Foster-influenced Bloomberg prices, lender reliance on substituted pricing, margin calls, default declarations,

24

liquidation activity, bankruptcy activity, loss shifting, and subsequent enforcement against Plaintiff personally.

135. Defendants used improper methods, including misuse of pricing mechanisms, concealment or nondisclosure of contributor-driven pricing, publication and adoption of unreliable substituted marks, exploitation of contractual pricing gaps, coordinated enforcement actions, failure to disclose material pricing conflicts, and use of distorted pricing to create or magnify default and loss narratives.

136. Defendants acted with legal malice because they intentionally, purposefully, and without lawful justification engaged in conduct they knew or should have known would injure Plaintiff's trade, business, profession, guarantee-fee income, reputation, and personal economic interests.

137. Defendants committed overt acts in furtherance of the conspiracy in Virginia and directed conduct into Virginia, including communications with Live Well personnel, pricing submissions affecting Virginia-based operations, U.S. Bank reporting relied upon by Virginia-related lenders and counterparties, defaults and enforcement directed at a Virginia company, and actions targeting Plaintiff personally as a Virginia resident.

138. Plaintiff suffered direct personal injury as a result.

139. Plaintiff is entitled to compensatory damages, treble damages, costs, reasonable attorneys' fees where recoverable, pre-judgment and post-judgment interest, and equitable relief under Virginia Code § 18.2-500 and other applicable law.

### COUNT II - COMMON-LAW CIVIL CONSPIRACY

140. Plaintiff realleges and incorporates by reference paragraphs 1 through 139 as though fully set forth herein.

25

141.  Defendants agreed, expressly or tacitly, to accomplish unlawful purposes or lawful purposes by unlawful means, including by using distorted, substituted, or unreliable pricing to trigger defaults, enforcement, liquidation, and loss-shifting against Plaintiff.

142.  Defendants committed overt acts in furtherance of the conspiracy, including those alleged above.

143.  The conspiracy proximately caused Plaintiff direct personal injury and damages.

## COUNT III - TORTIOUS INTERFERENCE WITH CONTRACT

144.  Plaintiff realleges and incorporates by reference paragraphs 1 through 143 as though fully set forth herein.

145.  Plaintiff had valid contractual relationships, including guarantee-fee agreements and related contractual economic rights arising from his personal guarantees and business role.

146.  Defendants knew or reasonably should have known of those contracts and economic rights, including because Plaintiff provided personal financial statements, audited financial statements, guarantee disclosures, and lender materials reflecting the same.

147.  Defendants intentionally interfered with those contracts by improper methods, including the pricing substitution, unreliable pricing publication and reliance, default cascade, and enforcement actions alleged herein.

148.  Defendants' interference caused termination, impairment, or destruction of Plaintiff's contractual income and related rights.

149.  Plaintiff suffered damages as a direct and proximate result.

## COUNT IV - TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

26

150. Plaintiff realleges and incorporates by reference paragraphs 1 through 149 as though fully set forth herein.

151. Plaintiff had reasonable business expectancies, including continued guarantee-fee income, continued professional standing in financial services, continued business opportunities, continued ownership value, continued ability to obtain credit and banking services, and continued income from his trade, business, and profession.

152. Defendants knew or reasonably should have known of those expectancies.

153. Defendants intentionally interfered with those expectancies through improper methods, including the conduct alleged above.

154. Plaintiff suffered damages as a direct and proximate result.

## COUNT V – CONCERT OF ACTION / ALTERNATIVE AIDING AND ABETTING
### (Bloomberg L.P., Intercontinental Exchange, Inc., ICE Data, and Other Defendants as Applicable)

155. Plaintiff realleges and incorporates by reference paragraphs 1 through 154 as though fully set forth herein.

156. Primary tortious conduct was committed by one or more co-defendants as alleged herein.

157. Bloomberg, Mattera, ICE, IDC, Krupa, Foster, Haddock, and the Lender Defendants knew of the essential nature of the conduct and provided substantial assistance, encouragement, market infrastructure, pricing inputs, data publication, operational substitution, enforcement reliance, or concealment that enabled the injury to Plaintiff.

158. To the extent Virginia law treats this claim as concerted action rather than an independent aiding-and-abetting tort, Defendants acted in concert and are jointly and severally responsible for the injuries caused by the common plan and overt acts alleged herein.

159. Plaintiff suffered damages as a direct and proximate result.

## PRAYER FOR RELIEF

A. Compensatory damages in an amount to be proven at trial;

B. Treble damages, costs, and reasonable attorneys' fees where recoverable under Virginia Code § 18.2-500;

C. Equitable relief, if any, as the evidence and Virginia law permit;

D. Pre-judgment and post-judgment interest;

E. Trial by jury on all issues so triable; and

F. Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Dated: July 8, 2026

Respectfully submitted,

Michael C. Hild
Plaintiff, pro se
2302 E. Marshall Street
Richmond, VA 23223
(804) 306-4314
michaelchristopherhild@gmail.com

29