**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

FLAGSTAR BANK, FSB,
Plaintiff,

v.                                                                     Case No. 19-cv-11512

MICHAEL C. HILD, et al.,                                 Hon. Matthew F. Leitman
Defendants.

---

**NOTICE OF LOSS OF COMMUNICATIONS, EXTRAORDINARY CHANGE IN**
**CIRCUMSTANCES, AND REQUEST FOR REASONABLE CASE MANAGEMENT**
**ACCOMMODATIONS**

---

Defendant Michael C. Hild, appearing *pro se*, respectfully submits this Notice to advise the

Court of extraordinary circumstances that will immediately and substantially affect his ability to

participate in this litigation.

On June 22, 2026, the United States District Court for the Southern District of New York ordered

Mr. Hild to surrender for service of his sentence while simultaneously imposing an expedited

briefing schedule for his forthcoming habeas petition under 28 U.S.C. § 2255. Thereafter, the

Court denied bail pending adjudication of that petition despite the expedited schedule it had

imposed, requiring Mr. Hild to prepare and litigate his forthcoming habeas petition while

simultaneously surrendering to custody and, during the ensuing intake process, thereby losing his

ability to communicate with counsel, with no certainty as to when those communications will be

restored.

1

Until yesterday, Mr. Hild had been advised that designation had not yet occurred and that surrender would likely be delayed until designation took place. Instead, on July 8, 2026, the SDNY advised Mr. Hild of his designation, resulting in only **48 hours' notice before surrender**.

As of the filing of this Notice, Mr. Hild knows essentially nothing regarding a mailing address, legal communication procedures, or when he will again be able to communicate with counsel, opposing parties, this Court, his family, or anyone else.

The uncertainty is further compounded because Mr. Hild's ultimate institutional placement remains unknown. Upon surrender, Mr. Hild has been instructed to provide documentation concerning previously reported threats of bodily harm, after which institutional officials will determine his housing placement. As a result, Mr. Hild cannot presently predict where he will be housed or when ordinary legal communications will resume. See **Exhibits A–C.**

The forthcoming § 2255 proceeding is of substantial importance not only to Mr. Hild's criminal case, but also to this litigation and numerous related civil actions. Many of the factual issues, witnesses, and allegations substantially overlap.

The forthcoming habeas petition raises substantial constitutional claims concerning trial counsel's failure to investigate and present evidence relating to government cooperating witness Dan Foster's role in supplying Bloomberg valuation data underlying the Government's "market value" theory at trial. Those same valuation issues, including Mr. Foster's conduct and the Bloomberg pricing evidence, are also central to factual issues that Defendants have repeatedly raised in this litigation.

The forthcoming petition further relies upon significant newly developed evidence from the Government's principal cooperating witness, Mr. Charles Darren Stumberger, whose subsequent federal court filings and statements materially depart from the narrative presented during Mr. Hild's criminal trial, including Mr. Stumberger's allegations of government corruption and his statements that threats were directed against him by the SDNY after he began speaking publicly. Indeed, many of the issues raised in the forthcoming § 2255 petition concern the same underlying events, witnesses, and valuation evidence that have been the subject of extensive motion practice in this action.

Mr. Stumberger is likewise a Defendant in this action, and the factual issues addressed in the forthcoming habeas petition substantially overlap with issues presently before this Court. Copies of the related filings are attached as **Exhibits A–C** for the Court's convenience.

Accordingly, the inability to meaningfully communicate with counsel, this Court, the parties, or anyone else while these overlapping issues are being prepared and litigated is likely to have consequences extending well beyond the criminal proceeding itself and directly impair Mr. Hild's ability to defend this litigation.

During whatever unknown intake and processing period follows surrender, Mr. Hild expects to lose access to his existing email account and court records, mail delivery, electronic notifications, and all ordinary means of communicating with the Court, counsel, the parties, and the outside world. He likewise has no ability to predict when those communications or access to files will resume.

Accordingly, Mr. Hild respectfully requests that the Court:

1. Take notice of these extraordinary circumstances in managing this litigation.

2. Continue any hearings or deadlines that cannot reasonably be addressed during the initial intake and processing period or, if a hearing becomes necessary, permit participation by whatever means are available under the circumstances or continue the matter until Mr. Hild has re-established communication with the Court.

3. Recognize that Mr. Hild may be temporarily unable to access his court records, receive electronic service, monitor email, receive mail, or otherwise respond to communications during this period through no fault of his own.

4. Permit Mr. Hild, once communication has been restored and he has regained access to his court records and litigation files, promptly to notify the Court and all parties of his updated contact information and to address any scheduling or procedural matters that arose during this period.

Mr. Hild submits this Notice solely so that the Court is aware of these extraordinary circumstances and may administer this case accordingly.

Dated: July 9, 2026

Respectfully submitted,

Michael C. Hild, pro se
2302 E. Marshall Street
Richmond, VA 23223
michaelchristopherhild@gmail.com
804.306.4314

4

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2026, a true copy of the foregoing was served by electronic mail upon Joseph J. Shannon, Fawzeih H. Daher, and Charles Darren Stumberger and was submitted to the Court through its procedures applicable to pro se electronic filings.

Michael C. Hild

Pro Se Defendant

2302 E Marshall Street

Richmond, VA 23223

804.306.4314

## MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG
LISA ZORNBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

_____

WRITER'S CONTACT INFORMATION

bjacobs@maglaw.com
212-880-9536
#

June 10, 2026

COUNSEL
JOSHUA BUSSEN
PIPPA HYDE***
KEFIRA WILDERMAN

_____

RETIRED/PARTNER EMERITUS
PAUL R. GRAND

_____

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

**BY ECF & EMAIL**
Hon. Ronnie Abrams
United States District Judge
United States Courthouse
40 Foley Square, Room 2203
New York, NY 10007

      Re:    <u>United States v. Michael Hild</u>, 19 Cr. 602 (S.D.N.Y.) (RA) (KHP)

Dear Judge Abrams:

      I am counsel for defendant Michael Hild, and I write respectfully to request that the Court grant Mr. Hild continued bail pending a petition for habeas corpus that Mr. Hild intends to file in this District within 45 days. In an Order issued yesterday, the Court set Mr. Hild's surrender date for July 10, 2026, and I respectfully request that the surrender date be stayed pending the Court's determination of this bail motion.

      Mr. Hild meets the standard for bail pending habeas because he has two substantial constitutional claims, described below, on which he is likely to succeed, relating to (1) his prior counsel's ineffective assistance in failing to pursue evidence of cooperating witness Dan Foster's involvement in Bloomberg's pricing of the bonds at issue in this case, which the government presented to the jury as "neutral," and which is an issue the Second Circuit expressly left open in resolving Mr. Hild's direct appeal, and (2) newly discovered evidence that the primary cooperating witness against Mr. Hild on whom this Court and the Second Circuit relied to sustain Mr. Hild's conviction has now said, in the context of recent civil proceedings, that the process leading to his guilty plea was "corrupt," and has suggested that the "shocking" Foster/Bloomberg evidence would have materially changed his testimony. In addition, Mr. Hild meets the standard because a prominent Virginia attorney has threatened, by email, to use connections to inmates and others in the prison system to cause harm to Mr. Hild after he surrenders to the BOP— threats that Mr. Hild reported to his Probation Officer but which have not, to Mr. Hild's knowledge, yet been fully investigated or acted upon.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 10, 2026
Page 2 of 6

Courts in this District have the power to grant bail pending habeas where the contemplated petition "raises at least one substantial claim" and where "'extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective." *United States v. Nkanga*, 452 F. Supp. 3d 91, 95-96 (S.D.N.Y. 2020) (Furman, J.) (quoting *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (internal quotation marks and alterations omitted)). For example, Judge Brieant granted a defendant convicted of conspiring to commit securities fraud and sentenced principally to three years' imprisonment "bail pending determination of the habeas petition." *Ostrer v. United States*, 584 F.2d 594, 596-97 (2d Cir. 1978). For another example, in *Nkanga*, with the government's consent, Judge Furman granted bail pending habeas, finding that the following "extraordinary circumstances" made "this case an appropriate one for bail": "the defendant's age; his multiple health issues; the nature of the defendant's offense; the precise timing of the sentencing proceeding (which occurred on March 12, 2020) in relation to the emerging COVID-19 pandemic; and the conclusions already reached by the Court in previous aspects of this litigation regarding the defendant's health issues, and apparent lack of dangerousness or risk of flight." *Id.* at 96. Judge Furman also relied on the fact that one of the claims in the habeas was that "but for counsel's allegedly ineffective assistance, the judgment would have included a surrender date permitting the defendant to be released on bail pending the COVID-19 crisis." *Id.*; *see also Rado v. Manson*, 435 F. Supp. 349 (D. Conn. 1977) (granting bail pending habeas given strength of constitutional claims).

Mr. Hild meets the standard for bail pending habeas. First, Mr. Hild intends to argue in his forthcoming petition that his trial counsel was ineffective in failing to pursue evidence of cooperating witness Dan Foster's involvement with Bloomberg's pricing of the bonds at issue, which Mr. Hild personally discovered after trial, but which this Court previously found was sufficiently disclosed in one page of government notes Mr. Hild's counsel received with Foster's 3500 material. Foster's involvement in Bloomberg pricing was significant because the government's core fraud theory depended upon persuading the jury that Bloomberg's valuations represented neutral, independent market evidence demonstrating that Live Well's valuations were knowingly inflated. Throughout trial and summation, the government repeatedly relied upon the disparity between Bloomberg pricing and Live Well's valuations as proof of scienter. The government presented Bloomberg as the benchmark against which falsity and fraudulent intent were measured. Evidence that Bloomberg's pricing for the bonds at issue was influenced by cooperating witness Dan Foster—a former Live Well insider who was seeking favorable treatment from the government—would have directly undermined the reliability and independence of that benchmark and therefore undermined completely the government's valuation and scienter theory.

Mr. Hild previously made a Rule 33 motion in this Court based on his discovery of the Foster/Bloomberg evidence, and this Court denied it. (Docket Entry 245.) In denying that motion, this Court relied exclusively on its finding that "the Court cannot 'infer due diligence on the part of [Hild] to obtain" the evidence of Foster's involvement with Bloomberg. (Docket

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Hon. Ronnie Abrams
June 10, 2026
Page 3 of 6

Entry 245 at 7.)  The Court wrote that "with due diligence, he could have developed evidence on Foster's involvement with Bloomberg long ago."  (Docket Entry 245 at 9.)  The Court did not assess whether Hild's counsel's failure to pursue the Foster/Bloomberg evidence amounted to ineffective assistance.  On direct appeal of this Court's decision, Mr. Hild argued, among other things, that to the extent this Court's ruling was based on a lack of diligence, his trial counsel, Benjamin Dusing, provided ineffective assistance.  The Second Circuit ruled that Mr. Hild's claim that his "counsel's failure to connect the Foster notes to the Bloomberg evidence amounted to constitutionally ineffective assistance at trial" is "best raised on collateral review."  *United States v. Hild*, No. 23-6136-CR, 2025 WL 2924205, at \*4 (2d Cir. Oct. 15, 2025).  Thus, in accordance with that decision, Mr. Hild's claim of ineffective assistance in connection with the Foster/Bloomberg issue may now be raised in Mr. Hild's habeas petition.

Mr. Hild is likely to succeed on his claim that his trial counsel provided ineffective assistance in failing to pursue evidence of Foster's involvement with Bloomberg.  To establish ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), Mr. Hild "must show both that (1) his counsel's performance fell below an objective standard of reasonableness, and (2) he suffered prejudice as a result."  (Docket Entry 140 at 49.)

As to *Strickland*'s first prong, in the face of claims of ineffective assistance, the government typically requests, and courts generally grant, motions to permit the allegedly ineffective attorney to provide an affidavit responding to the allegations of ineffective assistance. In the context of the Foster/Bloomberg issue, such an affidavit could theoretically attempt to explain counsel's failure to investigate Foster's relationship with Bloomberg despite the exculpatory nature of the evidence.  But in the unusual circumstances of this case, it is difficult to see how a court could possibly credit any such affidavit.  This Court has already refused to rely upon an affidavit supplied by trial counsel due to his "deeply troubling conduct" in another matter "which included threatening to 'blow up' a judge, staff attorneys, and opposing counsel— and his subsequent suspension from the practice of law in two states."  (Docket Entry 140 at 30-31.)  It is difficult to see how trial counsel could possibly offer a credible affidavit explaining his reasons for not pursuing the essential Foster/Bloomberg evidence given this backdrop and the importance of the Foster/Bloomberg evidence to Mr. Hild's case.

As to *Strickland*'s second prong, Mr. Hild expects in his petition to explain at length how the evidence of Foster's involvement with Bloomberg's pricing would have compromised the government's case and demonstrated Mr. Hild's innocence by undermining the government's claim that the Bloomberg prices were neutral, "market" prices, which was the crux of the government's trial presentation and summation.  The government relied on testimony from numerous witnesses that Bloomberg prices were independent and neutral (*e.g.*, Trial Tr. 782-85) and argued in summation that Bloomberg's neutral prices conflicted with IDC's, which purportedly proved fraud (*e.g.*, Trial Tr. 2176).  But the Bloomberg prices were not neutral; they were influenced by a government cooperating witness.  In fact, recent statements in civil litigation by the government's own primary cooperating witness, Darren Stumberger, strongly

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Hon. Ronnie Abrams
June 10, 2026
Page 4 of 6

support Mr. Hild's argument and demonstrate that if Mr. Stumberger had known about what he calls the "shocking" Foster/Bloomberg connection, his testimony would have supported Mr. Hild's position that the Bloomberg prices were not neutral.

It bears noting that when this Court previously addressed Mr. Hild's Rule 29 motion, this Court's opinion denying that motion relied extensively upon Mr. Stumberger's trial testimony, citing it and quoting it at length, including in multiple block quotes. (*See generally* Docket Entry 140 at 5-13, 19-28.) Mr. Stumberger, however, in a filing earlier this month dated June 1, 2026, in the Eastern District of Michigan, in a matter in which Flagstar Bank is seeking a judgment against Mr. Stumberger, has written the following:

> The Court should be aware by now of the remarkable chain of events involving numerous individuals, financial institutions, valuation providers, and professional advisors whose actions materially affected the valuation and disposition of the securities at issue. *To my knowledge, none of this information was presented during the 2021 trial in United States v. Hild. I am certain none of it was available to me when I entered my plea agreement in 2019.* While the 'Dan Foster' matters have been addressed in Hild's related proceedings from a notice perspective (or Hild's counsel had a chance to investigate), they have never been investigated, examined, or fully litigated. The *shocking chain of events related to Foster and others* has only been introduced to this Court's docket and record in 2025.

> Central to these newly developed facts is Dan Foster, a former Vice President of Live Well Financial who was identified by the Government as a cooperating witness and an unnamed co-conspirator in *United States v. Hild*. Following his departure from Live Well, Foster became involved in supplying HECM Interest-Only ("HECM IO") bond valuations to Bloomberg under extreme pressure to obtain a Non-Prosecution Agreement from the Government—which he ultimately received. *Evidence now demonstrates that the valuations Foster supplied to Bloomberg differed materially from those he previously supplied to Interactive Data Corporation ("IDC") while at Live Well. These discrepancies raise substantial questions regarding the accuracy, methodology, and integrity of the valuation process itself.* To the extent Flagstar's alleged damages theory relies upon valuations derived from, influenced by, or otherwise connected to Foster's pricing submissions, the reliability of those damages calculations is directly called into question.

*Flagstar Bank, FSB v. Stumberger*, 19 Civ. 11512 (MFL) (EAS) (E.D. Mich.) (Docket Entry 168 at 2, dated June 1, 2026) (Stumberger opposition to plaintiff's motion for entry of judgment) (emphases added). Stumberger's filing goes on to say:

> Foster entered into a proffer agreement with the SEC in 2017 and later obtained a non-prosecution agreement in connection with investigations involving Live Well Financial in 2019. The timing of his involvement presents factual issues directly relevant to valuation

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 10, 2026
Page 5 of 6

> reliability. *A pricing contributor who supplied valuations to Bloomberg while simultaneously cooperating with federal investigators and seeking a non-prosecution agreement presents obvious questions concerning the independence and reliability of those valuations.*

(*Id.* at 11 (emphasis added).)

> Mr. Stumberger continues:

> Foster affirmatively proposed a pricing relationship with Bloomberg for HECM CMO/IO securities. In an email within Exhibit E to ECF No. 144, Foster wrote that "the evaluation range is so wide for this particular product" and proposed that "Baird & Bloomberg team up," offering "an annual fee of 25k for 50 HECM CMO's priced weekly." Foster signed an SEC proffer agreement in November 2017, before the Bloomberg pricing relationship became operative, and by August 2019 the government had executed Foster's non-prosecution agreement. *The pricing information utilized to generate alleged losses was thus not supplied by a neutral third party in an ordinary-course market—but by a former Live Well insider facing substantial federal prison time, cooperating with the government.*

> Bloomberg's Larry Mattera asked whether Bloomberg could use Foster's levels "in production now," confirming Bloomberg was "a bit starved for data in this sector"—an admission confirming the absence of a robust, observable market. Foster sent Bloomberg the first "BAIRD - HECM CMO - BV AL Price Export," noting Bloomberg had "turned [it] on to immediately go into production." Bloomberg later acknowledged receiving quotes from Foster and Olivier Dupiton; but subsequent Bloomberg discovery failed to produce meaningful pricing submissions from Dupiton, leaving a record dominated by Foster's submissions, exports, and communications. This raises substantial questions about whether Foster was in practice the dominant or potentially sole identified contributor for the securities at issue. The pricing levels Foster later supplied into the Bloomberg ecosystem were materially lower than those previously supplied through the IDC process while at Live Well. A contributor who dramatically lowered his own valuations after becoming a government cooperator presents an obvious factual issue regarding the reliability of the resulting benchmark.

(*Id.* at 27-28 (emphasis added).)

Mr. Stumberger's filing shows that if called to testify today against Mr. Hild, his testimony would be different considering the Foster/Bloomberg evidence, which he was not aware of at the time of his plea. His testimony would not support the key component of the government's fraud theory, that the Bloomberg prices were neutral, market prices. Rather, at a minimum, Mr. Stumberger would confirm that the Foster/Bloomberg connection presents

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 10, 2026
Page 6 of 6

"obvious questions concerning the independence and reliability of those [Bloomberg] valuations." (*Id.*)

Second, Mr. Hild intends to raise the additional related argument that newly discovered evidence from Mr. Stumberger—namely, Mr. Stumberger's apparent view that his prosecution was "corrupt," that his plea was questionable, and that his testimony could have been different in light of the Foster/Bloomberg evidence—establishes that the testimony Mr. Stumberger gave at Mr. Hild's trial is no longer reliable. Because the jury would not have convicted without Mr. Stumberger's testimony, Mr. Hild is likely to succeed in his petition. *See, e.g.*, *Ortega v. Duncan*, 333 F.3d 102 (2d Cir. 2003) (granting habeas petition where significant witness recanted trial testimony such that "Ortega's conviction is in violation of his due process rights because without Garner's testimony, the jury would probably not have found Ortega guilty").

For example, in connection with the civil litigation noted above, in an email to the court, Mr. Stumberger said that the transcript of his plea proceeding was "among the most corrupt elements of the entire case." (Ex. A.) When discussing his plea allocution in court, Mr. Stumberger said, "[a]ll I can say about the guilty plea is it was solely the advice of counsel at the time" and that he was told there was "no other options" by his criminal counsel. (Ex. B at at 8.) He said that the plea allocution he wanted to read "was torn up and thrown out" and that he was simply "handed a piece of paper before the arraignment" that he read. (Ex. B at 8.) He also said that his defense in the civil case would be the "truth, better said, the facts of what happened" (as opposed to what he said in his plea allocution in the criminal case). (Ex. B at 8.) In an email to Mr. Hild's civil counsel, Mr. Stumberger highlighted his plea hearing transcript as an example of "corruption," and asked whether "Hartman and Racz" (the AUSA and FBI agent in the criminal case) "really want me [Stumberger] talking about this publicly?" (Ex. C.) On this record, in which newly discovered evidence confirms that Mr. Stumberger's testimony would be different today and that the lynchpin of the government's case—the Bloomberg "market" prices—would not withstand scrutiny, Mr. Hild's petition is likely to succeed.

Finally, bail pending habeas, or at least a stay of Mr. Hild's surrender date, is warranted considering the serious threats Mr. Hild has received from a prominent member of the Virginia bar. As reflected in the attached exhibits, which are being submitted under seal by email to Chambers only so that the Court may assess whether they may be filed publicly, a Virginia attorney—who is a partner at a Virginia firm and has practiced for more than 40 years—representing a defendant in separate litigation involving Mr. Hild and his wife, recently sent multiple unsolicited communications to Mr. Hild concerning his surrender date, including the following statement: "When do you report to your new accommodations? I know some people where you are headed and just want to make sure they will pay you a welcome visit. I suggest you have a welcome present ready to offer them just for your continued good health." (Exhibit D.) In a separate communication, the same attorney wrote: "When and where do you report? Since you won't be in the Richmond case anymore, the least I can do is send a housewarming gift c/o the warden so you will have something there to welcome you when you arrive." (Exhibit

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 10, 2026
Page 7 of 6

E.)[1]  Mr. Hild reported these communications to the U.S. Probation Officer supervising him on release, and the Officer responded, "[d]efinitely sounds like cyberstalking and threatening bodily harm/injury."  The attorney's emails suggest he may try to ensure that individuals he knows at whatever facility Mr. Hild gets designated to (whether inmates or BOP personnel) will pay Mr. Hild a "welcome visit" after he surrenders where they will cause him harm or extort him.  In addition to being inconsistent with any standard of professional conduct for a licensed and experienced attorney, these threats give rise to a genuine concern for Mr. Hild's welfare that the government should investigate and assess prior to his surrender, just as Judge Furman considered the safety of the defendant in *Nkanga* (from the pandemic in that case) in his decision approving bail pending habeas.  If Mr. Hild suffers harm while in custody, that would render any habeas remedy ineffective.  Mr. Hild poses no danger or risk of flight, as this Court's prior bail decisions have found.

For all these reasons, the Court should find that bail pending habeas is warranted, in which case Mr. Hild anticipates filing his petition in 45 days, far in advance of the due date of April 27, 2027.  The Court should also stay Mr. Hild's surrender date pending determination of this motion.

Respectfully submitted,

*/s/ Brian A. Jacobs*

Brian A. Jacobs

Enclosures (sealed enclosures by email only)

cc: All counsel (by ECF)

---

[1] Exhibits D and E are being submitted solely by email to Chambers to give the Court and the government the opportunity to assess whether they may be filed publicly or whether they should be filed under seal.

**From:** Darren Stumberger <cdjs2013@gmail.com>
**Sent:** Tuesday, December 17, 2024 4:57 AM
**To:** Holly Ryan <holly_ryan@mied.uscourts.gov>
**Cc:** Daher, Fawzeih H. <FDaher@bodmanlaw.com>; Shannon, Joseph <JShannon@bodmanlaw.com>; Bean, Dawn <DBean@bodmanlaw.com>; Charles Brown <cbrown@gsbblaw.com>
**Subject:** Re: Flagstar Bank, FSB v Live Well Financial, Charles Darren Stumberger, et al; USDC Eastern District of MI Case No. 2:19-cv-11512

O please post it
It's among the most corrupt elements of the entire case.
I will explain it all in my response.

Darren Stumberger
561-816-9721


> On Mon, Dec 16, 2024 at 3:01 PM Holly Ryan <holly_ryan@mied.uscourts.gov> wrote:
> Ms. Daher,
>
> I spoke with Judge Leitman, and he said that you should check with the AUSA in the SDNY to see if it needs to be sealed here.  For now, you should file your response with a placeholder for the exhibit.  You can add the exhibit once you hear back from the SDNY.
>
> Thank you,
>
> Holly A. Ryan
> Case Manager to the Hon. Matthew F. Leitman
> United States District Court for the Eastern District of Michigan
> 231 W. Lafayette Blvd
> Detroit, Michigan  48226
> (313) 234-5126
> holly_ryan@mied.uscourts.gov

**From:** Daher, Fawzeih H. <FDaher@BODMANLAW.COM>
**Sent:** Monday, December 16, 2024 2:03 PM
**To:** Holly Ryan <holly_ryan@mied.uscourts.gov>
**Cc:** Shannon, Joseph <JShannon@BODMANLAW.COM>; Bean, Dawn <DBean@BODMANLAW.COM>; cbrown_gsbblaw.com <cbrown@gsbblaw.com>; cdjs2013@gmail.com
**Subject:** Flagstar Bank, FSB v Live Well Financial, Charles Darren Stumberger, et al; USDC Eastern District of MI Case No. 2:19-cv-11512

**CAUTION - EXTERNAL:**

Ms. Ryan,

Flagstar is preparing to file its response to Stumberger's Motion to Set Aside Default today. One of the exhibits we intend to file with our response includes the transcript from Stumberger's plea hearing which took place on August 29, 2019. The top of the hearing transcript reads "SEALED – DO NOT DOCKET." We received this copy from the Southern District of New York docket because it was included as an exhibit in a filed letter to the court by the USA. See entry # 11 below.

Could you please advise on the best way we can file or provide a copy of this exhibit to the Court?

Thank you,

Fawzeih



**Fawzeih H. Daher**
1901 St. Antoine Street | 6th Floor at Ford Field | Detroit MI 48226
o: 313-393-7521 | FDaher@BODMANLAW.COM

*binclusive*



CONFIDENTIALITY NOTICE The contents of this message from Bodman PLC may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

| 08/29/2019 | | Minute Entry for proceedings held before Magistrate Judge Katharine H. Parker: Defendant is present with attorneys Robert Stern & Richard Morvillo; AUSAs Hartman & Estes are also present. Arraignment as to Darren Stumberger (1) Count 1,2,3,4,5 held on 8/29/2019. Plea entered by Darren Stumberger (1) Guilty as to Count 1,2,3,4,5. USMJ Parker recommends acceptance of the plea. A control date of 12/18/19 is set for an appearance before Judge Oetken, PSI is NOT ordered and transcript is ordered sealed. (Held under seal/delayed docketing on 8/27/19) (Court Reporter Vincent Bologna) (jnt) (Entered: 08/29/2019) |
|---|---|---|
| 12/16/2019 | 8 | LETTER by USA as to Darren Stumberger addressed to Judge J. Paul Oetken from AUSA Scott Hartman dated 12/16/2019 re: Request to adjourn control date Document filed by USA. (Hartman, Scott) (Entered: 12/16/2019) |
| 12/16/2019 | 9 | MEMO ENDORSEMENT as to Darren Stumberger on re: 8 LETTER by USA as to Darren Stumberger addressed to Judge J. Paul Oetken from AUSA Scott Hartman dated 12/16/2019 re: Request to adjourn control date. ENDORSEMENT: Granted. Sentencing is hereby adjourned to June 18, 2020 at 10:00 am. (Sentencing set for 6/18/2020 at 10:00 AM before Judge J. Paul Oetken) (Signed by Judge J. Paul Oetken on 12/16/2019) (ap) (Entered: 12/17/2019) |
| 04/23/2020 | 10 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - MOTION for Robert Stern and Richard Morvillo to Withdraw as Attorney. Document filed by Darren Stumberger. (Stern, Robert) Modified on 4/23/2020 (ka). (Entered: 04/23/2020) |
| 04/23/2020 | | NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Darren Stumberger. Notice to Attorney Stern, Robert to RE-FILE Document 10 MOTION for Robert Stern and Richard Morvillo to Withdraw as Attorney. Use the event type Letter Motion found under the event list Motions. (ka) (Entered: 04/23/2020) |
| 04/24/2020 | 11 | LETTER by USA as to Darren Stumberger addressed to Judge J. Paul Oetken from AUSA Scott Hartman dated 4/24/2020 re: Proposed Order Accepting Plea Document filed by USA. (Attachments: # 1 Exhibit Plea Transcript)(Hartman, Scott) (Entered: 04/24/2020) |



**bodman**
ATTORNEYS & COUNSELORS.

OFFICIAL PARTNER
OF THE DETROIT LIONS



**Mansfield Rule**
Certified *Plus* 2023–2024

Powered by
**DIVERSITY**LAB

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

— — —

FLAGSTAR BANK, FSB, a Federally
Chartered Savings Bank,

      Plaintiff,

  v.

LIVE WELL FINANCIAL, INC., a
Delaware corporation,
MICHAEL C. HILD, an individual,
ERIC ROHR, an individual, and
CHARLES DARREN STUMBERGER, an
Individual,

      Defendants.
_____/

Case No. 19-11512

Hon. Matthew F. Leitman

*(Hearing conducted
virtually using Zoom
Video Communications)*

<u>MOTION TO SET ASIDE DEFAULT JUDGMENT</u>

BEFORE THE HONORABLE MATTHEW F. LEITMAN
United States District Judge

Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan

Wednesday, March 5, 2025

*To obtain a copy of this official transcript, contact:*
*Robert L. Smith, Federal Official Court Reporter*
*(313) 234-2612 • robert_smith@mied.uscourts.gov*

*Motion to Set Aside Default Judgment • March 5, 2025*

**2**

APPEARANCES:

For the Plaintiff:       JOSEPH J. SHANNON, III
                         FAWZEIH H. DAHER
                         BODMAN, PLC
                         1901 St. Antoine Street, 6th Floor
                         Detroit, MI 48226
                         (313) 393-7549


For the Defendant
Michael Hild:            CHARLES J. BROWN, III
                         GELLERT, SEITZ, BUSENKELL & BROWN, LLC
                         1201 N. Orange Street, Suite 300
                         Wilmington, DE 19801
                         (302) 425-5800

For the Defendant
Charles Stumberger:      CHARLES DARREN STUMBERGER, Pro se
                         5400 Broken Sound Boulevard
                         Boca Raton, FL 33486
                         (561) 913-2565

<div style="text-align: center;">TABLE OF CONTENTS</div>

MATTER _____ PAGE

ECF No. 127       Motion to Set Aside Default Judgment
Discussion with Mr. Stumberger........  6
Discussion with Mr. Shannon...........  9
Discussion with Mr. Stumberger....... 15
Discussion with Mr. Shannon.......... 21
Ruling by the Court.................. 24

EXHIBITS:_____ Offered ____ Received

(No exhibits offered)

Detroit, Michigan *(Remote proceedings)*

Wednesday, March 5, 2025

at about 9:29 a.m.

— — —

(Court and Counsel present via Zoom Video Communications.)

THE LAW CLERK:  The United States District Court for the Eastern District of Michigan is now in session, the Honorable Matthew F. Leitman, United States District Judge, presiding.

The Court calls Case No. 19-11512, Flagstar Bank, FSB, v. Michael Hild, et al.

THE COURT:  All right.  Good morning.

Mr. Shannon, are you on for Flagstar?

MR. SHANNON:  I am, Your Honor.  And my associate, Ms. Daher, I think is on too, but she perhaps has not been promoted to a panelist.  She says she on but can't be seen so...  Oh, there she is right now.

Thank you, Scott.

THE COURT:  All right.  I can see you, Mr. Shannon, but your video has frozen.  I can hear you.

MR. SHANNON:  Oh, really?

THE COURT:  Yeah.

MR. SHANNON:  I can hear you and see you perfectly fine.  I'm surprised by that.  I'm just -- maybe I'm just

standing in one spot for once.

THE COURT: What I see is you sitting there in a very pensive pose with your hand or your chin.

Mr. Brown, are you on for Mr. Hild?

MR. BROWN: I am, Your Honor. Good morning.

THE COURT: Is Mr. Shannon frozen on your screen?

MR. BROWN: Your Honor, you were occasionally freezing and not -- but I'm trying to find Mr. Shannon now.

MR. SHANNON: Mr. Shannon is shaking his head back and forth.

MR. BROWN: I saw some movement. He's breaking up a little bit. I can hear him fine.

THE COURT: I hear Mr. Shannon fine too. If anybody has a problem hearing or seeing me, let me know right away.

Mr. Stumberger, you are on for yourself?

MR. STUMBERGER: Yes, Your Honor.

THE COURT: Okay. Welcome to everybody. Thank you all for joining me.

We are here for a hearing on Mr. Stumberger's motion to set aside the default. I have had an opportunity to review the motion, Flagstar's response, and Mr. Stumberger's reply, and I just have a couple questions that I would like to ask each side, and I'd like to start with my questions for you, Mr. Stumberger, if I could.

Mr. Stumberger, one of the points that you make in your motion is that I think it was October of '23 you were handed what you say was a stack of papers, and you say that the papers indicated they were expiring and should be disregarded.

Flagstar filed a proof of service indicating that what you were served was a copy of the summons, the complaint, and an order that I entered providing that the summons didn't expire until a week or ten days after it was served on you.

Can you help me understand why you thought the papers that were served on you were not active or operative or lack the force of law?

MR. STUMBERGER:  Sure, Your Honor.  My recollection was the papers handed to me on the street in New York, to what you just said, said they were expiring, and new ones would be sent to me.  So, like, I -- I didn't -- I didn't think that -- why would I focus on papers that were expiring in a week when new ones would be sent.  Like, I don't have any expertise in law or these legal proceedings.  I just read that they were expiring, and I would wait for the new ones to be sent.

THE COURT:  All right.  I haven't reviewed the packet in detail.  There is an expiration date for a summons, and I understand your point there, but where do you get the

idea that new ones would be sent?  I don't recall that being on any of the documents.

MR. STUMBERGER:  My recollection was there was language that a new set of documents would be provided to me. That's my recollection.  That's why I disregarded what was handed to me.

THE COURT:  You indicated in your motion that you were told to disregard the papers.  Who told you that?

MR. STUMBERGER:  My attorney, Xavier (phonetic). It was in passing.  He was walking away.  It was after the proceedings in downtown Manhattan.  I don't recall the exact language, but the tone and tenor at that moment was I read them -- I read the language saying they were expiring, new ones would be sent.  Xavier said something in passing, you know, don't worry about it.  I don't remember the exact language.  It all made sense because it said they were expiring, and new ones would be sent.

THE COURT:  All right.  Next topic is a totally different topic, the issue of a meritorious defense.

So one of the factors that I have to consider in deciding whether to set aside a default is looking at whether you have what is called a meritorious defense to the claims here.  Flagstar says you can't possibly have a meritorious defense here because, according to Flagstar, it is bringing civil claims against you based on the same conduct that you

admitted to in the federal court in New York when you pled guilty to committing crimes.

What is your answer to Flagstar's argument that you can't possibly have a defense to something that you pleaded guilty to?  Can you help me understand that.

MR. STUMBERGER:  Sure, Your Honor.  I want to be -- I want to proceed with caution in talking about the guilty plea and the allocution.  Obviously, this is all a massive perjury trap.

All I can say about the guilty plea is it was solely the advice of counsel at the time.  I was told explicitly there were no other options by Orrick, who was my counsel.  I can give you the reasons why they said that.  I still have my notes from August 2019 next to me right now.

What I wrote for the allocution was torn up and thrown out.  I was handed a piece of paper before the arraignment.  I read it.  I don't know who wrote it.  I have an idea who wrote it.  But the bigger picture here, Your Honor, is a guilty plea does not automatically establish guilt in the civil liability case.  My defense is the truth, better said, the facts of what happened.

What Flagstar has provided in terms of allegations and interrogatories are materially false, partially false, they admit truths, however you want to say it, and I dispute them.  So all I want to do is defend myself in court.

THE COURT: All right. Let me ask a related question. Mr. Stumberger, are you saying that your position in this case will be different from what you said when you entered your plea? In other words, you're telling me now, if I'm understanding you correctly, so I'm asking this as a question. I understand you to be saying, look, Leitman, I said a bunch of things under oath to a United States magistrate judge in New York when I pleaded guilty. I understand I said those. I understand I was under oath. But I'm telling you, Leitman, that in this case I'm going to say what is the truth and it is different from what was said in New York. Is that what you're saying?

MR. STUMBERGER: No. I'm not going to commit perjury. All I'm saying is what Flagstar has provided in terms of their allegations in the interrogatories are, again, false, partially false, omit truths, and I dispute them. That's all I want to do. I'm not going to commit perjury and I'm not going to be forced to commit perjury. I just want to defend myself against the allegations.

THE COURT: Okay. Let me turn to a couple questions for Mr. Shannon.

Mr. Shannon, you moved for summary judgment against Mr. Hild on the basis of collateral estoppel. I denied that motion essentially without prejudice, but I denied it because I couldn't see exactly what it was that the jury necessarily

found.  Remember we talked about -- I said that when you move for summary judgment based on a jury verdict it's necessary to have the jury instructions and all of that other stuff. Here where there's a guilty plea it's not obvious to me we have that same problem.

Why isn't the safest course of action for Flagstar here to set aside the default and put together quickly a motion for summary judgment based on the plea transcript and see if that is a -- a winning motion.  Why isn't that the most sensible way to go?

MR. SHANNON:  All right.  I now know when you ask a question like that you are thinking it's the way we should do it, but I don't think safety is an issue here.  We do qualify for a default, and the efforts put forward to set aside that default are deficient, and so I think my motion for a default judgment is completely safe.  And the reason I say that is two things, and I totally disregard, and I don't expect you to worry about the procedure that Mr. Stumberger filed.  It is what it is, he's unrepresented, and I get -- I think he get some liberal interpretation based on that.

But he said two things.  He said in documents, which he hasn't identified, and the words "the papers essentially said they were expiring" and he can't identify the document so he can't show good cause.

And with respect to the meritorious defense, I get

that he -- that he wants to defend himself, but what he said in his response to this motion is "I have not shared what my defense will be."

And so I don't think there's any risk associated with entering a default judgment and I think it is the most efficient thing to did.  I understand the Court's caution with respect to a motion for summary judgment though.

THE COURT:  Well, let me go through with you the factors and think out loud with you and get your response.

So you guys correctly identify in your briefing the three factors that I have to consider.  The first one is whether the default was willful.  And what I have before me on that is -- you know, it is not obvious to me that this was willful.  Mr. Stumberger says that the packet of documents he received had expiration dates on them.  That much I think is accurate.  My order said I was extending the summons to X date.  A summons says it expires on X date.  Without a lawyer, it is plausible to me that a lay person could read that and say what expiring means is -- that a lay person could get that and not understand if you are served before the expiration date that's what matters.  That's at least plausible to me.

And then in your papers you say to me that there was an evasion of service.  That in your words -- maybe in one of your e-mails you said he was -- he happened to be not

there, you know, conveniently when we showed up to serve him. But the affidavits that you attach to your motion from the process server simply say we went to a place, his wife gave us an address, we went to the other address and he wasn't there. That doesn't really speak to me about whether Mr. Stumberger was intentionally evading service, and he suggests that he wasn't. And his conduct in this action since I have encountered him is somebody who seems to be diligently trying to participate. He shows up every time we ask him to show up. So at least in my mind there's a question about willfulness. I want to take prejudice next, but what's your thought on that?

MR. BROWN: So, first of all, Your Honor, I included the issues with respect to evasion of service more to add response to allegations that have been made that somehow Flagstar was trying not to include Mr. Stumberger. I think his -- whether or not he was evading service or not is not relevant.

It is significant that I did have contact with Mr. Donaldson a long time ago and asked him to accept service, and that request was denied, which is Mr. Donaldson's right and Mr. Stumberger's right, and that's what caused us to ultimately serve him in the fashion which we did which was to catch him outside of court. Okay. So he was, in fact, served.

And if the answer is, you know, on unsubstantiated statements that the papers said that they should be ignored and a lawyer walking away -- and I wrote it down when he said it, it was his tenor and tone which led Mr. Stumberger to conclude that he could ignore the papers.

If that is all there is, then anytime a party receives a summons and a complaint, you know, merely deciding to ignore it would be sufficient to establish good cause because he decided to ignore it. And this is a guy that's walking out of a federal courthouse where he is facing very substantial criminal charges. It kind of boggles the mind that he thinks he should ignore a very, very large lawsuit based on the tenor and tone of his lawyer's statements. That's all I can say about that so --

THE COURT: All right. So the next -- the second factor is whether setting aside the default would prejudice the plaintiff. And you guys have --

MR. STUMBERGER: Your Honor --

THE COURT: -- some general statements in your response to the motion that it would -- the case has been pending several years. Basically, the primary prejudice you say is -- is delay. The case law you cite on page 8 of your response talks about prejudice being tangible harm such as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion.

Isn't this a case where given Mr. Stumberger's guilty plea the risk of prejudice is less than it would be in an ordinary case? In other words, at least according to Flagstar, Flagstar's position is that Flagstar has Mr. Stumberger locked down by virtue of his guilty plea, and according to Flagstar he has admitted under oath every fact that is necessary for Flagstar to prevail on its claims.

So granted that if I set aside the default there might be a bit more delay than otherwise, is there any meaningful risk in terms of evidentiary problems or other prejudice besides delay?

MR. SHANNON: Can I make one comment before I answer that question because I asked Fawzeih to look something up for me while Mr. Stumberger was talking. I just want to point out for the record that in previous pleadings Mr. Stumberger had identified a Jane Carbonaro as the person who told him to disregard the pleadings. I just want to make that point.

To your -- to your point, Your Honor, I guess I would agree with you that of the three factors this is the one that perhaps most strongly favors Mr. Stumberger, but we are looking at an affidavit that says -- I guess it's not even an affidavit or declaration but a statement by Mr. Stumberger that says he has defenses which he has not shared.

Case 2:19-cv-11512-ERA   Document 172-64   Filed 06/10/26   Page 130 of 64
*Motion to Set Aside Default Judgment • March 5, 2025*

**15**

Now, if I win a motion for summary judgment then this question is not relevant; but if I don't win a motion for summary judgment, I have to go back into discovery to find out what these defenses are.  I don't think the record that's in front of us supports the notion that Flagstar should have to spend that money to do so.

THE COURT:  All right.  Mr. Stumberger, let me come back to you for a second.  As Mr. Shannon noted, one of the factors that I have to consider is defenses to the claims.  Do you have any defenses other than your position that what Flagstar says is not true?  In other words, do you have any legal defenses that are separate and apart from your position that Flagstar is just wrong on the facts?

MR. STUMBERGER:  I'm not -- I'm not equipped at this moment.  I'm trying to get a lawyer for this in terms of coming up with other legal defenses.  All I've done is read the allegations, and I took notes on every single one.  And at this point that's my defense to dispute and tell the truth about each one of them.

And just, Your Honor, for your sake, this case has been going on for five years -- maybe it's six.  Okay.  It should be noted that the intervener in this case, Scott Hartman, Jordan Estes, Brandon Racz, the U.S. government, has had my location -- physical location, telephone number, e-mail address, place of employment, hours

I'm working, when I'm at the supermarket, gas station.  They know my whereabouts every second of the day.

THE COURT:  Mr. Stumberger, let me stop you for a second.  There is an e-mail attached to Mr. Shannon's papers where Mr. Shannon did exactly what you said he should have done, which is reach out to Mr. Hartman to try to get your contact information.  This is Docket No. 129-4, pageID.4505.  And Mr. Hartman said that all of his communications were with your lawyer.  Mr. Hartman directed Mr. Shannon to the lawyer and said, Mr. Hartman, that he was sorry he couldn't be of more help.

MR. STUMBERGER:  I don't know why that's my fault, Your Honor.  I don't know why that's my fault.  I don't know why I'm being punished for --

THE COURT:  Mr. Stumberger, I'm not saying that's your fault.  I'm saying you were making the point that what Mr. Shannon should have done was contact Mr. Hartman because he knew where you were, and I was just pointing out that that's exactly what he did.

MR. STUMBERGER:  Yep.

THE COURT:  I'm not saying that was your fault.

Mr. Stumberger, let me -- I'm trying to understand as a practical matter what this case would look like if it went forward.  If I set aside the default and if we ever get to some discovery, one of the things that would happen,

Mr. Stumberger, is you would be asked to and required to sit for a deposition.

MR. STUMBERGER: Uh-huh.

THE COURT: And during the deposition -- I am not Flagstar's lawyer, but my guess is that one of the things that Mr. Shannon would do would be to take your plea transcript and say to you, Mr. Stumberger, on this date, whatever it was, you appeared before a U.S. magistrate judge, and you said A, B, C. And then Mr. Shannon will say to you, Mr. Stumberger, is that true?

Can you give me any sense as to whether you are going to suggest that any of the statements you made to the magistrate judge were not accurate?

MR. STUMBERGER: Your Honor, I don't have the plea transcript in front of me. I haven't even seen it. I have asked for it. I have asked for minutes or whatever, the transcript from the trial. I don't want to speak out of line right now because I -- whatever I say has to -- you know, I can't dispute what I said under oath.

So I'm not prepared to -- I didn't know I was supposed to be prepared to tell the entire -- this is a public -- this is a public hearing, tell the entire world what my defense is. I thought you were supposed to reserve that for when the trial happens.

THE COURT: Mr. Stumberger, I'm glad you mentioned

that.  That's an important point and I wanted to talk to you about that.  The -- in a criminal case, what you're saying is in some cases true, that a criminal defendant subject to some issues about disclosing witnesses and stuff like that but a criminal defendant may not have to disclose to the United States government the defendant's defense to the case.

A civil case is very much the opposite.  A civil case has a whole -- a whole procedure where the defenses are set out at the very beginning in what are called the answer and affirmative defenses, and then there is discovery where the other side gets to ask you all sorts of questions about your defenses, and then the defenses are sometimes presented to the Court in what's called a dispositive motion before the trial.

So, again, with that, is there anything that you are not sharing with me because you don't think you have to?  So you've said very clearly that one of your defenses is Flagstar's wrong and their allegations are not true.  I understand that.  Are there any other defenses that you have because really this would be an important time to set them forth because in a motion to set aside a default, one of the factors I have to consider is a meritorious defense.  So is there anything else that you want to tell me?

MR. STUMBERGER:  Understood, Your Honor.  At this point -- up until this point I've only focused on the

allegations in the interrogatories.  I haven't even started trying to figure out other legal defenses.  I didn't know I was supposed to.  I thought you were just supposed to respond to the allegations similarly like Eric Rohr, for example.  Eric Rohr -- this is all supposed to be joint and several -- he's disappeared from the case.  I -- somebody sent me his responses.  He pled guilty.  His response was I don't admit to any of this, and somehow he's disappeared from the entire case.  Hild was convicted.  Why am I -- my question is why am I the only one being singled out for this default judgment?  Eric Rohr disappears, and it's kept private from the public.  All right.  I don't understand what's going on with Hild.  But I'm the only one with a default judgment.  I didn't realize I have to come up with other legal arguments.  I thought what was presented to me I'm supposed to respond to, and I've done that.

THE COURT:  All right.  A couple things, Mr. Stumberger, and I appreciate you seeking clarification, I think that would be helpful for all of us.  I don't know what happened to Mr. Rohr.  I haven't seen him in this case but perhaps there was a settlement or resolution that would explain that.

In terms of Mr. Hild, he has been defending this case and when somebody is here and defending there are no default proceedings.

And the reason there were default proceedings against you was that Flagstar believed that after serving you, you didn't respond, and then a default was entered. That's how we got here.

With respect to this idea of your understanding that you don't have to come forward with defenses, I think this makes clear why it's so important and really essential to have a lawyer if there's any possible way you can afford one. Because when somebody moves to set aside a default like you're doing, the basic rule that's been the law in what's called the Sixth Circuit, where I sit, for 40, 50 years is one of the things that the party needs to address when seeking to set aside a default is whether the party has a meritorious defense. So I understand that you as a lay person don't know that, but that's really one of the basics for the part of the proceedings where we are at now and why it is so important to try to get a lawyer, if at all possible, for you.

MR. STUMBERGER: I'm trying.

THE COURT: Is there -- is there anything else that you would like to say, Mr. Stumberger?

MR. STUMBERGER: No. My -- my objective is to get a lawyer somehow, some way. I can't afford it, but I'm trying to figure out other means to have a lawyer to defend myself. That is the plan.

THE COURT: All right. Mr. Shannon, anything else that you would like to say?

MR. SHANNON: Yeah. I didn't intend to create some sort of mystery with respect to Mr. Rohr. He has settled, and that's why he is no longer in the case.

And I do want the record to be clear that the plea transcript was attached as an exhibit to the motion that Mr. Stumberger is responding to.

THE COURT: It was -- Mr. Shannon, it was actually filed separately. Do you know if it was separately served on Mr. Stumberger?

MR. SHANNON: I don't know that. I apologize, Your Honor.

THE COURT: So it was -- it's Exhibit F to your motion, and the original filed motion has that as intentionally left blank.

MR. SHANNON: Well, we will --

THE COURT: It is filed on our docket, I read every sentence of it. I just didn't know if that was separately served on Mr. Stumberger.

MR. SHANNON: Fawzeih, do you know?

MS. DAHER: It was, Your Honor.

THE COURT: Okay. Mr. Shannon, let me --

MR. SHANNON: I want to bring to the Court's attention, for whatever reason it came up -- the ECF number

is -- it's like it double printed on it, but it is page 25 of the transcript itself. And I just -- line 22, I just want to read this very short piece. I know you've read it. But, you know, "From 2015 until its bankruptcy in 2019, Live Well, at the direction of CEO Michael Hild, submitted inflated valuations to IDC knowing that IDC was publishing those valuations in its database verbatim and expecting that Live Well's lenders would rely on those inflated valuations."

THE COURT: Yeah, I get it, I saw that.

Mr. Shannon, let me ask you a separate question, not on the issue of this motion. But every time we hear from Mr. Stumberger he indicates that he doesn't have the means to retain counsel, and Flagstar's seeking a huge judgment here. What about the idea of, if he's willing, take a creditor's exam of him and figuring out if he has any money, and if you decide he doesn't have funds trying to work out some sort of a resolution that gets him out of this case?

MR. SHANNON: So I know we're now talking about potential settlement, Your Honor, but that was the basis of the settlement with Mr. Rohr, and Mr. Rohr did come up with some money but it was a relatively modest amount in relation to the claim based on his submission of his financial statements, which the bank accepted and reviewed and then accepted a settlement.

And even if Mr. Stumberger doesn't have any money

at all, he might be able to negotiate a deal where he consents to a modest judgment of some kind, a couple hundred thousand dollars, just to see if at a later date he does have money. Those are certainly possibilities, tough to negotiation without a lawyer on the other side though but --

THE COURT: So, Mr. Stumberger, one of the things that I was suggesting here -- let me try to translate it into non-legales, if I can. Sometimes in cases where there is a party that is suing another party for money, here Flagstar is suing you, if the party bringing the case is satisfied that the defendant doesn't have any assets, the party bringing the case may be willing to resolve the case for a lot less than it was originally demanding. And you have taken the position that you don't have any assets or funds.

Are you interested in sitting for what's called a creditor's examination where Flagstar would ask you questions under oath about your assets, liabilities, all of your financial position, and then seeing if you're able to persuade them that you are not collectible and then trying to negotiate a deal with that? Do you have any interest in that?

MR. STUMBERGER: I'm open to anything, Your Honor. I can tell you that the U.S. government real time knows exactly my financial condition. I have to report to them monthly. I have to pay them -- I'm paying them $10 a month

just to give you context.  There has been a $45 million restitution amount provided by Judge Abrams in New York.  There's a million-dollar forfeiture.  The maximum amount that the government is taking from me is $10 a month.  So you want to have a conversation -- I'd be open to a conversation.  That's the context of this.

THE COURT:  All right.  Just so we're clear, it wouldn't be kind of an informal conversation in terms of what I'm thinking; it will be a formal creditor's exam where, first, Flagstar would send you requests where you'd have to provide bank statements and stuff like that, and then you would appear for a deposition and you'd would be sworn under oath subject to penalty of perjury and they would ask you questions.

MR. STUMBERGER:  Yeah.  That's total -- I'm totally fine with that.  The government is doing it right now.  I'm in no different position to do it with Flagstar.

THE COURT:  All right.  Anything else, Mr. Shannon?

MR. SHANNON:  No, Your Honor Your Honor.

THE COURT:  Okay.  Look, with respect to the motion to set aside default, this is a challenging motion to decide.  There are three factors, as Flagstar has indicated, under the *United Coin Meter* test, and I have to consider all of those.  I have to also consider this against the backdrop that there's a very strong preference to resolve litigation on the

merits.

The first factor that I have to consider when I'm deciding whether there's good cause to set aside the default is whether the default was willful. And I certainly understand's Flagstar position here that Mr. Stumberger, in Flagstar's words, received -- was properly served with a summons and complaint and, in Flagstar's words, made a decision not to participate in the litigation. I understand and I respect that argument.

I see things a little bit differently based on the record before me. Yes, it is true that Mr. Stumberg made a -- Mr. Stumberger made a decision that he didn't have to participate but, in my view, he has plausibly explained to me that that decision was based on a mistake, and at this point I'm persuaded that the mistake was one in good faith. I can understand how somebody who's not a lawyer could look at a summons and an order, both of which list an expiration date, and believe that somehow this thing would be ending upon the expiration of those documents. That, of course, is not accurate, but it is plausible, and I believe Mr. Stumberger when he tells me that.

And I'm persuaded also by Mr. Stumberger's conduct in this case since he has appeared. He seems to me to be somebody who is very diligently protecting his rights and wants to very actively and aggressively oppose the claims

against him.  And I don't believe that his posture would have been anything different when he was served with the papers if he understood what those papers were.  So I don't find that his default here was willful.  To the extent that it was based on an intentional decision, it seems to me that was an error rather than a willful decision not to participate in the case.

The next factor is whether setting aside the default would prejudice Flagstar.  And as always, I appreciate Mr. Shannon's candor here.  I don't believe that setting aside the default would unfairly prejudice Flagstar or, indeed, cause Flagstar much prejudice beyond a delay here.

This is a unique case given the plea transcript and Mr. Stumberger's admission at least from Flagstar's perspective of the dispositive facts in this case.  So if the case needs to be litigated on the merits, Flagstar by its own account seems to be in a very strong position to do that whether the default is set aside or not.

The last factor is whether there is a meritorious defense.  This one candidly is the most difficult. Mr. Stumberger is on one hand insisting that Flagstar's allegations are wrong, are not truthful.  It seems to me it's going to be a real challenge to reconcile that with the plea transcript.  He hasn't identified any other legal defenses.

So this factor is a difficult one, and I acknowledge that, but given Mr. Stumberger's adamant denials here and the other two factors that I think weigh strongly in favor of setting aside the default, and in light of the strong preference for resolving claims on the merits, I'm going to grant the motion to set aside the default.

I'm going to permit Flagstar to file a motion for summary judgment right out of the gate based on the plea transcript. It seems to me that the motion that may be available --- and I want to be clear, I don't yet know how this plays out, the motion, I don't have a predisposed decision here, but I will allow Flagstar to file some sort of a motion based on collateral estoppel or some other theory. If Flagstar files that motion, I will do a couple things. I will prioritize a decision on it so that we can get clarity sooner rather than later on Mr. Stumberger's participation in the case and whether we're going to keep going or whether it's resolved. But in any motion like this, if it is based on collateral estoppel, I think it's very important that Flagstar lays out here's the elements of collateral estoppel, here's the elements of our claims against Mr. Stumberger, here are the facts that he admitted, and here's the law as to how you apply collateral estoppel to facts admitted during a guilty plea. That's the piece of the puzzle that will need to be made clear to me as we line all of this up. So if

Flagstar files that motion, I will prioritize it.

In the meantime, I do think it makes sense, Mr. Shannon, for you and Mr. Stumberger to speak directly to see if there's some path to setting up a creditor's examination and seeing if there's some resolution forward. If Mr. Stumberger is paying ten bucks a month to the government, they seem satisfied he doesn't have assets and maybe there's a sensible path forward.

So what I will do is -- if you want to file a motion for summary judgment, Mr. Shannon, I will give you 45 days to file that motion because my hope is that within these 45 days you and Mr. Stumberger can speak directly and see if you can move forward in some sort of settlement framework because I don't want you to be spending fees on this motion if there is a possibility of reaching a resolution along the lines that you reached with Mr. Rohr.

So what we will do I will -- let me do this.  I think the sensible thing is I will set a status conference for 30 days from now.  That will be the only thing we set.

In these next 30 days, Mr. Shannon, would you and Mr. Stumberger please speak, and when we have our next status conference you let me know if the settlement framework is moving forward.  If it is, I will allow a little bit of time for that.  If not, I will set a briefing schedule on a summary judgment motion and a schedule for the rest of the

case forward.

So the only thing we're going to do now is spend the next 30 days with you and Mr. Stumberger speaking to see if you can reach a common ground or at least start framework on that.

Mr. Shannon, do you have any questions?

MR. SHANNON:  Just -- I was going to ask Fawzeih, do we have Darren's telephone number?

MR. STUMBERGER:  The Court does.

MS. DAHER:  I don't think we have --

THE COURT:  Mr. Shannon, what is your e-mail? Mr. Stumberger, would you write this down, please.

MR. STUMBERGER:  Yes.

MR. SHANNON:  It is attached to the notice, but it is jshannon@bodmanlaw.com.

THE COURT:  So, Mr. Stumberger, when we get off this hearing would you please e-mail Mr. Shannon your phone number so that he can reach out to you and you guys can see if there are discussions to be had in this regard?

MR. STUMBERGER:  Yes, Your Honor.

THE COURT:  Okay.  Then we'll set a status conference in 30 days.

Mr. Brown, can you give me a very short update on what is going on with Mr. Hild's Second Circuit appeal?  Have they decided it yet?

MR. BROWN:  Your Honor, it's my understanding that has not been decided.  I think there was oral -- I know that there was oral argument on the appeal.  Off the top of my head, don't hold me to it, I would say it happened within the last 30 days.

THE COURT:  Okay.

MR. BROWN:  I don't have a whole lot of communication with Mr. Hild's criminal counsel, but whether I heard it directly from him or Mr. Hild, the estimate is kind of anyone's guess, I guess, as far as how long the Second Circuit would take to rule on the appeal.

THE COURT:  Okay.  Thank you.  I appreciate all of your time and thoughts this morning.  I will look forward to speaking to you guys it about 30 days.  Hopefully Flagstar and Mr. Stumberger can get this thing on a glide path that makes some sense to both of them and works for both of them.  If not, we'll set a schedule when we reconvene.  Thank you very much for your time and arguments.  I appreciate it. Take care.

(Court recessed at 11:22 a.m.)

—   —   —

*C E R T I F I C A T I O N*

I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of FLAGSTAR BANK, FSB, a Federally Chartered Savings Bank vs. LIVE WELL FINANCIAL, et al., Case No. 19-11512, on Wednesday, March 5, 2025.

<div style="margin-left:40%">

*s/Robert L. Smith*
Robert L. Smith, RPR, CSR 5098
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

</div>

Date:  03/06/2025
Detroit, Michigan



**From:** Darren Stumberger <cdjs2013@gmail.com>
**Sent:** Thursday, June 5, 2025 4:00 PM
**To:** Charles Brown <cbrown@gsbblaw.com>
**Cc:** XAVIER DONALDSON <xdonaldson@aol.com>
**Subject:** Re: FW: Carickhoff v. Hild, Stumberger, et al.; Adv. Proc. No. 21-50966-LSS

And, I'm going straight to the press with this one.  Something I should have done with Flagstar.

Stay Tuned.

On Thu, Jun 5, 2025 at 3:29 PM Darren Stumberger <cdjs2013@gmail.com> wrote:

Good afternoon Mr. Brown,

I would say 'lol, is this a joke?' but unfortunately I know better.
The sheer level of corruption, and unprecedented criminal activity by all the parties involved in these cases holistically is infinity.  How has no one raised a voice yet?

1

Obviously this is the first I'm hearing of this. They even have my email, and phone number.

My last recollection regarding this was Spring of 2024 when they called me and asked if I would be on their team (whatever that means).  I replied, 'does Hartman and Racz' really want me talking about this publicly?' They abruptly hung up and I never heard from them again.

I have to go to Staples to print out the documents.  I'm starting from square one here, have no help, and have to read through everything.

I'll obviously defend this case and let the truth come out.

Thank you for your notification.

On Thu, Jun 5, 2025 at 2:56 PM Charles Brown <cbrown@gsbblaw.com> wrote:

Mr. Stumberger:


We have appeared together over Zoom a few times in connection with the Flagstar v. Live Well matter pending in Michigan.  I believe that you are aware that I am representing Michael Hild in that matter (as well as Laura Hild in connection with this matter).


I am reaching out because there appears to be a default order entered against you in the civil Delaware Bankruptcy Court case, *Carickhoff v. Hild, Stumberger, et al.; Adv. Proc. No. 21-50966-LSS*.  Please see the attached filings.


Given what I have read that you wrote in your filings related to what transpired in the related Michigan/Flagstar case, it occurred to us that it might also be possible that you are also not aware of the attached court filings related to you in this duplicative/interrelated Delaware case. While I don't know for sure, I am forwarding them to you as a courtesy.


If you are already aware of this default order and have explicitly decided not to defend this Delaware case, I apologize in advance for forwarding this to you. If that's the case, you did not need, nor probably want, a reminder from me.

2

With that being said, if you were unaware of this default order, could you please advise if you intend to defend the *Carickhoff v. Hild, Stumberger, et al.* case? It would be greatly appreciated if you could please let us know so the Hilds can plan their defense accordingly, as it is critical to know who the defendants at trial will be.  Thank you.

Charles J. Brown, III

Gellert Seitz Busenkell & Brown LLC

1201 N. Orange Street, 3rd Floor

Wilmington, DE 19801

302-425-5813

302-377-9714 (cell)

cbrown@gsbblaw.com

http://www.gsbblaw.com/

IRS Circular 230 Disclosure:

Pursuant to Treasury Regulations, any tax advice contained in this communication is not intended or written to be used, and cannot be used or relied upon by you or any other person, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing, or recommending to another person tax advice addressed herein.

Disclaimer:  The information contained in this communication is confidential and only for the use of the intended addressee(s).  If you have received this communication in error, any disclosure or use of such information is strictly prohibited.  Please notify the sender immediately and destroy all copies.  Thank you.

**EXTERNAL:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

From: **Thomas Wolf** twolf@ohaganmeyer.com
Subject: **Re: [EXTERNAL] Service – Amended Notice of Hearing [IMAN-ACTIVE.FID969733]**
Date: **Mar 25, 2026 at 12:34:45 PM**
To: **Dale Wolf** DWolf@ohaganmeyer.com, **Michael Hild** michaelchristopherhild@gmail.com
Cc: **Laura Hild** luludyer@yahoo.com

Michael,

When do you report to your new accommodations?  I know some people where you are headed and just want to make sure they will pay you a welcome visit. I suggest you have a welcome present ready to offer them just for your continued good health.

Meanwhile, we are eagerly awaiting the day when the law catches up to the other member of your grifter family.

Tom

**Thomas M. Wolf**
PARTNER

411 E. Franklin Street | Suite 500 | Richmond | VA | 23219
PH 804.403.7100 |  DIR 804.361.4551 | CELL 804.714.7420

---

**From:** Dale Wolf <DWolf@ohaganmeyer.com>
**Sent:** Wednesday, March 25, 2026 9:03 AM
**To:** Michael Hild <michaelchristopherhild@gmail.com>; Thomas Wolf <twolf@ohaganmeyer.com>
**Cc:** Laura Hild <luludyer@yahoo.com>
**Subject:** RE: [EXTERNAL] Service – Amended Notice of Hearing [IMAN-ACTIVE.FID969733]

Mr. and Mrs. Hild,

Please withdraw your notice of hearing. Defendant Panak's main counsel will be out of town that entire week.

Sincerely,
Dale Wolf

-----Original Message-----
From: Michael Hild <michaelchristopherhild@gmail.com>
Sent: Wednesday, March 25, 2026 11:23 AM
To: Thomas Wolf <twolf@ohaganmeyer.com>; Dale Wolf <DWolf@ohaganmeyer.com>
Cc: Laura Hild <luludyer@yahoo.com>
Subject: [EXTERNAL] Service – Amended Notice of Hearing

 CAUTION: This email originated from outside the organization.
 Do not click links or open attachments unless you are expecting them from the sender.


Counsel,

Please find attached Plaintiffs' Amended Notice of Hearing filed in the Circuit Court for the
City of Richmond.

Regards,
Michael Hild
Laura Hild

From: **Thomas Wolf** twolf@ohaganmeyer.com
Subject: **Reporting to prison**
Date: **Apr 29, 2026 at 3:27:01PM**
To: **Michael Hild** michaelchristopherhild@gmail.com

Michael,

When and where do you report?  Since you won't be in the Richmond case anymore, the least I can do is send a house warming gift c/o the warden so you will have something there to welcome you when you arrive.

Tom

**Thomas M. Wolf**
Partner
411 East Franklin Street | Suite 500 | Richmond | VA | 23219
PH 804.403.7100 | DIR 804.361.4551 | CELL 804.714.7420



**O'HAGAN MEYER**
ATTORNEYS ▲ ADVISORS

California ▲ Colorado ▲ Delaware ▲ District of Columbia ▲ Georgia ▲ Illinois
Maryland ▲ Massachusetts ▲ Michigan ▲ Nevada ▲ New Jersey ▲ New York
North Carolina ▲ Oregon ▲ Pennsylvania ▲ Virginia ▲ Washington

**Mansfield Rule™**
Certified 2023

OHaganMeyer.com

# EXHIBIT B

## MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG
LISA ZORNBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com
_____

WRITER'S CONTACT INFORMATION

bjacobs@maglaw.com
212-880-9536
#

COUNSEL
JOSHUA BUSSEN
PIPPA HYDE***
KEFIRA WILDERMAN
____
RETIRED/PARTNER EMERITUS
PAUL R. GRAND
____
ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

June 20, 2026

**BY ECF & EMAIL**
Hon. Ronnie Abrams
United States District Judge
United States Courthouse
40 Foley Square, Room 2203
New York, NY 10007

Re:   United States v. Michael Hild, 19 Cr. 602 (S.D.N.Y.) (RA) (KHP)

Dear Judge Abrams:

I am counsel for defendant Michael Hild, and I write respectfully to respond to the letter the government submitted yesterday, June 19, 2026 (the "Gov. Letter") (Docket Entry 266), opposing Mr. Hild's motion for continued bail pending a petition for habeas corpus.

The government's opposition largely ignores the central issue Mr. Hild's motion raises. Rather than engaging with the evidence concerning Dan Foster's role in the Bloomberg valuation process, the government mischaracterizes that evidence as peripheral to the case. The trial record shows otherwise—Bloomberg pricing was central to the government's ability to establish the "market" prices for the bonds at issue, which Mr. Hild was accused of inflating. The government's opposition minimizes also the significance of important new evidence from the government's primary cooperating witness, Darren Stumberger, ignoring both his email calling his guilty plea "corrupt" and his federal court filings explaining in detail how Live Well's demise was not due to fraud but rather to a coordinated conspiracy by government agencies—together with Foster—to bring down the company. Given the Foster/Bloomberg evidence and Mr. Stumberger's new narrative, if Mr. Hild were tried today, he would likely be acquitted. His trial attorney was deficient in not pursuing the Foster/Bloomberg evidence. His habeas petition is thus likely to succeed. For the reasons below, the Court should reject the government's arguments and grant Mr. Hild's motion.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Hon. Ronnie Abrams
June 20, 2026
Page 2 of 7

**I.      Mr. Hild's Claim About Dan Foster Supplying Bloomberg Prices While Cooperating with the Government Qualifies as a Substantial Claim**

The government argues that Mr. Hild's "claim about Dan Foster is not 'substantial'" for three reasons: (1) "Hild was convicted based on overwhelming proof of his intent to defraud his lenders" (Gov. Letter at 2); (2) "the Government did not proffer the Bloomberg prices as the relevant comparator for establishing that Hild intentionally inflated the value of Live Well's portfolio" and "the word 'Bloomberg' was uttered only *once* during the entirety" of the government's summation and rebuttal (Gov. Letter at 3 (emphasis in original)); and (3) trial counsel's failure to pursue the Foster/Bloomberg evidence was thus not deficient performance (Gov. Letter at 4).

The government's arguments all turn on a sleight-of-hand through which the government is attempting to minimize the significance of the Foster/Bloomberg evidence.  The government's argument that the word "Bloomberg" appeared only once in the summations is telling, because the relevant word is not "Bloomberg"; rather the relevant word is "*market*"—a word uttered over 1,000 times in the trial transcript.  The government's core argument at trial was that Live Well's prices "weren't *market* prices" but rather "were jacked up."  (*E.g.*, Tr. 26 (opening) (emphasis added); Tr. 2162 ("prices are already jacked up way above *market*") (summation) (emphasis added).)  The word "market" was effectively a synonym for "Bloomberg" at trial because it was Bloomberg's prices that multiple government witnesses relied upon when they testified about the "market" value of the bonds.  For this reason, the government's argument that it "did not offer any proof of the specific prices that Bloomberg assigned to the bonds" (Gov. Letter at 3) is irrelevant, because the government's witnesses testified about "market" prices of the bonds based on what they saw on Bloomberg, even if no specific Bloomberg prices were admitted at trial.

For example, the government elicited testimony from Alan Levy (from ICBC) about the "market" price of the bonds at issue and how the IDC prices were inaccurate, and on cross examination, Levy acknowledged that his basis for believing the IDC prices were not market prices was that "Bloomberg started marking up those assets" and the IDC prices "were materially different from the Bloomberg marks."  (Tr. 720; Tr. 721 ("Bloomberg started providing prices on these securities, which was off from where IDC was pricing it, so my understanding is strictly off of the – what the industry th[ought] these – this collateral is worth . . . ."); Tr. 721 ("Bloomberg came back as the market price.").)

For another example, the government asked Joe Redoutey (from Flagstar) on direct whether Flagstar attempted "to determine whether there was another pricing source for the value of the collateral," meaning the market value.  Redoutey answered, "we were able to determine that some of the bonds, I'm not sure if all of the bonds, were valued by Bloomberg," so they "look[ed] it up on the Bloomberg system."  (Tr. 749.) The government asked Redoutey how the

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 20, 2026
Page 3 of 7

Bloomberg values compared to the IDC values, and Redoutey said they were "[d]ramatically different" and that "Bloomberg was lower." (Tr. 749.)

For yet another example, former Live Well CFO Glen Haddock testified about how when IDC ceased pricing the bonds, Bloomberg subsequently became the pricing source reflected in reports being received from U.S. Bank, with valuations that were materially lower than the prior IDC valuations. (Tr. 1606-07 ("U.S. Bank was, appeared to be getting the numbers from Bloomberg instead of from IDC, and therefore the values were showing much less.").) Haddock then used the U.S. Bank valuations to make mark-to-market entries in Live Well's financial statements to align the company's financial reporting with the valuations being reported by U.S. Bank. (Tr. 1621.)

The fact that the government did not use the word "Bloomberg" extensively is of little moment, where the government's key witnesses relied upon Bloomberg's pricing for their understanding of the "market" prices of the bonds and testified at length about the "market" prices of the bonds, where Haddock's adjustments to Live Well's financial reporting were based on those "market" prices, and where the government's central argument at trial was that Live Well's prices were fraudulently inflated above the "market" price of the bonds. The Bloomberg prices were not merely a collateral issue, as the government now contends. Rather, the government's trial narrative was about how the accurate market values (rooted in Bloomberg prices) replaced the fraudulently inflated IDC values (which Live Well had been supplying), lenders reacted to those lower valuations (based on Bloomberg), margin calls followed, and Live Well's financial reporting changed. The government cannot credibly contend that the Bloomberg marks played no meaningful role in this narrative.

A substantial question exists as to whether trial counsel's failure to pursue the Foster/Bloomberg evidence was deficient performance—which it clearly was—and whether Mr. Hild suffered prejudice, which he clearly did. Mr. Hild is likely to succeed on these claims. The Court should reject the government's attempt to downplay the Foster/Bloomberg evidence, which formed the backbone of the government's proof of "market" value, where Bloomberg was the source the government's key witnesses consulted for their testimony about "market" value.

II.      **Mr. Hild's Claim About New Evidence from Darren Stumberger Is Substantial**

The government argues that Mr. Hild's related claim about Mr. Stumberger is "not substantial" (Gov. Letter at 4) because, in the government's view, Mr. Stumberger's statements in the *Flagstar* litigation do not undermine his trial testimony. The government argues that Mr. Stumberger told the *Flagstar* court that he was not going to "commit perjury," and that his argument there amounts to nothing more than that the Foster/Bloomberg evidence relates to damages in that litigation. (Gov. Letter at 4.)

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

As an initial matter, I provided the government with materials reflecting Mr. Stumberger's statements in the *Flagstar* case back in April 2025, so the government has had over a year to contact Mr. Stumberger and investigate his new claims. It is telling that the government's opposition is silent on whether it has been in touch with Mr. Stumberger, whether it has requested an affidavit from him disavowing his statements in the civil case (such as his characterization of his guilty plea as "corrupt"), and whether Mr. Stumberger is still cooperating with the government as his cooperation agreement requires. If the government has had contact with Mr. Stumberger in the last year and he has refused to continue cooperating, the government must disclose that as *Brady* information. If the government has made no effort to contact Mr. Stumberger to determine whether he stands by his guilty plea, it should disclose that as well, as such a failure would substantially weaken its response. Total inaction by the government would be practically inexplicable, given that Mr. Stumberger said his guilty plea was "among the most corrupt elements of the entire case" and that the AUSAs do not want him speaking publicly about it. (Docket Entry 264 Ex. A, C.)

Mr. Stumberger's own statements in the *Flagstar* case suggest that the government *has* been in touch with him, at least through his criminal counsel. In the *Flagstar* litigation, both in filings and on the record, Mr. Stumberger has stated that after he alleged in that litigation that his guilty plea was corrupt, he "received an extraordinary email from my former attorney . . . which *contained explicit threats* impacting both myself and my children" and that he is "liv[ing] under *direct threat*, and can no longer safely respond to inquiries related to this case or my defense." (19 Civ. 11512 (MFL) (E.D. Mich.) (Docket Entry 148 at 2) (emphasis added)); *see also* 19 Civ. 11512 (MFL) (E.D. Mich.) (Docket Entry 147 at 13) (Court transcript: "I'm not at liberty to talk . . . . about my involvement with Live Well, because I've been *threatened excessively* with jail time, as it relates to the plea and my defense for this case.") (emphasis added).) Considering Mr. Stumberger's allegations that he has been threatened based on his statements that are inconsistent with his plea, the government should have to disclose its communications with Mr. Stumberger and his counsel.

In addition to the government's failure to supply the Court with an affidavit or comparable assurance that Mr. Stumberger would stand by his trial testimony (which he apparently would not), the government's response is also deficient because it ignores Mr. Stumberger's most recent sur-reply filing in the *Flagstar* case, docketed on June 12, 2026—after Mr. Hild had submitted his original letter but before the government's submission. *Flagstar Bank, FSB v. Live Well Financial, Inc.*, 19 Civ. 11512 (MFL) (E.D. Mich.) (the "6/12 Stumberger Brief") (Docket Entry 171). The new 6/12 Stumberger Brief lays out in even more detail how the Foster/Bloomberg evidence undermines the argument that Live Well's bond prices were fraudulently inflated above market value—the central tenet of the government's fraud theory at Mr. Hild's trial.

If the contents of Mr. Stumberger's 6/12 Brief had been part of his trial testimony against Mr. Hild, Mr. Hild would likely have been acquitted. Mr. Stumberger's 6/12 Brief demonstrates

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Hon. Ronnie Abrams
June 20, 2026
Page 5 of 7

that if called to testify today, his testimony would show that the Bloomberg marks were the questionable, self-interested submissions of a government cooperator who stepped into the void to provide pricing on the bonds when IDC stopped pricing them because of the government's investigation. Significantly, Mr. Stumberger's 6/12 Brief does not retreat from his prior statements concerning the Foster/Bloomberg evidence. He expands upon them. Mr. Stumberger now expressly argues that the alleged losses were not the product of the conduct alleged at trial but were instead shaped by what he describes as a "simultaneous and deleteriously orchestrated chain of events" (6/12 Stumberger Brief at 1) involving the government investigation, IDC's cessation of pricing, Foster's Bloomberg submissions, and liquidation in a distorted market.

Mr. Stumberger writes, "[t]he government investigation dismantled the independent pricing mechanism that the entire repo lending structure depended upon—and the structure was then replaced with valuation pricing supplied by the government's cooperating witness [Foster]." (6/12 Stumberger Brief at 10.) Mr. Stumberger explains that the "pricing structure" for Live Well's bonds "*did not collapse because the market determined the bonds were worth less*." (Emphasis added.) Rather, "[i]t collapsed because the SEC investigated IDC's pricing methodology and IDC, in response to SEC concerns, ceased accepting and publishing prices for these securities." Thus, the SEC's actions "removed the one pricing benchmark that the entire lending and collateral structure depended upon, *not because independent market participants had reached a different view of value, but because the government's investigation had made IDC unwilling to continue publishing prices*." (6/12 Stumberger Brief at 11 (emphasis added).) Mr. Stumberger's statement that the pricing change was "*not* because independent market participants had reached a different view of value" would have undermined a key component of the government's trial presentation: that the market value of the bonds proved that Live Well's marks were fraudulently inflated.

Mr. Stumberger continues, "[i]nto that vacuum stepped Bloomberg—and into Bloomberg's data collection for these securities stepped Dan Foster. Foster was a former Live Well Vice President who had departed Live Well in 2017, entered into a proffer agreement with the SEC in November 2017, and was actively cooperating with federal investigators while simultaneously developing a formal pricing relationship with Bloomberg for HECM collateralized mortgage obligations . . . ." Mr. Stumberger details how "[t]he pricing levels Foster supplied to Bloomberg after departing Live Well differed materially from the valuations he had supplied to IDC while at Live Well." But there "has never been testing as to the accuracy or integrity of the model Foster used. . . . All that is known is that Foster was a government cooperator with the SEC and then the SDNY, and he supplied valuations to Bloomberg. . . . A pricing contributor who supplied valuations to Bloomberg while simultaneously cooperating with federal investigators and securing a non-prosecution agreement presents an obvious conflict and unresolved questions about the independence and reliability of those valuations." (6/12 Stumberger Brief at 12.) By questioning the reliability of the Bloomberg valuations, Mr. Stumberger casts doubt on the government's whole case. Further, Mr. Stumberger's argument is not merely that Bloomberg's valuations are unreliable, but also that the losses in this case were

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 20, 2026
Page 6 of 7

not caused by conduct at Live Well, and instead were caused by a sequence of events attributable to the government's own actions—from IDC's cessation of pricing, to Bloomberg's replacement role based on Foster's prices, to lenders relying on Bloomberg.

The positions reflected in Mr. Stumberger's 6/12 Brief were not newly created for purposes of that reply brief but rather elaborate on positions Mr. Stumberger previously expressed. Months earlier, during proceedings before Judge Leitman in the *Flagstar* litigation, Mr. Stumberger stated on the record that there had been "fake testimony," asserted that "Dan Foster . . . did this for all of these parties and they paid for it with a non-prosecution agreement," and represented that the threat came through his former counsel, Xavier Donaldson, who had received messages and calls from the Southern District of New York. (*See* 19 Civ. 11512 (MFL) (E.D. Mich.) (Docket Entry 147 at 13-15).)

Mr. Stumberger was the single most important witness at Mr. Hild's trial and the one whose testimony this Court principally relied in affirming Mr. Hild's conviction. Mr. Stumberger himself highlights in his 6/12 Brief how the government told this Court at his sentencing that meeting with him was "very helpful . . . in terms of thinking about how to present the case to the jury and *making sure that we ourselves understood the mechanics of the bonds*." (Exhibit A at 3 (quoting Sentencing Tr. at 7:21-8:1, *United States v. Stumberger*, No. 19 Cr. 608 (RA) (S.D.N.Y. Oct. 6, 2023)) (emphasis added).) Yet Mr. Stumberger, who knows the mechanics of the bonds as well as anyone, now attributes the losses in this case to the outside events and the Foster/Bloomberg pricing, not to fraud at Live Well.

If the very witness who had helped the government and the jury "under[stand] the mechanics of the bonds" had questioned the "market" price of those bonds at trial as the biased submissions of a government cooperator, the result of the trial would have been different. The government attempts to wave away that argument as Mr. Hild's "self-serving gloss on Stumberger's remarks in a separate litigation," but that response only underscores the deficient effort the government has put into opposing Mr. Hild's motion. (Gov. Letter at 5.) Mr. Hild's original letter did not offer a "self-serving gloss" on Mr. Stumberger's statements but rather offered multiple pages of block quotes from Mr. Stumberger's filings, in Mr. Stumberger's own words, without any gloss. In the face of Mr. Stumberger's own words, the government has done *nothing* to assure the Court that Mr. Stumberger's testimony would be the same today.

## III. This Case Involves Extraordinary Circumstances

The circumstances of this case are extraordinary by any standard. In no other case of note has a trial court discredited a lengthy affidavit from trial counsel, as this Court did, only to have additional evidence come to light that undermines the government's core argument at trial—evidence that is corroborated by new statements from the government's primary cooperating witness, including in filings in another federal court. These exceedingly rare

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 20, 2026
Page 7 of 7

circumstances demonstrate that Mr. Hild meets the standard for bail pending habeas.[1]  The Court should grant Mr. Hild's motion and stay his surrender date pending its determination.[2]

<div align="right">

Respectfully submitted,

/s/ Brian A. Jacobs

Brian A. Jacobs

</div>

cc: All counsel (by ECF)

_____

[1] The government submits as Exhibit A to its letter an email from the attorney who sent threatening communications to Mr. Hild (the "6/12 Email"), but the 6/12 email provides little assurance.  On the contrary, the email is notable for at least three reasons:  *First*, the email attempts to excuse the communications sent to Mr. Hild as "tongue in cheek" jokes.  But nothing about the original emails was funny.  The prospect of Mr. Hild needing a "welcome present" to ensure his "good health"—to avoid being attacked in prison—is not remotely humorous.  No reasonable person receiving the original emails would have taken them as "tongue in cheek" jokes.  *See Elonis v. United States*, 575 U.S. 723 (2015) ("A victim who receives that letter in the mail has received a threat, even if the author believes (wrongly) that his message will be taken as a joke.").  *Second*, the Rules of Professional Conduct in Virginia and elsewhere prohibit lawyers from "mak[ing] a false statement of fact."  Virginia Rules of Professional Conduct Rule 4.1(a).  The statement in the 6/12 Email that the attorney does "not know a single soul in any jail or prison" is inconsistent with the statement in the original email that "I know some people where you are headed and just want to make sure they will pay you a welcome visit"—a statement Mr. Hild would naturally have taken as true given the requirement that lawyers not make false statements (a rule the government seems content to ignore).  *Third*, it is notable that in arguing that the original email was not a threat, the attorney lobs another threat, stating, "[s]o that you won't be accused of misleading the court, you should supplement your letter to Judge Abrams with this email."  This statement merely confirms that the government should do more to assess whether there is a threat before Mr. Hild's surrender.  The government's assertion that it spoke with the attorney and credits the attorney's "just kidding" defense (Gov. Letter at 5) suggests an inadequate investigation.  The government notes that Mr. Hild has filed lawsuits the government views as "potentially frivolous" (Gov. Letter at 5), but no court has so ruled, and it is irrelevant to how a reasonable person would view the attorney's emails.

[2] The government states that for the Bureau of Prisons to designate a facility for Mr. Hild, Mr. Hild must submit to "processing by the Marshals."  (Gov. Letter at 7 n.3.)  But Mr. Hild was already processed at the time of his initial arrest, and defendants generally do not need to be processed a second time by the Marshals to be designated to a facility.  Courts in this district often set surrender dates, and we are unaware of any defendant ever being required to submit to processing for a second time before a facility can be designated.  The government offers no sound reason why this additional process is uniquely necessary in Mr. Hild's case.  In any event, the issue has nothing to do with whether the Court should grant bail pending habeas corpus.

EXHIBIT C

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG
LISA ZORNBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

bjacobs@maglaw.com
212-880-9536

COUNSEL
JOSHUA BUSSEN
PIPPA HYDE***
KEFIRA WILDERMAN

RETIRED/PARTNER EMERITUS
PAUL R. GRAND

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

#
June 23, 2026

**<u>BY ECF & EMAIL</u>**
Hon. Ronnie Abrams
United States District Judge
United States Courthouse
40 Foley Square, Room 2203
New York, NY 10007

Re: <u>United States v. Michael Hild</u>, 19 Cr. 602 (S.D.N.Y.) (RA) (KHP)

Dear Judge Abrams:

I am counsel for defendant Michael Hild, and I write respectfully to respond to the unauthorized sur-reply letter the government submitted last night, June 22, 2026 (the "Gov. Reply Letter") (Docket Entry 269), opposing Mr. Hild's motion for continued bail pending a petition for habeas corpus. To the extent the Court considers the government's sur-reply, the Court should consider this letter response as well, which explains why each of the three points in the government's sur-reply misses the mark. The Court should also order the government to disclose all communications with Mr. Stumberger and his counsel, which the government's sur-reply letter reveals for the first time took place in or about 2025.

*First*, the government inaccurately claims that the Bloomberg prices for the bonds were "**<u>not</u>** the proof the Government employed at trial" to show the market prices of the bonds. (Gov. Reply Letter at 1 (emphasis in original).) Rather, the government claims it relied on the "price at which Live Well bought the bonds" to prove the market value, and that the testimony by Messrs. Levy, Redoutey, and Haddock concerning the Bloomberg pricing was offered "primarily to explain the actions of certain trial witnesses." (Gov. Reply Letter at 1.) But there was never a dispute that Live Well purchased the bonds at prices lower than the prices at which Live Well marked them; Mr. Hild's defense was that he genuinely believed the bonds were worth more than Live Well paid and could be sold at that price. The government's counter to that argument was essentially that the bonds were *not* worth more than Live Well paid and could not be sold at the marked price. The key support for the government's argument was not the prices Live Well paid in the first place, but rather was the evidence offered by Levy, Redoutey, and Haddock—

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Hon. Ronnie Abrams
June 23, 2026
Page 2 of 4

based on Bloomberg valuations—about how the values of the bonds dropped to Bloomberg's "market" values after IDC stopped pricing them.  For the government to claim now that the Bloomberg prices were "**not** the proof the Government employed at trial" is not accurate.

      For example, in summation, the government highlighted Mr. Redoutey's testimony, including how Redoutey testified about seeing the bond values drop according to "Bloomberg," which proved that the prices Live Well was giving IDC were "jacked up."  (Tr. 2176; 2129-30.)  For another example, in summations, the government highlighted Mr. Levy's testimony "about the *market*."  (Tr. 2236 (emphasis added).)  Mr. Levy's testimony about the market included how the Bloomberg values were lower than the Live Well values.  (Tr. 721-22 ("Bloomberg, who is a major entity, started pricing these securities, and I saw it on the screen, so that is my understanding, as both the understanding from a company that gave me the listing of the prices that Live Well had on IDC and what they went to look to see what they could sell it in the marketplace at, due to various models, to model it as well, and also *what Bloomberg came back as the market price*." (emphasis added)).  The government specifically asked the jury to rely upon Levy's testimony because it showed "these things are way off market."  (Tr. 2167.)  And the government highlighted Mr. Haddock's testimony as well, claiming that Haddock got "wise to the scheme."  (Tr. 2168-69.)  Each of these witnesses—as the government's sur-reply letter does not dispute—testified about the Bloomberg values of the bonds being lower than Live Well's.  When the government relied on these witnesses by name in the summations to convince the jury that the Live Well prices were "jacked up," the government was effectively relying on the Bloomberg prices to prove this element, even if the government said the word "Bloomberg" just once and even if the government did not introduce the specific Bloomberg prices themselves.  The Court should reject the government's attempt to minimize the significance of the Foster/Bloomberg evidence to its case.

      *Second*, the government reveals—for the first time—that sometime in 2025, "the Government reached out to counsel for Stumberger," who responded "[s]everal weeks later," and said that counsel "did not believe Stumberger was saying or would say anything that would jeopardize his previous admission of guilt" in the *Flagstar* litigation.  (Gov. Reply Letter at 2.)  The government notably does not include the actual correspondence with its letter.  On this threadbare basis, the government asserts that it need not provide an affidavit from Stumberger and has no "*Brady*" material."  (Gov. Reply Letter at 2.)  But Mr. Stumberger's description of the communications his counsel received from the government was different.  Mr. Stumberger said that the government's communications "contained explicit threats impacting both myself and my children" and said he was unable to "safely respond" to questions—including about his "corrupt" plea where he just read a paper handed to him—because he was "liv[ing] under direct threat."  (19 Civ. 11512 (MFL) (E.D. Mich.) (Docket Entry 148 at 2) (emphasis added); Ex. A); *see also* 19 Civ. 11512 (MFL) (E.D. Mich.) (Docket Entry 147 at 13) (Court transcript: "I'm not at liberty to talk . . . . about my involvement with Live Well, because I've been *threatened excessively* with jail time, as it relates to the plea and my defense for this case.") (emphasis added).)  If the Court credits Stumberger's statements made in open court—and the government has urged the jury,

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 23, 2026
Page 3 of 4

this Court, and the Second Circuit to rely on Stumberger throughout this case—then the Court should not credit the description in the government's sur-reply letter of what the government said to Stumberger's counsel. At a minimum, the need to explore the conflicting accounts of the government's interactions with Stumberger—and whether the government threatened him as he said in open Court—only supports Mr. Hild's position that the circumstances here are extraordinary. Further, Mr. Stumberger's filings are important due largely to his statements about the Foster/Bloomberg evidence and how that evidence changes the trial narrative, and the government's account of its communications with him sidesteps those issues.

The Court should order the government immediately to disclose all communications with Stumberger and his counsel from the close of trial to the present. If the government in fact threatened Stumberger, such a threat would be *Brady* material that should have been disclosed over a year ago, while Mr. Hild's direct appellate process was still ongoing. At a minimum, the mere fact that Stumberger's lawyer emailed the government a year ago with a reassurance expected from defense counsel—which the government has failed to disclose—does nothing to diminish the significance of Stumberger's statements in the *Flagstar* case, which demonstrate the importance of the new Bloomberg evidence.

Even accepting the government's characterization of its interaction with Stumberger, the Foster issue remains substantial because the government's witnesses relied upon Bloomberg-derived market information while the jury never heard who was supplying those prices, how Bloomberg obtained them, or whether Foster was a contributor. Stumberger's filings confirm the importance of the Foster/Bloomberg evidence, and nothing about the government's interaction with his counsel changes that.

The government's reply letter includes a footnote arguing that the government's investigation began in 2019 (Gov. Reply Letter at 2-3 n.3), and that Foster's submissions to Bloomberg before that thus could not have been biased by his cooperator status. But Foster's efforts to cooperate with federal authorities began with the SEC in 2017, not with the SDNY in 2019. According to Stumberger, the relevant chain of events began when the SEC's investigation caused IDC to cease pricing the bonds, thereby eliminating the independent benchmark upon which the repo lending structure depended. Bloomberg then assumed that role through a pricing relationship Foster sought to develop, including proposing that Bloomberg and his firm team up while he was seeking to cooperate with federal authorities. The chronology is also significant because the SEC investigation was subsequently referred to the Department of Justice. Thus, the SEC and SDNY phases are not wholly separate events, but part of the same sequence identified by Stumberger. Notably, the SEC portion of that chronology occurred during the tenure of current United States Attorney Jay Clayton as Chairman of the SEC. By beginning its timeline in 2019, the government omits the very events that Stumberger identifies as the origin of the pricing disruption, the Bloomberg valuation process, and the resulting losses. The Court should reject the government's timeline.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

Hon. Ronnie Abrams
June 23, 2026
Page 4 of 4

*Third*, and finally, the government argues that Mr. Hild has not set forth "any extraordinary circumstances" (Gov. Reply Letter at 3), but the government still fails to grapple with and recognize the significance of the Foster/Bloomberg evidence and Mr. Stumberger's ringing endorsement of the importance of that evidence. If the case were tried today, Mr. Hild would be acquitted. Mr. Hild's counsel was ineffective in not pursuing the Foster/Bloomberg evidence, which would have changed the case and Mr. Stumberger's testimony. The government's sur-reply also never meaningfully addresses the central ineffective-assistance issue presented by Mr. Hild's motion. The question is not simply whether Bloomberg was mentioned frequently at trial or whether Mr. Stumberger has formally recanted his guilty plea. The question is whether counsel's failure to investigate the Foster/Bloomberg evidence was deficient performance. Even accepting the government's characterization of the facts, the sur-reply never adequately explains why counsel's failure to investigate those issues was objectively reasonable, or why evidence bearing directly on the source of the purported market prices, the causes of the alleged losses, and the credibility of key witnesses would not have made a difference to the jury. Those are the issues that make the forthcoming habeas petition and the circumstances extraordinary.

The Court should order the government to produce all communications with Mr. Stumberger and his counsel and grant bail pending habeas.

Respectfully submitted,

*/s/ Brian A. Jacobs*

Brian A. Jacobs

cc: All counsel (by ECF)